1

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF IOWA
EASTERN DIVISION

- - - - - - - - - - - - - - X
MICHAEL JOSEPH SELLERS,          :
            Plaintiff,           :
                                 :
vs.                              :  Case No. 12-CV-2050-
                                 :  JSS
DEERE & COMPANY A/K/A CLYDE      :
DEERE COMPANY, AND CLYDE         :  **DEPOSITION OF**
D'CRUZ, INDIVIDUAL,              :  **DAVID CHRISTY**
                                 :
            Defendants.          :
- - - - - - - - - - - - - - X
WANDA JO LENIUS and GARY         :
GENE LENIUS,                     :
                                 :
            Plaintiffs,          :
                                 :
vs.                              :  Case No. 12-CV-2063-
                                 :  JSS
DEERE & COMPANY a/k/a JOHN       :
DEERE COMPANY, KEVIN             :
KEITH, CLYDE D'CRUZ, BRIAN       :
MATSON, and ROBERT BARNES,       :
individuals,                     :
                                 :
            Defendants.          :
- - - - - - - - - - - - - - X
DELYORCE RAYE REBOUCHE,          :
                                 :
            Plaintiff,           :
                                 :
vs.                              :  Case No. 12-CV-2064-
                                 :  JSS
DEERE & COMPANY a/k/a JOHN       :
DEERE COMPANY, RODGER            :
BURRIS, and BRUCE BOARDMAN,      :
INDIVIDUAL,                      :
                                 :
            Defendants.          :
- - - - - - - - - - - - - - X

---

3

I N D E X

WITNESS: DAVID CHRISTY                              PAGE

By Mr. Vint.......................................   4


EXHIBITS:                               FIRST REFERENCED

  81 - Documents related to audits...............  33

  107C - Global Job Evaluation - David Christy,
         5-1-04..................................  73

---

2

- - - - - - - - - - - - - - X
GAYLE LELA FORSTER and           :
GREGORY DAVID FORSTER,           :
                                 :
            Plaintiffs,          :
                                 :
vs.                              :  Case No. 12-CV-2072-
                                 :  JSS
DEERE & COMPANY a/k/a JOHN       :
DEERE COMPANY, KEVIN KEITH,      :
BRIAN MATSON, BRIAN              :
CARLSON, and CLYDE D'CRUZ,       :
            Defendants.          :
- - - - - - - - - - - - - - X


**DEPOSITION OF DAVID CHRISTY**,

taken by the Plaintiffs before Melissa A. Burns,

Certified Shorthand Reporter of the State of Iowa, at

625 First Street SE, Suite 400, Cedar Rapids, Iowa,

commencing at 10:12 a.m., Tuesday, December 3, 2013.

APPEARANCES:

For the Plaintiffs:     PATRICK T. VINT, ESQ.
                        Hopkins & Huebner, PC
                        2700 Grand Avenue, Suite 111
                        Des Moines, IA 50312

For the Defendants:     ANGEL A. WEST, ESQ.
                        Nyemaster Goode, PC
                        700 Walnut Street, Suite 1600
                        Des Moines, IA 50309



        MELISSA A. BURNS - CERTIFIED SHORTHAND REPORTER

---

4

1          P R O C E E D I N G S

2              D A V I D   C H R I S T Y,

3    called as a witness by the Plaintiffs, being first

4    duly sworn by the Certified Shorthand Reporter, was

5    examined and testified as follows:

6                  E X A M I N A T I O N

7    BY MR. VINT:

8         Q.   Would you please state your name for the

9    record.

10        A.   David Christy.

11        Q.   David, do you go by Dave?

12        A.   Sure.

13        Q.   Mind if I call you Dave?

14        A.   No problem.

15        Q.   Dave, my name is Pat Vint. I'm an attorney

16   at Hopkins & Huebner. I represent a number of

17   employees, including Mike Sellers, who I think will be

18   the primary focus of our talk today in a case against

19   John Deere.

20             Have you had your deposition taken before?

21        A.   No.

22        Q.   Have you ever testified in court before?

23        A.   No.

24        Q.   I'm going to go over a couple ground rules

**9**

1    Q.   Continuing education and things like that?

2    A.   Yeah.

3    Q.   Dave, what did you do after graduating from

4 Iowa in 2000 -- I think you said 2000 -- 2000, excuse

5 me.  What did you do after graduating?

6    A.   I joined John Deere very shortly

7 thereafter.

8    Q.   What was your initial position with John

9 Deere?

10   A.   It was called a CPS coordinator.  CPS stood

11 for common purchasing system.

12   Q.   And what were your job duties as a CPS

13 coordinator?

14   A.   I would tell people that if you wanted to

15 spend company money, you had to write a purchase

16 order, and if in the process of writing that purchase

17 order something went wrong, you would call me and I

18 would help you.

19   Q.   I'm assuming the Deere purchase order

20 system was computerized at that point?

21   A.   Yeah.

22   Q.   You weren't doing paper forms or anything

23 like that; correct?

24   A.   Correct.

25   Q.   There's been a lot of talk throughout this

**10**

1 case of job grades.  Do you understand the concept of

2 job grades at Deere?

3    A.   Yes.

4    Q.   Do you know what your job grade was when

5 you started as a CPS coordinator?

6    A.   5.

7    Q.   How long did you stay in that position as a

8 CPS coordinator?

9    A.   I'm not sure if the title changed of my

10 job.  I don't remember that detail.  But essentially I

11 did that role until we brought in SAP in 2006.  Along

12 with increasing responsibilities.

13   Q.   I'm going to try to unpack that just a

14 little bit.  You essentially stayed in your position

15 as a CPS coordinator from the time you joined Deere in

16 2000 until SAP came in in 2006; is that correct?

17   A.   Yes.

18   Q.   But you mentioned that you had additional

19 responsibilities; is that right?

20   A.   So I was hired to have a very tactical role

21 of what I just described of when you write a purchase

22 order, if something doesn't work, you call me.  That's

23 kind of a narrow scope.

24        And as time went on, I expanded my role

25 into creating sites and writing queries in the

**11**

1 databases and helping with the accounts payable

2 system, just like the purchasing system.  Writing

3 reports.

4    Q.   Did your title ever change when you

5 received these additional responsibilities?

6    A.   I don't remember it changing.  I never -- I

7 don't remember paying attention.  If it did, I don't

8 remember.

9    Q.   That's fine.  Did your pay grade change at

10 any point while you were still a CPS coordinator?

11   A.   The GJE caused it to go from a 5 to a 6.

12   Q.   I'll get into that process a little bit

13 later.

14        Was there any other change in your pay

15 grade while you remained as a CPA coordinator other

16 than what you say the GJE did?

17   A.   I don't remember a change happening to the

18 grade during that time.  The first year I was a 5

19 nonexempt, meaning I didn't get overtime, and I was

20 putting in a lot of overtime to get work done, and so

21 they said, "Well, we don't want to pay you so we'll

22 make you an exempt."

23        So I kind of got a promotion from --

24   Q.   So you went from a 5 nonexempt to 5 exempt

25 mostly because you were working enough hours it made

**12**

1 sense for them to move you to exempt?

2    A.   Yeah, I had the work ethic -- yes.  Yes.

3    Q.   When you first started in 2000, what

4 department, or what line, were you working with?

5    A.   I've always worked in supply management.

6 Does that answer your question?

7    Q.   I think so.  Were you in Waterloo?

8    A.   Yes.

9    Q.   When you began?

10   A.   Yes.

11   Q.   I'm assuming since you have an East Moline

12 address, you're no longer in the Waterloo plant; is

13 that right?

14   A.   Correct.

15   Q.   Did that after SAP came in in 2006?

16   A.   Yes.

17   Q.   What role did you take on when SAP came in

18 in 2006?  Or what was your new job title, I should

19 say?

20   A.   Purchased parts parameter analyst.

21   Q.   And you took that role in 2006?

22   A.   Yes.

23   Q.   How long did you stay in that position?

24   A.   Two and a half years.  Until 2009.

25   Q.   And at that point did your grade was as

**APP002**

69

1 doing well and keeping the company running like I'm
2 doing my job trying to keep the company running.
3 Q. Did Daria ever contact you specifically and
4 say, "I need you to go in and independently of Mike
5 review these bailment issues, review why we have this
6 decrease in the percentage"?
7 A. I don't remember ever reviewing the
8 agreements. I could easily see running a query, I
9 guess, in the PO database. I would do something like
10 that all the time. But the agreements, no, I don't
11 remember that.
12 Q. On an actual analysis level, did she ever
13 say, "Hey, take a look at the database and see if you
14 can find why we had this 40 percent drop"?
15 A. I don't remember a request like that, no.
16 Q. I only have a couple more questions for you
17 and we're done.
18 You mentioned that when GJE came in your
19 grade pushed up from 5 to 6; is that right?
20 A. Yes.
21 Q. Do you recall if there was any additional
22 responsibilities that came along with that increase or
23 was it simply -- well, I'll just stop the question
24 there.
25 Did you have any additional

70

1 responsibilities when you moved from Grade 5 to
2 Grade 6 as a result of GJE?
3 A. No.
4 Q. It was the same job you had been in before?
5 A. Yes. In my case the Global Job Evaluation
6 results, whatever, showed that I was being paid a 5 to
7 do the work of a 6. So that was simply an
8 equalization.
9 Q. Understandable. When you moved to
10 purchased parts parameter analyst from 2006 to 2009,
11 you said before "Daria was able to get me up to a 7."
12 Is that correct? I have the quote written down so I
13 just want to make sure.
14 MS. WEST: Can you say that again? I'm
15 sorry.
16 BY MR. VINT:
17 Q. Earlier today we talked about the fact that
18 you went to purchased parts parameter analyst in 2006;
19 correct?
20 A. Yes.
21 Q. And I asked you what your grade was, and
22 your quote at the time was "Daria was able to get me
23 up to a 7."
24
25 Q. You're saying she's not the change?

71

1 A. That sounds right. Once we went to SAP,
2 yes.
3 Q. How did you move from CPS coordinator to
4 purchased parts parameter analyst. Did you post for
5 the job yourself, or did someone approach you and say,
6 "I think you're good for this job"?
7 A. I did not post for it. I was -- so there
8 was -- when the Waterloo factory was getting ready for
9 SAP, we spent a year of preparations for that, it was
10 a major involvement, and there was maybe a dozen,
11 maybe two dozen people that were taken off of their
12 job full-time and either backfilled or other people
13 had to cover for one year.
14 And all those people -- since they were
15 taken off of their job, all those people had to find
16 new jobs -- or needed a new job. Once SAP was here
17 and that temporary transition time was over, those
18 jobs would just evaporate.
19 So it was very common for people to be
20 getting new jobs at that time. Not to mention the
21 rest of the business people getting new jobs.
22 And one of my colleagues actually left
23 the -- not Mike. I'm not aware of her being involved
24 in this case. She actually decided to post while she
25 was in that transition and left the team and did

72

1 something else, and when I asked her about it she
2 said, "Well, you've got to watch out for number one,"
3 and I said, "No, I don't. I'm valued enough, I do not
4 need to be jumping ship and looking, they'll take care
5 of me," and they did.
6 Q. And I guess I understand your answer, but I
7 want to get a couple specifics out of the way here.
8 Who approached you about moving to purchased parts
9 parameter analyst in 2006 if you didn't post for it
10 yourself?
11 A. It was probably Daria.
12 Q. You don't recall a meeting though where she
13 said, "Hey, I think you would be good for this job"?
14 A. No, and it probably wasn't a discrete -- a
15 unique, specific meeting, because I knew the legacy
16 system they were transitioning from better than
17 anybody else, I'm not trying to brag about that, and
18 then my role in that year of transition was managing
19 the data going from the legacy system to the new
20 system.
21 So I knew the legacy, I knew the data, and
22 in order to make sure the data went correctly from the
23 old system to the new, I had to learn what it did. So
24 I already knew, I was way ahead of anybody else as far

Case 6:12-cv-02010-JSS Document 84-2 Filed 02/08/14 Page 3 of 190
Susan Frye and Associates, Inc.        (515) 284-1972        18 of 35 sheets
APP003

73

1 person to be in that role.

2     So it was either they reassigned me whether

3 or not I wanted to or not or they wait months for

4 someone to get up to speed while they find something

5 else for me to do. So I just assume that they thought

6 it was a natural fit and a win-win scenario so it kind

7 of was obvious over time.

8     **Q.   Did Daria ever approach you and say, "Hey,**

9 **I'm going to try to get your grade moved up from a 6**

10 **to a 7"?**

11     A.   I don't remember her saying that as much as

12 like with the 9. It was, "Here you go." After the

13 fact.

14     **Q.   I'm going to hand you Exhibit 107C. And**

15 **I'm not doing this as a gotcha thing, I just want to**

16 **make sure that we've got the record clear on what**

17 **happened.**

18     **It's a Global Job Evaluation sheet from**

19 **May 1 of 2004 for you where you were moved to**

20 **information technology analyst III. And it says that**

21 **your grade moved from 5 to 7.**

22     A.   Yep.

23     **Q.   Okay. I think you've testified to me that**

24 **you went from 5 to 6, and then you bumped to 7 when**

25 **you moved to the new job.**

74

1     A.   Yep.

2     **Q.   Did you actually move from 5 to 7 within**

3 **the same job and then stayed as a lateral afterwards?**

4     A.   I was an anomaly.

5     **Q.   Okay.**

6     A.   And I did get this and Daria was very happy

7 to give it to me, and a week later she called me into

8 her office and said it didn't work out. And she was

9 very apologetic that it got through Clyde, it got

10 through -- what was the guy's name, the HR guy at the

11 time, and everybody approved it, she handed it to me,

12 I had it in my hand.

13     And within a week or two later, I forgot

14 how long it was, they -- it came back that somebody on

15 high said, "No. He may not jump two grades at one

16 time, he may only have one." And so they took it away

17 from me.

18     And that's why I said Daria was able to get

19 me a 7 when SAP came around because she knew GJE said

20 I should be getting paid 7. But there was some other

21 random thing somewhere that said you can't have two at

22 once.

23     **Q.   Did they ever tell you who it was that**

24 **nixed you?**

25     A.   (Steven Deary foreclosure.)

75

1     **Q.   You have to say yes or no.**

2     A.   Sorry. No. And I understood. I mean it's

3 a company, it's a business, it's a corporation. You

4 have policies all over the place. I wasn't happy but

5 I understood. I mean it didn't mean people were

6 trying to be mean to me. It's not personal, it's just

7 business.

8     MR. VINT: That's all I have for you. I

9 appreciate your time.

10     (Deposition concluded at 11:58 a.m.,

11 December 3, 2013.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

76

1     C E R T I F I C A T E

2     I, the undersigned, a Certified Shorthand

3 Reporter of the State of Iowa, do hereby certify that

4 there came before me at the time, date, and place

5 hereinbefore indicated, the witness named on the

6 caption sheet hereof, who was by me duly sworn to

7 testify to the truth of said witness's knowledge, that

8 the witness was thereupon examined under oath, the

9 examination taken down by me in shorthand and later

10 reduced to a transcript through the use of a

11 computer-aided transcript device under my supervision

12 and direction, and that the deposition is a true

13 record of the testimony given and of all objections

14 interposed.

15     I further certify that I am neither

16 attorney or counsel for, nor related to or employed by

17 any of the parties to the action in which this

18 deposition is taken, and further that I am not a

19 relative or employee of any attorney or counsel

20 employed by the parties hereto, or financially

21 interested in the action.

22     Dated at Des Moines, Iowa, this 5th day of

23 December, 2013.

24

    /s/Melissa A. Burns

    CERTIFIED SHORTHAND REPORTER

1

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF IOWA
EASTERN DIVISION

- - - - - - - - - - - - - X
MICHAEL JOSEPH SELLERS,                :

          Plaintiff,                   :

vs.                                    :   Case No. 12-CV-0250-
                                           JSS
DEERE & COMPANY A/K/A JOHN             :
DEERE COMPANY, AND CLYDE               :   **VIDEOTAPED DEPOSITION**
D'CRUZ, INDIVIDUAL,                         **OF**
                                       :   **JOSEPH CLYDE D'CRUZ**
          Defendants.                  :      **VOLUME 1**
- - - - - - - - - - - - - X
WANDA JO LENIUS and GARY               :
GENE LENIUS,                           :

          Plaintiffs,                  :

vs.                                    :   Case No. 12-CV-2063-
                                           JSS
DEERE & COMPANY a/k/a JOHN             :
DEERE COMPANY, KEVIN                   :
KEITH, CLYDE D'CRUZ, BRIAN             :
MATSON, and ROBERT BARNES,             :
individuals,                           :

          Defendants.                  :
- - - - - - - - - - - - - X
GAYLE LELA FORSTER and                 :
GREGORY DAVID FORSTER,                 :

          Plaintiffs,                  :

vs.                                    :   Case No. 12-CV-2072-
                                           JSS
DEERE & COMPANY a/k/a JOHN             :
DEERE COMPANY, KEVIN KEITH,            :
BRIAN MATSON, BRIAN                    :
CARLSON, and CLYDE D'CRUZ,             :

          Defendants.                  :
- - - - - - - - - - - - - X

MELISSA A. BURNS - CERTIFIED SHORTHAND REPORTER

---

2

**VIDEOTAPED DEPOSITION OF**

**JOSEPH CLYDE D'CRUZ**

**VOLUME 1,**

taken by the Plaintiffs before Melissa A. Burns,

Certified Shorthand Reporter of the State of Iowa, at

700 Walnut Street, Suite 1600, Des Moines, Iowa,

commencing at 9:13 a.m., Tuesday, September 17, 2013.

APPEARANCES:

For the Plaintiffs:      GREGORY T. RACETTE, ESQ.
                         AMY B. PELLEGRIN, ESQ.
                         PATRICK T. VINT, ESQ.
                         Hopkins & Huebner, PC
                         2700 Grand Avenue, Suite 111
                         Des Moines, IA 50312

For the Defendants:      FRANK HARTY, ESQ.
                         ANGEL A. WEST, ESQ.
                         Nyemaster Goode, PC
                         700 Walnut Street, Suite 1600
                         Des Moines, IA 50309

Also Present:            MICHAEL SELLERS
                         GARY LENIUS
                         GREGORY FORSTER
                         DAVID W. MEIER

Videographer:            AMY COOPER

---

3

I N D E X

WITNESS:  JOSEPH CLYDE D'CRUZ                          PAGE

By Mr. Racette.................................    6

EXHIBITS:                               FIRST REFERENCED

1 - Job Evaluation Approaches for GJE...........  49

2 - Hay Guide Chart Profile Method of Position
    Evaluation.................................   40

3 - Job Family Modeling Draft Project Plan......  50

5B - Deere GJE benchmark job evaluation summaries
     dated 6-24-03.............................   76

5D - Deere WWCA memo re gap in supply management
     employees based on position and knowledge
     dated 7-7-03.............................. 207

5E - Deere supply management benchmark job
     evaluation summaries dated 9-22-03........  89

5F - Deere GJE job function analysis for supply
     management, undated.......................  90

6B - John Deere Grades Before and After GJE -
     Wanda Lenius & Gayle Forster.............. 256

9 - Personnel File/Performance Evaluations -
    Mike Sellers............................... 108

10 - Personnel File/Performance Evaluations -
     Wanda Lenius.............................. 230

25 - John Deere Policy Against Harassment....... 197

26 - Supply Management Organizational Chart....  35

33 - Transcript of Mike Sellers' meeting with
     Clyde D'Cruz and Daria Jerauld, 2-14-05... 170

36 - Susan Bowman and Linda Hibben emails
     concerning commodity issue in supply
     management, 9-7-04........................ 269

---

4

EXHIBITS:                               FIRST REFERENCED

43 - Key emails involving Clyde D'Cruz and
     Kevin Keith............................... 183

81 - July 2001 through 2004 audits (Mike
     Sellers)................................. 136

87 - Mike Sellers emails....................... 114

**5**

1        P R O C E E D I N G S
2        MS. COOPER:  On the record beginning the
3  videotaped deposition of Clyde D'Cruz requested by the
4  plaintiffs in the matter of Michael Joseph Sellers, et
5  al., Plaintiffs, versus Deere & Company, et al.,
6  Defendants, in the United States District Court,
7  Northern District of Iowa, Eastern Division, Case Nos.
8  12-CV-2050, 2063, and 2072.
9        Today's date is September 17, 2013, and the
10  approximate time is 9:13 a.m.  This deposition is
11  being held in the offices of Nyemaster Goode,
12  700 Walnut Street, Suite 1600, Des Moines, Iowa.
13        My name is Amy Cooper, Certified Legal
14  Videographer, of Fidelity Video Services,
15  Incorporated, Johnston, Iowa.
16        Counsel will please identify themselves for
17  the record.
18        MR. RACETTE:  This is Greg Racette with Amy
19  Pellegrin and Pat Vint for the plaintiffs.
20        MR. HARTY:  Frank Harty and Angel West for
21  the defendants.
22        MS. COOPER:  The oath will now be
23  administered by Melissa Burns, Certified Shorthand
24  Reporter, of Susan Frye and Associates, Des Moines,
25  Iowa.

**6**

1        JOSEPH CLYDE D'CRUZ,
2  called as a witness by the Plaintiffs, being first
3  duly sworn by the Certified Shorthand Reporter, was
4  examined and testified as follows:
5                EXAMINATION
6  BY MR. RACETTE:
7        Q.   Mr. D'Cruz, my name is Greg Racette, and
8  you've been sitting through a lot of these
9  depositions; correct?
10        A.   Yes, sir.
11        Q.   So I'm going to assume you know how they
12  work; correct?
13        A.   Yep.
14        Q.   You have to say yes or no.
15        A.   Yes.
16        Q.   All right.  Have you ever had your
17  deposition taken before today?
18        A.   No, sir.
19        Q.   Just as a reminder, as we just did, if you
20  mean to say yes or no, you have to say it for the
21  record.  Okay?
22        A.   All right.
23        Q.   If I ask a question you don't understand,
24  let me know, because I want to make sure you
25  understand the question.  Okay?

**7**

1        A.   Yes.
2        Q.   If you need a break -- counsel said your
3  neck is bothering you.  If you have any reason to take
4  a break or need one, just let me know, and we'll stop
5  the video and we'll take the break.  Okay?
6        A.   Thank you.
7        Q.   All right.  Because we could be here a
8  while because there's a lot of information I have to
9  go through with you.
10        A.   Sure.
11        Q.   Can you tell me your full name, please.
12        A.   Yeah.  Joseph Clyde D'Cruz.
13        Q.   And can you tell me your date of birth and
14  age?
15        A.   ████████ '59.  Fifty-three.
16        Q.   And your home address?
17        A.   ████████████ Bettendorf, 52722, Iowa.
18        Q.   And how long have you been living in
19  Bettendorf?
20        A.   Since 2005.
21        Q.   And can you tell me your height and weight?
22        A.   Six foot, 248.
23        Q.   And has that been -- I know you've been the
24  same height since 2000, but is that what you weighed
25  back in 2000 approximately too?

**8**

1        A.   No.  I was probably about 220.
2        Q.   Have you served in the military?
3        A.   No, sir.
4        Q.   Okay.  Do you have any criminal record of
5  any sort?
6        A.   No, sir.
7        Q.   Educationwise can you tell me where you've
8  gone to school, what degrees that you've achieved?
9        A.   Yes.  I have a bachelor's degree in
10  mechanical engineering technology from Campbell
11  University in Buies Creek, North Carolina, and I have
12  an MBA in supply chain operations from Arizona State.
13        Q.   Can you tell me the year of the Campbell?
14        A.   1996, and 2003 for the master's.
15        Q.   And that was an MBA?
16        A.   Yes, sir.
17        Q.   Any other education other than that?
18        A.   Well, I had associate's degree at Sheridan
19  College in Canada.
20        Q.   What college was that again?
21        A.   Sheridan College.
22        Q.   Is it like the motel or is it
23  C-h-a-r-i-t-o-n?
24        A.   S-h-e-r-i-d-a-n.
25        Q.   Okay.  What was the degree in again?  The

Case 6:12-cv-02050-JSS   Document 84-3   Filed 02/08/14   Page 6 of 90

13

1    Q.    -- 2000.
2    A.    Yeah.
3    Q.    That's when you came to Deere.
4    A.    Uh-huh.
5    Q.    Senior buyer. Again, in that position what
6  did you basically do as a senior buyer?
7    A.    I was responsible for -- there was two of
8  us. I was responsible for setting up the Clayton,
9  North Carolina, facility, getting all the suppliers
10  lined up. Basically preparing that facility for
11  production and then subsequently ongoing production.
12    Q.    And how big a facility was that?
13    A.    About 400 people.
14    Q.    And what were they making?
15    A.    Wheel loaders and backhoes.
16    Q.    I'm sorry?
17    A.    Wheel loaders and backhoes.
18    Q.    And Caterpillar makes more, I'm going to
19  say, commercial type of implements; right? As opposed
20  to farm equipment. Or do they have separate divisions
21  for that?
22    A.    Caterpillar is a construction and mining
23  equipment manufacturer. They had a little stint in
24  agriculture, but they divested that interest.
25    Q.    That's what I meant. They're concentrating

14

1  in construction as opposed to agriculture.
2    A.    Correct.
3    Q.    You had two senior buyers or two buyers
4  altogether at that plant?
5    A.    There was another gentleman and myself.
6  And we were really responsible for all the purchasing
7  at the Clayton, North Carolina, plant.
8    Q.    As a senior buyer, did you have any type of
9  supervisory responsibilities?
10    A.    It started out as an individual contributor
11  role for a couple of years, and then I actually moved
12  into the indirect materials side where I had some
13  direct reports. I think -- yeah.
14    Q.    And how many did you have direct
15  reporting --
16    A.    Oh, I think I had like maybe two or three,
17  if I recall.
18    Q.    And then what's a procurement manager?
19  What did you do in that position?
20    A.    Well, basically I got transferred to the
21  Sanford, North Carolina, facility for Greenfield
22  operation and they make skid steers, and it was a
23  setup and also napkin sketch to production of a new
24  product, and then I had expansive responsibilities. I
25  had all the logistics and warehousing and management

15

1  systems, and I had to recruit and then bring in a
2  whole new crew.
3    Q.    It's a little bit foreign to me, but as a
4  procurement manager, were you involved in doing what
5  on a day-to-day basis for the company? What types of
6  activities would you be procuring or managing so to
7  speak?
8    A.    All right. The title is a little bit
9  misleading, but basically it's a materials manager
10  position. So basically it's end-to-end supply chain.
11  It covers logistics, it covers setting up a bill of
12  materials, it includes all of the purchasing of the
13  material, finding the suppliers, setting the sourcing
14  strategies, and then of course all the logistics which
15  is the inbound for freight to align that process.
16        So it's really a materials management
17  function. I was called a procurement manager which is
18  a little misleading.
19    Q.    So in that position was it more of a
20  supervisory position as opposed to a hands-on
21  situation?
22    A.    Both. Both. Because, in essence, when we
23  started the Sanford facility, I had to recruit
24  personnel for those roles. And so, needless to say, I
25  had the luxury of Caterpillar being a big company to

16

1  bring some people in, and then also with that recruit
2  local talent.
3    Q.    When you were at Sanford, how many people
4  did you have reporting to you?
5    A.    I had about 25.
6    Q.    And did you hire most of those yourself?
7    A.    Yes.
8    Q.    And who did you report to at Sanford?
9    A.    I reported to a business operations
10  manager. We were a very flat organization.
11    Q.    And what was his name?
12    A.    William Allenbaugh.
13    Q.    Can you spell the last name?
14    A.    A-l-l-e-n-b-a-u-g-h.
15    Q.    And is he -- do you keep in touch with him
16  at all? Have you kept in touch with him?
17    A.    No. No.
18    Q.    And when you hired -- were you hiring --
19  what type of positions were you hiring people for?
20  Can you just give me the short version of the types?
21    A.    Sure. Purchasing, logistics, materials
22  management.
23    Q.    And when you used the term "materials
24  management," does that include the purchasing of

Case 6:12-cv-02350-JSS   Document 84-3   Filed 03/06/14   Page 7 of 190
Susan Frye and Associates, Inc.                    (515) 284-1972                    4 of 112 sheets
APP007

21

1  have grades for the different positions, or do you
2  recall?
3      A.   Yes, sir, they did.
4      Q.   Was it grades like we're talking about here
5  from 6 to 15 or whatever, or do you recall?
6      A.   It's not a direct correlation.  They use
7  different numbers.  But you know, same type of thing.
8      Q.   Did you become familiar with that Hay's
9  process at Caterpillar?
10     A.   No.
11     Q.   You didn't have any knowledge of how it
12  worked or what the purpose of it was or anything of
13  that?
14     A.   I knew it at a cursory level, and that is
15  it was about really evaluating job content, and
16  then -- they used some kind of a point system, and
17  that's all I knew about it.
18     Q.   When you were at Caterpillar in the
19  procurement management position --
20     A.   Right.
21     Q.   -- you said you hired a lot of those
22  people; correct?  The 25 or so that you brought on for
23  that special job; correct?
24     A.   Uh-huh.
25     Q.   Is that yes or no?

22

1      A.   Yes, sir.  Sorry.
2      Q.   And did you give anybody raises or promote
3  anybody when you were there at that job for about
4  three years?
5          MR. HARTY:  I'm going to object.  That's
6  compound.
7  BY MR. RACETTE:
8      Q.   Go ahead.  You can still answer.
9      A.   Which part, sir?
10     Q.   What I'm asking you, of the 25 people or so
11  when you were procurement manager, did you ever give
12  anyone a raise or promote them?
13         MR. HARTY:  Same objection.
14         You can answer if you want to pick one.
15     A.   Well, I would just say that certainly I did
16  give merit increase.
17  BY MR. RACETTE:
18     Q.   And when you use the term "merit increase,"
19  what does that mean to you?
20     A.   Well, you know, I guess on an annualized
21  basis the company had a process of evaluating, and
22  then they basically decided what the employee would
23  get.
24     Q.   Did you as their supervisor have input as
25  to a merit increase for your employees at Caterpillar

23

1  or not?
2      A.   Well, again, the way it worked was we gave
3  reviews and then the company decided what the
4  individuals would get based on some algorithms or
5  whatever formulas that they used.
6      Q.   If you gave someone a bad review, would
7  that be reflected normally in their wages or grade?
8          MR. HARTY:  That's compound.
9          You can answer.
10     A.   I guess it depends.  I'm not sure.
11  BY MR. RACETTE:
12     Q.   Do you think that the evaluations you did,
13  I would assume, were used for some purpose, were they
14  not?
15     A.   Yes.
16     Q.   What was the purpose they were used for?
17  What's your understanding?
18     A.   Well, the evaluation was really a function
19  of feeding back to the employee how they were doing.
20  Certainly it was used as a basis for compensation.
21  And I guess at some point those evaluations are used
22  for promotability.  For career growth.
23     Q.   For what?
24     A.   Promotability or career growth.
25     Q.   And then you were assembly operator

24

1  manager for about a year; is that right?
2      A.   Yeah.
3      Q.   Why such a short time?
4          MR. HARTY:  Objection.  It's argumentative.
5  It assumes facts.
6          You can answer.
7      A.   I was on the job about a year, and call it,
8  if you would, a midlife crisis.  You know, I kind of
9  was looking at my future and wasn't necessarily
10  interested in another opportunity, but you know,
11  basically an opportunity presented itself and it was a
12  good one and I took it.
13  BY MR. RACETTE:
14     Q.   And how does the midlife crisis figure into
15  that.  How does that -- why did you leave the
16  management operations assembly job to go to Deere?
17     A.   Well, again, most of the facilities that I
18  worked at at Caterpillar were 400-plus.  Not very big.
19  Okay?  And when this opportunity got presented to me,
20  it was to go to the flagship operation for John Deere,
21  it was oversight for multiple facilities, a much
22  broader position and scope, and that was very
23  attractive.
24     Q.   How did you find out about the Deere job,

**APP008**

25

1    A.    I was headhunted.

2    **Q.    Through a headhunter.**

3    A.    Yes.

4    **Q.    Okay.  And did you just apply, make an**

5    **application, when you found out that there was an**

6    **opening?**

7    A.    No.  I didn't have to do that.  I was

8    headhunted, and then they have a process and they

9    initiate the contact.

10    **Q.    Do you recall who interviewed you for the**

11    **job?**

12    A.    No, sir, I did not.

13    **Q.    I'm sorry?**

14    A.    It's -- I don't remember who interviewed

15    me.  I really had -- the initial headhunt was with

16    another facility, and that was with a facility in

17    North Carolina at Deere.

18    **Q.    And did anybody interview you at Waterloo**

19    **before you took the position?**

20    A.    Oh, yes.  Yes.

21    **Q.    Who interviewed you at Waterloo?**

22    A.    Andrew Hansen.

23    **Q.    And what was his position at the time?**

24    A.    He was the supply management manager at

25    Waterloo.

26

1    **Q.    And I'm assuming that from what you've told**

2    **me you had been -- really your supply management**

3    **experience had been at Canada Caterpillar?  You were**

4    **in supply management at that point?  Or purchasing?**

5    A.    Canada as well as in North Carolina.

6    **Q.    Then the three years you were senior buyer**

7    **in North Carolina.**

8    A.    Uh-huh.

9    **Q.    Is that a yes?**

10    A.    Yes, sir.

11    **Q.    And when you were the senior buyer, as I**

12    **understand it, in North Carolina, you really didn't**

13    **manage anybody, maybe a couple direct reports; is that**

14    **correct?**

15    A.    Yes.

16    **Q.    What sold you to John Deere at that point?**

17    **What do you think sold you to John Deere as far as**

18    **being a good prospect for this position of -- what**

19    **position did you obtain?  Supply management manager?**

20    MR. HARTY:  It's three questions.

21    Compound.

22    BY MR. RACETTE:

23    **Q.    He has to make these objections, but you**

24    **have to answer unless he tells you not to.  Do you**

25    **understand the question?**

27

1    MR. HARTY:  Really, Greg, it really is.

2    Which question do you want him to answer?  What sold

3    him, what he thought sold him, or what job he took?

4    BY MR. RACETTE:

5    **Q.    Well, I think we'll have the**

6    **question read -- did you understand the question?**

7    A.    If you could break it down for me, I'll

8    answer it.

9    **Q.    What do you understand sold you to Deere**

10    **for this position as supply management manager?**

11    A.    Again, the attraction was -- I did not get

12    the supply management manager position.

13    **Q.    What position did you get?**

14    A.    I was a division manager.  Hired on as a

15    division manager at Caterpillar as of March 2000.

16    **Q.    At Caterpillar?**

17    A.    Sorry.  At John Deere.  Sorry.

18    **Q.    And give me that -- what was it again, your**

19    **title?**

20    A.    Division manager, purchasing.

21    **Q.    What did you try to -- what experience did**

22    **you feel sold you to Deere concerning that position?**

23    A.    I had a very diverse background in

24    purchasing, materials management.  I had done quite a

25    few different jobs at Caterpillar.  And there's a lot

28

1    of synergy in terms of -- and commonality between

2    process and supply base at Deere and at Caterpillar.

3    So from an assimilation standpoint, it was easy for me

4    to make the switch.

5    **Q.    When you came in as division manager of**

6    **purchasing --**

7    A.    Uh-huh.

8    **Q.    -- who were you in charge of or how many**

9    **people were you in charge of at that point?**

10    A.    I might have had about 15 to 20.

11    **Q.    And was that in the supply management**

12    **department or what department was that?**

13    A.    It was in supply management.

14    **Q.    Was there -- when you got hired as division**

15    **manager of purchasing, was there a supply management**

16    **manager at that point?**

17    A.    Yes.

18    **Q.    Who was that?**

19    A.    That was Andy Hansen.

20    **Q.    And so you eventually got his job; correct?**

21    A.    Yes, I did.

22    **Q.    Okay.  How long were you division manager**

23    **of purchasing?**

24    A.    Five months.

25    **Q.    How old were you at that time?  I haven't**

Case 6:12-cv-02050-JSS   Document 84-3   Filed 02/06/14   Page 9 of 190

APP009

29

1  done the math, but in 2000 what was your --
2      A.    I haven't done the math, but I think I was
3  early 40s.
4      Q.    Early 40s?
5      A.    Yeah.
6      Q.    Do you remember what pay you came in at
7  approximately?  What your salary was?
8      A.    Yeah.  I think it was 110.
9      Q.    Do you remember, did they have grades when
10  you came in at that point?
11      A.    No.
12      Q.    No grades.
13      A.    Well, there were grades that I became aware
14  of when I got in, but when I was offered the job, it
15  was not a grade.  It was a salary.
16      Q.    Okay, and I may be confused.  When you were
17  offered the job, you certainly got a salary, I
18  understand that.  But did they tell you what grade you
19  would be starting out as?
20      A.    No.
21      Q.    You didn't know?
22      A.    No.
23      Q.    But it was a grade.
24      A.    There's a grade associated when I got in,
25  but I did not know what the grade was when I got

30

1  offered.
2      Q.    What was the grade when you got in?  What
3  did you find out it was?
4      A.    It was a Grade 10.
5      Q.    Did that mean anything to you at that time?
6      A.    No.
7      Q.    You didn't have any idea where a Grade 10
8  fit in the Deere hierarchy?
9      A.    At that point I assumed it was a mid grade,
10  but I did not know in terms of the echelon because it
11  was different -- it was a different structure to what
12  I had come from.
13      Q.    And what was your understanding when you
14  got hired as division -- well, let me ask you this:
15  How did you then get the position of supply management
16  manager?  What happened in five months to give you
17  that position?  How did you get that?
18      A.    You'd have to ask the general manager, but
19  I mean, basically I was offered the position.
20      Q.    In the five months you were there before
21  you got the supply management manager's job, what had
22  you done?  Your basic duties, what were they?
23      A.    I was running the purchasing for a division
24  of supply management there.  I had some commodities,
25  and you sort of would -- with my team --

31

1  Or with my team.
2      Q.    Who was your -- who did you report to at
3  that point?  Was it Andy Hansen?
4      A.    Andy Hansen.
5      Q.    And had there been -- were there other
6  people -- to your knowledge other people considered
7  for the position of supply management manager at that
8  time, or do you know?
9      A.    I do not know.
10      Q.    How did Andy Hansen present the offer to
11  you?
12      A.    Mike Triplett presented the offer, not Andy
13  Hansen.
14      Q.    And who was Mike Triplett at that time?
15      A.    He was the general manager of Waterloo
16  Works.
17      Q.    And were you surprised, or what was your
18  reaction?
19      A.    I would say I was a little surprised, but
20  my sense when I came to John Deere was that I think
21  they were interested in me for a more senior position,
22  but they never said it.
23      Q.    And why did you have that impression?
24      A.    Well, I think if you look at my background,
25  I was very well qualified and experienced for that

32

1  role, and I believe my contributions or whatever they
2  felt, demonstrated the potential to position me for
3  that position.
4      Q.    Again, I'm sorry, I probably asked you
5  this.  When you became division manager of purchasing,
6  how many people did you have under you?  15 to 20, is
7  that what you said?
8      A.    Yeah.  Yeah, about that I recall.
9      Q.    And then when you became the supply
10  management manager, that increased significantly; is
11  that correct?
12      A.    Yeah.  I went to 130.
13      Q.    And the most you had supervised, as I
14  understand it, at Caterpillar was the 75 people and
15  that would be in the factory, not supply management.
16      A.    Yes.
17      Q.    Were the 25 that you were supervising at
18  Caterpillar in North Carolina, were they in supply
19  management or purchasing, or was that a different area
20  as well?
21      A.    They were in supply management.  So
22  basically very, very similar to what was at Deere.
23      Q.    But going from -- the most that you had
24  ever supervised in supply management was at
25  Caterpillar when you ran the operations in Sanford;

Case 6:12-cv-02050-JSS  Document 84-1  Filed 01/03/14  Page 10 of 110

APP010

33

1  correct?
2      A.    No.  I had people before that.
3      Q.    You had people --
4      A.    In Caterpillar Canada, my first job, I had
5  close to 35 in the factory.
6      Q.    In the factory.
7      A.    Yes.
8      Q.    But not doing supply management work.
9      A.    It was a function of supply management.  It
10  was logistics and material distribution.
11     Q.    So the most before was 35 people; correct?
12     A.    Right.
13     Q.    And never had you done anywhere -- managed
14  anywhere near 130 people all in supply management;
15  correct?
16     A.    Correct.
17     Q.    And you had been with Deere five months;
18  correct?
19     A.    Nine months.
20     Q.    Nine months.
21     A.    Because I joined in March 2000.
22     Q.    Did you -- with the -- that was a
23  promotion; correct?
24     A.    Yes, sir.
25     Q.    A big promotion?

34

1      A.    Yes.
2      Q.    And Mr. Hansen, did he -- when he hired you
3  for that position, did he describe to you what he
4  expected you to do?
5      A.    Yes.
6      Q.    Just tell me what he told me he wanted you
7  to do.
8      A.    Well, basically when I arrived there, I was
9  responsible for purchasing for the Donald Street site.
10  Assembly operations.  So basically that was
11  commodities that we purchased that supported the
12  production lines in Donald Street.
13     Q.    That's when you were division manager?
14     A.    Manager.  Correct.
15     Q.    What did he tell you when you were going to
16  take on the manager of supply management?  What did he
17  tell you he expected of you, what he wanted you to
18  accomplish?
19     A.    He didn't tell me anything.  It was Mike
20  Triplett who told me what I had to do.
21     Q.    What was Mike Triplett's position again?
22     A.    He was the general manager for all of
23  Waterloo Works.
24     Q.    And what did he tell you that he wanted you
25  to do, wanted you to accomplish?

35

1      A.    He wanted me to pursue direct material cost
2  reduction, improve supply base performance, and you
3  know -- you know, basically support the new product
4  programs.  And, you know, help us to meet our targets
5  on new product programs.
6      Q.    If you would go to Volume III of your
7  notebooks that are beside you there.  And if you turn
8  to Exhibit 26.  Do you have that in front of you?
9      A.    Yes, sir.
10     Q.    You can see the first page is an
11  organizational chart.
12     A.    It's in writing, yeah.  Okay.
13     Q.    Yeah.
14     A.    Okay.
15     Q.    And your name appears at the top; is that
16  correct?
17     A.    Correct.
18     Q.    As manager of supply management; is that
19  correct?
20     A.    That's correct.
21     Q.    And just in a nutshell what is supply
22  management since we haven't defined that.  What is
23  that as it applies to Deere and your job at that time?
24     A.    As it applies to Deere.  It's the
25  management of raw or finished material from concept

36

1  all the way through to production.  So you're either
2  supporting the procurement, the logistics, supply of
3  material into the facilities for production, either
4  into an assembly operation or into a manufacturing
5  operation.  And --
6      Q.    Go ahead.
7      A.    -- you support also -- the incorporation of
8  material not only into current production but also
9  into new products.
10     Q.    In a nutshell simplifying it, is it supply
11  management is the part of Deere that deals with the
12  purchasing of parts that are going to be used in their
13  implements?
14     A.    It's the scheduling, it's the demand
15  planning, and the purchasing of the material that goes
16  into the products.
17     Q.    Okay.  In this supply organizational chart,
18  excuse me, you can see in Exhibit 26 there is like --
19  let's go to page 4.  Do you see the pages are actually
20  numbered at the bottom?
21     A.    Yeah.  Uh-huh.
22     Q.    Does that include all the different
23  divisions there over those four pages that you would
24  be in charge of or were in charge of?

APP011

37

1    Q.   So there was business process manager.

2    A.   Right.

3    Q.   I don't know, I can't tell what the date of

4    this chart is.  Do you see on page 2 it looks like

5    8-23-04.  If you go to the bottom of page 2, do you

6    see that kind of cut out there?

7    A.   Yes.

8    Q.   When you look at the names on here, does

9    that look about when this organizational chart -- what

10   period it would apply to?

11   A.   I guess if you've got a date on there and

12   you've got the information there --

13   Q.   Well, it seems --

14   A.   I cannot recall exactly, but if --

15   directionally, this looks correct.

16   Q.   Okay.  When you look at Daria -- Jerauld?

17   A.   Jerauld, yes.

18   Q.   Okay.  She was a business process

19   manager; is that correct?

20   A.   Yes.

21   Q.   Do you remember when you hired her?

22   A.   I don't recall the exact date.

23   Q.   Do you remember what position you hired her

24   for?

25   A.   Yeah.  I had a -- I want to say a newly

38

1    created area where we already had a small organization

2    of individuals that were responsible for our

3    procurement systems.  And coupled with that we had to

4    put more emphasis on process improvement, and so

5    basically Daria was selected for that position.

6    Q.   And do you remember when you hired her back

7    in -- I don't know, 2003, 2004, somewhere in that time

8    frame.  Do you remember how old she was at that time

9    when you hired her?

10   A.   No.

11   Q.   As a business process manager -- I may be

12   confused a bit.  When you use "procurement systems,"

13   that term, what do you mean by that?  What are the

14   procurement systems?  What do those people do?

15   A.   Well, to facilitate supply into the

16   facility, we had electronic communication and

17   communication of our schedules and orders and

18   everything else.  We had communication out to the

19   suppliers.  And then we had performance metrics and

20   systems to measure the performance of those suppliers.

21       So the business process manager in part was

22   responsible for managing all of that.

23   Q.   So would the process people, Mr. D'Cruz, be

24   people that were kind of -- I'm just going to use an

25   analogy, kind of coaches of the process involved in

39

1    far as purchasing items and getting them in and

2    figuring out electronically how you can move them

3    faster, that type of thing?

4    A.   Their job was really to ensure the fluidity

5    and linearity of the systems of being able to bring

6    the material in and transact it in an efficient way to

7    be able to get it to production.  And so they did it

8    both on the incoming and the outgoing.

9    Q.   So she was business process manager.

10   A.   Right.

11   Q.   Then Craig Pashan -- is it Pashan?

12   A.   Pashan, yeah.

13   Q.   P-a-s-h-a-n.  He was procurement manager.

14   Is that different -- how does that differ from what

15   she did?

16   A.   Craig was basically responsible -- based on

17   what you have here, he was responsible for cost

18   reduction.  Direct material cost reduction.  And his

19   job was specifically to work on projects to take cost

20   out of our material.

21   Q.   Then if you turn the page, page 2, of

22   Exhibit 26.

23   A.   Yes.

24   Q.   Brian Matson was manager of supplier

25   integration?

40

1    A.   Yes.

2    Q.   Okay.  And were those all the people that

3    he would have been supervising directly at that point?

4    Listed on page 2.

5    A.   He did not have direct supervision of all

6    these people.  He had some, and then he had some

7    interim managers that reported to him that supervised

8    some of the people in that chart.

9    Q.   Okay.  And then Michael McGonegle was

10   manager of tactical purchasing.

11   A.   Right.

12   Q.   What is that?

13   A.   Tactical purchasing is really the

14   management of current production, which is -- that's

15   after a product is introduced and it's running for a

16   number of years.  He was responsible for expediting

17   and management of material in that area.

18   Q.   Turn to page 3.  Ken Schmitz was the

19   manager of indirect materials and services?

20   A.   Yes.

21   Q.   And what was that?  What did that consist

22   of?

23   A.   So indirect materials and services are

24   anything other than parts.  So if you need landscaping

25   services, tooling for the process, anything used in

Case 1:12-cv-02650-JBS-JBC   Document 84-25   Filed 02/03/14   Page 22 of 190
Susan Frye and Associates, Inc.          (515) 284-1972          10 of 112 sheets

APP012

41

1 the facility, Ken's group would be responsible for
2 that. But not parts.
3     Q.   Then Paul Garcia, manager of OFP supplier
4 quality. What was that?
5     A.   Paul was responsible for quality assurance
6 of parts as it relates to current production. And by
7 the way, interspersed in that was support for the cost
8 reduction.
9     Q.   And then Heidi Wirtz, page 4, supervisor of
10 tactical supplier quality. What was that?
11     A.   That is on the ground, on the floor
12 management of material in the factory. And when we
13 have like a nonconforming material, it was her job to
14 quarantine it and seek out disposition and
15 reconciliation with the supplier on defective
16 material.
17     Q.   And then Bruce Iverson was manager of
18 logistics, and I think you said that's actually making
19 sure things are moving, pricing them, that type of
20 thing?
21     A.   Right. Just to clarify, that was not part
22 of my area at the time. Okay?
23     Q.   All right. So you were in charge of all
24 those people. Who directly reported to you then?
25     A.   All of the people in bold that you have

42

1 her. Daria, Craig, Brian, Mike, Ken, and Paul.
2     Q.   All the supervisors.
3     A.   Yes. And of course Heidi Wirtz reported to
4 Paul, not to me.
5     Q.   And if you turn to page 7 of Exhibit 26,
6 does that correctly do an organizational diagram as to
7 who the direct reporters were to you?
8     A.   Yes.
9     Q.   And if you turn to page 8 of Exhibit 26,
10 would this be who directly reported to Daria Jerauld?
11     A.   Yes.
12     Q.   And if you go down in this chart on page 8,
13 Mike Sellers is -- I don't know really how to read
14 this organizational setup here, but who did -- did he
15 report to who?
16     A.   He reported directly to Daria.
17     Q.   And before Daria did he report directly to
18 you?
19     A.   For a period of time, yes.
20     Q.   If you turn to page 9 -- well, I don't care
21 about page 9. So skip that.
22         Turn to page 10 of Exhibit 26. Would this
23 be a correct organizational chart for who Brian
24 Matson -- for who directly reported to him?
25     A.   This is exploded view, and, to answer your

43

1 sure. Level one exploded view. So, in other words,
2 there are some interims in here that are missing.
3     Q.   Then if you turn to page 14.
4         By the way, was Brian Matson -- was he the
5 head of PDP?
6     A.   Yes.
7     Q.   Can you tell me what PDP is?
8     A.   Product delivery process.
9     Q.   And would PDP be dealing with new product
10 development?
11     A.   Yes.
12     Q.   And if you turn to page 14 of Exhibit 26,
13 Mike McGonegle, was he -- does that show, as far as
14 you can tell, his -- direct reporters to him?
15     A.   Again, this is an exploded chart of all the
16 people there, but I believe there were intermediate
17 steps here.
18     Q.   Okay. And OFP, was he in charge of that?
19 Mr. McGonegle.
20     A.   Yes. Yes.
21     Q.   And what's OFP?
22     A.   Order fulfillment process.
23     Q.   And was that involving the purchase for
24 ongoing or current products?
25     A.   Right.

44

1     Q.   And if you turn to page 15, Paul Garcia is
2 supply quality. What is that again? What's supply
3 quality? What would these people be doing?
4     A.   Okay. The quality engineers that Paul had
5 were of two flavors. One, we talked about Heidi
6 Wirtz's group, they kind of handled the day-to-day
7 stuff on the floor and dispositioning, reconciliation
8 of issues.
9         We had a proactive group of quality
10 engineers that worked on what we called supplier
11 development. In other words, not one-off-type quality
12 issues. They would be chronic issues. And so Paul
13 had a contingent of people that worked on that.
14         And then last is those people at times
15 would double team with the supplier development people
16 to work on introduction of cost reduction.
17     Q.   Okay. Were they actual engineers? Quality
18 engineers?
19     A.   Some of them were. I would say some of
20 them were people that had a lot of experience on the
21 shop floor and actually worked in manufacturing. So
22 they had applications engineering experience. And,
23 you know, very, very strong mechanical aptitudes,
24 things like that.
25     Q.   And if a person was in a QA-aid type position, were

APP013

61

1    Q.   So you did -- typical outputs and what you
2  told me about cost management, ability to get the
3  parts out, all those things would be performance
4  indicators as well?
5    A.   Yeah.  Basically PDP is a six-phase
6  process, and your ability to execute on that six-phase
7  process really defines your performance.
8    Q.   Gotcha.  Give me those six things, would
9  you?
10   A.   Well, phase one -- again, they're phases;
11 right?  So phase one is when they have the theory of
12 what they want to do for the product.  Phase two is
13 start to identify suppliers.  Phase three is selecting
14 the supplier.  Phase four is looking at the cost.
15        Like we have target costs that we have to
16 meet on the product.  So for the components that
17 you're managing, making sure that you work with the
18 supplier, negotiate to hit those target costs.  And
19 then getting it into production on time so that we can
20 introduce the product.  That's five and six.
21   Q.   And those are the essence of a PDP buyer's
22 job; correct?
23   A.   No, that's the PDP process.  The buyer's
24 job is to support those six phases.
25   Q.   And did you leave anything out that they

62

1  have to support?
2    A.   No.
3    Q.   And so if you were asked for GJE to do a
4  family factors analysis for PDP, that's what you would
5  have told them basically; is that correct?
6    A.   No.  I'm answering your question.  Again,
7  I'm not involved in the GJE process, but again, the
8  key things there that define the position are
9  really -- you asked me for outputs, I gave you the
10 outputs.  But skills, knowledge, these other things
11 that are mentioned here, are pretty crucial also.
12   Q.   Well, what would that be in PDP, skills and
13 knowledge?
14   A.   Well, specifically it depends on the
15 commodities that you're managing.  So whether they're
16 complex, medium complexity, low complexity.  And then
17 coupled with that would be something like if you have
18 an engineering background or an applications
19 background.
20        Because the more complex the commodity, the
21 more technical it is, the individual has to have --
22 for that specific job, you've got to have a much
23 stronger suit of skills.
24   Q.   Who -- the six phases that you just told me
25 about --

63

1    A.   Uh-huh.
2    Q.   That doesn't mention complexity of
3  products, does it?
4    A.   No, that's really -- is really a process to
5  get us from concept of a product all the way into
6  production.  That's all that is.  That's a
7  PDP-engrained process that we use at Deere.
8    Q.   And that's what they're measured by if they
9  do that; correct?
10   A.   Well, it's their contribution into that
11 process.
12   Q.   Now, commodities.  Can you tell me if you
13 ever filled out anything for GJE setting forth what
14 was a high complex commodity, a medium complex
15 commodity, or a low complex commodity?
16   A.   No.  I did not.
17   Q.   You did not.
18   A.   No.
19   Q.   How would they know in this family then
20 what commodities would be complex as high or low,
21 medium?  How would they know that?
22        MR. HARTY:  Calls for speculation.
23        You can answer the question if you know.
24   A.   Well, first of all, the question was did I.
25 I'm saying I know as a general knowledge, but I was

64

1  not the one who initially defined those.
2  BY MR. RACETTE:
3    Q.   Who did if you didn't?
4        MR. HARTY:  Calls for speculation.
5        You can answer if you know.
6    A.   I don't know.
7  BY MR. RACETTE:
8    Q.   You're the head of that department though,
9  aren't you?
10   A.   Right.
11   Q.   Okay.  You would be what I think -- and I
12 don't know, because nobody seems to know yet, but
13 functional level team, you would be somebody that
14 would be hopefully defining the families underneath
15 you, wouldn't you?  Or helping in that regard?
16        MR. HARTY:  It's compound, ambiguous.
17 BY MR. RACETTE:
18   Q.   Go ahead.  You can answer.
19        MR. HARTY:  And also it's directly contrary
20 to his prior testimony that he had no involvement in
21 the process.
22        MR. RACETTE:  Counsel, if you've got an
23 objection, I don't mind that, but if you're going to
24 lead the witness along or have him stop testifying

Case 3:12-cv-02050-JSS   Document 84-25   Filed 02/03/14   Page 12 of 190
Susan Frye and Associates, Inc.                    (515) 284-1972                    16 of 112 sheets
APP014

77

1  labeled at the top "Deere & Company Benchmark Job
2  Evaluations"?
3      A.  Uh-huh.
4      Q.  So by at least June of '03 the job
5  descriptions for supply management and the grades were
6  done; right?  They were all it looks like created --
7      A.  According to this (indicating).
8      Q.  Yeah, according to this.
9      A.  Yes.
10     Q.  Okay.  And did you know them by that time
11 as well?  Is that about the time frame?
12     A.  No, sir, I did not.
13     Q.  Do you know the time frame you knew the
14 grades?
15     A.  I knew the grades when they announced it
16 the following year.
17     Q.  And would it be fair to say for the people
18 mapping -- did you do any mapping of jobs?
19     A.  No, I didn't do -- let me think through
20 that.  Not for these positions here.
21     Q.  And would it be fair to say -- did you look
22 at any of the benchmark things that they were
23 supplying out of GJE to your managers?
24     A.  No.
25     Q.  Would you turn to 5C.  Can you do that?

78

1  Flip it to there.
2      A.  Sure.
3      Q.  Do you know what -- have you seen this
4  document before?
5      A.  No, I have not.
6      Q.  It says "Supply Management PAQs" -- well, I
7  guess we got "Supply" cut off.
8      A.  Yeah, I got that.
9      Q.  Okay.  Does that look to you like anything
10 you've ever seen?  I mean ever handled --
11     A.  No.
12     Q.  Okay.  Now, I'm going to ask you to turn to
13 5D.  Can you do that?
14     A.  Yeah.
15     Q.  Thank you very much.  Now, this is an
16 email; correct?
17     A.  Yep.
18     Q.  And it's from WWC@deere.com.  What is that?
19 Or who is that?
20     A.  WWC, I believe, is Waterloo Works
21 Corrective Action.
22     Q.  What is that?
23     A.  I believe what this is is an internal audit
24 that was done.  I don't know who did it, whatever, I
25 mean I can see this.

79

1          Somebody did an assessment and -- WWCA is
2  very similar to NCCA, which is another process where
3  we do audits, and then they have things that come out
4  of those audits that get cataloged, and then we
5  typically are asked to action on them or discuss them
6  or whatever.
7      Q.  Okay.  Do you know back at this time, this
8  is dated May 6 of 2002 --
9      A.  Right.
10     Q.  -- you had been now in -- you had been
11 manager of the supply management area for a little
12 over a year at that time?  Would that be correct?
13     A.  Yeah.  That's about right.
14     Q.  Okay.  And do you know who was in that
15 WWCA, who would have done this type of audit back at
16 that time?
17     A.  I don't recall.  I really don't.
18     Q.  Okay.  Is there -- if I was to call Deere
19 up and say, "Can you connect me with the Waterloo
20 Works corrective action department," do they have a
21 department like that?
22     A.  I don't know.  I don't.
23     Q.  Did they have one when you were there?
24     A.  Not that I'm aware of.  To be honest with
25 you, you know, I saw this, but I can't connect it.

80

1  It's been a long time.
2      Q.  So, anyways, they give you a problem
3  number, 6156; correct?
4      A.  Right.
5      Q.  And this did come to you at this time,
6  Monday, May 6, 2002?
7      A.  Uh-huh.
8      Q.  You have to say yes or no.
9      A.  Yes.  Well, I'm just reading what you got
10 here so...
11     Q.  And it says "Problem Title:  April internal
12 assessment - based on findings there is a gap in the
13 knowledge of supply management employees based on
14 position moves and lack of training."  So I'm assuming
15 that came to you --
16     A.  Yeah.
17     Q.  -- correct?  And what were they referring
18 to?  What's your understanding of what they were
19 referring to?
20     A.  At face value there was an audit done,
21 somebody identified a gap, and that was generated
22 (indicating).
23     Q.  I'm sorry?
24     A.  I said there was a gap identified that
25 came from an April corrective action or something that came

Case 6:12-cv-02050-JSS   Document 84-3   Filed 02/03/14   Page 15 of 190

APP015

81

1  out of the audit, and that's what's there and it was
2  communicated to me.
3      Q.   Okay. And I'm assuming that when there is
4  a problem identified like this, that it's pretty
5  important you get it corrected; is that right?
6      A.   It depends. First of all, you want to get
7  a clarification of where they were coming from, what
8  the circumstances were, and then of course you
9  definitely take it seriously enough that you do
10 something.
11     Q.   Now, it says "For details on the problem,
12 click on the URL."
13     A.   Yeah.
14     Q.   I'm assuming you did that.
15     A.   I don't recall. You know, it's '02 so --
16     Q.   Well, I know you don't recall, but you
17 would have done that, wouldn't you? I mean you just
18 don't get this way and say, "Oh, I might look it up or" --
19     A.   Yeah. Yeah. Okay. Then I would say I
20 probably did at the time.
21     Q.   And we don't have that so I don't know what
22 that provided. Do you recall when you clicked there
23 what came up or what did it show?
24     A.   No, I don't.
25     Q.   They're saying that "Based on findings."

82

1  So they must have had some type of findings; correct?
2      A.   Yes.
3      Q.   And what they're alluding to is the gap is
4  in knowledge of the employees based on position moves
5  and lack of training. So who was moving these people
6  around? It had to be you, correct?
7      A.   My department.
8      Q.   And who moves people in your department?
9      A.   My staff and myself.
10     Q.   All right. And had you been moving some
11 people into positions that evidently lacked training
12 and knowledge?
13     A.   That's a two-part answer.
14     Q.   Well, answer it -- do you want to separate
15 them? That's fine.
16     A.   All right. So I'll answer your question.
17 So, number one, the position moves are a function of,
18 one, the reorg that we did --
19     Q.   When did you do the reorganization?
20     A.   Two thousand -- October 2001 it started.
21 But coupled with that we also had the company announce
22 a SERP, special early retirement, and we were
23 introducing an ag strategic sourcing organization,
24 another divisional level.
25     Q.   Okay. I understand. So position, it was a

83

1  time. So the position moves were a function of people
2  being moved into the org, but also we had people
3  taking the SERP and retiring at the same time. Okay?
4  And we had people taking opportunities into strategic
5  sourcing, which was another group.
6          So the position moves, just to clarify, was
7  not just purely -- it was a circumstance around three
8  different events that would have constituted those
9  moves.
10     Q.   And what I'm interested in, I understand
11 that there was an early retirement involved in this
12 too?
13     A.   There was a SERP, yeah, that came -- which
14 was one of those things that came up, yeah.
15     Q.   And this is -- you know, you've only been
16 there a year; right? In this position.
17     A.   Yeah.
18     Q.   So all these moves occurred during your
19 year you were there as you recall?
20     A.   Those moves occurred over a four-year
21 period while I was there.
22     Q.   While you were there.
23     A.   Yeah.
24     Q.   But this is only 2002 and they're
25 complaining.

84

1      A.   Right. Right. Right. Right.
2      Q.   Okay. So it's only a year.
3      A.   Yeah.
4      Q.   Okay. So in the first year, they came --
5  and again, I'm going to try to get from your counsel
6  what the findings were because we don't have those
7  yet. Okay?
8          But do you remember which people, what
9  positions, they were claiming lacked training and/or
10 knowledge?
11     A.   No, I don't.
12     Q.   Do you remember how many positions?
13     A.   No, I don't.
14     Q.   Do you remember what you did to correct it,
15 if anything?
16     A.   No, I don't.
17     Q.   And if you would turn to page 2, they come
18 back at you a year later, this is dated July 7, 2003,
19 and at this point Mike Sellers gets a copy, and it's a
20 "Status Update." Okay? That's what it claims it is
21 here. And it's the same problem, and the severity of
22 this they put as "Major." Do you see that?
23     A.   Yep.
24     Q.   What's that mean to you?
25     A.   I would estimate that it was a

Case 6:13-cv-02050-JSS Document 84-2 Filed 02/03/14 Page 16 of 190
Susan Frye and Associates, Inc.                    (515) 284-1972                              21 of 112 sheets
APP016

85

1 major severity.
2     **Q.** Well, what -- how important is it for you
3 **to comply with audits that occur at John Deere of your**
4 **department?**
5     A. It depends on the audit.
6     **Q.** Well, if it's labeled as "Severity:
7 **Major," is that something you just pooh-pooh and say,**
8 **"Hey, big deal, I could care less"?**
9     A. No, you want to get clarification as to who
10 defined it as a major or a minor, because again, it's
11 in their opinion. And again, we appropriately put it
12 in the context and appropriately deal with it.
13     **Q.** Okay. They say the person responsible,
14 **supervisor responsible, is you.**
15     A. Uh-huh.
16     **Q.** Now, did you do anything in a year?
17 **Because it doesn't look like at this point it's been**
18 **corrected. Did you do anything?**
19     MR. HARTY: It's been asked and answered.
20 BY MR. RACETTE:
21     **Q.** Did you make any moves to undo that gap
22 **that they're talking about with your employees having**
23 **lack of experience, training, or knowledge?**
24     MR. HARTY: It's been asked and answered.
25     You can answer.

86

1     A. I do not recall. I would have not just
2 left it lie sleeping. We would have taken the
3 actions. I just do not recall the steps that were
4 taken.
5 BY MR. RACETTE:
6     **Q.** Was there -- was this -- to your knowledge
7 **did you ever do -- make any moves, as you sit here now**
8 **trying to recall, to correct that gap before you left**
9 **that department?**
10     A. Absolutely. I mean we have a learning
11 catalog -- one of the things, again, is I would just
12 clarify that we have a situation where we have a high
13 degree of attrition for a variety of reasons, people
14 retiring, people moving to other positions, and the
15 company has a curriculum relative to supply management
16 and other areas where people can actually take that,
17 plus you supplement it with experienced leaders to
18 help to bring those people up. Okay? So that's
19 typically how you do it.
20     Because, again, somebody could put
21 something like this out there, but with all due
22 respect, you know, you're just not going to suddenly
23 turn somebody around and make them experienced
24 overnight, you know.
25                                       So would you agree, though, if you've got someone there that

87

1 prescribe, lay out the things, really understand what
2 the issue is, and then of course -- we have -- we have
3 the capability in the learning catalog for people to
4 take courses.
5     **Q.** And while we're there, when you talk about
6 **experience, I'm assuming that experience in John**
7 **Deere, or any other company, comes from, you know,**
8 **working at a place over the years; right? I mean one**
9 **of the things where you gain experience is the longer**
10 **you do something; correct?**
11     A. I don't think it's a total determiner.
12     **Q.** If you think -- if somebody has been doing
13 **a job for 20 years, do you think they're going to have**
14 **more experience than someone that's done it for two**
15 **years? Or if someone hasn't done it at all?**
16     A. It depends on a variety of skills that they
17 have in addition to experience. The dynamics of the
18 changing environment that we're in requires a lot more
19 than just experience. You have to be -- you have to
20 have other capabilities, and it's a combination of all
21 three.
22     You could have 20 years of experience, but
23 if you don't have computer skills or you don't have a
24 deep understanding of business acumen because either
25 you've not developed yourself or whatever, then that's

88

1 going to be an issue.
2     So it's just not purely -- you just can't
3 make a decision purely based on somebody being in a
4 job, you know, for a number of years.
5     **Q.** Do you think if someone has been doing
6 **something for a long period of time successfully, that**
7 **that would be the type of training that you would look**
8 **for in advancing that person or not?**
9     A. Again, I think you would have to sit down
10 and really work with that person to understand that.
11 Because some people could be performing successfully
12 in a job, but they don't necessarily have the
13 capability to go to the next level. And we -- or --
14 you know, those are some of the kind of things we run
15 into.
16     You know, just because you performed a job
17 real well doesn't always mean that's a predictor for
18 you to be able to go into something else.
19     **Q.** Do you think that young people know
20 **computer skills a lot better than someone that is over**
21 **40?**
22     A. I can't answer that question.
23     **Q.** Do you think placing young people in
24 **positions with lack of training and knowledge of the**
25 **job that's important -- if there's someone there that**

Case 4:12-cv-02050-JSS Document 84-3 Filed 02/03/14 Page 17 of 190
Susan Frye and Associates, Inc.    (515) 284-1972    22 of 112 sheets
APP017

89

1  has experience in the job over a number of years?
2          MR. HARTY:  It's compound.  Argumentative.
3          You can answer.
4          It's also ambiguous.
5          Again, you can answer.
6      A.  I really can't -- sir, I can't really
7  answer your question.
8  BY MR. RACETTE:
9      Q.  I'm going to have her read that back and
10 just make sure that you can't answer that.  Okay?
11     A.  Go ahead.
12         (The requested portion of the record was
13 read.)
14     A.  There's a lot of factors.  I just can't
15 answer it yes or no.
16     Q.  If you turn to Exhibit 5E, do you recognize
17 that?  Have you ever seen that before?
18     A.  No.
19     Q.  In the bottom right-hand corner, it's dated
20 9-22-03.  Do you see that?
21     A.  Okay.  I don't think we're on the same page
22 here.
23     Q.  Oops.  I'm sorry.  5E.  Do you have 5E?
24     A.  Yeah, I'm there.
25     Q.  5E.  Look right down in your right-hand

90

1  corner up above John --
2      A.  Oh, okay.  9-22-03.  Right.
3      Q.  And then it says right below that, "Global
4  Job Evaluation, Supply Management Benchmark Profiles."
5          Do you see that?
6      A.  Yeah.
7      Q.  And then at the top it's titled "Deere &
8  Company Supply Management Benchmark Job Evaluations."
9          Do you see that?
10     A.  Yeah.
11     Q.  And what you're telling me as manager of
12 the supply management department, you never saw this.
13     A.  No.  I just need to get a quick drink here.
14     Q.  Oh.  Yeah.  Go ahead.
15         If you turn to Exhibit 5F for a moment, the
16 next one?
17     A.  Sure.
18     Q.  And do you recognize this document at all?
19     A.  No, I don't.
20     Q.  You'll see at the very bottom square,
21 "Supply Management Specialist III."
22         Do you see that at the very bottom?
23     A.  Yeah.
24     Q.  If you read over in the column under "Job
25 Function/Major Purpose" -- Oops.  I'm sorry.  I --

91

1  shouldn't, but -- take a moment and read that over to
2  yourself, if you would.
3      A.  Okay.
4      Q.  Does that -- it has a description there of
5  the job function and the major purposes of a supply
6  management specialist III; is that correct?
7      A.  Right.
8      Q.  And this is drawn up by Deere; is that
9  correct?
10         MR. HARTY:  Objection.  He's already told
11 you he's never seen it before.  Foundation.
12 BY MR. RACETTE:
13     Q.  But my question is do you see anything in
14 that job function for a supply management
15 specialist III that refers to commodity or complexity
16 of commodity?
17     A.  As it's written I don't see anything in
18 there.
19     Q.  Okay.  Would you tell me, Mr. D'Cruz, did
20 you -- when did you, or did you, hire Mr. Sellers to
21 work for you?
22     A.  I believe it was in 2003.  And it was a --
23 again, I want to clear up the semantics around
24 "hiring."  He was already working at Deere.  He just
25 transferred over into my group.

92

1      Q.  You gave him a job though; right?
2      A.  Yes.
3      Q.  Okay.  And what job did you put him into?
4      A.  I put him into a -- we call it a process
5  pro.
6      Q.  And can you describe for me what that job
7  consisted of basically?
8      A.  Yeah.  It's basically -- in the role that
9  Mike was in, he was a facilitator working on our
10 scorecard metrics, PDP playbook, audit.  Okay.  Those
11 were the things that were assigned to him.  And
12 basically he worked with -- you know, with my staff to
13 garner that information.  It was an individual
14 contributor role.
15         So basically, you know, no direct reports,
16 just strictly working to gather information.  And at
17 times process pros are used also for leading a project
18 and facilitating it.  So that was his role.
19     Q.  Did he work with you then you said or under
20 you, or how was the --
21     A.  He was a direct report to me.
22     Q.  Okay.
23     A.  Right.
24     Q.  Did he report to anybody else?
25     A.  He may have reported -- just one time.

Case 3:11-cv-02056-JSG   Document 84-25   Filed 02/03/14   Page 18 of 190          APP018

93

1     Q.   And was he -- did you ever refer to him as
2  your right-hand man on occasion?
3     A.   Yeah.  I did.
4     Q.   You'll have to excuse my ignorance.  I'm
5  still processing myself a lot of these jobs.
6     A.   Sure.
7     Q.   So it's not your explanation that's
8  lacking, it's my ability to comprehend.  Okay?
9         So as a process pro, was his job to do what
10  on a daily basis?  What kind of stuff was he doing?
11  Can you describe that for me?
12     A.   He was assigned projects.
13     Q.   From you?
14     A.   Yeah.
15     Q.   And would they be -- what kind of stuff?
16  Can you just give me some examples?
17     A.   Sure.  So metrics scorecard.  Basically --
18     Q.   What is that?
19     A.   So, in other words, we have key vitals that
20  you measure.  Kind of like when you go to the doctor.
21  Right?  You've got cholesterol, blah-blah-blah.  Ours
22  was supplier delivery, quality metrics.  You know, I
23  can think of those two mainly.
24        So his job was to collate that.  He would
25  also run -- you know, basically collect up information

94

1  for presentations at our employee meetings, that kind
2  of stuff.  And then we also had him work with Brian's
3  team on a PDP playbook.
4     Q.   What is that?
5     A.   Well, a playbook is really just a running
6  commentary from chronological standpoint of the
7  development of product.  Because one of the things we
8  were having issues with was continuity of -- if
9  somebody left, there's all this history in the
10  development of a product on the supply management side
11  that got lost.  So Mike worked with Brian and his team
12  to develop this playbook.  Okay?
13        And then the other thing was he was
14  assigned to work on our procurement audit.  Okay?  And
15  then, you know, there was always a little extra
16  bandwidth or capacity if something came along where I
17  would want him to investigate something where I would
18  give him something.
19     Q.   So he was also kind of your man Friday.  If
20  you needed something, he would do it?
21     A.   Yeah.
22     Q.   Okay.  When you brought him into that
23  job -- did you create that job, by the way?
24     A.   Yeah.  I did.
25     Q.   And what grade was it -- I mean when you

95

1  brought him in?
2     A.   He was laterally moved over at a 7.
3     Q.   So you -- I'm assuming you made that job so
4  you made him a 7; right?
5     A.   No, I didn't do that.  Basically I met with
6  the HR department.
7     Q.   Okay.
8     A.   And we talked about some moves.
9     Q.   Okay.
10     A.   And basically it was a lateral
11  developmental move and he was brought over.  So they
12  would have worked with me on that.
13     Q.   But that's your decision; right?
14     A.   In terms of what?
15     Q.   If it's a lateral move.  I mean because HR
16  doesn't know -- they don't know anything about the
17  jobs --
18     A.   Any move -- any move you make taking
19  somebody from one position to another has to go
20  through the HR department.  I cannot -- I can propose
21  it, they can kill it or they can support it, but they
22  always want to make sure, one, that we're looking at
23  what is that person going to do, so on and so on.
24     Q.   But they have to rely on your input because
25  you're creating the job.

96

1     A.   Yeah.  Sure.  Well, created -- a lot of
2  these positions had some degree of definition.  So if
3  they didn't, then we'd would work with them.
4     Q.   And being quite candid with you,
5  Mr. D'Cruz, I've deposed a lot of HR people.  Okay?
6  So we're going to do Mr. Keith, we'll have him here,
7  maybe others, but I'm sure HR's position is they rely
8  on the supervisor to tell them what the job is going
9  to consist of, what is expected of that person --
10     A.   Sure.
11     Q.   -- and how it's going to work; correct?
12     A.   Sure.
13     Q.   They don't know and don't follow every job
14  in the plant.  They don't have the time to do that;
15  correct?
16     A.   Correct.
17     Q.   Just so we're clear here, when you brought
18  Mike in, you're the one that told them, "This is what
19  I want, this is what I want to happen, and is there
20  any problem with that happening."  Correct?  That's
21  kind of how it goes.
22     A.   Correct.  Yes.
23     Q.   Is that right?
24     A.   Yes.
25     Q.   And so what grade did he come in when I said we put him at a Grade 7,

APP019

97

1 that was your decision to put him at a Grade 7;

2 correct?

3       MR. HARTY: I'm going to object. It's been

4 asked and answered. It's argumentative. It also

5 misstates his prior testimony.

6       You can answer.

7 BY MR. RACETTE:

8     Q. Go ahead.

9     A. Again, I'll just reiterate. I met with

10 them, I basically -- he was a Grade 7, we talked about

11 a developmental opportunity for Mike, and basically it

12 was left to bring it over on a lateral.

13     Q. Well, let me ask you, when you talk about a

14 development opportunity for him, would that with be --

15 when you say "development," did you also tell them it

16 would be some type of promotion or a chance for him

17 promote himself --

18     A. No.

19     Q. -- or to get a higher --

20     A. No. It was a developmental opportunity.

21 Mike would be an individual contributor in a supply

22 management specialist job, and Mike and I had talked

23 previously and I saw this as a unique opportunity to

24 put him in a situation where he could show that he had

25 some leadership skills, which as you start to move out

98

1 of individual contributor, that's the way you get

2 opportunities; right? So the idea here was to put him

3 in an environment to demonstrate his capabilities.

4     Q. When you talked to him, did you say, "Look,

5 this is just lateral, you'll probably have no further

6 opportunities out of here, it's a dead end, forget

7 about it, this is it --

8       MR. HARTY: It's compound. Argumentative.

9 BY MR. RACETTE:

10     Q. -- or did you have a conversation that with

11 developing his skills further or expanding them, that

12 that would be good for him in the future?

13       MR. HARTY: Compound.

14     A. So I'll kind of try to answer one question.

15 Which one would you like me to answer?

16 BY MR. RACETTE:

17     Q. You get the gist. Go ahead.

18     A. All right. All I would say is that the

19 discussion as I would recall it would have taken place

20 with Mike, "This is what we want to bring you into,

21 it's an opportunity for you to development." Okay?

22 And we would have brought him into the position if he

23 was willing. There was no pushback, we don't make any

24 promises. Okay?

25     Q. And when you put him into that

99

1 position, did you increase his salary?

2     A. I don't recall. I would have thought it

3 was just a lateral. I don't recall the details.

4     Q. And if you -- could you have said, "I want

5 to make this" -- to HR could you have said, "I think

6 it's going to be not only developmental, but I think

7 it's going to be expanding his responsibilities, I

8 want to upgrade him" and recommend that?

9     A. Hypothetically I could have --

10     Q. Yeah.

11     A. -- but the point was he is coming into a

12 position that he --

13     Q. I understand.

14     A. -- had no experience in, it was an

15 opportunity for him to garner -- and by the way, that

16 was quite routine for people to get laterals.

17     Q. Why did you choose Mike Sellers?

18     A. Well, number one, when I first got to

19 Deere, Mike had a lot of good ideas, and he would come

20 to me and -- you know, as we were starting to take a

21 look at the org -- you know, his managers had said to

22 me this guy has been in this position for a period of

23 time. Okay?

24     There were some other factors there

25 actually which related to performance. He had some

100

1 issues on the hydraulics PDP desk. I was getting

2 complaints that, you know, we had missed some things

3 on -- some hydraulic things with Saur-Danfoss and a

4 few other things, and as such when you look -- Mike

5 had been doing that job for a while, I thought this

6 was a unique opportunity for him with his manager's,

7 of course, recommendation to give him, you know, a

8 shot to do this. Okay?

9     When I say -- so that was really the basis

10 for how he got to where he was with this. Okay?

11     MS. COOPER: Mr. Racette, we need to change

12 the tape.

13     MR. RACETTE: Okay. Fine.

14     MS. COOPER: Off the record ending Tape 2

15 at 11:18 a.m.

16     (Noon recess.)

17     MS. COOPER: On the record beginning Tape 3

18 at 12:23 p.m.

19 BY MR. RACETTE:

20     Q. Mr. D'Cruz, let me go back just for a

21 second. When you got switched -- when you first --

22 we've got a train here in the background.

23     When you shifted to manager of supply

24 management after nine months or so you said, were you

25 told when you made the shift into that

Case 2:12-cv-02050-JES Document 84-35 Filed 02/03/14 Page 20 of 190

109

1 comments by I'm assuming -- at the bottom there, it
2 says "Manager/Supervisor Year End Summary."
3     A.   Uh-huh.  Yes.
4     Q.   And it says "It was in fact a challenging
5 year, but many good things happened because of that.
6 Many of the new employees that your input and
7 knowledge of the suppliers and product was much
8 appreciated.  I appreciated your input and efforts on
9 the impact team to identify requirements and workload
10 for hydraulics."
11     A.   Right.
12     Q.   To your knowledge was he in hydraulics at
13 that point in OFP?
14     A.   I'm not sure.
15     Q.   Okay.  And is hydraulics one of what you
16 called a complex, at one point, commodity?
17     A.   Yes.
18     Q.   And it says "You have valuable insight into
19 the hydraulic industry and its product.  That's what
20 makes you just a critical player on the hydraulics
21 team."
22     Now, you, I think, mentioned -- when I said
23 about Mike what made you hire him, you talked about,
24 well -- you said some good things and managers said
25 good things about him, but then you said he had some

110

1 problems in hydraulics.  That doesn't look like to me
2 as having problems in hydraulics.
3     Do you have other information that you can
4 refer me to?
5     A.   Just give me a second here.  Okay?
6     Q.   Sure.
7     A.   If you go to Exhibit 77.
8     Q.   Page 77?
9     A.   Page 77.
10     Q.   Okay.  Now, that's the 2002 evaluation;
11 right?
12     A.   Right.
13     Q.   Okay.  This is your -- this is your
14 evaluation; right?
15     A.   Right.  So my comments were --
16     Q.   Yeah, I was asking you when you brought him
17 in under you, before brought him in under your
18 umbrella --
19     A.   Right.
20     Q.   -- it appears that he wasn't having any
21 problems with hydraulics.  In fact, he was given a
22 compliment by his former supervisor that he knew that
23 area quite well; correct?
24     A.   That is correct.
25     Q.   Okay.  Now -- so you're there.  Here, let's

111

1 let's go to page 77.  You were going to point
2 something out.  Go ahead.
3     A.   Yeah.  So let's keep in mind that I think
4 '02 is more relevant simply because Mike came in
5 halfway through the year, and if you go to page 77,
6 his previous supervisor was the one who put those
7 comments in there about the issues on some of the work
8 he did.
9     Q.   And where are you reading on page 77?
10     A.   "Manager Mid Year Summary."
11     Q.   Okay.  Okay.  And what about there is
12 referring to hydraulics?
13     A.   Well, Saur-Danfoss, Fema valves, these are
14 all hydraulics.
15     Q.   Which ones now?
16     A.   If you read "Manager Mid Year Summary"?
17     Q.   Got it.
18     A.   It says here "Some things that could have
19 been handled more quickly include" $700,000
20 reimbursement, Fema valve.  That was while he was in
21 hydraulics.
22     Q.   Okay.  And the first paragraph, "Highlights
23 the first half of the year included picking up Zeus
24 and working through some developmental problems"?
25     A.   Yes, sir.

112

1     Q.   So he was doing some other things as well.
2     A.   Right.
3     Q.   While we're there on page 70 which is
4 you -- now, you assessed him in 2002; correct?
5     A.   Yeah.
6     Q.   The second half of the year?
7     A.   The second half of the year, right.
8     Q.   And if you go to page 78, it says -- you
9 mention it's a transition year and kind of he was
10 getting up to par on the new job; correct?
11     A.   Yeah.
12     Q.   Okay.  And then if you turn to page 79
13 through 82, what are these areas?  "Critical
14 Competencies."  What are these areas talking about?
15     A.   At the time these -- and this is a
16 continuance at Deere.  You have competencies that
17 you're measured on that are correlated with the job.
18 So these are typically the competencies this were tied
19 here.
20     Now, whether this was -- this is pre GJE.
21 So some of this was -- the ones that we thought were
22 essential, I'm not sure.  Okay?  That's what that is
23 though, competencies.
24     Q.   Okay.  And on all these, as you go through
25 here, you and Mike basically checked off for him

**APP021**

113

1 "Advanced" or "Proficient." Does that sound right?
2     A.    Uh-huh.
3     Q.    So that would be good?
4     A.    For the most part, yeah. Sure.
5     Q.    Did you have any problems with Mike in
6 2002?
7     A.    Do you want to get specific as to what you
8 want me to --
9     Q.    Yeah. I didn't see anything specifically
10 in your assessment at the end of the year --
11    A.    Right.
12    Q.    -- that you said was a problem. Was there
13 anything -- I was looking at page 78.
14    A.    Right. So -- sure. So I think if you look
15 at page 78 here, I talk about "focus on your"
16 organizational skills, setting priorities. Okay?
17 Mike's -- again, he was on the job about six months
18 during this period. His biggest challenge was able to
19 win the respect and relationships with my staff.
20    Q.    And that would be the various managers in
21 supply management?
22    A.    Exactly. The direct -- my direct reports.
23    Q.    Did he ask you at points -- he's testified
24 earlier. He said that was difficult, dealing with the
25 managers, especially coming in in the middle of the

114

1 year, and he said he asked you for help with that. Do
2 you remember, did you have conversations with him
3 along those lines?
4     A.    Sure. We had coaching sessions. So much
5 so that I actually went to HR to find some
6 opportunities for him in terms of getting some
7 additional training.
8     Q.    And I think he went to that; correct?
9     A.    Yes. So, I mean, we -- you know,
10 recognizing the challenges, recognizing how does he
11 get aware. You know, I worked with him, I worked with
12 HR to find some opportunities for Mike.
13    Q.    And when you're talking about -- or I guess
14 when I'm talking about, and you're talking about,
15 dealing with your managers, did you recognize that
16 that was going to be a tough issue? Not just -- are
17 you blaming that on Mike's conduct or just it's a
18 tough situation when you're coming in?
19    A.    It's a tough situation. You're in
20 production, you're dealing with managers, but frankly,
21 you know, that's kind of where you got to be if you
22 want to basically be able to develop leadership. You
23 have to be able to learn how to deal with that.
24    Q.    Okay. Now, if you would, I'd have you turn
25 to Volume IV, and I've got 150. Exhibit 87.

115

1     A.    Okay. I don't have Volume IV.
2     Q.    Is that Volume IV? I think that is. See
3 if Exhibit 87 is in there. That's all you need.
4     A.    I don't want to mess up your file here.
5     Q.    It's so efficient.
6     A.    Okay.
7     Q.    Do you have that baby open there?
8     A.    Uh-huh.
9     Q.    Okay. This is just a number of different
10 emails, and they're not, you know, one after the
11 other. Just some, I think, that have been picked out
12 by myself and going over with you. Okay?
13    A.    Uh-huh.
14    Q.    But most of these are involving you,
15 Mr. Sellers, or I think Daria Jerauld. Okay?
16         This first one is dated April 5. Page 1 of
17 Exhibit 87.
18    A.    Uh-huh.
19    Q.    Dated April 5. And is this kind of -- it
20 says "Subject: Confirming job expectations." So
21 you're just kind of setting out to Mike what you're
22 expecting of him. Would that be fair?
23    A.    Yes, sir. That's fair.
24    Q.    Then if you turn to page 2, this is from
25 Mike back to you, I guess the same day, and maybe --

116

1 it's a string here. I went in reverse. This actually
2 was before the one on --
3     A.    Exactly.
4     Q.    -- page 1. You wouldn't want to hire me
5 for tech stuff. Okay? I guarantee you that.
6         In any event, he -- Mike is laying out a
7 bunch of things here in paragraph 2. "Here's my
8 perception of my process responsibilities."
9         Do you see that?
10    A.    Uh-huh.
11    Q.    Is that correct? Can you take a moment and
12 just read those over? Is that what you expected of
13 him at that time? Because he puts down, I think, your
14 comments too, or you maybe put those down or whatever.
15    A.    Well, to put it a different way is I
16 synthesized this into the final on the first page.
17 Okay? So basically you look at the time 9:19 a.m. He
18 gave me his input at 8:48, and basically -- so
19 basically I took his input and made it what I believe
20 is crystal clear as to what the expectations were with
21 him.
22    Q.    And he's got -- it looks like to me when
23 you count the bullet points here, he's got seven
24 different bullet points. Were these seven aspects of
25 his process responsibilities? I know in one of Leo's everything

Case 4:14-cv-00050-JEG Document 84-35 Filed 02/08/16 Page 22 of 190

APP022

117

1  is in multiples of five.  You know, five primary
2  responsibilities and five stretch goals and all that.
3        Were these his main projects that you
4  expected him to be involved with?
5        A.    For the most part.  What I would tell you
6  though again is -- I think it captures the essence,
7  but his role was somewhat dynamic.  So it doesn't mean
8  that there couldn't be additives to this.
9        Q.    Okay.
10        A.    But what I did is I took what he said here,
11  and I actually in my first couple of lines explained,
12  you know, what he'd be responsible for.
13        Q.    Okay.  So if I understand you right, his
14  job responsibilities were kind of flowing.  I mean
15  they could change from time to time, week to week,
16  that type of thing?
17        A.    It's static for the most part.  He had
18  specific things like the playbook, PDP metrics, OFP
19  metrics.  But there was always a little bandwidth for
20  something else.
21        Q.    Okay.  Fair enough.  Now, if you turn to
22  page 6 of 87, this is April 19 from Mike Sellers to
23  you, and he talks about "Here's the initial start-up
24  efforts."  What's this about, can you tell me?
25        A.    I guess if I was to read this, it would

118

1  suggest --
2        Q.    You can look at the next page too, because
3  the next page kind of goes with it.  Does that help
4  you out?  The next few pages are the attachments.
5        A.    Oh, yeah, yeah, yeah.  Thanks.  Because
6  that threw me off a little bit.
7        MR. HARTY:  So for the record you're asking
8  him to read pages 6, 7, and 8 before answering this
9  question?
10        MR. RACETTE:  Yeah.
11        A.    I guess what I would say, it just looks to
12  me like Mike has summarized his activities and what he
13  does and the time frame.
14  BY MR. RACETTE:
15        Q.    So -- and it's kind of laying out for you
16  kind of a schedule that he's on?  Would that be fair?
17        A.    Uh-huh.
18        Q.    Did it look appropriate to you?  I mean can
19  you tell?  Did it look okay or you don't remember?
20        A.    It's 12 years.  I mean it looks good, but I
21  can't really vouch for the detail.
22        Q.    He's got a PSS on this page 6, and it says
23  "There will be some initial resistance from the
24  standpoint that my approach will put the spotlight on
25  areas which have previously gone dark."

119

1        Do you know what he is referring to there?
2        A.    Sure.  I mean if you're going to put
3  metrics out there and it's in a certain area, some
4  people are going to do better than others.  And
5  needless to say, somebody is going to, you know, have
6  some issues with that and then we have to work through
7  it.
8        Q.    And this would be the managers that would
9  be doing the pushback on this?
10        A.    Yeah.
11        Q.    Okay.  Would that be -- what I was trying
12  to get at, would that be where some of the conflict
13  would be coming in, between him and the managers?
14        A.    It depends on the way you handle it.
15        Q.    And -- but it could potentially -- it looks
16  a potential area for pushback and conflict?
17        A.    Sure.  Absolutely.
18        Q.    All right.  Something you would expect.
19        A.    Yes.
20        Q.    Okay.  And then you -- on April 25 you give
21  him this scorecard, page 9 and 10.  Just very briefly
22  what's that?  What's that trying to show?
23        MR. HARTY:  Go ahead and -- understanding
24  that these were just presented today, go ahead and
25  review them.

120

1  BY MR. RACETTE:
2        Q.    Yeah.  Yeah.  Take your time.  You can look
3  at these.  I don't mean to rush you in any way.
4        A.    What would you like me to answer again,
5  sir?  Sorry.
6        Q.    I was just wondering what this was.  You've
7  given him an example, I think you said, of a
8  scorecard?
9        A.    Yeah.  So what this would appear to be is
10  that -- Mike Clayton is no longer with the company
11  anymore, but Mike put together a scorecard which I
12  thought was a quick glance, informative approach, and
13  I sent it to Mike just to use it as a teaser to say,
14  "Look, you know, can you leverage this in the
15  scorecard you develop."
16        Q.    This is my question, Mr. D'Cruz:  Is it --
17  when you use the term "scorecard," would it be --
18  what's the scoring, I guess, is what I'm trying to
19  figure out.
20        A.    Well, it's -- we have different semantics
21  here, but metric scorecard, dashboard indicator.  You
22  know, it's just a summary of the vitals of the
23  business, and what I was trying to get him to do is
24  compartmentalize that into a scorecard.  So I just
25  didn't want him to reinvent the

121

1  wheel.
2      Q.   Got it.  And I understand this page 11 --
3  or 10 is a sample; right?
4      A.   Yeah.
5      Q.   Would this be so if you're Brian Matson or
6  you're McGonegle, whatever, that Mike would be
7  producing something showing them where you're at and
8  maybe how you need to improve, stuff like that?  Is
9  that what the scorecard is about?
10     A.   He would have to collaborate with them to
11 come up with something that was mutually agreeable.
12     Q.   Okay.
13     A.   Which would hit the vitals, but again, him
14 bringing his insights to what he saw and work with
15 them.
16     Q.   So they would have to work with him to get
17 that scorecard.
18     A.   Yes, sir.
19     Q.   Okay.  I gotcha.  And that's where they
20 might push back and that point and say, "I can't get
21 there"?  I mean is that where the possibilities lie?
22     A.   Perhaps.  Perhaps, yeah.
23     Q.   If you would go to page 12 now of
24 Exhibit 87.  This is from Mike to you and it says
25 "Based on prior discussions with Gary D."  Who is

122

1  "Gary D"?
2      A.   Gary Dangelser.
3      Q.   Dangelser.  Okay.  And what was his
4  position then?  Do you remember, Mr. D'Cruz?
5      A.   I think Gary was an OFP tactical manager.
6  We had different titles back then.
7      Q.   Was he under you?
8      A.   Yeah.
9      Q.   Okay.  "I believe you wanted to see this
10 info (commodity team management schedule, status on
11 managing OFP desk loads).  The latter will be added to
12 the OFP scorecard by Monday."
13          If you look at pages 13 and 14, was this
14 the OFP people or was that PDP?
15     A.   This is PDP.
16     Q.   This is PDP?  Okay.
17     A.   Wait a second.  Wait a second.  Let me
18 look.  Because I haven't seen these before.  Hold on.
19          MR. HARTY:  For the record, you're asking
20 him to look at pages 12, 13, and 14?
21          MR. RACETTE:  Yeah.
22     A.   This is all OFP stuff.  Not PDP.
23 BY MR. RACETTE:
24     Q.   And this would be in 2002, May; correct?
25     A.   As a first draft, sure.  Yeah.

123

1      Q.   Now, turn to page 15 of Exhibit 87.  This
2  is a May 6, 2002, from Mike Sellers to you.  What's a
3  SMART goal?
4      A.   Do you want me to define it?
5      Q.   There's dumb goals?  I don't know.
6      A.   Smart, measurable, attainable, realistic,
7  time based.
8      Q.   It's an acronym.
9      A.   Yes, sir.
10     Q.   Does -- was Mike required -- Mr. Sellers
11 required to set his own goals, or were those something
12 you were supposed to set?  How did that work?
13     A.   It worked in conjunction collaboratively.
14 You know, you could put your own together, sometimes
15 we were given things, but generally we tried to work
16 together on defining those.
17     Q.   Gotcha.  Did you work with him to come up
18 with this pages 16 and 17 of his SMART goals back in
19 2002?
20     A.   I don't recall this document to be honest
21 with you.
22     Q.   Can you take a moment, take a moment, look
23 it over, and see if that coincides with your -- if it
24 refreshes your recollection about what his SMART goals
25 were when he started in that position.

124

1          MR. HARTY:  For the record, 15, 16, 17 of
2  Exhibit 87.  Right?
3          MR. RACETTE:  Correct.  Actually, 16 and
4  17.
5      A.   I would say -- directionally I would say
6  this looks reasonable, but what we ended up with, I
7  couldn't tell you unless I looked through it some
8  more.
9  BY MR. RACETTE:
10     Q.   So there may have been -- after Mike
11 presented it to you, you could tweak it?
12     A.   We would have sat down and actually walked
13 through all of it.
14     Q.   Did you -- on these jobs he lists on
15 pages 16 and 17, these goals, had you ever performed
16 any of these things, any of these functions, yourself?
17     A.   I did the playbook.  I did it at
18 Caterpillar.
19     Q.   Gotcha.
20     A.   Metrics, I think -- you know, development
21 of metrics, I've done that.
22     Q.   Did you do what he's doing?  I mean this
23 same thing?
24     A.   No, not to that, but I mean, I've had
25 people do it, so -- I've never done the exact -- I'd probably would

APP024

133

1  evolution in making PDF more effective. How you go
2  about managing your products and what's important is
3  in your court."
4         Correct?
5     A.    (Moving head up and down.)
6     Q.    All right. So by the time he got it done,
7  you were pretty happy with it; that fair?
8     A.    I believe so.
9     Q.    I'm going to have you turn to page 38 of
10 Exhibit 87.
11        MR. HARTY: 38?
12        MR. RACETTE: Uh-huh.
13    A.    Okay.
14 BY MR. RACETTE:
15    Q.    And you can go back -- actually go to
16 page -- I guess, yeah, actually start at 38 there.
17 It's a July 19, 2002, email from Stephanie Atteberry
18 to Jeffrey Alexander, and you and Gary Dangelser were
19 copied off, concerning a procurement audit. And what
20 I'm -- you can read the whole thing.
21        MR. HARTY: Pages 38 through 40 of
22 Exhibit 87?
23        MR. RACETTE: Yeah.
24 BY MR. RACETTE:
25    Q.    Really the only part I'm concerned with and

134

1  wanted to ask you about is on page 39.
2     A.    Uh-huh.
3     Q.    It's three-quarters of the day down. "Has
4  full compliance in regard to obtaining tooling
5  bailments been reached? When was this achieved?"
6         Do you see that?
7         Have you read that? Have you had a chance?
8     A.    (Moving head up and down.)
9     Q.    First of all, who is Stephanie Atteberry?
10    A.    She was my assistant.
11    Q.    Is that like -- was she your secretary --
12    A.    Administrative assistant, yeah.
13    Q.    Like a secretary?
14    A.    (Moving head up and down.)
15    Q.    Okay. Is this information you would have
16 supplied her, or is this something she would have
17 drafted up?
18    A.    She would not have drafted this. She would
19 have had to have worked with some people to get that
20 information, and then she just basically cut and
21 pasted.
22    Q.    Okay. This is from her to Jeffrey -- who
23 was he? Who was Jeffrey Alexander at the time? Do
24 you know?

135

1     Q.    All right. What I'm interested in, it
2  says -- this is on July 19, 2002, it says "Current
3  status shows 85.4 percent compliance by Waterloo
4  suppliers. This translates to 333 out of the 390
5  production suppliers having confirmed either no John
6  Deere owned tooling or signed the bailment agreement
7  indicating the John Deere Waterloo owned tooling.
8         "20 of the 57 remaining suppliers have
9  provided tooling lists but have not signed the tooling
10 bailment agreement. The remaining 37 suppliers have
11 been contacted, but neither a tooling list nor a
12 bailment agreement have been generated."
13        Do you know where that information came
14 from? Do you have any idea?
15    A.    I don't recall. I really don't.
16    Q.    Okay. Then at that top of page 38 on
17 August 10, you emailed to Mike saying "I would like
18 you to own this." "Make sure we're complying. Go
19 through the details." You suspected you said things
20 were being done, others weren't, and you want to clean
21 up the audit next time around.
22    A.    Uh-huh.
23    Q.    So what did that mean? What were you
24 telling Mike then?
25    A.    Well, I was assigning this to Mike at about

136

1  this time.
2     Q.    August of 2002?
3     A.    Right.
4     Q.    Assigning what?
5     A.    Assigning, in essence, the audit to him.
6  Because we had a formal audit coming in '04. So
7  basically up to that point -- again, my recollection
8  of who had what, I can't tell you, but at that point
9  there were some open items on here.
10        As you can see through that, you
11 highlighted the one where we had to get better level
12 on tooling bailments. And of course recognizing this
13 isn't static, it's dynamic, right, we're constantly
14 adding, I need to have an owner, and basically Mike
15 was assigned to manage the audit. For the Waterloo
16 Works for supply management. With obviously working
17 through other people.
18    Q.    Hold on a minute. Keep that right there
19 where you got it, if you would.
20    A.    Okay.
21    Q.    Leave it right there. And I'm going to
22 have you turn to Plaintiff's Exhibit 81.
23    A.    Exhibit -- oh.
24    Q.    Leave that right there, if you would, and

Case 6:12-cv-02050-JSS   Document 84-25   Filed 03/08/24   Page 26 of 190
Susan Frye and Associates, Inc.                    (515) 284-1972                    34 of 112 sheets
APP025

149

1    A.    Okay?  And so I don't necessarily view that
2 as me not knowing what's going on.  It's more of a
3 case of, listen, I'm a little uncomfortable here that
4 we're not solid, guys, and you know, I want to make
5 sure that we've got a strong process.
6          Because the formal audit was in 2004.  And
7 so this was kind of an interim audit that they do, and
8 it basically then allows us to make sure, one, that we
9 know exactly what we need to do at that point.
10         So that's really what I would say was the
11 intent there.
12   Q.    Did anybody follow up on that at that time,
13 do you know?
14   A.    I don't recall.  Based on this email at
15 page 44, I basically asked Mike to pull the team
16 together, and then in the next month I really actually
17 assigned him the responsibility of the whole audit
18 process.
19   Q.    Okay.  And then if you turn to page -- my
20 page is going to be off here so bear with me.  47h.
21 Do you have a page 47h in Exhibit 81?
22   A.    I've got a 47g.  What does it say on it?
23   Q.    It says "John Deere Waterworks (sic)
24 Procurement Audit," December 7.
25   A.    47h.  Hold on a second.  Yeah.

150

1    Q.    Okay.  And if you turn to page 47k, which
2 is page 3 of that audit, you can see now "Waterloo
3 Works Supply Management procedures require Supply
4 Management personnel to obtain a bailment agreement
5 from a supplier prior to issuing a purchase order for
6 tools costing 3,000 or more."
7          Then "Review of procedures and records for
8 tooling revealed there are a large number of missing
9 documents.  Bailment agreements on file:  133 of 234,
10 57 percent.  Tooling lists on file," 130 of 234.
11   A.    Uh-huh.
12   Q.    "56 percent."
13   A.    Uh-huh.
14   Q.    "The unit does not document sound business
15 reasons for not obtaining a bailment agreement.
16 Waterloo Works does not have adequate procedures for
17 management review of tooling bailing agreements."
18         So my question to you is in 2002 didn't you
19 misrepresent to the audit people the status of the
20 bailment agreements?
21         MR. HARTY:  "You" being the witness?
22         MR. RACETTE:  Yes.
23   A.    No.  I take the audit report of 2002, and
24 then from 2002 to 2004 we had a degradation of the
25 collections agreement that we had prior.

151

1 BY MR. RACETTE:
2    Q.    Okay.
3    A.    So we were actually doing quite good, and
4 again, just so we're clear about auditing, the
5 auditing is not just done by supply management.  The
6 accounting group is heavily involved in the process of
7 looking at the details.  You asked me earlier about
8 Alexander, he's one of the accountants.  And Dolan is
9 also.
10   Q.    Why don't you turn to page 49 of
11 Exhibit 81.
12   A.    Yeah.
13   Q.    And this is an email from Daria Jerauld to
14 you dated October 25, 2004.  It says --
15   A.    October what?
16   Q.    October 25, 2004.
17   A.    I'm losing it here again.  So what page?
18   Q.    Do I have the wrong --
19         MR. HARTY:  Mine says October 29.
20   A.    Yeah.
21 BY MR. RACETTE:
22   Q.    Hold on here.  My pages must be screwed up.
23 Page 48.  I'm a page off for some reason here.
24 Page 48 of Exhibit 81.  This is an email from Daria
25 Jerauld to you, a copy to Mike Sellers, dated

152

1 October 25, 2004.
2         MR. HARTY:  I'm sorry, what page are you on
3 now?
4         MR. RACETTE:  48.
5         THE WITNESS:  Page 48.
6         MS. COOPER:  Mr. Racette, your microphone,
7 please.
8         MR. RACETTE:  Oh, I'm sorry.
9 BY MR. RACETTE:
10   Q.    Are you on that page?
11   A.    Uh-huh.
12   Q.    Take a moment and read that, would you?
13   A.    Okay.
14   Q.    Did you have a chance to read this?
15   A.    All right.
16   Q.    And it says the subject is "Bailment Status
17 Audit.  Importance:  High."  And it says "Clyde, I
18 have just met with Sue Groene who is auditing bailment
19 status."
20         Who is Sue Groene?
21   A.    I don't quite know.  She is either in the
22 accounting or the auditing staff.
23   Q.    "For starters, she did acknowledge the
24 significant efforts made to improve our bailment
25 situation.  At the same time, the issue is quite black

Case 1:12-cv-02050-JSS   Document 84-3 Filed 02/03/14 Page 26 of 190
Susan Frye and Associates, Inc.          (515) 284-1972          38 of 112 sheets
APP026

153

1   and white that we're not in good enough shape so we
2   have work to do.  She noted that in the 2001 audit, it
3   appears that we were 39 percent compliant for having
4   bailments on file where today we are tracking at
5   43 percent."
6          So explain that to me.  How could she go
7   back and verify actually when you said you were 91
8   percent you were 39 percent?
9       A.   I can't.  I really can't.
10      Q.   And now it says "we are tracking at
11  43 percent."
12      A.   Uh-huh.
13      Q.   "Not much of an improvement on the
14  surface."  Correct?
15      A.   Right.
16      Q.   "However, it's important to note that back
17  in 2001, we were really only 13 percent compliant
18  because the other 26 percent had poor integrity; i.e.,
19  an email note or comment that 'yes, we have a
20  bailment' and not an actual bailment agreement."
21         So actually when you put down in 2002 in
22  reply to the internal audit that you were at 91
23  percent compliant, you were actually at 13 percent.
24  How do you explain that?
25      A.   I can't.

154

1       Q.   And whose fault is that?
2       A.   Which part?
3       Q.   Whose fault is it that it was represented
4   in 2002 that you were at 91 percent of bailment
5   agreements when you were actually at 13 percent?
6       A.   I guess whoever gave me the information at
7   the time.
8       Q.   And you take -- the buck stops with you --
9       A.   I take the responsibility for it.  Yep.
10      Q.   -- so it was your fault; correct?
11      A.   Yep.
12      Q.   And did you ever admit that to anybody at
13  Deere?
14      A.   I took responsibility for the '04 results.
15      Q.   No, you blamed it on Mr. Sellers, didn't
16  you?
17      A.   No, I took the responsibility of it myself.
18      Q.   We can go through the emails, but you
19  blamed it -- and I've got an email from a superior,
20  but you blamed it on Mr. Sellers for misleading you.
21  Explain that to me.
22      A.   Okay.  So basically from 2002 to '4,
23  irrespective of whether the results in 2002 were
24  incorrect --

155

1   from 2002 to 2004 what actually happened on
2   Mr. Sellers' watch was he got you from 13 percent
3   compliant to 43 percent.  Is that correct?
4       A.   Based on what you've got in the data here.
5       Q.   And he actually did better than that,
6   because I can go to his performance evaluation.  He
7   actually got you up to 73 percent.  And you still
8   blamed him for this in your performance -- his
9   performance evaluation of 2004.
10         How did you do that and why?
11         MR. HARTY:  It's compound, argumentative,
12  and misstates the record.
13  BY MR. RACETTE:
14      Q.   Go ahead.
15         MR. HARTY:  You can answer if you know what
16  he's asking you.
17      A.   I think you have to ask me a specific
18  question and then I'll try to answer it.
19  BY MR. RACETTE:
20      Q.   Let's just go on with this and we'll get
21  back to that.  Continuing on, "Mike Sellers started
22  from scratch to add integrity to the process, so for
23  our response comments, we should note that we moved
24  from 13 compliant to 43 percent compliant.  Still not
25  good enough, but much better."

156

1          Let's go to Exhibit -- Notebook I and go to
2   Exhibit 9.
3       A.   Notebook I?
4       Q.   Notebook I.  Exhibit 9.
5       A.   Exhibit 9.
6       Q.   Exhibit 9 in Volume I.  Do you have that?
7       A.   I'm under Section 9; right?
8       Q.   Yeah.  Section 9.
9       A.   Okay.
10      Q.   Before -- we're going to go back to that,
11  but before we get there, turn to -- back to
12  Exhibit 81.  I'm sorry to jump around on you here a
13  little bit.
14      A.   Okay.
15      Q.   And if you go to pages 54 through 56, read
16  the Barry Schaffter email from him to Adel Zakaria
17  dated December 8, 2004.
18         MR. HARTY:  You're going to have to correct
19  the pages.  Because our 54 is a bunch of italics.
20  BY MR. RACETTE:
21      Q.   Yeah, 53 to 55.  If you read starting at
22  the bottom there, Barry Schaffter.
23         MR. HARTY:  And ours would go to 56.
24         MR. RACETTE:  56.  Excuse me.

157

1  thing?
2      Q.  Yeah, would you?
3          MR. HARTY:  Confirm for me so that we know
4  we've got the right exhibit.
5          THE WITNESS:  53 through 56.
6          MR. HARTY:  Does 53 start off with an email
7  from you to Barry dated December 9, 2004?
8          MR. RACETTE:  December 8 -- or yeah,
9  December 9.  Yeah.
10         MR. HARTY:  It does?
11         THE WITNESS:  It says December 8, 2004,
12  right.
13  BY MR. RACETTE:
14     Q.  In the -- do you know what employee is
15  being talked about here in this email?
16     A.  Yeah.  Mike Sellers.
17     Q.  And is it in regard to the bailments that
18  he's being criticized for?
19     A.  It's a combination of the bailments and the
20  audit.
21     Q.  If you go now to Exhibit 9 in Volume I
22  where I had you turn.  Go to page 107.  Or actually go
23  to page 106.
24     A.  Yep.
25     Q.  And if you turn for a moment to page 97 of

158

1  Exhibit 9.  This is Michael Sellers' 2004 evaluation
2  by Daria Jerauld.
3      A.  Uh-huh.
4      Q.  Why is he -- why is his job title supply
5  management specialist III?
6      A.  Because when -- this is what year?
7      Q.  2004.
8      A.  Okay.  Well, if he was reporting to Daria,
9  he was moved into a supply management specialist III
10  map.  That's the only thing I can recall.
11     Q.  You can see -- if you turn to page 106 of
12  Exhibit 9, and you see "Employee Ongoing Comments"
13  about three-quarters of the page down?  May of 2004?
14     A.  Uh-huh.
15     Q.  And he's saying "44 million of tooling has
16  now been documented."  Do you know what that means?
17     A.  I'm guessing he just took the value of what
18  was on the purchase orders and aggregated it.
19     Q.  And it says "48 percent of the high dollar
20  tools are covered by bailment agreements."  Do you
21  know what that means?
22     A.  I guess he's kind of done a Pareto, and
23  he's working on the high ones first.
24     Q.  "Have 53 percent of required bailment
25  agreements completed -- 2005 at year end serving item.

159

1      A.  That's what it says there, yes.
2      Q.  Turn to page 107.  At the bottom of that
3  page 106, you can see we're now at the end of the
4  year, "Employee Year End Comments."  Do you see that?
5          And he goes "Significantly lowered our
6  factory's tooling risks by insuring that 92 percent
7  of" the tooling assets are now covered by bailments.
8      A.  Uh-huh.
9      Q.  And "Have documented over 44 million in old
10  and new tooling."
11     A.  Where are you seeing that?  I'm sorry.
12     Q.  I'm sorry, the top of page 107 under his
13  comments, paragraph 1.
14     A.  Yep.
15     Q.  Do you see it now?
16     A.  Yeah.
17     Q.  Okay.  And then he says "76 percent of
18  necessary bailment agreements are now in place."
19     A.  Right.
20     Q.  Okay.
21     A.  This was at -- when was that?  Year end.
22  Okay.
23     Q.  And then if you read -- if you read on
24  page 107 Daria Jerauld's comments, she criticizes him
25  now significantly for the bailment situation.  Do you

160

1  want to read that over a second?  Take a moment.
2      A.  Yeah.
3      Q.  That isn't correct, is it?
4          MR. HARTY:  It's ambiguous.
5  BY MR. RACETTE:
6      Q.  Oh, I'm sorry.  Is that correct, that
7  criticism of him, as you now look at what happened?
8          MR. HARTY:  It's ambiguous.
9          You can answer.
10     A.  Could you repeat the question?  I'm sorry.
11  BY MR. RACETTE:
12     Q.  Yeah.  Is the criticism that Daria Jerauld
13  makes of the situation with the bailment, that's not
14  correct, is it?
15     A.  Which part is not correct?
16     Q.  That it's his fault that it was
17  misrepresented in the 2004 audit.
18     A.  This wasn't a misrepresentation.  It was a
19  case of -- from '02 to '04, he had a responsibility to
20  have zero audit items, and so within the two years
21  that he had the responsibility, he was supposed to
22  make sure we had all the bailment agreements, make
23  sure we had the CPS coordination, all of those things.
24         The question is is we were told very
25  agreements completed -- 2005 at year end serving item.

Case 2:05-at-00658   Document 84-25   Filed 02/08/14   Page 28 of 190

165

1  Correct?

2     A.   If my manager told me about it.

3     Q.   You don't think she did?  I mean you're all

4  upset with your client.  You don't think Daria told you

5  what the situation was?  In fact, didn't we just go

6  over an October 25 email I think you were copied on

7  where the whole situation was explained to you; is

8  that correct?

9     A.   Actually, October 25 was too late, because

10  by then the audit was already in full bloom.  So

11  basically if you're telling me midyear, which is the

12  comment -- okay?

13     Q.   Uh-huh.

14     A.   At that point -- in May and October, we had

15  a lot of catch-up to do to make sure we don't get a

16  zero repeat audit item.  Okay?  And at that point

17  that's the basis of whatever took place later.  Okay?

18     Q.   I don't see anything from you after May of

19  '04, I don't see anything from Daria after May of '04

20  except the October 25, 2004, email from her to you

21  explaining what a dire situation Mike was put in,

22  Mr. Sellers, and complimenting him for all the hard

23  work he'd done to get it to 43 percent.

24          Now, are you telling me that from

25  October 25 of '04 until she did his evaluation in

166

1  November of '04 that that whole situation changed

2  somehow?

3          MR. HARTY:  Ambiguous, compound,

4  argumentative.

5          You can answer if he's not going to change

6  his question.

7     A.   All I'm going to say is up to October 24,

8  the audit time, we were not at the standard we needed

9  to be at.

10  BY MR. RACETTE:

11     Q.   And you blamed that on Mr. Sellers.

12     A.   Mr. Sellers was involved with the auditors,

13  they went through the results, and basically he had

14  the ownership of those audit items.  And it was not

15  only tooling bailment, he had some other things.

16  Okay?

17     Q.   Sure.  Do you remember in May of '02

18  Mr. Sellers explaining to you about Jerry Gehrke

19  giving him an inaccurate midyear assessment and you

20  changing it?  Do you remember anything of that nature?

21     A.   I don't.

22     Q.   Do you know when you're doing an evaluation

23  of one of -- did you -- by the way, when one of your

24  managers did an evaluation, the performance

25  evaluations of your employees, did you have input to

167

1  those evaluations yourself or would you totally rely

2  on what the manager would do?

3     A.   I would rely on the manager.  If somebody

4  was going to get a -- the highest rating, I don't know

5  what it was because they've changed the titles over

6  the last few years, then just to be consistent we

7  would sit down and the person would say, "Listen, this

8  is the reason why I believe this person should get

9  such and such a rating" just for consistency.  But

10  they write the reviews.

11     Q.   But you did Mike.  Mike was under your

12  direct control.  Correct?

13     A.   I did --

14          MR. HARTY:  Let me interpose an objection.

15  Objection.  It's ambiguous as to time.

16     A.   Maybe get specific on the time and then

17  maybe we can get there.

18  BY MR. RACETTE:

19     Q.   That's fair enough.  You started out

20  specifically supervising Mike, I think, in 2001, 2002,

21  that time frame?

22     A.   I don't recall the exact dates, but I had a

23  short stint with him.

24     Q.   And then Daria Jerauld came in?

25     A.   Exactly.

168

1     Q.   Okay.  Okay.  And do you -- when someone

2  gets a "Does Not Meet Expectations" --

3     A.   Uh-huh.

4     Q.   -- what significance does that have for his

5  future at Deere, if any?

6     A.   It depends on what happens in the next

7  year.  That's all I would say.  I mean it's not --

8  it's not the end all.  You know, basically just

9  because you get a rating like that doesn't mean you

10  can't come out of it.

11     Q.   Did you -- at some point did Mike -- I

12  believe he in September or October of '04 asked to

13  have a 360 review done?

14     A.   Yeah.

15     Q.   That was as part of this "Does Not Meet"

16  evaluation that Daria Jerauld gave him in '04?

17     A.   I don't quite recall it that way.

18     Q.   Well, how do you recall it?

19     A.   I think the 360 was done in terms of his

20  interrelationships and, it was good for him to get

21  that, but I don't think they were together.

22     Q.   What's your understanding of why a 360

23  review was done concerning Mr. Sellers?  In '04.

24     A.   Well, first of all, the 360 review is

25  done to help out the -- the employee, the manager.  All we

Case 4:12-cv-03009-JSW Document 84-25 Filed 02/03/14 Page 29 of 190

169

1  do is we approve the cost.
2      **Q.  Let me ask you, Mr. D'Cruz, what is a 360**
3  **review?  Explain that to me.**
4      A.  A 360 review is a -- you send out a
5  feedback to people you pick, okay, to get feedback on
6  the way you're perceived.  Okay?  Or the way they feel
7  about you.  I've done them, other people have done
8  them, and then you get the input.  And then basically
9  with that input you work with a coach.
10      If you decide you want to share it with
11  your manager, it's optional, but you're not obligated
12  to.  That's how it works.
13      So a 360 will cover a bunch of dimensions.
14  I haven't done one in a long time so -- but that's
15  typically what you do.
16      **Q.  Okay.  So I may not be understanding it.**
17  **Does the employee hand out some type of questionnaire**
18  **or something to people --**
19      A.  It's electronic.  Okay?  So basically what
20  you do -- and again, you know, they've had different
21  iterations so I want to be careful here.  Okay?
22      But basically you handpick who you want to
23  fill it out and you send it out via email.  And you
24  know, you attach a cover note or something, and then
25  hopefully everyone responds and it's anonymous, and

170

1  then basically you've got your information.
2      **Q.  And do you remember Mr. Sellers requesting**
3  **to do that towards the end of '04?**
4      A.  I don't remember other than you just
5  brought it up, but if he did one, he did one.
6      **Q.  If you would in Volume III, turn to**
7  **Exhibit 33.  This is Mr. Sellers' recording of a**
8  **meeting with you and Daria on February 14 of 2005.**
9      A.  You said Volume III?
10      **Q.  Yeah, Volume III.  Exhibit 33.**
11      A.  Okay.
12      **Q.  This is a recording he did of a meeting you**
13  **had with Mr. Sellers and Daria on February 14.  Do you**
14  **remember this meeting?**
15      MR. HARTY:  I'm going to object to that
16  preamble.  This is not a recording.  This is the
17  plaintiff's own transcript, and the defendants in this
18  case do not believe that it's accurate.
19      With that objection, you can go ahead.
20      MR. RACETTE:  Sure.
21  BY MR. RACETTE:
22      **Q.  If you would turn to page 4 of that**
23  **exhibit.  I'm sorry.  And you look in the middle of**
24  **the page where it goes "Daria," "Clyde," "Daria,"**
25  **"Clyde," "Mike."  Do you see that?  "Mike."**

171

1      A.  Yep.
2      **Q.  Could you read that paragraph and the rest**
3  **of the page onto the top of page 5.**
4      A.  Okay.
5      **Q.  So evidently Mike is talking at that point,**
6  **Mr. Sellers, about his 360 review and that it came**
7  **back, and the bulk of the folks that participated in**
8  **it saw him the same way that he was seeing himself as**
9  **being competent, doing a good job, and the only**
10  **negative was Daria Jerauld.  That's what he's**
11  **inferring there.  Is that correct?**
12      A.  I don't know what's correct to be honest
13  with you.  This is his transcript.  So I -- to be very
14  frank, I can't answer that question.
15      **Q.  Well, assuming that he didn't just make**
16  **this up, is that what this transcript says?**
17      A.  Which part?
18      **Q.  Starting on page 4, "Mike," up to the top**
19  **of page 5.**
20      A.  I don't know what is correct, because to be
21  very honest with you, I'm not a coach, and I mean,
22  Daria is making some -- allegedly making some comments
23  here, but I really can't answer it to be honest with
24  you.
25      **Q.  What do you -- why do you have the 360**

172

1  **review?  What's the purpose of that?**
2      A.  I think -- I think it's to garner -- one is
3  awareness.  You know, any individual -- how we
4  perceive ourselves and how other people perceive us
5  may be two different things.  So it really fosters the
6  ability of people to develop interpersonal
7  relationship as well as look at -- you know, kind of
8  look in the mirror.
9      You've got to be careful with them because
10  you're going to get varying responses, but that's
11  really the purpose of it, and then you work with a
12  coach and you develop that.  So the 360 reviews are,
13  again, an optional thing for people.
14      **Q.  But what my point is, what do you use those**
15  **for?  Do you just -- people do them and you just throw**
16  **them in the wastebasket or do they have some value?**
17      A.  That depends on the individual.  I guess
18  the issue is, again, it's an optional tool available
19  to an employee.  They can take it to heart, they can
20  decide to trash it, whatever they want.  I mean it's
21  their call whether they want to do it.  Nobody forces
22  them to.
23      **Q.  And management has -- it serves no purpose**
24  **for management.  They don't even look at it.**
25      A.  It's a

Case 6:11-cv-03053-MDH Document 84-25 Filed 02/03/14 Page 30 of 90.

**APP030**

173

1 policy. Unless the employee brings it to us.

2    **Q.   If the employee brings it to you and tells**
3 **you the results, what does management do with that?**
4 **Do they try to follow up?**

5    A.   Number one, the management -- if the
6 employee wants to bring it, that's his prerogative,
7 but he's going to typically work with an independent
8 coach based on -- people that are skilled and
9 qualified to interpret the result.

10        So typically the manager is not going to
11 get in there and talk about remedial -- I mean if the
12 employee chooses to bring it up, they're at liberty to
13 do so, but our job is not to critique the 360 because
14 we have a complete team at Deere that does that
15 independent of the manager. Simply because we want
16 that person to feel comfortable.

17    **Q.   So was Mike's 360 review reviewed by**
18 **someone other than you and Daria Jerauld.**

19    A.   I never saw his 360 review.

20    **Q.   I know, but was it reviewed by someone**
21 **else?**

22        MR. HARTY: Calls for speculation.

23    A.   Don't know.

24 BY MR. RACETTE:

25    **Q.   Is it supposed to be reviewed by someone**

174

1 **else?**

2    A.   Don't know.

3    **Q.   I thought you said it was. Did I**
4 **misunderstand? I thought you said a 360 review you**
5 **have someone else look at that so there's no --**

6    A.   No. No. The 360 review is generated, you
7 get a booklet. It's called a profiler. Now, you can
8 decide to engage a coach and get involved with a coach
9 or not.

10    **Q.   Who was Mike's coach?**

11    A.   I don't know. Again, it's independent.

12    **Q.   Well, if the 360 review comes back and it's**
13 **totally opposite of what management's assessment is,**
14 **does management go back and talk to these people, try**
15 **to review the information that they have, or not?**

16        MR. HARTY: Compound.

17 BY MR. RACETTE:

18    **Q.   You can still answer it.**

19    A.   Repeat the question.

20        MR. RACETTE: Go ahead. Read it back,
21 Melissa.

22        (The requested portion of the record was
23 read.)

24    A.   I can't answer the question simply because
25 the 360 review is never done between an employee and

175

1 enlists to do that. We don't even know who the
2 coaches are.

3        So it's going to be their prerogative. If
4 they feel strongly about the feedback that they have
5 and they want to discuss it with a manager, they can
6 do that, but we don't see those results. I don't see
7 those results.

8 BY MR. RACETTE:

9    **Q.   Could you -- I'm going to have you turn to**
10 **Exhibit 87 again. Could you grab that in front of you**
11 **there?**

12    A.   Sure. Which book?

13    **Q.   It's in the other papers there, Mr. D'Cruz.**

14    A.   Oh. Okay. This one. All right. Sure.
15 Let me close this book up. Sorry. Unless you want me
16 to go back to it.

17    **Q.   No problem.**

18    A.   Okay.

19    **Q.   I want you to turn to page -- it may be 47**
20 **yours because I seem to be a page off on what I'm**
21 **looking at here.**

22    A.   Okay.

23    **Q.   Is that an email from Mike Sellers to you?**

24    A.   Okay. How does it start?

25    **Q.   I've got an email December 13, 2002, at the**

176

1 **top.**

2    A.   This was in 87?

3    **Q.   This is in -- it's in 87, yeah.**

4        THE WITNESS: What does yours look like?

5        MR. HARTY: Not even close.

6    A.   I've got a procurement audit.

7 BY MR. RACETTE:

8    **Q.   Really?**

9        MR. HARTY: Is it a handwritten 47?

10        MR. RACETTE: No, it's just a little
11 short --

12        MS. PELLEGRIN: Read the Bates number.

13        MR. RACETTE: It's 0934. But that might
14 not help because they're not in order.

15        MR. HARTY: Mine's 0927.

16        MR. RACETTE: Let me see if I can find it.

17 It's this one here.

18 BY MR. RACETTE:

19    **Q.   Page 49 of Exhibit 87. Do you have that**
20 **now in front of you? I apologize.**

21        MR. HARTY: Let me see yours.

22    A.   Okay. Your question, sir?

23 BY MR. RACETTE:

24    **Q.   If you turn to then page 50, is that**
25 **read -- date it's dated 02- 3 this again -- does it**

Case 6:12-cv-02050-JSS Document 84-25 Filed 02/08/14 Page 33 of 190
Susan Frye and Associates, Inc.          (515) 284-1972          44 of 112 sheets
APP031

213

1    read.)

2    A.    I don't recall.  I really don't.

3    BY MR. RACETTE:

4    Q.    Did anybody from Deere at any point come to

5    you before this lawsuit was filed and review with you

6    what had happened in your department concerning the

7    age of people from when you started to 2005?

8    A.    No.

9    Q.    The -- let me go back here.  Did you --

10   Mr. Sellers also testified that typically he heard you

11   make comments about people to two employees that they

12   were over 40 or 50.  Do you remember making those

13   comments to somebody that "you're over 40," "you're

14   over 50" --

15   A.    No.

16   Q.    Do you remember making those comments to

17   Dick Fauser?

18   A.    No.

19   Q.    Do you know who Dick Fauser is?

20   A.    Yes.

21   Q.    Who is he?

22   A.    He was a supply management specialist.

23   Q.    I'm sorry?

24   A.    He was a supply management specialist.

25   Q.    How old was he?

214

1    A.    I don't know.

2    Q.    Did you ever, do you recall, raise your

3    voice or get upset at any time with Gayle Forster?

4    A.    No.

5    Q.    Did you ever raise your voice or get upset

6    with Wanda Lenius?

7    A.    No.

8    Q.    Did you ever raise your voice or get upset

9    with Mike Sellers?

10   A.    What's the -- I guess I've got to clarify.

11   What's the definition of "raising voice"?

12   Q.    Did you ever yell at Mr. Sellers?

13   A.    My inflection, my tone may have been

14   higher, but I've never yelled.

15   Q.    He was at Product Engineering Center in

16   '02 you were talking to him about a purchasing

17   department audit and wanted to know the status of the

18   audit, and he was telling you (sic), "You do know we

19   have to pass this audit," and Mike said -- you were

20   standing right in front of him, your face right in

21   front of his face, and Mike said he's going to try,

22   and you exploded within about six inches of his face

23   and you told him, "Try is not good enough.  You're

24   going to make this happen."  And he could actually

25   feel spit from you as you were on top of him.

215

1    Do you remember that confrontation?

2    A.    No, I don't.

3    Q.    What was the setup like at Deere where you

4    and Mr. Sellers worked?  Were you separate offices?

5    Offices right next to each other?  What do you recall?

6    A.    It depends what year because in some cases

7    I was -- one year Mike was across from me outside my

8    office and significant room between the two, and the

9    other times I moved to Donald Street site and Mike and

10   I did not have any interface.

11   Q.    Okay.  So the only time you would have been

12   opposite him -- and he said this occurred in '02,

13   would that have been the year you were sitting across

14   from him?

15   A.    Yeah, I had a rotating office.  So

16   basically I had an office at Donald Street and I had

17   one at PEC.  So I was basically constantly shuttling

18   between facilities.

19   Q.    He said that when he was trying to nail

20   down these new metrics that we were speaking about

21   earlier and he told you he was having problems with

22   making your managers accountable for certain things,

23   you blew up, started to use curse words and got up,

24   jumped out of your chair and started pounding your

25   fist on the table, slammed your chair back against the

216

1    wall, pushed the table, slammed a door, and it was so

2    hard that the window shook and that Mike McGonegle and

3    Brian Matson and Gary Dangelser were all present and

4    witnessed this.

5    Do you remember that?

6    MR. HARTY:  Compound.

7    BY MR. RACETTE:

8    Q.    Do you remember that incident?

9    A.    I recall a discussion with the team about

10   the issue of the progress on the metrics.

11   Q.    Do you remember Mike ever coming to you

12   and -- well, let me put it this way:  Mike says you

13   criticized him for not getting the managers to meet

14   the metrics.  Does that make sense to you that --

15   A.    No.  It doesn't make sense.

16   Q.    He said that -- what I meant makes sense,

17   holding the managers -- was that part of Mike's job to

18   hold the managers to --

19   A.    Absolutely not.  That was my

20   responsibility.

21   Q.    Okay.  And he said that you kept chastising

22   him for that even though he kept requesting you to

23   talk to the managers about that.

24   A.    No.  What we really basically agreed to was

25   the way we would structure the support of the metrics,

Case 4:12-cv-00050-JEG on Document 84-25 Filed 02/03/14 Page 32 of 190
Susan Frye and Associates, Inc.          (515) 284-1972          54 of 112 sheets
APP032

217

1  try to work with the managers, and try to get the
2  appropriate information and the results.
3      Q.   Who is Royal Jolley?  Do you know that
4  individual?
5      A.   Royal was -- I think he was specialist in
6  the OFP group for a while.
7      Q.   Did you have to make grading decisions 12
8  months out before -- for budget reasons?  As far as
9  what your individual employees were graded?
10     A.   I don't understand the question.  I'm
11 sorry.
12     Q.   Did you in setting up the grades for the
13 people that worked for you, did you have to do that 12
14 months before the actual salaries were going to kick
15 in?
16     A.   (Moving head from side to side.)
17     Q.   No?
18     A.   No.
19     Q.   When did you do it usually?
20     A.   I never ever did set the grades for the
21 people.
22     Q.   Before GJE you never even set a grade for
23 people?  You set it for Mike Sellers.  We know that.
24 You set it for Daria Jerauld.  We know that.
25     A.   No.

218

1          MR. HARTY:  Hang on.  Objection.  One, it
2  misstates the record.  Two, it's argumentative.
3  Three, it's compound.
4  BY MR. RACETTE:
5      Q.   Who set the grade for Mike Sellers when you
6  brought him in?
7      A.   From what point to what point?
8      Q.   When you brought him in.  2001 or so.  When
9  he first started working in that new position for you.
10     A.   As I said before, that was between the HR
11 department and myself in terms of understanding we're
12 taking him to a developmental move, what's the
13 appropriate, you know, grade level, and it was decided
14 that that would be lateral at a 7.
15     Q.   And you had input into that of course.
16     A.   Yeah, when I described what the
17 developmental move was going to be.
18     Q.   And who decided what the grade would be for
19 Daria Jerauld when you brought her in?
20     A.   Basically based on the context of where she
21 was.  She was already -- I don't remember what her
22 grade was but she was a higher grade.  So when she
23 came in.
24     Q.   Was any -- do you know if there was other
25 processes at Deere's --

219

1      A.   Oh, there was quite a few.
2      Q.   Were most of them Grade -- what did you
3  bring Mike in as?  A 7?
4      A.   Yeah.
5      Q.   Were most of the other ones 8s?  Was that
6  job usually an 8?
7      A.   I don't know.  At that point there wasn't
8  the formality that we have today.
9      Q.   Is there any reason you made Mike a 7 other
10 than his age?
11     A.   Let's correct that.  All right?  Basically
12 I didn't make Mike a 7.  Mike was making a
13 developmental move as a process pro.  And basically
14 when he was moved into that role, I met with the HR
15 department, and it was agreed that that was the
16 appropriate level.
17     Q.   Do you know how long Mike had been working
18 at Deere's?
19     A.   No, I didn't.
20     Q.   You didn't check that?
21     A.   No.
22     Q.   He'd been employed there since -- according
23 to the records I have, since June 1 of 1979.  And he'd
24 been a 7 level since June 1 of 1996.
25     A.   Uh-huh.

220

1      Q.   And all that experience didn't count for
2  anything?
3          MR. HARTY:  It's argumentative.  It's
4  ambiguous.
5  BY MR. RACETTE:
6      Q.   Go ahead.  You can answer the question.
7          MR. HARTY:  You can answer the question.
8      A.   To be honest with you, I don't know how to
9  answer the question.
10 BY MR. RACETTE:
11     Q.   Why not?
12     A.   Well, to be very honest with you, I mean, I
13 don't sit there and look at the person's profile of
14 when they were hired and all those details.  We look
15 at the talent, the capabilities and the skills.
16 That's what we look at.
17         We don't get into looking at people's -- I
18 don't even know what Mike's history was before that,
19 to be honest with you, other than his past job as a
20 supply management specialist.
21     Q.   Did you have -- were there any -- would you
22 have hired Mike for a new spot if there was any
23 question that he was not a good employee?
24     A.   Repeat that question.
25     Q.   Sure.  I'll have her read it back.

Case 3:12-cv-02050-JSS   Document 84-1   Filed 02/03/14   Page 33 of 190

221

1    A.    Sure.

2         (The requested portion of the record was

3    read.)

4    A.    Depends on the spot.

5    Q.    Well, let me ask you, what qualities about

6    Mike did you feel fit the new position?

7    A.    Mike had good technical skills, but he

8    lacked the leadership.  So the idea was to bring him

9    in so that he could be put in a position where he

10   could facilitate and lead and we'd get some visibility

11   to his capability in that area.  So he didn't really

12   have that skill set.

13   Q.    And the skill set.  Was he brought in to

14   supervise people?

15   A.    No.

16   Q.    Then what are you talking about leadership

17   in that position?

18   A.    Well, you can be in a position where you

19   don't have people reporting to you but you're expected

20   to influence without authority.  I've been in one of

21   those positions.  And I did not have direct authority

22   over those individuals.

23   Q.    Can you define for me what you meant with

24   leadership for Mr. Sellers?  How was he going to lead?

25   A.    Facilitate, rally people around projects,

222

1    be able to pull the information together.  Okay?

2    That's the kinds of thing in terms of -- influencing,

3    you know, getting buy-in, those kind of things.

4    Q.    During the course of time when he worked

5    for you either directly, or under Daria Jerauld, did

6    his responsibilities expand, increase?

7    A.    I believe when he had the audit

8    responsibility working for Daria, we gave him -- we

9    had a student reporting to him, which is, you know, 20

10   hours a week, and -- but again, I would not be in a

11   position -- it was a student and potentially an

12   intern, and that was about it to my knowledge.

13   Q.    Did he ever supervise anybody else other

14   than a student to your knowledge?

15   A.    Not that I'm aware of.

16   Q.    Again, I'm going to ask you, did his --

17   during the course when he worked for you and Daria

18   Jerauld, did his duties and responsibilities expand at

19   all during that time?

20   A.    That's kind of open-ended.  I mean, you

21   know, you asked me to look through some stuff.  I did.

22   I don't know much more than that.

23        When it switched to Daria, to be honest

24   with you, what she assigned him and all the rest of

25   it, I can't say.  Okay?  But I asked him to go do

223

1    Q.    If someone does want to -- let's just take

2    advance at Deere.  Okay?  Let's say I'm a Grade 7 and

3    I want to get to a Grade 8.  How do you go about doing

4    that?

5    A.    7 to 8 in what area?

6    Q.    Let's take 6 to 7.  I don't care what it

7    is.  5 to 6.  How do you get at Deere -- let me just

8    reverse a minute.

9         Why do you at Deere have semiannual

10   performance evaluations for your employees?

11   A.    I cannot answer that question.

12   Q.    You don't know?

13   A.    It's the protocol of the way the GPMS

14   system was set up.

15   Q.    What are those evaluations used for?

16   A.    One is to pursue the -- to ensure we're

17   staying on track with our goals for the organization.

18   Two, it does represent interim feedback to the

19   employee about how they're progressing.

20   Q.    That's it?

21   A.    Your question again was midyear?

22   Q.    What's the advantage of an employee getting

23   a good evaluation?

24   A.    Well, I guess if they get a good

25   evaluation, in essence it's related to -- it's

224

1    correlated with their performance and potential

2    compensation.

3    Q.    What if your -- how then do you progress --

4    if you're a 7 and you want to get to an 8, if you're

5    a 6 and want to get to a 7, how do you do that at

6    Deere?

7    A.    Okay.  One, there is in GPMS a vehicle

8    called a development plan.  And that development plan

9    can be written up by the employee and then sit down --

10   or vice versa.  But typically we ask the employee to

11   put the development plan together, and you sit down

12   and you actually go through some of the skills and

13   things that you need to garner.

14        And then I think the other thing is that we

15   have in supply management today is a career planning

16   type of matrix that kind of shows you some potential

17   paths.

18   Q.    Any other way?  But that's kind of -- I

19   don't know if that answered my question.  I understand

20   what you're saying.  But my question is how do you get

21   from a 7 to an 8 if, let's say, you're -- can you

22   perform your way into a better job at Deere's or it

23   doesn't matter?

24        MR. HARTY:  That's compound, ambiguous.  I

25   think you asked compound questions.

273

1  honest, I don't know the scope of GJE. All right? At
2  this time I didn't know what the touch points were.
3  You know, we've got Region 2 which is Europe, I've got
4  United States.
5          I was most concerned specifically about my
6  own organization. I didn't go and benchmark -- which
7  it sounds like this is some of the cross-talk here.
8          From my standpoint, I didn't know the gamut
9  of this.
10     **Q.  But my question is, number one, why would**
11 **Linda Hibben nearly six months after my clients were**
12 **graded to 6 be searching for answers as to why they**
13 **were graded to 6?**
14         MR. HARTY: Calls for speculation.
15     A.  Very -- I guess I would just tell you
16 need to ask Linda Hibben.
17 BY MR. RACETTE:
18     **Q.  Wouldn't it be true that commodities,**
19 **Mr. D'Cruz, didn't have a darn thing to do with their**
20 **grading?**
21     A.  Sir, I cannot answer that because this
22 whole scenario here -- do you see my name on here
23 anywhere?
24     **Q.  I'm asking you. Isn't it true that they're**
25 **grading to a Grade 6 didn't have anything to do with**

274

1  the commodity they were handling?
2          MR. HARTY: Calls for speculation.
3  BY MR. RACETTE:
4      **Q.  Isn't that true?**
5      A.  No.
6      **Q.  Well, let me ask you, did you at any time**
7  **anywhere in these massive documents place down**
8  **somewhere that commodities was the only factor that**
9  **was important in supply management?**
10     A.  I did not place that down. There was a GJE
11 functional committee that was developed, which I was
12 not a part of, that defined all this.
13     **Q.  And that's not true, is it? The commodity**
14 **someone handles in supply management isn't the only**
15 **factor that's important for their performance, is it?**
16         MR. HARTY: It's compound. It's ambiguous.
17 It's argumentative.
18 BY MR. RACETTE:
19     **Q.  I'll have her read it back.**
20         (The requested portion of the record was
21 read.)
22     A.  Again, I'm out of school on the GJE and the
23 Hay process --
24     **Q.  I didn't ask you that --**
25     A.  that -- I cannot -- provide you factual

275

1  and all I'm saying is they had a structured process to
2  develop this with functional committees, which I was
3  not a part of, so I cannot sit here and speculate that
4  there's other factors that are rolled in there to do
5  that.
6          Job mapping to the job, I've kind of
7  illustrated to you on some of the functional pieces of
8  that. That's all I could really offer on that.
9      **Q.  And you have no explanation why Linda**
10 **Hibben was still searching in September of '04 for a**
11 **reason why my clients were graded lower than anybody**
12 **else in PDP.**
13         MR. HARTY: That's compound, argumentative,
14 and it's been asked and answered about four times.
15         MR. RACETTE: And we'll end it here for
16 today. I should be able to get done tomorrow probably
17 easily by nine or 9:30.
18         MR. HARTY: So start at nine?
19         MR. RACETTE: Well, we could. If you want
20 to start at nine, we could do that.
21         MR. HARTY: Let's go off.
22         MS. COOPER: Off the record ending Volume 1
23 on Tape 6 at 1659.
24         (Deposition adjourned at 4:59 p.m.,
25 September 17, 2013.)

276

1                  C E R T I F I C A T E
2          I, the undersigned, a Certified Shorthand
3  Reporter of the State of Iowa, do hereby certify that
4  there came before me at the time, date, and place
5  hereinbefore indicated, the witness named on the
6  caption sheet hereof, who was by me duly sworn to
7  testify to the truth of said witness's knowledge, that
8  the witness was thereupon examined under oath, the
9  examination taken down by me in shorthand and later
10 reduced to a transcript through the use of a
11 computer-aided transcript device under my supervision
12 and direction, and that the deposition is a true
13 record of the testimony given and of all objections
14 interposed.
15         I further certify that I am neither
16 attorney or counsel for, nor related to or employed by
17 any of the parties to the action in which this
18 deposition is taken, and further that I am not a
19 relative or employee of any attorney or counsel
20 employed by the parties hereto, or financially
21 interested in the action.
22         Dated at Des Moines, Iowa, this 10th day of
23 October, 2013.
24
                            /s/Melissa A. Burns
25                          CERTIFIED SHORTHAND REPORTER

Susan Frye and Associates, Inc.          (515) 284-1972          69 of 112 sheets

**APP035**

**APP036-042**

**FILED UNDER SEAL**

1

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF IOWA
CENTRAL DIVISION
- - - - - - - - - - - - - - X
MICHAEL JOSEPH SELLERS,      :

        Plaintiff,           :

vs.                          :   Case No. 12-CV-2050-
                                 EJM
DEERE & COMPANY A/K/A JOHN   :
DEERE COMPANY, RODGER
BURRIS, AND CLYDE D'CRUZ,    :
INDIVIDUAL,
                             :

        Defendants.          :
- - - - - - - - - - - - - - X
WANDA JO LENIUS and GARY         **COPY**
GENE LENIUS,                 :

        Plaintiffs,          :

vs.                          :   Case No. 12-CV-2063-
                                 EJM
DEERE & COMPANY a/k/a JOHN   :
DEERE COMPANY, KEVIN
KEITH, CLYDE D'CRUZ, BRIAN   :
MATSON, and ROBERT BARNES,
individuals,                 :

        Defendants.          :
- - - - - - - - - - - - - - X
DELYORCE RAYE REBOUCHE,      :

        Plaintiff,           :

vs.                          :   Case No. 12-CV-2064-
                                 EJM
DEERE & COMPANY a/k/a JOHN   :
DEERE COMPANY, RODGER
BURRIS, and BRUCE            :
BOARDMAN, INDIVIDUAL,
                             :

        Defendants.          :
- - - - - - - - - - - - - - X

                 **DEPOSITION OF JERRY IHM**

     LAURA R. FULTON - CERTIFIED SHORTHAND REPORTER

---

2

- - - - - - - - - - - - - - X
GAYLE LELA FORSTER and
GREGORY DAVID FORSTER,       :

        Plaintiffs,          :

vs.                          :   Case No. 12-CV-2072-
                                 EJM
DEERE & COMPANY a/k/a        :
JOHN DEERE COMPANY, KEVIN
KEITH, BRIAN MATSON,         :
BRIAN CARLSON, and CLYDE
D'CRUZ, INDIVIDUAL,          :

        Defendants.          :
- - - - - - - - - - - - - - X

                 **DEPOSITION OF JERRY IHM,**

taken by the Plaintiffs before Laura R. Fulton,

Certified Shorthand Reporter of the State of Iowa, at

2100 Asbury Road, Dubuque, Iowa, commencing at

10:19 a.m., Thursday, January 30, 2014.

APPEARANCES:

For the Plaintiffs:       PATRICK T. VINT, ESQ.
                          Hopkins & Huebner, PC
                          2700 Grand Avenue
                          Suite 111
                          Des Moines, IA 50312-0111

For the Defendants:       ANGEL A. WEST, ESQ.
                          Nyemaster Goode, PC
                          700 Walnut
                          Suite 1600
                          Des Moines, IA 50309-3899

---

3

                    I N D E X

DEPOSITION OF JERRY IHM                 Examination

By Mr. Vint . . . . . . . . . . . .          4




              INDEX TO EXHIBITS

         No exhibits were marked herein.

---

4

1              P R O C E E D I N G S

2                   JERRY IHM,

3    called as a witness by the Plaintiffs, being first

4    duly sworn by the Certified Shorthand Reporter, was

5    examined and testified as follows:

6                   E X A M I N A T I O N

7    BY MR. VINT:

8         Q.    Jerry, my name is Pat Vint.  I'm an

9    attorney from Des Moines.  My firm represents a number

10   of plaintiffs, including Greg and Gayle Forster, in a

11   case against John Deere.

12        A.    Okay.

13        Q.    We brought you here for your deposition

14   today.

15        A.    Okay.

16        Q.    Have you ever had your deposition taken

17   before?

18        A.    Nope.

19        Q.    Okay.  I'm going to go over a couple of

20   ground rules with you so we're on the same page going

21   forward.  I'm going to try to ask as simple questions

22   as I can; but if there's a question that you don't

23   understand or a question you don't hear, just ask me,

24   and I'll try to rephrase or have the court reporter

25   read it back.  Okay?

37

1    THE WITNESS: Yeah. Some of the -- the
2    people that were unhappy with, maybe, what a
3    supervisor that they worked for was --
4        MS. WEST: I just saw your hand gesture. I
5    didn't know if you were pointing.
6    BY MR. VINT:
7        Q.   When you say "these people," are you saying
8    that the only people you ever saw or heard discuss
9    problems or discrimination at Deere were the
10   plaintiffs in this case; or did you hear any other
11   people that had done that?
12       A.   Well, probably just the -- the plaintiffs.
13       Q.   Okay. Did Greg ever make any remarks to
14   you that he thought he was being mistreated?
15       A.   No. No. Not -- not himself, no.
16       Q.   Okay. Did he make any remarks about
17   anybody else being mistreated?
18       A.   I don't think so, that I can recall,
19   that -- that he -- other than Gayle. I mean, he
20   definitely made comments that he thought she was
21   mistreated.
22       Q.   Okay. Did -- Well, let me just ask you
23   this: What did he say about Gayle's mistreatment or
24   what Gayle was facing?
25       A.   Well, never got into the nitty-gritty

38

1    details; but it just sounded like there was a -- a big
2    issue with a particular supervisor.
3        And, I mean, I never saw this guy or ever
4    met him; but this Clyde D'Cruz, there was a lot of
5    comments about how he was mistreating people, whether
6    it be, I think, harassment of women or -- or age, you
7    know, discrimination, or something. That's -- was
8    pretty much the -- the comments.
9        Q.   All right. Did those comments solely come
10   from Greg, that you heard, I guess, at least?
11       A.   Well, probably from Gayle too.
12       Q.   Okay. Anybody else talk about Clyde D'Cruz
13   around you?
14       A.   Not to me, no. Because, like I said, I --
15   I wasn't the object of their conversation. In fact,
16   they probably didn't want other people to know because
17   this was their issue; and you don't broadcast, you
18   know -- you know, all this stuff, you know, that's
19   going on in your life.
20       Q.   Did you hear at any -- from anybody, other
21   than the named plaintiffs -- so other than the
22   Leniuses or the Forsters or Mike Sellers or Delyorce
23   Rebouche -- of any EEOC complaint filed against Deere
24   at your time at Engine Works?
25       A.   No. The only ones that I was thinking of.

39

1        Q.   Okay. Did you hear from anybody other than
2    the named plaintiffs of any age or gender
3    discrimination occurring at Deere?
4        A.   No. And I wouldn't have. Because, hey,
5    I'm just a contract guy. I -- I didn't even work for
6    Deere at that time. I --
7        In fact, I didn't even work through my LLC
8    when I was at Waterloo. They wouldn't -- For some
9    reason they didn't want to do that. So I had to go
10   through another party, a third party.
11       It was an engineering firm in Waterloo, a
12   Bob -- God, I can't think of the name of him anymore.
13   But all he did was I'd turn my time in to him, and
14   he'd send me a check. And he got paid 22 percent of
15   my salary for sending me a check, which I told them,
16   "That's absolutely ridiculous. You can send me the
17   check."
18       Q.   Jerry, have you talked to Greg or Gayle
19   Forster since you left Engine Works in 2005?
20       A.   Couple of times. A few times I -- not
21   recently, but I -- when Greg would come to Dubuque
22   sometimes, I told him, you know, "Let me know if
23   you're in town, because we can go out to have dinner."
24   And we did that a few times.
25       Q.   All right. When did that -- Or when did

40

1    those times occur?
2        A.   Oh, my God. I don't know. 2006, '7, '8,
3    '9. I don't know.
4        Q.   Did Greg, at any of those times, talk about
5    the status of Gayle's case or any additional issues
6    with how she was being treated at Deere?
7        A.   Not about how she was treated, but
8    sometimes he'd mention that she seems to be moving
9    forward but very slowly.
10       Q.   Okay. Did you attend a Deere Christmas
11   party in November of 2004?
12       A.   A Deere Christmas party. No. Not put on
13   by Deere. I --
14       Q.   Okay. Let me rephrase. Did you attend any
15   parties hosted by Deere employees around that time?
16       A.   No parties.
17       Q.   Okay.
18       A.   I did go -- I was invited to a Deere
19   employee down there, their home, for dinner.
20       Q.   Okay. Who was that?
21       A.   Daria and Bob -- Bob Jer-rard (phonetic)?
22   Is it Jerauld?
23       Q.   Jerauld?
24       A.   Jerauld.
25       Q.   And that is the party you're thinking of.

Case 6:12-cv-02050-JSS   Document 84-3   Filed 02/08/24   Page 38 of 190
Susan Frye & Associates, Inc.                      (515) 284-1972                      10 of 18 sheets
APP044

41

1    A.   Yeah.  But it wasn't a party; it was just a
2  dinner.
3    Q.   Okay.  What was --
4    A.   And I can give you all the details about
5  that --
6    Q.   Sure.
7    A.   -- if you want.
8    Q.   Go ahead.
9    A.   Daria and Bob worked at Dubuque, and I was
10  part of -- Our hiring process at Dubuque, you know,
11  project engineers, which I was one, we would interview
12  people, and we'd hire.
13       Well, we hired Daria.  She came from what
14  was the John Deere Rotary Engine Division out in New
15  Jersey, I believe; and when they folded up or -- or
16  closed that facility and sold it off, I think, to
17  Curtiss-Wright, or whatever, she and a bunch of other
18  people were spread through the organization and
19  interviewed for jobs.
20       Well, we hired Daria; and then I think she
21  met Bob either before or -- or right after she got
22  there.  And he graduated from University of
23  Wisconsin-Platteville, so we interviewed Bob too; and
24  we hired both of them.
25       And Bob actually worked in my -- in the

42

1  crawler group for a little bit; but I didn't have
2  direct connection with him because I had, like, 40
3  people, so I had, like, five lead engineers.  So he
4  did -- he worked with one of the leads.
5       But, anyway, got to know Daria fairly well
6  because when my wife was going through the cancer
7  stuff, Daria would always stop by and have encouraging
8  words.
9       And the people at Deere were so doggone
10  good to us during that time, and we -- we'd get
11  flowers upon flowers and cards, and stuff, at home.
12  And some of these people, like Daria, would kind of
13  take leadership and arrange to have a card passed
14  around and signed by people, and whatever.
15       And I didn't know this until much later,
16  but I think Daria lost her mother when -- through
17  cancer.  So she was very concerned about what I was
18  going through, and my wife.  So got to know Daria
19  quite well.
20       Well, then they got moved on to Waterloo;
21  and when I was down there, Daria found out I was
22  working there, and I would stay -- like, three nights
23  a week I'd stay down in a motel in Waterloo, and the
24  other couple days I'd probably commute because it was,
25  like, an easy 60-minute -- 70-minute -- when it was

43

1  for me.  Because I lived on Thunder Hills, you know,
2  west side of town.
3       Well, anyway, she said -- invited me out to
4  dinner.  And this was -- I don't know -- around the
5  holidays.  Thanksgiving or Christmas, or something.
6  And then I went to dinner there.
7    Q.   Was that at her house?
8    A.   Yeah, her and Bob's house.  And she and Bob
9  and their two kids, or whatever they had, and myself.
10    Q.   Okay.  Anybody else there?
11    A.   No.
12    Q.   Was there any discussion during that dinner
13  of Gayle or Greg Forster?
14    A.   No.  Nope.
15    Q.   Was there any discussion there of other
16  Deere employees that had made complaints?
17    A.   No.
18    Q.   Okay.
19    A.   No.
20    Q.   Any --
21    A.   It was strictly a friendly relationship
22  that Daria had, I guess, and Bob, with me.
23       No, there -- there was probably no business
24  that I recall even talked about.
25       MR. VINT:  Okay.  That's all the questions

44

1  I have for you, Jerry.
2       MS. WEST:  And I have none.
3       (Proceedings concluded at 11:09 a.m.)

45

C E R T I F I C A T E

1    I, the undersigned, a Certified Shorthand

2    Reporter of the State of Iowa, do hereby certify that

3    there came before me at the time, date, and place

4    hereinbefore indicated, the witness named on the

5    caption sheet hereof, who was by me duly sworn to

6    testify to the truth of said witness's knowledge, that

7    the witness was thereupon examined under oath, the

8    examination taken down by me in shorthand and later

9    reduced to a transcript through the use of a

10    computer-aided transcript device under my supervision

11    and direction, and that the deposition is a true

12    record of the testimony given and of all objections

13    interposed.

14    I further certify that I am neither

15    attorney or counsel for, nor related to or employed by

16    any of the parties to the action in which this

17    deposition is taken, and further that I am not a

18    relative or employee of any attorney or counsel

19    employed by the parties hereto, or financially

20    interested in the action.

21    Dated at Des Moines, Iowa, this 30th day of

22    January, 2014.

23

24

    /s/ Laura R. Fulton

25    CERTIFIED SHORTHAND REPORTER

1

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF IOWA
EASTERN DIVISION

- - - - - - - - - - - - - X
MICHAEL JOSEPH SELLERS,       :

        Plaintiff,            :

vs.                           :   Case No. 12-CV-2050-
                              :   JSS
DEERE & COMPANY A/K/A JOHN    :
DEERE COMPANY, AND CLYDE      :   **DEPOSITION OF**
D'CRUZ, INDIVIDUAL,           :   **DARIA JERAULD**

        Defendants.           :
- - - - - - - - - - - - - X
WANDA JO LENIUS and GARY      :
GENE LENIUS,                  :

        Plaintiffs,           :

vs.                           :   Case No. 12-CV-2063-
                              :   JSS
DEERE & COMPANY a/k/a JOHN    :
DEERE COMPANY, KEVIN          :
KEITH, CLYDE D'CRUZ, BRIAN    :
MATSON, and ROBERT BARNES,    :
individuals,                  :

        Defendants.           :
- - - - - - - - - - - - - X
DELYORCE RAYE REBOUCHE,       :

        Plaintiff,            :

vs.                           :   Case No. 12-CV-2064-
                              :   JSS
DEERE & COMPANY a/k/a JOHN    :
DEERE COMPANY, RODGER         :
BURRIS, and BRUCE BOARDMAN,   :
INDIVIDUAL,                   :

        Defendants.           :
- - - - - - - - - - - - - X

2

- - - - - - - - - - - - - X
GAYLE LELA FORSTER and        :
GREGORY DAVID FORSTER,        :

        Plaintiffs,           :

vs.                           :   Case No. 12-CV-2072-
                              :   JSS
DEERE & COMPANY a/k/a JOHN    :
DEERE COMPANY, KEVIN KEITH,   :
BRIAN MATSON, BRIAN           :
CARLSON, and CLYDE D'CRUZ,    :

        Defendants.           :
- - - - - - - - - - - - - X

**DEPOSITION OF DARIA JERAULD,**

taken by the Plaintiffs before Melissa A. Burns,

Certified Shorthand Reporter of the State of Iowa, at

607 Sycamore Street, Waterloo, Iowa, commencing at

12:54 p.m., Thursday, October 10, 2013.

MELISSA A. BURNS - CERTIFIED SHORTHAND REPORTER

3

APPEARANCES:

For the Plaintiffs:     GREGORY T. RACETTE, ESQ.
                        AMY B. PELLEGRIN, ESQ.
                        Hopkins & Huebner, PC
                        2700 Grand Avenue, Suite 111
                        Des Moines, IA 50312

For the Defendants:     ANGEL A. WEST, ESQ.
                        Nyemaster Goode, PC
                        700 Walnut Street, Suite 1600
                        Des Moines, IA 50309

Also Present:           MICHAEL SELLERS
                        DAVID W. MEIER

4

I N D E X

WITNESS:  DARIA JERAULD                           PAGE

By Ms. Pellegrin................................  5


EXHIBITS:                             FIRST REFERENCED

 9 - Personnel File/Performance Evaluations
     of Mike Sellers............................  50

26 - Supply Management Organizational Chart......  20

81 - July 2001 through 2004 audits (Mike
     Sellers)...................................  93

92 - 360 review - Mike Sellers..................  126

**5**

1          P R O C E E D I N G S

2              DARIA JERAULD,

3    called as a witness by the Plaintiffs, being first

4    duly sworn by the Certified Shorthand Reporter, was

5    examined and testified as follows:

6                  EXAMINATION

7    BY MS. PELLEGRIN:

8        Q.    Mrs. Jerauld, before we went on the record,

9    I introduced myself.  My name is Amy Pellegrin, and

10   this is Greg Racette, and we represent the plaintiffs

11   in this matter.

12            Have you ever had your deposition taken

13   before?

14       A.    No.

15       Q.    Just a few ground rules.  She's trying to

16   get everything down that we say.  So you have to

17   actually say yes or no rather than nod your head.

18       A.    Right.

19       Q.    And if I ask a question you don't

20   understand, just go ahead and ask me to rephrase or

21   repeat.  Otherwise I'm going to assume you understand

22   the question.

23       A.    Okay.

24       Q.    Did you review any documents before your

25   deposition today?

**6**

1        A.    I did.

2        Q.    And what documents were those?

3        A.    I saw some transcripts of previous

4    depositions, and I was provided with a lot of paper

5    that I kind of perused through various documents.  I

6    didn't really read anything thoroughly.  I just kind

7    of familiarized myself with what was presented.

8        Q.    What depositions did you read?

9        A.    I read -- thoroughly like from beginning to

10   end?

11       Q.    Which depositions were you provided?

12       A.    Or looked at?  I believe I saw Mike

13   Sellers, Wanda Lenius, Gayle Forster, Kevin Keith --

14   and that one I saw like literally very, very little of

15   it because I had only looked at it just this morning.

16   Clyde D'Cruz.  And that one I also just looked at very

17   briefly.

18            And then Brian Matson's.  And that one I

19   read very thoroughly to get a feel for what a

20   deposition is because I really didn't have any frame

21   of reference.

22       Q.    And when you say a lot of other paper,

23   could you at least give us the topics of what those

24   documents were?

25       A.    It was -- I don't even remember.  It had three

**7**

1    your binder of exhibits.  Only she didn't see it in a

2    binder, it was on a CD.

3    BY MS. PELLEGRIN:

4        Q.    Did you actually review those documents?

5        A.    I kind of flipped through them.  I did not

6    study them.

7        Q.    And could you just state your name for the

8    record.

9        A.    My first name is Daria, D-a-r-i-a.  My last

10   name is Jerauld, J-e-r-a-u-l-d.

11       Q.    And your address?

12       A.    ████████████  in Denver, Iowa.

13       Q.    And are you married?

14       A.    I am.

15       Q.    And what's your husband's name?

16       A.    Robert.

17       Q.    Same last name?

18       A.    Correct.

19       Q.    And did you graduate from high school?

20       A.    Yes.

21       Q.    And where did you graduate from?

22       A.    Emaculate Conception High School in Lodi,

23   New Jersey.

24       Q.    And what year was that?

25       A.    1981.  I had to think about that.

**8**

1        Q.    And did you have any further education?

2        A.    Yes.  I went to Stevens Institute of

3    Technology in Hoboken, New Jersey, where I received a

4    bachelor of engineering degree with a concentration in

5    materials and metallurgy.

6        Q.    What year was that?

7        A.    1985.

8        Q.    Any other schooling?

9        A.    Yes.  I have a master's in industrial and

10   organizational psychology from Capella University, and

11   I finished that -- I have to think now.  I believe it

12   was June of 2004.

13       Q.    Where is Capella University?

14       A.    It's mostly online, because I started when

15   I was an expatriate so I needed a virtual venue, and I

16   believe the headquarters is in the Twin Cities.

17       Q.    Any other schooling?

18       A.    No.

19       Q.    And if we could just go through your

20   employment history.  What was your first full-time

21   job?

22       A.    With John Deere or before John Deere?

23       Q.    If you had work before John Deere, then you

24   can start with that.

**APP048**

13

1  Dubuque as a Labor Grade 7, and then in 1994 you were
2  the supply management strategic -- strategic supply
3  management something specialist.
4       A.   A strategic supply management specialist.
5  Back then they called us a supply management engineer.
6  The titles have changed.
7       Q.   And you were a Labor Grade 7 still?
8       A.   Correct.
9       Q.   And then you moved laterally to the
10 hydraulics commodity.  So you were still a strategic
11 supply management specialist but you just switched
12 commodity; is that accurate?
13      A.   Correct.
14      Q.   And that was a lateral move so you were
15 still a Labor Grade 7?
16      A.   Correct.
17      Q.   And then you were then promoted to the H
18 series crawler.  What was your title again at that
19 point?
20      A.   I would have been the PLMT lead or --
21 actually, I apologize, PMT, because we called them
22 project management teams back then.  They're PLMTs
23 now.  PMT lead for supply management for the H series
24 crawler.  I was essentially a supervisor in supply
25 management would have been on the books.

14

1       Q.   I assume you had direct reports at that
2  time?
3       A.   Well, I had direct reports as a Labor
4  Grade 6 in New Jersey because I had the engineering
5  drafting department.  I had a mix of John Deere
6  personnel and contractors.  We did things a little bit
7  differently at the rotary engine division because we
8  were a smaller unit.  And then I had direct reports as
9  a Labor Grade 8 at the Dubuque Works.
10      Q.   So you were not in a supervisory capacity
11 between New Jersey until you were the PMT lead.
12      A.   Correct.
13      Q.   And then you were transferred to Waterloo.
14 That was lateral so you were still Labor Grade 8 at
15 that point?
16      A.   Correct, but I was essentially promoted in
17 place to a Labor Grade 9 during that stint.
18      Q.   When you became the master process pro?
19      A.   They were actually calling me the master
20 process pro long before the promotion, which is very
21 typical.
22      Q.   And before you were the master, am I
23 correct in saying you were just a process pro for
24 product delivery?

15

1       Q.   So then we're to 2001.
2       A.   In 2001 we were transferred to Torreon,
3  Mexico, where I became a business process consultant.
4  It is the same exact thing as a master process pro,
5  but they wanted a different title because there was a
6  Labor Grade 7 master process pro in Torreon, Mexico,
7  at the time, and to be fair to her and to not kind of
8  be somebody showing up and kind of taking the job,
9  they called me a business process consultant, and then
10 she actually reported to me.  Along with the
11 continuous improvement team.
12      Q.   So you had the entire continuous
13 improvement team?
14      A.   Yes.
15      Q.   As your direct reports?
16      A.   Yes.  All Mexican.  Because I was there.
17 And I was a Labor Grade 9.
18      Q.   And how long were you in Mexico?
19      A.   Returned from Mexico in August of 2003 to
20 become the manager of supply management business
21 processes here in Waterloo reporting to Clyde D'Cruz.
22      MR. RACETTE:  What was that position again?
23      THE WITNESS:  It was called manager of
24 supply management business processes.
25      A.   It was a nice mix of my past.

16

1  BY MS. PELLEGRIN:
2       Q.   And were you still Labor Grade 9 at that
3  point?
4       A.   I was still a Labor Grade 9.  And shortly
5  after I returned -- I returned in August of '03.  So
6  around maybe November-ish of '03, I was asked to
7  facilitate a team led by Mike McGonegle because we
8  needed to do a reorganization.
9            And out of that reorganization, I ended up
10 not only with the supply management business process
11 professionals but also with the hydraulics commodity,
12 the electrical commodity, and the foreign desk.
13           So I did have at that point also buyers and
14 planners reporting to me in addition to the process
15 folks.  I had that job, again, at Labor Grade 9.
16      Q.   And what was the reorganization you
17 referred to?
18      A.   We had a group of continuous improvement
19 professionals reporting to -- Craig Pashan, I believe,
20 led them.  And that group was being scaled back
21 because I believe we didn't have enough engineering
22 horsepower to get the continuous improvement projects
23 finished.
24           So we were asked by Clyde to take a look at
25 the org structure and try and restructure that

1  fact that we knew SAP was coming, and we had to
2  prepare ourselves for that with rigor.
3      Q.   So just to make sure that I'm tracking,
4  when you came in August 2003 and became the manager of
5  supply management of business processes, were the
6  individuals we talked about in the reorganization,
7  were they under you immediately, or was it not until
8  the reorganization?
9      A.   Not until the reorg.
10     Q.   So when you came over in August of 2003,
11 did you have direct reports at that time?
12     A.   When I first arrived, I was told that Mike
13 Sellers would be reporting to me. After I arrived, I
14 think I was literally there the first week, a
15 gentleman named Dick Fauser walked into my office,
16 plopped down in a chair and said, "So you're here to
17 replace me."
18          And I said, "Excuse me?"
19          And he said, "Well, I've got all the
20 process people."
21          And I said, "Okay. And who would that be?"
22          And he said that he was a team lead for
23 David Christy, Sharon Heine -- and it might not have
24 been Sharon but for those roles. He was the team lead
25 for CPS coordinator, supplier collab coordinator, EDI

1  coordinator, AE/JD CROP. Not Mike Sellers. And I
2  don't think we had an EDI coordinator -- we didn't
3  have Leita at that time -- or that role.
4          So there was this small group of people
5  that he was under the impression that they would be
6  reporting to me.
7          So I called Clyde who was, I think, on
8  vacation actually, and I said, "Does Trudy Baird and
9  David Christy and these other people report to me?"
10         And he said, "Yes."
11         And I said, "Okay."
12         So that's how I found out who was reporting
13 to me. So I did have the process people.
14     Q.   And you said Dick Fauser was the one that
15 came in and talked to you about that?
16     A.   Yes.
17     Q.   Was he retiring or where was he going?
18     A.   No, he was a buyer that was given the
19 opportunity to provide -- not supervision, so to
20 speak, but some guidance and leadership to some of the
21 technical people, the process people on the team.
22     Q.   So then would Dick be reporting to you as
23 well?
24     A.   No, huh-uh. He stayed in the buyer
25 community. He stayed as a buyer. He didn't -- he was

1      Q.   But when you first came over, your
2  understanding is you were just going to have Mike
3  Sellers as your only direct report?
4      A.   That was my initial understanding in
5  conversations before I arrived with Clyde, and then
6  when I arrived, it changed a little bit.
7      Q.   Did Clyde tell you anything else about the
8  job before you got here?
9      A.   He told me a little bit about his vision.
10 He wanted help with getting more structure and
11 processes in line, because we had started to hear
12 rumblings that SAP was going to come.
13          He asked me to help Mike Sellers because he
14 said that Mike Sellers had been reporting to him
15 directly, and he was having issues with Mike trying to
16 get Mike to produce and he wanted me to take that
17 over.
18     Q.   What specifically did he tell you about
19 Mike besides having trouble getting him to produce?
20     A.   He said that he was well educated and would
21 get into analysis paralysis. That's the quote that I
22 recall. That he had hard trouble actually producing,
23 that he'd been trying to work with him to help him be
24 a better facilitator of the staff.
25          He was having difficulty interacting with

1  the staff and being able to accomplish his goals. So
2  I came in and I took over that role.
3      Q.   Did you take any of the jobs that Mike was
4  doing at that time on yourself or you were just
5  supervising him?
6      A.   I attended the staff meeting instead of
7  Mike. So that was the one change that happened
8  initially. And other things that he was doing I did
9  not take on, he continued to do them.
10     Q.   And do you know what those duties were at
11 that time?
12     A.   He was responsible for the audit, and he
13 was responsible for -- he wasn't responsible for
14 parameters, David Christy was responsible for actually
15 changing the parameters in the system, because we had
16 that pretty fairly well locked down. We didn't want
17 anybody putting their fingers into the system.
18          But Mike would make recommendations about
19 changes that we could or should make to the
20 parameters, and these are not in SAP so they're far
21 simpler, much different in terms of functionality. So
22 I remember him being responsible for that.
23          And then because he was a process pro, he
24 facilitated some teams here and there, but I don't
25 remember too many details.

33

1    Q.   Did he have any direct reports at that
2  time?
3    A.   No.
4    Q.   To your knowledge between 2003 and 2004,
5  did he ever have any direct reports?
6    A.   After the reorg -- which was after I
7  arrived.  So I arrived in August and then around
8  November we did the reorg -- I picked up all these
9  other people.  You know, Heidi and Sandy and
10 blah-blah, and in order to make my life a little bit
11 easier with regards to filling out time cards, filling
12 out performance management forms, if somebody was
13 absent either to take a vacation, that kind of
14 day-to-day stuff that supervisors do, I did ask him to
15 become a team leader for that group.
16   Q.   And who was in that group?
17   A.   As I recall, David Christy, Ofelia Iversen.
18 The part-time student took all of his work direction
19 from David Christy.  David Christy actually personally
20 hired him.  But I think for like time card purposes
21 and whatnot, I think that Mike had responsibility for
22 that.
23   Q.   And who was that?
24   A.   Mitch Munson.  And beyond that I don't
25 recall.

34

1    Q.   So was it your understanding that Mike was
2  not giving work direction to all three of those
3  individuals?
4    A.   No.
5    Q.   Was he at any time?
6    A.   No.
7    Q.   Was there anything else that Clyde told you
8  about Mike prior to you coming over to Waterloo in
9  2003?
10   A.   I think that pretty well summarizes it.
11   Q.   And we can go through his job
12 responsibilities more in detail.  I was just curious
13 what you remembered at this point.
14        Let's just talk about GJE for a second.  Do
15 you know what GJE is when I refer to that?
16   A.   I do.
17   Q.   And you came over -- first of all, were
18 they implementing GJE in Mexico?
19   A.   I never heard of it in Mexico.
20   Q.   When was the first time you learned about
21 GJE?
22   A.   As I recall, when I came back to the U.S.,
23 maybe about a year later or so we had -- Clyde gave me
24 a spreadsheet that had -- had my people on it and had
25 like labor grades on it.

35

1    Q.   So when you say "a year later," are you
2  talking about August of 2004?
3    A.   If I had to put a date on it, that's where
4  I would put it.
5    Q.   Did you ever communicate to any of the
6  people you were supervising what their GJE results
7  were?
8    A.   When HR gave us the official paperwork to
9  hand to the employee, then yes.
10   Q.   And do you recall when that was?
11   A.   I do not.
12   Q.   Do you think that happened before or after
13 the date that you just told me about in August 2004?
14   A.   I don't remember.
15   Q.   So when you first -- when you were talking
16 about this August 2004, roughly speaking, what were
17 you given or told that made you learn about GJE?
18   A.   I remember seeing a spreadsheet that Clyde
19 gave us that had like people's names and labor grades
20 and like maybe job family or something listed.  And I
21 don't remember all the details.
22        It does stand out in my mind only because
23 David Christy's came back higher than I would have
24 expected, and then that actually turned out to be an
25 error.

36

1         So there were iterations that were going on
2  by the powers that be.  I couldn't tell you who.  I
3  assume HR.
4         And then I remember some sort of official
5  documentation, maybe a piece of paper that we handed,
6  that said, you know, like their name and their title
7  and their grade, et cetera.
8    Q.   And the last thing you were talking about,
9  were those individual sheets of paper?
10   A.   I believe so.
11   Q.   Each employee had their own sheet?
12   A.   Yes.  It wasn't like a -- nobody knew what
13 anybody else was.
14   Q.   So could those have been the result of the
15 GJE?
16   A.   Oh, I'm sure it was.  I just don't know who
17 did all that.
18   Q.   Do you know when you saw those?
19   A.   You mean like a date?
20   Q.   Just a time period in general.
21   A.   Around that same summer of '04.  I couldn't
22 give you an exact.  I'm sure it's documented in John
23 Deere history someplace.
24   Q.   No, it is, I'm just trying to get a grasp
25 like about the time period.  Was it, like August of

**APP051**

41

1  coordinator II was a Labor Grade 5 nonexempt, you
2  disagreed with that?
3      A.   No.  That's not correct.  When I saw the
4  EDI coordinator, period, no Is or IIs, it had come
5  back as a 5 nonexempt.  And my reaction to that, along
6  with my colleagues, was that is not representative of
7  that particular role, and we submitted a PAQ and it
8  came back with a title of EDI coordinator II and a
9  Grade 6.
10     Q.   And so you did receive some sort of
11  feedback later that showed the Labor Grade 6 that had
12  changed.
13     A.   Yes.
14     Q.   And do you recall when you filled out the
15  PAQ?
16     A.   I don't.
17     Q.   But the spreadsheet that you mentioned
18  earlier was the document that alerted you to the Labor
19  Grade 5 issue.
20     A.   Yes.
21     Q.   So you were thinking that might have been
22  summer of 2004?
23     A.   Or thereabouts.  You just told me it's May
24  2004 so it had to be before that.
25     Q.   Were you in Waterloo at the time?

42

1      A.   Yes.  I came to Waterloo in --
2      Q.   So we know it was after August 2003.
3      A.   Correct.  And it was definitely after
4  November, because when we did the reorg, we didn't
5  have any kind of global job information.
6      Q.   Were you ever given your results under GJE?
7      A.   Yes.  Clyde presented to me my grade.
8      Q.   And what was your job title under GJE?
9      A.   It was a Labor Grade 9, and I think it was
10  division supply management specialist.
11     Q.   Did you ever see a job description for
12  that?
13     A.   Not -- not then.  Job descriptions were
14  published later in on online tool.
15     Q.   Do you know when they were published?
16     A.   I do not.
17     Q.   And when you say "later," later from when?
18     A.   I was first told I was a division --
19  manager of -- I can't remember, division supply
20  management manager, Grade 9, and then the job
21  descriptions showed up later.  And I have no idea what
22  that time frame was.
23     Q.   But you've seen a job description since
24  then?

43

1  Grade 15.
2      Q.   We went over just a little bit ago what
3  jobs you believed Mike Sellers was responsible for
4  when you came over in August of 2003.  Did Clyde
5  communicate those to you?
6      A.   Well, Clyde gave me a rundown of what he
7  was working on, I don't remember the details, and then
8  Mike would have drafted his own performance management
9  goals.
10     Q.   And when -- his 2003 goals would have
11  already been drafted at that point; correct?
12     A.   Correct.
13     Q.   Were you given any other documents that
14  would have described his job?
15     A.   Not that I recall.
16     Q.   How did you learn about his job then when
17  you first came over?
18     A.   I knew what Clyde told me, and then I read
19  his performance management -- his existing performance
20  management review for 2003 and I looked backwards at
21  some previous ones.
22     Q.   Were there any other documents that you
23  looked at?
24     A.   Not that I recall.
25     Q.   Did his job duties change during that time

44

1  period when you first came over?
2      A.   When I first arrived?
3      Q.   Yes.
4      A.   I changed nothing when I first arrived
5  other than he no longer attended the staff meeting.
6      Q.   Was that your decision for him to no longer
7  attend the staff meeting?
8      A.   It was Clyde's decision.
9      Q.   Do you know why?
10     A.   He had told me that Mike was ineffective in
11  facilitating that staff meeting and he wanted me to
12  facilitate it.
13     Q.   So Mike was facilitating those meetings
14  prior to your arrival?
15     A.   I believe so, but I never witnessed that
16  myself.
17     Q.   When you first came over, were you
18  assigning him -- were you giving him work direction?
19     A.   When I very first arrived, I -- for the
20  first month or two, I mostly just observed what people
21  did so that I could kind of get a feel for what people
22  were doing.
23     Q.   At the end of 2003 when you first arrived
24  in Waterloo, do you know if Mike was having to take on

**45**

1    A.   No.

2    **Q.   People that may have been absent or that**

3 **sort of thing?**

4    A.   Later on we asked him to do a study of

5 Trudy Baird's service parts desk.  She was doing -- we

6 have a service parts warehouse in the Quad Cities, and

7 sometimes when the line is running short of material,

8 they'll pull parts out of that service parts

9 warehouse.

10        And there was a woman that was -- it was

11 her full-time job to do that, and she became ill

12 and --

13    **Q.   Is this Trudy Baird you're talking about?**

14    A.   Yes, this is Trudy Baird.  And Mike as the

15 process pro, we said, "Would you please sit down and

16 document that process."  Because it was a bit of a

17 mystery to all of us.  None of us really knew what she

18 did.

19        And I recall him figuring out what she did,

20 and then he significantly improved it.  He created a

21 form, and it became automated, and it went from hours

22 a day to minutes.

23    **Q.   Do you recall when this happened?**

24    A.   I don't.

25    **Q.   Was it end of 2004?**

**46**

1    A.   I think so.

2    **Q.   And I guess just kind of speaking more**

3 **generally, what is a process pro?**

4    A.   So a process pro -- do you know what a

5 Black Belt is?

6    **Q.   I've seen the term in the documents, but if**

7 **you can explain that.  Because that's a John Deere**

8 **term; right?  Black Belt?**

9    A.   No, Black Belt is a GE term.  And Master

10 Black Belt.  They have to do with using Six Sigma

11 tools to facilitate and continuously improve, and GE

12 under Jack Welch, they made that their lifeblood.  I

13 mean that's how they survived.

14        And John Deere, John Deere likes to John

15 Deere-rize things.  So when we adopted the process, we

16 changed the acronyms, and then we changed the titles

17 so we had process pros and master process pros instead

18 of Black Belts and Master Black Belts.

19        And a process pro, or a master process pro,

20 either way, would be highly trained in the use of Six

21 Sigma tools to facilitate projects -- high-level,

22 high-producing projects with savings or continuous

23 improvement.

24    **Q.   So can you just describe in layperson terms**

25 **what does a process pro do on a daily basis?**

**47**

1    A.   On a daily basis?  Facilitate meetings,

2 hold people accountable, help teams work through Six

3 Sigma processes, because most people -- the general

4 population is not typically trained in critical to

5 quality flow-downs and fishbone diagrams and all those

6 other tools that you use in Six Sigma.  Statistical

7 analysis.

8        So a process pro would help an area

9 improve.  And document.  Document processes.

10    **Q.   And so does that mean that there would be a**

11 **variety of projects throughout the year?**

12    A.   There should be, yes.

13    **Q.   And so does that mean that the job**

14 **assignments are changing?**

15    A.   Yes.

16    **Q.   So it's kind of a fluid job.**

17    A.   It can be.

18    **Q.   When you first arrived in August of 2003,**

19 **sometime in that time period, did you find out that**

20 **Mike was looking for other jobs?**

21    A.   Not that I recall.

22    **Q.   A position within John Deere.**

23    A.   Not that I recall.

24    **Q.   Do you recall having a conversation with**

25 **him about his -- well, let me rephrase.  Mike had**

**48**

1 testified that he was applying for other jobs and that

2 you approached him about it and said, you know, "We

3 need you, we don't want you to leave" sort of

4 conversation, and at that time he was being threatened

5 with a "Does Not Meet" by Clyde.

6    **Does that ring any bells for you?**

7    A.   I can't answer to the part about him being

8 threatened, because I have no knowledge of anyone

9 being threatened.  I do know that for the end of 2003,

10 fiscal 2003, Clyde was leaning towards giving him a

11 "Does Not Fully Meets" rating or -- I don't think it

12 was called that back then.  "Unsuccessful" I think it

13 was called.  Or "Does Not Fully" -- I don't remember.

14 It's changed over the years.  But less than a

15 successful rating.

16        And I was new and I wanted my own time to

17 be able to observe Mike, and from my very short period

18 of time, August, September, October, which is

19 essentially a quarter, I didn't feel comfortable

20 giving him that rating and I was the one that was

21 going to have to do it.  So I suggested a successful

22 performance.

23    **Q.   So --**

24    A.   Or "Meets Expectations."

25    **Q.   So at the end of the fiscal year 2003, you were the**

Case 3:12-cv-03050-JES Document 84-35 Filed 02/03/14 Page 12 of 190

**APP053**

49

1  one who did the performance evaluation on Mike --
2      A.   At the end of the year.
3      Q.   -- at the end of the year.
4      A.   Yes.
5      Q.   So you only observed him for --
6      A.   A quarter.
7      Q.   -- two months or so?
8      A.   A few months, yeah.
9      Q.   Because the fiscal year ended --
10     A.   -- the end of October.  So the majority of
11  August -- I arrived August 4.  So August, September,
12  October.  So one quarter.
13     Q.   So is it my understanding Clyde recommended
14  the "Does Not Meets"?
15     A.   Correct.
16     Q.   And it was your decision to give him a
17  "Meets Expectations" that year?
18     A.   Correct.
19     Q.   Did you have any further conversation with
20  Clyde about that?
21     A.   Not that I recall.
22     Q.   He just told you I think he should get a
23  "Does Not Meet" this year?
24     A.   I don't recall how he said it.  I know that
25  that was his recommendation.  But then ultimately he

50

1  left it up to me.
2      Q.   If you want to flip to Exhibit 9.  And the
3  page numbers I'm going to be looking at are at the
4  bottom of the page.  Okay?  Some of these documents
5  are paginated in different places so I'm always going
6  to be referring to the bottom of the page.
7      A.   Got it.
8      Q.   If you flip to page 83?
9      A.   Okay.
10     Q.   And you can go ahead and flip through this
11  performance evaluation if you want.  My understanding
12  is this is the 2003 performance evaluation of Michael
13  Sellers.
14          Would you agree with that?
15     A.   Not yet.
16     Q.   Your signature would be on page 96.
17     A.   No, I found it in the front.  I usually put
18  my name or initials when I make comments.  Okay.
19     Q.   And just briefly going through this one,
20  there's a "Target" with numbers below it, a column,
21  and then there's the "Manager Assessment."
22     A.   Right.  That's Clyde's assessment.
23     Q.   That's what I was going to ask.  I notice
24  in many of the comments, they would have your name,
25  and then you would give Clyde or another a comment, when

51

1  fiscal 2003.
2      A.   Correct, because it was an insufficiency of
3  this tool back then that you loaded the assessment at
4  the start of the year, and it didn't have a little
5  place to edit for the end of the year, which was kind
6  of annoying.  Okay?
7      Q.   Would Clyde --
8      A.   Clyde would have set that initial
9  assessment.
10     Q.   So if you had been Clyde, you could have
11  gone in and edited it?
12     A.   If I had been Clyde in November of 2002, I
13  could have gone in and edited it.
14     Q.   So when we see a "Manager Assessment" on
15  one of these --
16     A.   That's Clyde.
17     Q.   -- they are entered at the beginning of the
18  year?
19     A.   That is correct.  And my assessment is for
20  the end of the year.  So "Sustaining the Deere
21  Values," we have a target of 4, Clyde had him at a 1,
22  and then, you know, I gave him a 2 at the end of the
23  year.
24     Q.   But the performance evaluation for 2003
25  evaluates his performance from --

52

1      A.   For the entire year.
2      Q.   -- November 2002 until the end of October
3  2003; correct?
4      A.   Correct.
5      Q.   And so the numbers that you give him here,
6  what are you basing those on?
7      A.   My observations.
8      Q.   So the two months or so --
9      A.   And the use of the form.  There's a very
10  detailed document that describes each one of these in
11  detail.  So like "Sustaining the Deere Values,"
12  "Establishing Objectives and Performance Plans,"
13  there's a document that has each of these
14  competencies, and then there's a grid.
15          And there is no bad -- there is no bad
16  rating on there.  It's not like A, B, C, D, E, F.
17  It's a range of 1 to 7.  And 1 or 2 does not
18  necessarily mean that it's -- that you're performing
19  poorly.  It's that you're not at target.  And it tends
20  to move with grades.
21          And this actually improved with Global
22  Jobs.  So this kind of predates Global Jobs.
23     Q.   So when you say it moves with grades, does
24  the target number move?
25     A.   No.  As you move up in grade -- grade in each fun.

**61**

1    A.   Because as a manager you have visibility to
2  events that are taking place that you don't
3  necessarily share with the rest of the organization.
4    Q.   Do certain individuals have observations
5  into other areas of the job that you wouldn't
6  necessarily have?  Of Mike Sellers' job?
7    A.   Not likely.
8    Q.   So his direct reports wouldn't have a
9  different experience as him as their supervisor than
10  you would have.
11    A.   Well, the direct reports would have an
12  extremely different experience.  Not talking about
13  Mike, I can think of lots of cases where a supervisor
14  treats their people very well, very fairly, but then
15  they treat their peers terribly and they're
16  disrespectful to their manager.  So it's not always
17  the same view depending on what your vantage point is.
18         So the people that Mike was providing some
19  guidance to, since he was a team leader, would have
20  possibly had a different view than me.
21    Q.   So their observations could have been
22  different than yours.
23    A.   Certainly.
24    Q.   If you look just down to the next section
25  there.  I believe it's under "Performance:  Holding

**62**

1  People Accountable For Achieving Results."  In your 1
2  December '04 comments, I see your initials at the end
3  so I assume those are your comments; correct?  It
4  starts with "Mike, this is the one area you really
5  need to focus."
6    A.   Yes.
7    Q.   In the third sentence, you say "You had
8  added the task of supervision in this past year and
9  holding others accountable for the audit is a gap."
10         Earlier I thought you said that he did not
11  have a supervisory role.
12    A.   Yeah, he was a team lead.  So I'm using the
13  word "supervision" there loosely in that I asked him
14  to do some performance management, I asked him to
15  approve some time cards, he was supposed to make sure
16  people showed up for work.
17         But like, for example, he did not
18  administer any pay plans or have any access to
19  anybody's salary information.
20         Specific work direction would always come
21  to me.  I mean I can remember very, very clearly that
22  David Christy and Ofelia Iversen and such would come
23  directly to me and ask me for assistance.
24    Q.   Do you know if they came to him for work
25  direction as well?

**63**

1    A.   No, I don't.  They shouldn't have.
2    Q.   And maybe I'm reading this sentence wrong,
3  but "You had the added task of supervision this past
4  year and holding others accountable for the audit is a
5  gap."
6         So are you saying there that he
7  was given -- the latter part of that sentence,
8  "holding others accountable for the audit is a gap,"
9  does that mean that he was giving work direction to
10  the people related to the audit?
11    A.   Well, that's what we discovered is that he
12  was asking other people to do tasks and not doing a
13  good job of holding them accountable.
14    Q.   So he was delegating work for the audit for
15  which you did not know he was doing?
16    A.   I don't recall specifically.  I can talk
17  specifically about bailments because that is -- was a
18  rather traumatic event for the factory.  But I don't
19  recall specifically about these others.
20    Q.   And he was assigned the bailments; correct?
21    A.   He was assigned being responsible for the
22  audit in its entirety.
23    Q.   Was that lined out in his job
24  responsibilities?
25    A.   You know, I don't know without going back

**64**

1  and reading them.
2    Q.   We're actually going to go through all of
3  them so we can hold that question off.
4         If you want to skip to page 100.  Here's
5  where we start the stretch goals.
6    A.   Uh-huh.
7    Q.   And remind me again what the stretch goals
8  are.  Are these the SMART goals?
9    A.   Well, SMART is a tool that's used for both
10  stretch goals and job responsibilities.  A stretch
11  goal is supposed to be more significant.  You're
12  supposed to stretch yourself and try and achieve
13  something more.
14    Q.   And could you just explain to me what this
15  first stretch goal is just in layperson terms, if you
16  can?
17    A.   So the first goal says he would reduce the
18  order stability metric.
19    Q.   So what's an order stability metric?
20    A.   So order stability is the amount of noise
21  that gets transmitted out to the supply base, and you
22  can play around with parameters to kind of dampen that
23  noise so that they don't see so much change and it has
24  some pretty devastating consequences in addition.
25    Q.   And were -- and how would you describe this

**APP055**

85

1    A.   Yeah.  Please repeat that.

2    Q.   Was Trudy Baird responsible at that time --

3   before she went on medical leave, was she responsible

4   for ordering hot parts?

5    A.   Yes.

6    Q.   What does that mean?

7    A.   As I described it earlier, it's when you

8   have the parts distribution center down in Milan,

9   Illinois, and the line is running low and we'll recall

10   parts from there to keep the line running.

11    Q.   So she's ordering parts that will be

12   distributed to the line?

13    A.   Yes.

14    Q.   So if the parts aren't ordered, would the

15   line go down?

16    A.   Yes.

17    Q.   And that's a pretty big deal, isn't it?

18    A.   Yes.

19    Q.   So when Trudy was on medical leave, did

20   Mike take over ordering all the hot parts?

21    A.   For a short period of time.  As he

22   documented the procedure.

23    Q.   So he was doing the study and he was

24   ordering the parts?

25    A.   He did it simultaneously.  So one of the

86

1   best ways for a process pro to really understand is to

2   jump in and do it.  So he did it, he documented it,

3   and improved it.

4    Q.   And Trudy Baird was a full-time employee

5   when she was there?

6    A.   Yes.

7    Q.   And so she would spend approximately eight

8   hours a day doing her job while she was there?

9    A.   She -- yeah, I will testify that she

10   managed to fill an eight-hour day doing that job.  She

11   was a Labor Grade 2.  She was somebody that moved

12   extremely slowly and, quite frankly, wasn't

13   particularly bright.

14    Q.   But it was an important job to make sure

15   those hot parts were filled.

16    A.   It was an optional job.  In reality it's

17   something that we did that we really didn't want to

18   do, to recall those parts back.

19    Q.   But if the parts had not been recalled

20   back, you just testified earlier the line would go

21   down?

22    A.   Sometimes, yeah.

23    Q.   So, I mean, the hot parts were important to

24   order.

25    A.   Yes.

87

1    Q.   Is that fair?

2    A.   It's fair.

3    Q.   And when Trudy Baird was on medical leave,

4   she was only working one day a week?  Is that your

5   recollection?

6    A.   Oh, I don't recall that at all.  I just

7   recall her being off.

8    Q.   But you don't dispute that Mike actually

9   did order the hot parts while Trudy was gone?

10    A.   For a short period of time while he

11   documented the process.

12    Q.   And then do you recall when Mitch Munson

13   was asked to cover Emily Delagardelle's planner

14   position?  Do you recall that incident?  She was

15   moving positions?

16    A.   I don't.

17    Q.   You don't recall or do you not think that

18   that happened?

19    A.   I don't recall it.

20    Q.   If Mike testified that Mitch took over

21   Emily's job who was a planner -- do you remember if

22   Emily was full-time or not?

23    A.   I believe Emily was a student.

24    Q.   Does that mean that her job was not

25   full-time?

88

1    A.   It was not full-time.

2    Q.   Could it have been in the summer?

3    A.   I don't know the time frame.  Oftentimes

4   students will work full-time in the summer, but I

5   don't know the time frame.

6    Q.   And Mitch was a part-time employee; is that

7   correct?

8    A.   I believe he was a student.

9    Q.   And did he leave partway through 2004?

10    A.   I recall Mitch leaving.  I do not recall

11   when.  But he left and came back.

12    Q.   So do you know who took over Emily

13   Delagardelle's planner position when Mitch wasn't

14   there to do it?

15    A.   No, I do not.

16    Q.   So if Mike testified that he was the one

17   that took over that planner position during that time,

18   could you dispute that?

19    A.   I can't dispute it, but I don't recall any

20   of my process people ever becoming planners for a

21   period of time.

22    Q.   And taking over a planner position wasn't

23   included in any of the job responsibilities in his

24   performance management.

Case 6:12-cv-02050-JSS   Document 84-3   Filed 02/08/14   Page 50 of 190
Susan Frye and Associates, Inc.          (515) 284-1972          22 of 64 sheets
APP056

89

1    Q.   Do you recall Mike being assigned to
2  represent the department in the enterprise community
3  of practice meetings?
4    A.   Yes.
5    Q.   And was this a part of his job
6  responsibilities?
7    A.   Yes.
8    Q.   What part of his job responsibilities does
9  that fall under?
10    A.   Where it says participate in the acquire
11  CoP.
12    Q.   Oh, the CoP stands for --
13    A.   -- community of practice.
14    Q.   Okay.  Do you recall assigning Mike two
15  part-time UNI students to give work direction to
16  during a portion of that year?
17    A.   Yes.  There would have been two students
18  that came in from -- they usually worked like spring
19  break through the end of the term.  So April, May.  A
20  few weeks.
21    Q.   And supporting enterprisewide capability
22  planning.  What is that?
23    A.   Capability planning?
24    Q.   Yes.  Do I have it -- is there something --
25  a similar term that I'm just misspeaking?

90

1    A.   I don't know that term at all.
2    Q.   Okay.  Mike testified that he supported the
3  pilot and development of enterprisewide capability
4  planning.
5    A.   Never heard of it.
6    Q.   So would it be fair that that wasn't within
7  his job responsibilities listed out either?
8    A.   I've never heard of it.  It's not in his
9  job responsibilities.
10    Q.   And so all these things that we just went
11  over, all but one of them, the CoP, these were all
12  things that he was doing -- or that he has testified
13  to that he was doing in addition to his job
14  responsibilities.
15       Do you have anything that would dispute
16  that he was doing these extra tasks?
17    A.   Not at this time as I sit here, no.
18    Q.   And some of them you couldn't recall.  So
19  were these things that were assigned by you?  Were any
20  of these assigned by you, I should ask?
21    A.   I don't recall.  Other than the CoP.  I
22  mean this is nine years ago.  I don't remember.
23    Q.   Sure.  I understand.  Do you recall ever
24  being told by Clyde to give Mike additional work?

91

1    Q.   Did he ever tell you that he thought Mike
2  wasn't busy enough?
3    A.   No.
4    Q.   And you said that with kind of a reaction.
5  Did you think Mike was busy?
6    A.   I think Mike had enough to do.  I don't
7  ever remember Clyde saying that.
8    Q.   Did Clyde ever come to you and ask for help
9  during 2004 with his job duties?
10    A.   2004.  Calendar or fiscal?
11    Q.   Fiscal.
12    A.   Not that I recall.
13    Q.   Could he have done that and you just don't
14  remember?
15    A.   He may have.
16    Q.   Do you know -- I mean if you don't recall,
17  I can assume the answer, but if he did ask for help,
18  did you ever give him any?
19    A.   Not that I recall.
20    Q.   Were you aware of the number of hours that
21  Mike was putting in to try to complete all of his job
22  tasks?
23    A.   No.
24    Q.   In his 2004 performance evaluation he
25  received a "Does Not Meet."  Were these additional

92

1  things that he was doing on top of his five job
2  responsibilities considered in that evaluation?
3    A.   You're making the assumption that he was
4  actually doing those things, and I can't make that
5  assumption.  So can you rephrase that question?
6    Q.   Well, I can't, because Mike has testified
7  that he has and you've testified you don't recall.  So
8  if Mike was doing additional tasks that weren't within
9  his job responsibilities, does he get any sort of
10  credit, are those things that you consider when you're
11  evaluating him, or do you just look at the job
12  responsibilities that are listed on the sheet?
13    A.   In a hypothetical situation, you would
14  include other work that people are doing and you would
15  document it in the year-end comments.  So I'd have to
16  look at the year-end comments.
17    Q.   And I'm looking at page 112.  It should be
18  Exhibit 9 still.
19       Are you there?
20    A.   Yes.  Is this now 2005?
21    Q.   No, this is still 2004.  Your signature
22  should be on the same page actually.
23    A.   Oh, yes.  Okay.
24    Q.   In the last paragraph of your year-end
25  comment in 2004 it starts "While the year-end rating is a

**APP057**

93

1  Does Not Fully Meet" --
2      A.   Uh-huh.
3      Q.   -- and it goes on to say "You did get
4  credit for the solid work you did in parameter
5  management, manifest, and order stability.  Plus you
6  did very well in ad hoc requests that came up
7  throughout the year."
8      A.   Uh-huh.
9      Q.   Could that comment have been directed
10 towards some of these assignments that he took over?
11     A.   I don't know.  It's just typical that
12 process pros handle ad hoc requests that come up, and
13 I don't remember specifically what it refers to.
14     Q.   And you may not know of every single
15 request that comes up that Mike goes and makes sure
16 that it gets taken care of; right?
17     A.   That's a fair statement.
18     Q.   And if you want to review -- well, scratch
19 that.  Let's just go to Exhibit 81.
20     A.   81 did you say?
21     Q.   Yes, please.
22     A.   Okay.
23     Q.   So if we just look at the cover page of
24 this, it says "John Deere Waterloo Works, Procurement
25 Audit Report, 10 July 2001."

94

1      A.   Uh-huh.
2      Q.   Have you ever seen this document before?
3      A.   Yes, but not since the audit in 2004.  I
4  wasn't here for this one (indicating).
5      Q.   So you weren't in Waterloo in July of 2001.
6  If you turn to page 5, if you look under
7  "Company-Owned Supplier Tooling," that section, and
8  then the third paragraph under there it says "Unit
9  procedures require bailment agreements and
10 verification listings from suppliers with
11 company-owned tooling."
12     A.   Uh-huh.
13     Q.   "The tooling database contains 398
14 suppliers."
15     A.   Uh-huh.
16     Q.   So in 2001 is it fair to say that there
17 were 398 suppliers in the database during that year?
18     A.   Based on this, yes.
19     Q.   And a review revealed that 33 percent of
20 those had no verifications.
21     A.   That's right.
22     Q.   And 61 percent had no bailment agreement.
23          What does "no verifications" mean?
24     A.   No way to know.  Nobody had done the
25 verification with the supplier to check on the

95

1  and then you have to go back and verify, "Do you still
2  have the tool in-house?"
3      Q.   So there's a periodic checking to make sure
4  that the bailment is still accurate.
5      A.   Uh-huh.
6      Q.   If you turn to page 6, at the very top of
7  the page, it says "The unit agrees with the findings."
8  Do you know who the unit is?
9      A.   Well, the unit would be John Deere Waterloo
10 Works.  It's their audit.
11     Q.   And if you go to page -- if you go to
12 page 4 --
13     A.   I'm going backwards?
14     Q.   Yeah.
15     A.   Okay.
16     Q.   It says "Supply Management Involvement in
17 Product Engineering Center Purchasing Decisions."  And
18 then on page 5, the page we were just on, it says --
19 under the "Company-Owned Supplier Tooling," it has
20 "JDWW supply management procedures."
21          So could it be that the unit is actually
22 more specific than that, that it's the supply
23 management, or do you know?
24     A.   When you do an audit, the unit is the one
25 that's audited.  So the unit provides the response.

96

1      Q.   So here it could have been the supply
2  management unit.
3      A.   No, it's the unit, John Deere Waterloo
4  Works.
5      Q.   So it's your testimony that this unit
6  response is for all of John Deere Waterloo Works.
7      A.   Correct.
8          (A private conversation was held between
9  Mr. Racette and Mr. Sellers.)
10         THE WITNESS:  Incorrect.
11         MR. RACETTE:  I didn't ask anything, ma'am.
12         THE WITNESS:  I heard you so it counts as a
13 question.
14 BY MS. PELLEGRIN:
15     Q.   If you look just below where we're reading
16 there --
17         MS. WEST:  Which page are you on?
18         MS. PELLEGRIN:  I'm on page 6 still.
19 Sorry.
20 BY MS. PELLEGRIN:
21     Q.   It says "The unit agrees with the
22 findings," and then it goes on, and you can read that
23 if you want, and then it says "Responsible Party:
24 Team Leader Supply Management."

APP058

97

1    Q.   Does that mean the responsible party is who
2    wrote this?
3    A.   What's confusing is usually that's a
4    person's name, but there would be a responsible party
5    that wrote this response on behalf of the unit.
6    Q.   Okay.
7    A.   The Waterloo Works.
8    Q.   So why was supply -- I know that you
9    weren't here for this one, but with your familiarity
10   of the audit, why would there be a specific supply
11   management leader for all of Waterloo Works?
12        MS. WEST:  Calls for speculation.
13        MR. RACETTE:  You still have to answer.
14        THE WITNESS:  I'm sorry?
15        MS. WEST:  You can answer.
16        THE WITNESS:  Oh, I can answer?
17   A.   So the response is on behalf of all of John
18   Deere Waterloo Works, that's the unit that's being
19   audited, and then somebody, depending on the area, in
20   this case it's supply management, wrote this response
21   on behalf of the unit.  So the responsible party is on
22   behalf of the unit.
23   BY MS. PELLEGRIN:
24   Q.   So would it be fair to say on page 5 when
25   it talks about the 398 suppliers, those suppliers were

98

1    within supply management of the unit of Waterloo
2    Works?
3         MS. WEST:  Calls for speculation.
4    A.   It's the same thing.  The unit has 398
5    suppliers and the supply management department leads
6    them.  It's the same thing.
7    BY MS. PELLEGRIN:
8    Q.   Okay.  So then we aren't disagreeing on the
9    fact that the unit and supply management are the same
10   thing as well.
11   A.   It depends which response we're looking at.
12   Q.   Well, this is all one document.
13   A.   Right, but there's a number of different
14   responses.
15   Q.   The response we just read, it says "Unit
16   Response:" at the top of page 6.  That's the one we
17   just read.  It says "Responsible Party:  Team Leader
18   Supply Management."  Correct?
19   A.   Right.
20   Q.   And that's in response to what we looked at
21   on page 5; is that fair?
22   A.   That's fair.
23   Q.   So we are in agreement that the 398
24   suppliers were supply management suppliers.
25   A.   On this particular response, yes.

99

1    Q.   So if we switch to page 26.
2    A.   Okay.
3    Q.   And here you'll see similar information at
4    the top of the page to what we just went over.  And
5    then at the bottom it says "Follow-up Response."
6    A.   Uh-huh.
7    Q.   And the responsible party below that
8    paragraph says "Division Manager Purchasing Jerry
9    Gehrke."
10        Do you know who that is?
11   A.   Yeah, I know Jerry.
12   Q.   And what department was he in?
13   A.   I'm not a hundred percent sure.  I know
14   that when I arrived, Mike McGonegle had just replaced
15   him, so I can assume it was OFP supply management.
16   Q.   And in that response it says "We have 390
17   current suppliers with 353, 91 percent, of those
18   having a current bailment agreement.  Bailment
19   procedures were established in August 2001 to prevent
20   the issue of purchase orders without a bailment
21   agreement.  There will be retraining in August 2002 to
22   ensure this is being followed."
23        So at the time of this response, Jerry
24   Gehrke was reporting that 91 percent of the suppliers
25   had a current bailing agreement.  Is that fair?

100

1    A.   I don't know the source of his information,
2    but that is what he's reporting.
3    Q.   And Clyde testified in his deposition that
4    he would have had to approve this response before it
5    was submitted.  So this was a response from the supply
6    management department; is that fair?
7         MS. WEST:  Calls for speculation.
8    A.   I don't -- it is as written in front of me,
9    so yes.
10   BY MS. PELLEGRIN:
11   Q.   Sure.  And in 2001 Mike Sellers wasn't
12   involved in the audit; is that correct?
13   A.   I have no idea.
14   Q.   Do you know when he was assigned the audit
15   responsibilities?
16   A.   I do not.  When I came in 2003, I was told
17   he had responsibility for the audit, but I don't know
18   how far back that went.
19   Q.   And the record will show that he was
20   assigned audit responsibilities in 2002.
21   A.   Okay.
22   Q.   So at this point Mike Sellers was not
23   involved in the audit.  Now, if we flip ahead to
24   page 47h.  So it's kind of towards the end.

101

1    Q.   Now, this is dated September 7, 2004.  Is
2  that correct?
3    A.   Uh-huh.  Yes.
4    Q.   So this is the audit that essentially Mike
5  is being blamed for; is that fair?
6    A.   For the bailment piece, yes.
7    Q.   So he's only being blamed for the
8  bailments.
9    A.   Yes.
10    Q.   If you flip to page 47k, it reports there
11  at the bottom under "Bailing Agreements & Tooling
12  Lists" that the bailing agreements at the time of this
13  document were at 57 percent.
14         Do you see that?
15    A.   Yes.
16    Q.   Now flip to page 48, please.
17    A.   Uh-huh.
18    Q.   Now, this is an email written from you to
19  Clyde D'Cruz, cc Mike Sellers, on October 25, 2004.
20         Do you see that?
21    A.   Yes.
22    Q.   Do you recall this email?  You can take the
23  time to read it if you like.
24    A.   Yeah, just give me a second.
25         Uh-huh.

102

1    Q.   And in this email it says that you met with
2  Sue Groene.  Who was Sue Groene?
3    A.   She was on the audit team.
4    Q.   Was she an internal auditor then?
5    A.   Yes.
6    Q.   And you write "She," Sue Groene, "did
7  acknowledge the significant efforts made to improve
8  our bailment situation."
9    A.   Yes.
10    Q.   "At the same time, the issue was quite
11  black and white that we are not in good enough shape
12  so we have work to do."
13    A.   Uh-huh.
14    Q.   You go on to say that "She noted that in
15  the 2001 audit it appears that we were 39 percent
16  compliant for having bailments on file where today we
17  are tracking at 43 percent."
18    A.   Right.
19    Q.   Now, the document we just looked at says
20  that in 2001 Mr. Gehrke was reporting that he was
21  91 percent compliant.
22    A.   Uh-huh.
23    Q.   And you go on to say in this email
24  "However, it is important to note that back in 2001 we
25  were really only 13 percent compliant because that

103

1  other 26 percent had poor integrity."
2    A.   Yes.
3    Q.   So not only was 91 percent not accurate,
4  but in fact, the 39 percent was actually 13 percent?
5    A.   So apples and oranges; right?  This is
6  being written in 2004.  The auditors are looking back
7  from their vantage point back to the data from 2001,
8  and they are coming up with their numbers as to where
9  we stood back in 2001.
10         It's not looking at the audit document, and
11  I cannot speak to the audit document from 2001.  I
12  wasn't there.
13    Q.   And so when you're distinguishing between
14  them looking back and the audit document, I'm not
15  quite sure I'm following there.
16    A.   So they're looking at data.  Never mind,
17  just pretend that that document from 2001 doesn't
18  exist.  They're just looking at data in the present
19  moment.  And in the present moment, they're looking
20  backwards at the data and saying, "Well, it looks like
21  in 2001 we were really only 13 percent compliant
22  because the other 26 had poor integrity."
23         She's also acknowledging the significant
24  efforts we've made to improve our bailment situation,
25  and that was during the audit.  When we realized that

104

1  Mike had misrepresented this situation, we went into
2  scramble mode and we made significant strides
3  improving.
4    Q.   So in 2001, looking back at the actual
5  data, they were 13 percent compliant.  So at that time
6  when they reported that they were 91 percent
7  compliant, that was a misrepresentation, was it not?
8    A.   I don't think so because I don't know where
9  that data came from or if they were measuring
10  differently.  They may have been measuring -- let me
11  back up.
12         What we learned through the information
13  Mike was providing was that he was doing some sort of
14  Pareto analysis based on dollar values, not on actual
15  numbers.  So when you do -- do you know what Pareto
16  is?
17    Q.   You can define it.
18    A.   The 80/20 rule?
19    Q.   Sure.
20    A.   So when he looked at the high-dollar
21  volume, he was reporting in the 90-ish percent.
22         MR. RACETTE:  Who?  Who?  Who?  Who was
23  reporting at 90 percent?
24         THE WITNESS:  Mike Sellers.

Case 6:13-cr-06050-DGL Document 84-35 Filed 02/03/14 Page 54 of 190
Susan Frye and Associates, Inc.          (515) 284-1972          26 of 64 sheets
APP060

1    THE WITNESS:  Right before this audit.

2    MR. RACETTE:  Where is that, ma'am?

3  Point that out where Mike Sellers ever reported it at

4  90 percent --

5    MS. WEST:  Can she finish answering the

6  question she was answering first?

7    MR. RACETTE:  Well, I would like to know.

8    MS. WEST:  Okay, but you know what, she's

9  asking the questions, not you.  It's one person.

10  BY MS. PELLEGRIN:

11    **Q.  Go ahead.**

12    A.    So we had been told that we were 90-plus

13  percent compliant for this audit by Mike Sellers

14  because of this -- the measurement system that he was

15  using was looking at dollars, not at numbers of tools;

16  okay?

17    And he would present myself and Clyde and

18  Mike McGonegle every so many months with a little pie

19  chart that showed that we were 90-plus percent

20  compliant.

21    I don't know if that same methodology was

22  being used in 2001.  If it was, you're really really

23  comparing apples to oranges.  I can only speak to

24  2004.  In 2004 the auditors came to town, and they

25  were looking at specific numbers of tools for specific

1  numbers of suppliers.

2    **Q.  Sure.**

3    A.    And using that methodology retrospectively,

4  they're telling us how compliant we were in 2001, and

5  they're also telling us how compliant we are in the

6  present moment in 2004, and she's acknowledging the

7  stride we made over the couple of weeks during the

8  audit process in 2004.

9    **Q.  Okay.  I understand that.  So in 2001 what**

10  **we just went over was that there was 398 suppliers and**

11  **that Mr. Gehrke reported that they were 91 percent**

12  **compliant with bailing agreements --**

13    A.    Bailment agreements.

14    **Q.  Bailments.  Fast-forward to 2004, we find**

15  **out they're actually 13 percent compliant and that**

16  **Mike had actually improved this number to 43 percent,**

17  **and you acknowledge here that he had made great**

18  **strides; is that correct?**

19    A.    Oh, no, no, no, no, no.  We're not

20  acknowledging that he's making great strides.

21    **Q.  Oh, I think you do.**

22    A.    Oh, no, no --

23    **Q.  You say "Mike Sellers started from scratch**

24  **to add integrity to the process, so for our response**

25  **comments, we should note 2005 moved from 13 percent**

1  **compliant to 43 percent compliant."**

2    A.    So you have to understand what's really

3  going on.  Okay?

4    **Q.  Well, I see here that you say that he**

5  **"started from scratch to add integrity to the**

6  **process."  So what does that mean?**

7    A.    I'll explain.  So Mike Sellers is copied on

8  this note.  Okay?  So this is a note being written to

9  Clyde and copying Mike.  So this is written in such a

10  fashion that it's okay for Mike to read this.

11    What was really happening behind the scenes

12  is that we had another individual doing a deep dive

13  into the database to determine where we were at and to

14  quickly pull together what was happening.  That person

15  was really giving us the solid foundation we needed to

16  prove to the audit staff that we were going to be okay

17  going forward.

18    **Q.  And who was that person?**

19    A.    Mitch Munson.

20    **Q.  And so you were just misrepresenting to**

21  **Mike himself telling him that he was adding integrity**

22  **to the process.  You were misleading him.**

23    A.    I was sparing his feelings.

24    **Q.  You don't strike me as the sort of person**

25  **that spares somebody's feelings.**

1    A.    You're seeing me in a situation that's

2  uncomfortable.  You don't see me every day at work.

3    **Q.  So what would be the purpose in sparing**

4  **Mike's feelings if he was in a lot of trouble for this**

5  **audit?**

6    A.    Well, he was in a lot of trouble and the

7  information was unfolding, but the credit that we're

8  being given here for the great strides that we were

9  making was during the audit while we were under the

10  gun after Mike misrepresented where we were to the

11  audit staff in terms of the information being current,

12  and apparently "current" meant that he hadn't updated

13  it for months and months, and then when we fell back,

14  regrouped, and started to get a better baseline, we

15  were quickly scrambling, calling buyers, getting

16  bailments put in place, to try and at least not be

17  pathetic with the audit results and try and raise the

18  bar a little bit.  And the auditor acknowledged us for

19  the work that we were doing.

20    **Q.  So you were being untruthful when you said**

21  **that Mike added integrity to the process.**

22    A.    I was -- can you point to where you're

23  reading exactly, please.

24    **Q.  It's in the paragraph "She noted that in**

**APP061**

109

1 paragraph.

2     A.   Yeah, he started from scratch to help

3 rebuild everything that we had while we were under

4 crunch time because we were all in trouble because of

5 the audit results.

6     Q.   Who came up with the numbers 13 percent and

7 39 percent?

8     A.   13 and 39.

9     Q.   It says "it appears we were 39 percent" --

10     A.   Yeah. Sue.

11     Q.   And if you flip to the next page on

12 page 49. If you look at the bottom of that page,

13 there's an email from Daniel Dolan. Who is that?

14     A.   Somebody in accounting, I believe.

15     Q.   And it looks like you were included in this

16 email. Do you recall that email?

17     A.   I don't.

18     Q.   And this email says "I am puzzled" -- it

19 says "Christian, Sue, Daria, I am puzzled by two of

20 the repeat audit comments. Something isn't adding up

21 to me. In October 2002 the Waterloo follow-up audit

22 response was," and it quotes the portion of the audit

23 response that we read earlier.

24       Do you see that?

25     A.   I do.

110

1     Q.   Mr. Dolan goes on to say "Based on that

2 response, either we lied or we've changed a

3 significant number of suppliers."

4       Do you see that?

5     A.   I do.

6     Q.   And so we aren't comparing apples and

7 oranges here, are we? There was a misrepresentation

8 back in the 2002 Waterloo follow-up audit response

9 citing that there were 91 percent bailment agreements

10 current?

11     A.   Let me read my response, please.

12       I believe that Mr. Dolan is referring to

13 the 91 percent that's written in the audit. He's not

14 referring to current state with Sue looking backwards

15 at what's actually on file.

16     Q.   But you would agree that the 91 percent was

17 not an accurate number at that time?

18     A.   You know, I guess so. I can't get inside

19 his head. I don't know what he's thinking.

20     Q.   But he said "either we lied or we've

21 changed a significant number of suppliers." So he's

22 not saying that things -- he's saying that that number

23 was either inaccurate or the number of suppliers has

24 changed; correct?

25     A.   Correct, but we knew backwards while we

111

1 know how that 91 percent was calculated. If it was

2 calculated based on dollar value Pareto, which is what

3 Mike was doing leading up to the audit, and that is

4 not correct and misrepresents reality, then we're

5 comparing apples to oranges.

6     Q.   And you're saying Mr. Dolan and Miss Groene

7 are internal auditors; correct?

8     A.   No, Dan is a -- I'm sure -- yeah, I'm

9 sorry, next page, "Dan Dolan, Controller, Waterloo

10 Works."

11     Q.   And what role would he have had in the

12 audit?

13     A.   Well, all audits that have anything

14 financial related, the controller is going to be

15 involved.

16     Q.   And you keep mentioning misrepresentation

17 by Mr. Sellers.

18     A.   Uh-huh.

19     Q.   What documentation do you have that shows

20 that he ever made that representation to you?

21     A.   Well, I don't know that I have it written

22 down. In the months preceding the audit, he would

23 periodically show me and show Clyde how well we were

24 doing with bailments, and they would always be numbers

25 up in the 90s.

112

1       And then when the audit staff was present

2 in my office, they said, "Is this information

3 current" -- he was asked, "Is this information

4 current," and his response was, "Well, that depends on

5 what the definition of 'current' is."

6       So we asked him, "When was this updated,"

7 and it turned out that it hadn't been updated for

8 months.

9     Q.   When I see in your response to Mr. Dolan's

10 email -- or do you respond to Mr. Dolan?

11     A.   I do not.

12     Q.   Why didn't you respond to him and tell him

13 that Mike had misrepresented all the numbers?

14     A.   Maybe I did and maybe it's not in the

15 email. I don't know. This is to Mike, Dave Christy,

16 looks like I grabbed his home address instead of his

17 work address, and Mitch Munson.

18     Q.   And if you look back on page 48 again, you

19 continue in that October 25 email, you say "Mike, I

20 need you to do the following."

21     A.   Uh-huh.

22     Q.   Why are you assigning him additional tasks

23 if he was misrepresenting numbers and doing things so

24 poorly?

25     A.   Because that was the -- we had to get -- we

1 allowed him to continue to do it, and then behind the

2 scenes we were also doing it again.

3    Q.   So you were having him do duplicate work?

4    A.   Yes.

5    Q.   You were just trying to trick him into

6 thinking that what he was doing was proper?

7    A.   No.  We wanted him to recover from the

8 situation that he had created, but we didn't trust him

9 any longer so we had to have somebody else do the work

10 behind the scenes in addition.

11    Q.   And had he kept you in the loop earlier in

12 the year as to where he was with the bailments?

13    A.   Yes, and they were always in the 90-plus

14 range.

15    Q.   When you say "always," throughout the

16 entire time he was doing the bailments he was

17 reporting 90 percent?

18    A.   You know, I don't remember the entire time.

19 I remember in the months approaching the audit as we

20 were prepping for the audit.

21    Q.   Because in May he told you that he was

22 48 percent compliant.

23    A.   Yeah, I don't remember where we were in

24 May.  I just remember before the audit that he had

25 done a calculation based on dollars saying that based

1 on the dollars, that we were in the 90-plus percent

2 range and that that would be adequate.

3    Q.   So when he was reporting to you these

4 dollar amounts, did you ever stop and say, "How many

5 bailing agreements do we have"?

6    A.   Not that I recall.

7    Q.   Did you have any responsibility for the

8 audit?

9    A.   The audit was primarily Mike's

10 responsibility.

11    Q.   Clyde didn't give you any sort of

12 responsibility for the audit?

13    A.   Well, he reported to me so I had some

14 responsibility in that regard, just like Clyde was

15 responsible for the audit, and during the audit we had

16 to completely fall back and regroup, and then I took

17 complete responsibility and was the lead for it.

18    Q.   You took complete responsibility for it?

19    A.   For providing the responses and making sure

20 that each -- it wasn't just this area, there were

21 other areas, but coordinating with -- you know, like

22 certificates of insurance and that group and making

23 sure that the responses were written properly.

24    Q.   And so you don't have a reason for why

25 earlier on in the year you said, "Why didn't Mike

1 don't care about the total number of dollars, I want

2 to know about the bailments.  You're responsible for

3 the bailments."  Why didn't you do that?

4    A.   Because he was the expert on the topic and

5 he was representing to us that we were covered.  And

6 the numbers were in line with the previous audit so it

7 was very logical, it made sense.

8    Q.   And how are they in line with the previous

9 audit?

10    A.   The previous audit reports 91 percent

11 compliant.

12    Q.   And that audit was misrepresented back in

13 2001?

14    A.   Didn't know that.

15    Q.   And so when he was saying he was 48 percent

16 compliant by May, he was actually starting from

17 13 percent compliant?

18    A.   I don't know that.  What are you looking

19 at?

20    Q.   I'm looking at Mike's performance

21 evaluation, his ongoing comments in May of 2004.

22    A.   And what number is that?

23    Q.   It's page 106.

24    A.   Of which --

25    Q.   Exhibit 9.  Sorry.

1         MS. WEST:  That exhibit is not out anymore.

2 Did you say 104?

3         MS. PELLEGRIN:  Page 106.

4         (The requested portion of the record was

5 read.)

6 BY MS. PELLEGRIN:

7    Q.   Is that correct?

8    A.   I have nothing to tell me that that's true

9 in front me right now.

10    Q.   And your ongoing comments right below that

11 are "My only hesitation here is that it is very

12 Sellers dependent.  We need to really make bailments a

13 part of everyone's life so that we don't regress if

14 you should change positions."

15         Wasn't that your job to make sure that that

16 was spread out as his supervisor?

17    A.   No, that was his job.  He's the

18 process pro.  He's responsible for documentation and

19 he's responsible for education.

20    Q.   And you're ultimately responsible for what

21 he produces; correct?

22    A.   Well, that's how chain of command works,

23 yes.

24    Q.   So you relied on him allegedly giving you

25 these 90-plus reports and if he didn't until right

117

1  before the audit was due that you decided that that
2  was inaccurate?
3      A.   It was during the audit when the auditors
4  calculated the numbers and showed me basically a
5  different set of numbers in terms of how covered we
6  are that I was shocked, because it didn't line up with
7  what Mike had been sharing, and called him into my
8  office.  And he had paperwork and stuff to show the
9  auditors, and the auditor said, "Is this information
10 current?"
11          And he said, "That depends on what your
12 definition of 'current' is."
13          And that was the first clue that maybe we
14 were in trouble there.
15     Q.   So in October of 2004, you describe Mike as
16 starting from scratch and improving the integrity of
17 the process, and then a month or so later you told him
18 that he completely failed the audit and he did not
19 meet expectations for that year.  Is that correct?
20     A.   He was scrambling during the audit to start
21 from scratch and improve it.
22     Q.   Do you normally wait until the last minute
23 to tell someone they haven't met their goals for the
24 year or their job responsibilities?
25     A.   When somebody lies to you and you only have

118

1  that information and you trust your employees, then
2  no, you don't tell them ahead of time because you
3  don't know.
4      Q.   How many people did you tell that Mike lied
5  about the bailment agreements?
6      A.   Clyde D'Cruz.
7      Q.   Nobody else?
8      A.   No.
9      Q.   Do you recall having a meeting with Mike
10 and Clyde in February of 2005?
11     A.   Yes.
12     Q.   Did you review the transcript of that
13 meeting, or listen to it, before today?
14     A.   I'm sorry.  I don't understand.  Listen to
15 it?
16     Q.   That meeting was tape-recorded.  Were you
17 aware of that?
18     A.   I'm aware now that it was tape-recorded
19 unbeknownst to me.  I didn't know there was a copy of
20 the tape.
21     Q.   So you didn't see a copy of the transcript
22 that was made?
23     A.   I've seen a transcript generated by
24 Mr. Sellers.  I haven't seen a legitimate transcript
25 of an audit tape -- a copy of the tape of the audit.

119

1      Q.   Did you ever tell Kevin Keith that Mike
2  lied to the auditors?
3      A.   I don't recall telling Kevin.  I'm sure
4  that Kevin was ultimately aware, but I don't know if
5  he heard that from me or from Clyde.
6      Q.   Was anybody else in the HR department
7  aware?
8      A.   Not that I'm aware of.
9      Q.   Did you ever tell any of the auditors that
10 Mike lied?
11     A.   No.  We tried to fall back and regroup.
12 They were in the room when he misrepresented, so in
13 front of the auditors I did react to his statement
14 that "that depends on what the definition of 'current'
15 is."
16     Q.   Do you still have Exhibit 81 in front of
17 you?  Probably not.
18     A.   Yes.
19     Q.   You do.  Okay.  If you could switch back to
20 page 47k again.
21     A.   There's a lot of 47s.  Yes.
22     Q.   Were these numbers -- in the 2004 report,
23 were these correct?
24     A.   Yes.
25     Q.   And this was the actual audit report?

120

1      A.   Yes.
2      Q.   So this was the representation made at that
3  time of the status of the bailments.
4      A.   It was -- it was where we were when they --
5  it's where we were when they wrote the audit.  Based
6  on the data the auditors pulled.
7      Q.   Then the next page, 47l, it says "Unit
8  Response."  Did you prepare that response?
9      A.   I did.
10     Q.   And so you agreed with those findings.
11     A.   Well, you'll note that I corrected them as
12 of this writing.  Because the response was on the 31st
13 of January, and I don't remember what date they wrote
14 it, but by that time we had kind of crawled our way
15 back up to 76 percent covered with 92 percent of the
16 assets.
17     Q.   And so when you say 92 percent of the value
18 of the assets, is that the --
19     A.   That's the format that Mike had been -- the
20 metric that Mike had been providing to us.  Not the
21 number but the metric that he had been sharing prior
22 to.
23     Q.   And it says there "Person Responsible:
24 Daria Jerauld."  That's you; correct?
25     A.   Yes.  I was responsible to follow the audit.

**APP064**

121

1    Q.   And so Mike didn't actually make any
2   representations in the audit, did he?
3    A.   Ultimately, no.
4    Q.   When did you learn about Mike having health
5   problems?  Specifically his depression and anxiety.
6    A.   I don't remember exactly when he shared
7   that.
8    Q.   Do you recall a general time period?
9    A.   I don't.
10   Q.   Was it before 2005?
11   A.   I don't know.
12   Q.   If documentation shows that he told you
13  sometime in December of 2004, does that ring a bell at
14  all?
15   A.   It really doesn't.  I don't really remember
16  any -- you know, lots of people have depression and
17  anxiety, and it's not something that stands out in my
18  mind.
19   Q.   Do you remember him telling you how he was
20  suicidal at that time?
21   A.   I do remember -- I'll wait.  Because I
22  can't think.  I'm easily distracted.
23   Q.   That's okay.  I'd rather you be focused.
24       MS. PELLEGRIN:  Can we go off the record.
25       (Discussion was held off the record.)

122

1        MS. PELLEGRIN:  Back on the record.
2   BY MS. PELLEGRIN:
3    Q.   Go ahead.
4    A.   So I remember -- and I don't remember when,
5   I'm sorry, I have no time frame for you, but I
6   remember Mike coming to me and saying that he was
7   purposely driving at high speeds without wearing a
8   seat belt.  And to me that sounded like suicide.
9        And I was very concerned, I went straight
10  to Clyde and shared with Clyde what had been said, and
11  Clyde -- same reaction, very concerned, and
12  immediately picked up the phone and called Chris Cox,
13  the safety guy who the company doctor reported to, and
14  then the company doctor got involved.
15   Q.   Did you instruct Mike to go see the Deere
16  doctor at that point?
17   A.   Well, you can't instruct anybody to do
18  anything, but I did give him the advice that, you
19  know, the Deere doctor is there if he wants to go see
20  him.
21   Q.   Do you know if anything else happened with
22  this knowledge that Mike was suicidal?  Do you know if
23  any other action was taken?
24   A.   No, I don't.
25   Q.   Did you ever tell Clyde that he should be

123

1   careful letting Clyde know about this because he would
2   view it as a sign of weakness?
3    A.   No.
4    Q.   And once you found out about Mike's
5   depression and anxiety issues, did he explain to you
6   some things that would make him be able to perform his
7   job better?
8    A.   Not that I recall, no.
9    Q.   Did you ever receive anything from the
10  Deere doctors, from Mike's treating physicians, as to
11  work restrictions?
12   A.   No.  That would be called a DDR.  No.
13   Q.   Did you ever tell Mike he was not allowed
14  to use a conference room at work?
15   A.   I got a call from some people at the
16  Product Engineering Center saying that Mike was using
17  conference rooms, and they called me and wanted to
18  know if it was for business reasons.  And it wasn't,
19  it was Mike just wanted to work in a conference room.
20       So I did tell him that, you know, unless
21  there was some sort of doctor's note, he would have to
22  work at his desk like everyone else.
23   Q.   But you did understand that the reason he
24  wanted to use the conference room was because of his
25  mental condition.

124

1    A.   I don't recall why he wanted to use the
2   conference room other than he wanted to work in a
3   conference room.  And like I said, without a doctor's
4   note saying that there's a legitimate reason why you
5   have to work in a conference room, it's something we
6   just couldn't accommodate, we didn't have the space.
7    Q.   How many conference rooms -- what building
8   was this in, first of all?
9    A.   The call I got was from the Product
10  Engineering Center, which was not the building that we
11  worked in.
12   Q.   So was he there on assignment that day or
13  do you know?
14   A.   No.  Just there using conference rooms.
15   Q.   And what building were you in normally?
16   A.   Tractor cab assembly operations on Donald
17  Street.
18   Q.   The Donald Street site?
19   A.   Yes.
20   Q.   Were there conference rooms there for him
21  to be able to work?
22   A.   There were conference rooms that are
23  available for people to use for meetings and private
24  phone calls and things -- interviews, things of that

**APP065**

125

1  him to just sit in and work.

2      Q.   So if it helped to accommodate his work, he

3  was not allowed to use that unless it was for another

4  business purpose?

5      A.   It was certainly allowed as long as he had

6  a doctor's note.

7      Q.   So it's your testimony you didn't know

8  about any doctor's note that existed?

9      A.   Correct.

10     Q.   Now, Mike underwent a 360 review.  Was this

11 something that was required of him?

12     A.   A 360 is suggested.  It's a great

13 development tool.  I don't remember it being a

14 requirement.

15     Q.   Was it in his developmental goals?

16     A.   I don't recall.

17     Q.   If it is in a person's developmental goals,

18 is that something that if they don't do it by the end

19 of the year, that would be looked down upon?

20     A.   No, not at all.  Development goals are more

21 optional.

22     Q.   So if someone doesn't do any of their

23 developmental goals throughout the year, that won't

24 affect their evaluation whatsoever?

25     A.   No.

126

1      Q.   If they do do all their developmental

2  goals, does that help their evaluation?

3      A.   Only if it had a direct impact on the

4  competencies or job responsibilities or stretch goals.

5      Q.   And would a 360 review have an impact on

6  those things?

7      A.   It depends how the person decides to use

8  it.  If they use the results and work with a coach,

9  then it could.

10     Q.   So if you complete a developmental goal of

11 the 360 and someone used it appropriately, then it

12 could positively affect their evaluation?

13     A.   If they put it to good use, yes.

14     Q.   Do you recall Mike's 360 review?

15     A.   Yes.

16     Q.   And we've got -- I've got it marked here,

17 it's a new exhibit.  Exhibit 92.

18          And have you ever undergone the 360 review?

19     A.   Yes.

20     Q.   How does it work?

21     A.   You send out a request -- it's all done

22 electronically and anonymously, but you provide a list

23 of names, and then a request is sent out to peers or

24 people you work with, your manager, or managers if you

25 have a -- I've had two managers -- and they have an

127

1  opportunity to answer a questionnaire describing you.

2  And then that information comes back to you, and it's

3  anonymous except for your direct manager.

4      Q.   And you were his direct manager at this

5  time; correct?

6      A.   That's right.

7      Q.   So in any of the pages that it refers to

8  "boss," is that you?

9      A.   That's me.

10     Q.   Do you know who the direct reports, peers,

11 and others were that filled this out for Mr. Sellers?

12     A.   No.

13     Q.   And if you would turn to page 56.  They're

14 numbered at the bottom.

15     A.   Uh-huh.

16     Q.   This is the composite of a number of

17 "Career Issues" it says.

18     A.   Uh-huh.

19     Q.   And there are different columns.  It says

20 "Self," "Boss," "Direct Reports," "Peers," "Others,"

21 and "Average."

22     A.   Uh-huh.

23     Q.   And if I look at the columns comparing your

24 scores to Mike's peers and direct reports, for the

25 most part they're consistently lower.

128

1      A.   Sure.

2      Q.   And in some cases they're significantly

3  lower.  For instance, "Makes sure that people have no

4  'surprises.'"

5      A.   Right.

6      Q.   His direct reports give him a 4.  Is that

7  on a 5 scale?  Do you know?

8      A.   I don't know.

9      Q.   I see some numbers that are above 4 so I

10 guess I'm just assuming it's a 5 scale.  Is a 4 a good

11 score?  Do you remember?

12     A.   There's no good or bad.  That's not how it

13 works.

14     Q.   So then how does it work?

15     A.   So you would -- it's a Likert scale.  So,

16 you know, you provide kind of a relative rating on a 1

17 to 5 scale.  And so this is -- it's not like a test.

18 It's just feedback.

19     Q.   Okay.  So if in one of your 360 reviews

20 your boss gave you all 1s, would you be happy about

21 that?

22     A.   I've had 360s where I've gotten 1s from a

23 boss, and it forces you to be introspective and say

24 what am I doing, how am I coming across, and how can I

Case 1:14-cv-02050-JEG     Document 84-25  Filed 02/09/14   Page 60 of 190

APP066

```
 1              C E R T I F I C A T E
 2         I, the undersigned, a Certified Shorthand
 3  Reporter of the State of Iowa, do hereby certify that
 4  there came before me at the time, date, and place
 5  hereinbefore indicated, the witness named on the
 6  caption sheet hereof, who was by me duly sworn to
 7  testify to the truth of said witness's knowledge, that
 8  the witness was thereupon examined under oath, the
 9  examination taken down by me in shorthand and later
10  reduced to a transcript through the use of a
11  computer-aided transcript device under my supervision
12  and direction, and that the deposition is a true
13  record of the testimony given and of all objections
14  interposed.
15         I further certify that I am neither
16  attorney or counsel for, nor related to or employed by
17  any of the parties to the action in which this
18  deposition is taken, and further that I am not a
19  relative or employee of any attorney or counsel
20  employed by the parties hereto, or financially
21  interested in the action.
22         Dated at Des Moines, Iowa, this 31st day of
23  October, 2013.

24

               /s/Melissa A. Burns
25             CERTIFIED SHORTHAND REPORTER
```

Susan Frye and Associates, Inc.                    (515) 284-1972

# APP068-194

# FILED UNDER SEAL

John Deere Waterloo Works
Supply Management



**PLAINTIFF'S
EXHIBIT
26**



JOHN DEERE

## *Organizational Chart*

| Name | Title | Phone Extension | Mail Code |
|------|-------|-----------------|-----------|
| **D'Cruz J Clyde** | **Manager, Supply Management** | **4269** | **PEC** |
| Doubet Stephanie R | Administrative Assistant | **8124** | PEC |
| | | | |
| Department 08s - Business Process Improvement | | | |
| **Jerauld Daria A** | **Business Process Manager** | **7649** | **DSS** |
| Fordyce Heidi A | Supply Management Specialist | 8691 | DSS |
| Galer Sandra E | Supply Management Specialist | 7191 | DSS |
| Jost Dennis L | Supply Management Specialist | 8642 | DSS |
| Marsh Kathi S | Supply Management Specialist | 4544 | DSS |
| Meier Yelena A | Supply Management Planner | 7539 | DSS |
| Rowenhorst Elroy J | Supply Management Planner | 7177 | DSS |
| Szabo Eva | Supply Management Planner | | |
| Thede Cynthia S | Supply Management Planner | 5019 | DSS |
| Van Lengen Kimberly K | Supply Management Planner | 7134 | DSS |
| Christy David L | CPS Coordinator | 6230 | DSS |
| Heine Sharon A | Supplier Collaboration Coordinator | 4223 | DSS |
| Hopkins Ginny M | EDI Coordinator | 7935 | DSS |
| Iversen Ofelia | AE/JDCROP Coordinator | 7120 | DSS |
| Munson Mitchell B | Regular Part Time | 7709 | DSS |
| Sellers Michael J | Process Pro | 8126 | DSS |
| Thoms Leita J | EDI Coordinator | 7434 | DSS |
| | | | |
| Department 15s - Continuous Improvement | | | |
| **Pashan Craig S** | **Procurement Manager** | **6216** | **DSS** |
| Bodensteiner Jason | Consultant | 7538 | DSS |
| Delagardelle Emily M | ? | 6481 | DSS |
| Dufner Andrea J | Supplier Integration Analyst | 7306 | DSS |
| Frank Kimberly K | Supply Mgmt Specialist | 6302 | DSS |
| Jensen Jennifer L | ? | 7662 | DSS |
| King Bill E | Supply Mgmt Specialist | 6472 | DSS |
| Trunck Traci A | Supply Mgmt Specialist | 4781 | DSS |

Department 16s - Supplier Integration

| Matson Brian R | Manager, Supplier Integration | 6310 | PEC |
|---|---|---|---|
| Albro James C II | PDP Quality Engineer | 6235 | PEC |
| Beuter Rachelle C | Supply Management Specialist | 6340 | PEC |
| Brammer Richard E | Supply Management Specialist | 8518 | PEC |
| Buhr Luke K | Regular Part Time | 8833 | PEC |
| Chari Sreenivas | PDP Quality Engineer | 8889 | PEC |
| Coleman Clarence Jr | PDP Quality Engineer | 7130 | PEC |
| Davis William C (WLOO) | PDP Quality Engineer | 8834 | PEC |
| Forster Gayle L | Supply Management Specialist | 7891 | PEC |
| Goodwin Joseph D | Supply Management Specialist | 6442 | PEC |
| Hartz Tim J | Supply Management Specialist | 8781 | PEC |
| Kinney Keri L | Supply Management Specialist | 8189 | PEC |
| Lenius Wanda J | Supply Management Specialist | 8133 | PEC |
| Mennenga Cynthia L | Decision Coordinator | 8131 | PEC |
| Musch Andrew J | Experimental Parts Planner | 7732 | PEC |
| Natvig Matthew A | Supply Management Specialist | 8421 | PEC |
| Patel Dashrath J | PDP Quality Engineer | 7591 | PEC |
| Reinke Jamie | Supply Management Specialist | 7141 | PEC |
| Shah Ramesh P | Quality Engineering Team Leader | 8780 | PEC |
| Souhrada Samantha | New Program Coordinator | 8728 | PEC |
| Steele Micah Y | Supply Management Specialist | 8775 | PEC |
| Williams Jaime S | Regular Part Time | 6409 | PEC |

Department 21s - Operational Purchasing

| Mc Gonegle Michael J | Manager, Tactical Purchasing | 8860 | DSS |
|---|---|---|---|
| Albrecht Kathryn L | Supply Management Planner | 4303 | WAS |
| Aldrich Hope E | Supply Management Specialist | 5414 | WAS |
| Aten James W | Supply Management Specialist | 8789 | WAS |
| Atteberry Stephanie A | Supply Management Planner | 6729 | WAS |
| Baird Trudy J | Supply Management Planner | 7341 | DSS |
| Fauser Richard D | Supply Management Specialist | 8719 | DSS |
| Grant Linda M | Supply Management Specialist | 4068 | WAS |
| Hammer Michelle D | Supply Mgmt Specialist | 6498 | DSS |
| Heisterkamp Jeffrey W | Supply Management Planner | 6203 | DSS |
| Henderson Valda L | Supply Management Planner | 7854 | DSS |

2

APP196

| Keating Thomas C | Supply Management Specialist | 7126 | WAS |
|---|---|---|---|
| Larsen Mary E | Supply Management Planner | 5783 | DSS |
| Markham Reggie J | Supply Management Planner | 4061 | WAS |
| Patel Rakhi D | Supply Management Planner | 7645 | WAS |
| Schulte Dale M | Supply Management Specialist | 7634 | DSS |
| Testorff Diana R | Supply Management Planner | 4107 | WAS |
| Watkins Michael R | Supply Management Planner | 4754 | WAS |
| Westergreen Timothy J | Supply Management Planner | 7253 | DSS |

Department 27s - Indirect Materials & Services

| Schmitz Ken L | Manager, Indirect Materials and Services | 4968 | WAS |
|---|---|---|---|
| Peck John | IM&S Team Leader | 6173 | WAS |
| Clendenen Charlotte A | Supply Mgmt Planner | 7255 | WAS |
| Hathaway Phyllis M | Supply Mgmt Specialist | 4166 | WAS |
| Jolley Royal M | Supply Mgmt Specialist | 8367 | WAS |
| Keith Thomas G | Supply Management Specialist | 8670 | WAS |
| Marken Mark L | Supply Mgmt Specialist | 5381 | WAS |
| Orona Denise | Administrative Assistant | 5969 | WAS |
| Rommel Connie L | Supply Mangement Planner | 7638 | WAS |
| Shaver Pamela S | Supply Mgmt Planner | 5601 | WAS |
| Smith Michael J (JDWLOO) | Supply Mgmt Specialist | 4295 | WAS |
| Steffes Terry Lynn | Supply Management Specialist | 5381 | WAS |
| Tillotson Jessica M | STP | 4888 | WAS |
| Van Deest Ann | Supply Management Specialist | 4178 | WAS |
| Vollenweider Thomas L | Expense Stores Analyst | 4417 | WAS |

Department 33s - OFP Supplier Quality

| Garcia Paul | Manager, OFP Supplier Quality | 7577 | DSS |
|---|---|---|---|
| Boeding Russell R | Warranty Engineer | 8563 | PEC |
| Brown Ronald D | Commodity Quality Engineer | 4519 | WAS |
| Bullock Jack W | Quality Improvement Engineer | 8518 | DSS |
| Conrad Chris S | Commodity Quality Engineer | 7368 | DSS |
| Day William D | Commodity Quality Engineer | 8871 | WAS |
| Gatlan Dan D | Quality Improvement Engineer | 8524 | DSS |
| Grady Michael R | Commodity Quality Engineer | 8985 | DSS |
| Guetzlaff Robert W | Commodity Quality Engineer | 4820 | DSS |

APP197

| Koisti Kerry L | Quality Improvement Engineer | 7001 | DSS |
| McCullough Brian E | Quality Improvement Engineer | 6234 | DSS |
| Simon Evelyn J | Supply Management Specialist - Warranty | 7219 | PEC |
| Smith Kevin H | Quality Improvement Engineer | 8546 | DSS |
| Wells Craig | Commodity Quality Engineer | 7838 | DSS |
| **Wirtz Heidi A** | **Supervisor, Tactical Supplier Quality** | **7278** | **DSS** |
| Berry Justin E | STP | 6225 | DSS |
| Buescher Melvin H | Tactical Quality Engineer | 4899 | DSS |
| Corwin Steve S | Tactical Quality Engineer | 4465 | DSS |
| Hajar Maher S | Tactical Quality Engineer | 4248 | WAS |
| Hawker Kenneth C | Tactical Quality Engineer | 4782 | WAS |
| Patek Lynn E | Tactical Quality Engineer | 8129 | DSS |
| Ranson Andrew | Tactical Quality Engineer | 4432 | DSS |
| Thode Steven C | Tactical Quality Engineer | 7411 | DSS |
| Tott Ashlee M | Tactical Quality Engineer | 7888 | DSS |

## *Logistics departments related to Supply Management*

| Name | Title | Phone Extension | Mail Code |
| --- | --- | --- | --- |
| **Iversen Bruce C** | **Manager, Logistics** | **7876** | **DSS** |
| **Ward Mark (Timothy M)** | | **7439** | **DSS** |
| | | | |
| Department 437 - Container Management | | | |
| **Krouse Curtis D** | | **7712** | **DSS** |
| Simmons Lyle | | 4038 | DSS |
| | | | |
| Department 449 - Misc. | | | |
| Brown Steven H | | 8403 | DSS |
| Moetsch Michael P | | 7656 | DSS |
| **Grosse Debra J** | | **7095** | **DSS** |
| Sanderson John B | | 6080 | DSS |
| | | | |
| **Potter John R** | | **7168** | **DSS** |
| | | | |
| Department 448 - OFP Planning | | | |
| Fischels Peggy L | | 4222 | DSS |

4

APP198

| Commodity Description | Commodity Specialist Manager | Buyer Desk | Commodity Specialist | Commodity Quality Engineer Manager | Commodity Quality Engineer |
|---|---|---|---|---|---|
| Bearings, snap rings, fasteners, labels | Zeinio William J 309-765-4610 | NB | Boiler Dan C x8787 | Matson Brian R x6310 | Davis William C x8834 |
| Cab, HVAC, springs, manuals, exhaust | Matson Brian R x6310 | NC | Lenius Wanda J x8398 | Matson Brian R x6310 | Albro James C II x6235 |
| Castings, machined castings | Matson Brian R x6310 | NM | Hartz Tim J x8781 | Matson Brian R x6310 | Charl Sreenivas x8889 |
| Electrical | Matson Brian R x6310 | NE | Natvig Matthew A x8421 | Matson Brian R x6310 | Patel Dashrath J x8673 |
| Fabrication 1 | Matson Brian R x6310 | NJ | Beuter Rachelle C x8779 | Matson Brian R x6310 | Coleman Clarence Jr x7130 |
| Fabrication 2 | Matson Brian R x6310 | NK | Brammer Richard E x8518 | Matson Brian R x6310 | Coleman Clarence Jr x7130 |
| Forging, friction, drive train, screw mach, powder | Matson Brian R x6310 | NR | Kinney Keri L x8189 | Matson Brian R x6310 | Charl Sreenivas x8889 |
| Hydraulic lines, seals | Matson Brian R x6310 | NL | Forster Gayle L x6189 | Matson Brian R x6310 | Davis William C x8834 |
| Hydraulics | Matson Brian R x6310 | NH | Steele Micah Y x8775 | Matson Brian R x6310 | Shah Ramesh P x8780 |
| Plastics, cooling, seats, glass | Matson Brian R x6310 | NP | Goodwin Joseph D x8492 | Matson Brian R x6310 | Albro James C II x6235 |
| Steel | Collison Marianne 309-765-4780 | NT | Vanherzeele Teresa L 309-748-5113 | Matson Brian R x6310 | Coleman Clarence Jr x7130 |
| Wheel & tire | Matson Brian R x6310 | NW | Hammer Michelle D x6498 | Matson Brian R x6310 | Charl Sreenivas x8889 |

All phone numbers are 319-292-xxxx unless otherwise marked

03 May 2004

OFP- Org.

| Commodity Description | Commodity Specialist & Material Planner Manager | Buyer Desk | Commodity Specialist | Material Planner Desk (1) | Material Planner Name (1) | Material Planner Desk (2) | Material Planner Name (2) | Material Planner Desk (3) | Material Planner Name (3) | Commodity Quality Engineer Manager | Commodity Quality Engineer | Quality Improvement Engineer | Logistics Container Representative |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ...ings, snap rings, labels | Zelnio William J 309-765-4610 | FJ | Boller Dan C x8787 | PJ | Patel Rakhi D x7645 | - | - | - | - | Garcia Paul x7577 | Grady Michael R x8985 | (none) | Heidemann Jerald H x7798 |
| Cab, cooling | Mc Gonegle Michael J x8860 | FC | Keating Thomas C x7126 | PC | Heisterkamp Jeffrey W x6203 | - | - | - | - | Garcia Paul x7577 | Smith Kevin H x8546 | Smith Kevin H x8546 | Grimm Dana x7359 |
| ...stings, aluminum die castings, machining | Mc Gonegle Michael J x8860 | FM | Grant Linda M x4068 | PL | Markham Reggie J x4061 | PM | Watkins Michael R x4754 | - | - | Garcia Paul x7577 | Day William D x8871 | McCullough Brian E x6234 | Cary Rodney L x4590 |
| Electrical | Jerauld Daria A x7649 | FE | Galer Sandra E x7191 | PE | Thede Cynthia S x5019 | - | - | - | - | Garcia Paul x7577 | Wells Craig x7838 | Koisti Kerry L x7001 | Simmons Lyle x4038 |
| Fasteners | Zelnio William J 309-765-4610 | FF | Boller Dan C x8787 | PF, TR | Testorff Diana R x4107 | - | - | - | - | Garcia Paul x7577 | Grady Michael R x8985 | (none) | Heidemann Jerald H x7798 |
| Foreign 1 | Jerauld Daria A x7649 | FX | Fordyce Heidi A x8691 | PX | Meier Yelena A x7539 | PQ | Szabo Eva (Hungary) 011-36-96-337-220 | - | - | Garcia Paul x7577 | (refer to commodity quality engineer) | (none) | (refer to commodity container rep.) |
| Fore... | Jerauld Daria A x7649 | FY | Marsh Kathi S x4543 | PY | Marsh Kathi S x4543 | - | - | - | - | Garcia Paul x7577 | (refer to commodity quality engineer) | (none) | (refer to commodity container rep.) |
| ears, shafts, forgings, ...w machine, drive train ...mbly, powdered metal, rings, friction material, farmout | Mc Gonegle Michael J x8860 | FR, 0F | Fauser Richard D x8719 | PR | Patel Rakhi D x7645 | PV | Albrecht Kathryn L x4303 | P2, P3, 0F | Atteberry Stephanie A x6729 | Garcia Paul x7577 | Brown Ronald D x4519 | McCullough Brian E x6234 | Cary Rodney L x4590 |
| Hydraulics | Jerauld Daria A x7649 | FH | Jost Dennis L x8642 | PH | Van Lengen Kimberly K x7134 | PK | Rowenhorst Elroy J x7717 | - | - | Garcia Paul x7577 | Grady Michael R x8985 | Bullock Jack W x7212 | Simmons Lyle x4038 |
| Interfactory | Ward Mark (Timothy M) x7439 | FG | Grosse Debra J x7095 | PG | Grosse Debra J x7095 | PN | Sanderson John B x6080 | - | - | Garcia Paul x7577 | (none) | | Lehnen Bruce E x7806 |
| Plastics | Mc Gonegle Michael J x8860 | FB | Heine Sharon A x4223 | PB | Heisterkamp Jeffrey W x6203 | - | - | - | - | Garcia Paul x7577 | Smith Kevin H x8546 | Smith Kevin H x8546 | Lehnen Bruce E x7806 |
| ...eet metal / fabrications | Mc Gonegle Michael J x8860 | FA | Aten James W x8789 | PA | Larsen Mary E x5783 | PD | Henderson Valda L x7854 | PT | Westergreen Timothy J x7253 | Garcia Paul x7577 | Guetzlaff Robert W x4820 | Gatlan Dan D x8524 | Lamos Jeffrey D x7839 |
| Steel | Collison Marianne 309-765-4780 | FT | Vanherzeele Teresa L 309-748-5113 | PS, P1 | Aldrich Hope E x5414 | - | - | - | - | Garcia Paul x7577 | Brown Ronald D x4519 | McCullough Brian E x6234 | Lamos Jeffrey D x7839 |
| Wheels & tires | Mc Gonegle Michael J x8860 | FW | Hammer Michelle D x6498 | PW | Thede Cynthia S x5019 | | | | | Garcia Paul x7577 | Thode Steven C x7411 | (none) | Simmons Lyle x4038 |

...hone numbers are 319-292-xxxx unless otherwise marked

17 May 2004

Case 6:12-cv-02050-JSS   Document 84-3   Filed 02/03/14   Page 68 of 190

**APP200**



APP201



Supply Management

Mgr Division Purchasng
**Daria Jerauld**

08S OFP Tact Purch Core

Advanced Analyst
**Dennis Jost**

08S OFP Tact Purch Core

Supply Mgmt Specialist
**Virginia Hopkins**

08S OFP Tact Purch Core

Supply Mgmt Specialist
**Heidi Fordyce**

08S OFP Tact Purch Core

Supply Mgmt Specialist
**Kathi Marsh**

08S OFP Tact Purch Core

Supply Mgmt Specialist
**Sharon Heine**

08S OFP Tact Purch Core

Info Technology Anlyst
**David Christy**

08S OFP Tact Purch Core

Sr Materials Specialst
**Open position**

08S OFP Tact Purch Core

EDI Systems Coordinatr
**Leita Thoms**

08S OFP Tact Purch Core

Process Pro
**Michael Sellers**

08S OFP Tact Purch Core

Regular Part Time
**Open position**

08S OFP Tact Purch Core

Supply Mgmt Planner
**Yelena Meier**

08S OFP Tact Purch Core

Supply Mgmt Planner
**Ofelia Iversen**

08S OFP Tact Purch Core

Information Technology Analyst
**Open position**

8

**APP202**



08S OFP Tact
Purch Core

Advanced Analyst
**Dennis Jost**

| 08S | 08S | 08S | 08S |
|---|---|---|---|
| Electro-Hydraulc Purc | Electro-Hydraulc Purc | Electro-Hydraulc Purc | Electro-Hydraulc Purc |
| Supply Mgmt Specialist | Supply Mgmt Planner | Supply Mgmt Planner | Supply Mgmt Planner |
| **Sandra Galer** | **Elroy Rowenhorst** | **Kimberly Van Lengen** | **Cynthia Thede** |



Supply Management

Mgr Division Purchasng
**Brian Matson**

| | | | |
|---|---|---|---|
| 16S Supplier Integration<br><br>Supply Mgmt Specialist<br>**Timothy Hartz** | 16S Supplier Integration<br><br>Decision Coordinator<br>**Cynthia Mennenga** | 16S Supplier Integration<br><br>Engineer<br>**V Sreenivasa Chari** | 16S Supplier Integration<br><br>Supply Mgmt Specialist<br>**Gayle Forster** |
| 16S Supplier Integration<br><br>Supply Mgmt Engineer<br>**Ramesh Shah** | 16S Supplier Integration<br><br>Engineer<br>**Dashrath Patel** | 16S Supplier Integration<br><br>Supply Mgmt Specialist<br>**Keri Kinney** | 16S Supplier Integration<br><br>Supply Mgmt Specialist<br>**Open position** |
| 16S Supplier Integration<br><br>Supply Mgmt Engineer<br>**Clarence Coleman Jr** | 16S Supplier Integration<br><br>Supply Mgmt Planner<br>**Samantha Souhrada** | 16S Supplier Integration<br><br>Supply Mgmt Engineer<br>**Jim Albro II** | 16S Supplier Integration<br><br>Supply Mgmt Planner<br>**Andrew Musch** |
| 16S Supplier Integration<br><br>Supply Mgmt Specialist<br>**Wanda Lenius** | 16S Supplier Integration<br><br>Supply Mgmt Specialist<br>**Matthew Natvig** | 16S Supplier Integration<br><br>Supply Mgmt Specialist<br>**Open position** | 16S Supplier Integration<br><br>Supply Mgmt Engineer<br>**Open position** |
| 16S Supplier Integration<br><br>Regular Part Time<br>**Luke Buhr** | 16S Supplier Integration<br><br>Regular Part Time<br>**Mitch Munson** | 16S Supplier Integration<br><br>Supply Mgmt Specialist<br>**Open position** | 16S Supplier Integration<br><br>Quality Engineer<br>**William Davis Jr** |
| 16S Supplier Integration<br><br>Supply Mgmt Specialist<br>**Rachelle Beuter** | 16S Supplier Integration<br><br>Supply Mgmt Engineer<br>**Joseph Goodwin** | 16S Supplier Integration<br><br>Supply Mgmt Specialist<br>**Micah Steele** | 16S Supplier Integration<br><br>Regular Part Time Student<br>**Jaime Williams** |

16S Supplier Integration

Supply Mgmt Specialist
**Jamie Reinke**

1 0

APP204



Supply Management
Div Mgr Supply Mgmt
Craig Pashan
15S Unit Src E-SRC MW CR
Supply Mgmt Specialist
William King
15S Unit Src E-SRC MW CR
Supply Mgmt Specialist
Andrea Dufner
15S Unit Src E-SRC MW CR
Supply Mgmt Specialist
Traci Trunck
15S Unit Src E-SRC MW CR
Supply Mgmt Specialist
Open position
15S Unit Src E-SRC MW CR
Supply Mgmt Specialist
Open position
15S Unit Src E-SRC MW CR
Supply Mgmt Specialist
Kimberly Frank
15S Unit Src E-SRC MW CR
Supply Mgmt Specialist
Jennifer Jensen
15S Unit Src E-SRC MW CR
Supply Mgmt Specialist
Emily Delagardelle



Supply Management
Mgr Division Purchasng
Kenneth Schmitz
27S Indirect Mtrls/Srvcs
Supply Mgmt Specialist
Open position
27S Indirect Mtrls/Srvcs
Supply Mgmt Specialist
Michael Smith
27S Indirect Mtrls/Srvcs
Supply Mgmt Specialist
Open position
27S Indirect Mtrls/Srvcs
Supply Mgmt Specialist
Phyllis Hathaway
27S Indirect Mtrls/Srvcs
Supply Mgmt Specialist
Ann VanDeest
27S Indirect Mtrls/Srvcs
Administrative Assist
Denise Orona
27S Indirect Mtrls/Srvcs
Regular Part Time
Jessie Tillotson
27S Indirect Mtrls/Srvcs
Supply Mgmt Specialist
Mark Marken
27S Indirect Mtrls/Srvcs
Supply Mgmt Specialist
Thomas Keith



27S Indirect
Mtrls/Srvcs

Supply Mgmt
Specialist
**Mark Marken**

27S Indirect
Mtrls/Srvcs II

Supply Mgmt
Planner
**Peggy Essmann**



Supply Management

Mgr Division Purchasng
**Michael Mc Gonegle**

| 21S OFP Tact Purch Proces | 21S OFP Tact Purch Proces | 21S OFP Tact Purch Proces | 21S OFP Tact Purch Proces |
|---|---|---|---|
| Supply Mgmt Specialist **Richard Fauser** | Supply Mgmt Specialist **Hope Aldrich** | Supply Mgmt Planner **Timothy Westergreen** | Supply Mgmt Planner **Michael Watkins** |
| 21S OFP Tact Purch Proces | 21S OFP Tact Purch Proces | 21S OFP Tact Purch Proces | 21S OFP Tact Purch Proces |
| Supply Mgmt Specialist **James Aten** | Supply Mgmt Planner **Diana Testorff** | Supply Mgmt Specialist **Royal Jolley** | Supply Mgmt Planner **Valda Henderson** |
| 21S OFP Tact Purch Proces | 21S OFP Tact Purch Proces | 21S OFP Tact Purch Proces | 21S OFP Tact Purch Proces |
| Supply Mgmt Specialist **Thomas Keating** | Record Clerk **Trudy Baird** | Supply Mgmt Planner **Reggie Markham** | Supply Mgmt Specialist **Dale Schulte** |
| 21S OFP Tact Purch Proces | 21S OFP Tact Purch Proces | 21S OFP Tact Purch Proces | 21S OFP Tact Purch Proces |
| Supply Mgmt Planner **Open position** | Supply Mgmt Planner **Open position** | Supply Mgmt Planner **Kathryn Albrecht** | Supply Mgmt Planner **Stephanie Atteberry** |
| 21S OFP Tact Purch Proces | 21S OFP Tact Purch Proces | 21S OFP Tact Purch Proces | 21S OFP Tact Purch Proces |
| Supply Mgmt Specialist **Jeff Heisterkamp** | Supply Mgmt Specialist **Open position** | Supply Mgmt Planner **Open position** | Supply Mgmt Specialist **Linda Carey-Grant** |
| 21S OFP Tact Purch Proces | 21S OFP Tact Purch Proces | | |
| Supply Mgmt Specialist **Michelle Hammer** | Supply Management Specialist **Richard Brammer** | | |

14



Supply Management
Manager OFP
Supplier Quality
**Paul Garcia**

| 33S OFP Supplier Quality | 33S OFP Supplier Quality | 33S OFP Supplier Quality | 33S OFP Supplier Quality |
|---|---|---|---|
| Supply Mgmt Specialist **Evelyn Simon** | Engineer **Russell Boeding** | Quality Engineer **Mircea Gatlan** | Quality Engineer **Brian McCullough** |
| 33S OFP Supplier Quality | 33S OFP Supplier Quality | 33S OFP Supplier Quality | 33S OFP Supplier Quality |
| Quality Engineer **Ronald Brown** | Quality Engineer **Chris Conrad** | Quality Engineer **William Day** | Quality Engineer **Michael Grady** |
| 33S OFP Supplier Quality | 33S OFP Supplier Quality | 33S OFP Supplier Quality | 33S OFP Supplier Quality |
| Quality Engineer **Robert Guetzlaff** | Quality Engineer **Jack Bullock** | Quality Engineer **Kevin Smith** | Quality Engineer **Kerry Koisti** |
| 33S OFP Supplier Quality | 33S OFP Supplier Quality | 33S OFP Supplier Quality | |
| Supervisor Purchasing **Open position** | Quality Engineer **Craig Wells** | Supervisor Purchasing **Heidi Wirtz** | |



33S OFP Supplier Quality
Supervisor Purchasing
Heidi Wirtz
33S OFP Supplier Quality II
Regular Part Time
Justin Berry
33S OFP Supplier Quality II
Quality Engineer
Maher Hajar
33S OFP Supplier Quality II
Quality Engineer
Stephen Corwin
33S OFP Supplier Quality II
Quality Engineer
Kenneth Hawker
33S OFP Supplier Quality II
Quality Engineer
Steven Thode
33S OFP Supplier Quality II
Quality Engineer
Open position
33S OFP Supplier Quality II
Quality Engineer
Andrew Ranson
33S OFP Supplier Quality II
Tactical Quality Engineer
Ashlee Tott
33S OFP Supplier Quality II
Quality Engineer
Melvin Buescher
33S OFP Supplier Quality II
Tactical Quality Engineer
Lynn Patek



Ag-NA/Aust/Asia &GTIS
SrVPMf&EngGbA gTr&ImSrc
**Adel Zakaria**

Mfg&EngGblTract or&ImpEq
Mgr JD Waterloo Works
**Barry Schaffter**

Mfg&EngGblTract or&ImpEq
Dir Wldwd Trc Comp Eng
**Klaus Hoehn**

Mfg&EngGblTract or&ImpEq
Director China Operations AG NA/AU/AI
**Douglas Schenk**

Mfg&EngGblTract or&ImpEq
General Mgr
**David Rodger**

Mfg&EngGblTract or&ImpEq
General Mgr
**Bill Horton**

Mfg&EngGblTract or&ImpEq
Mgr Seeding Division
**Patrick Pinkston**

Mfg&EngGblTract or&ImpEq
General Mgr
**Bernhard HAAS**

Mfg&EngGblTract or&ImpEq
Factory Mgr
**Michael Evitts**

Mfg&EngGblTract or&ImpEq
Factory Mgr Cylndr Div
**Donald Tholl**

Mfg&EngGblTract or&ImpEq
Dir Sup Mgmt Ag Eq Div
**James Olson**

Mfg&EngGblTract or&ImpEq
General Manager, India
**Henry Puhl**

APP211



Mfg&EngGblTractor&ImpEq
Mgr JD Waterloo Works
Barry Schaffter
Waterloo Works
Controller
Daniel Dolan
Waterloo Works
Mgr Total Quality
Levin Thompson
Waterloo Works
Mgr Supply Management
Clyde D'Cruz
Waterloo Works
Sr Admin Assistant
Patricia Fisher
Waterloo Works
Mgr HR
Kevin Keith
Waterloo Works
Mgr Prd Plng&Del WWks
James Herring
Waterloo Works
Mgr Factory Marketing
Michael Johanning
Waterloo Works
Mgr Manufacturing
Dave DeVault
Waterloo Works
Dir AMS
John Winter



No Degree



Human Resources

Division Mgr
**Tammy Kulas**

05S HR JDPS EW
EE Funk

HR Rep
**Open position**



APP215



Human Resources
Division Mgr
**Linda Hibben**

| International Assignee | International Assignee | International Assignee | Sal-Leave of Absences |
|---|---|---|---|
| Engineer | Engineer | Project Engineer | Coop Product Engrg |
| **Casee Eisele** | **Edwin Eisele** | **Yifei Hou** | **Open position** |

| 05S HR Wo Works, Fdy, PEC | Sal-Leave of Absences | 05S HR Wo Works, Fdy, PEC | 05S HR Wo Works, Fdy, PEC |
|---|---|---|---|
| HR Rep | STP Product Engineerng | HR Coordinator | HR Rep |
| **Susan Parker** | **Joe Cullen** | **Open position** | **Debra Mirs** |

| Sal-Leave of Absences | 05S HR Wo Works, Fdy, PEC | 05S HR Wo Works, Fdy, PEC | International Assignee |
|---|---|---|---|
| Coop Product Engrg | HR Rep | HR Rep | Coop Product Engrg |
| **Open position** | **Amy Wagner** | **Open position** | **Mike Rehberg** |

| International Assignee | International Assignee | International Assignee | Sal-Leave of Absences |
|---|---|---|---|
| Coop Product Engrg | Project Engineer | Engineer | STP Product Engineerng |
| **Anna Jones** | **Steven Klabunde** | **Jeremie Peterson** | **Open position** |

| Sal-Leave of Absences | 05S HR Wo Works, Fdy, PEC |
|---|---|
| Coop Product Engrg | HR Rep |
| **Open position** | **Open position** |

# 2003 PDP Organization

**Brian Matson**
**Supplier Integration Manager (PDP)**  BMO?

| | | | |
|---|---|---|---|
| **Todd Tibbets** SM Specialist & Quality Engineer | **Wanda Lenius** SM Specialist (WL 02345) | **Mike McGonegle** PLMT SM Team Leader 7000-Series | **Dave Wiese** PLMT SM Team Leader 8000-Series |

**Keri Kinney**
SM Specialist
(RE 39544)

**Tim Hartz**
SM Specialist
(RX 26274)

**Jamie Reinke**
Program Coordinator
7000-Series

**Jack Bullock**
SM Specialist
(RW 33951)

**Gia Duke**
SM Specialist
(GD 32174)

**Jeff Heisterkamp**
Program Coordinator
8000-Series

**Matt Natvig**
SM Specialist
(RX 41133)

**Don Wulfekuhle**
SM Specialist
(RW 35720)

**Cynthia Mennenga**
Decision Coordinator

**Cathy Klein**
SM Specialist
(RX 32774)

**Ramesh Shah**
SM Specialist
& Quality Engineer

**Ofelia Iversen**
Exp. Parts Planner

**Dan Boller**
SM Specialist
(Unit 90)

**Andrew Musch**
Exp. Parts Planner   AM51017

Stephanie Atteberry (SA 40428)

## JOHN DEERE

# JURAN QUALITY IMPROVEMENT PROCESS
## Mission Statement

## " Need Better Control of Off-site Tooling "

**Problem Statement:**   Recent audits have highlighted a major deficiency in the way we manage "Company-owned supplier tooling."  At present, we do not have bailment agreements for all company-owned tooling within our supplier's facilities. JDWW has committed to resolving this by Mar 2003.

Key areas of concern:
- We do not have a formal process on this issue.
- We do not have proper documentation on all company-owned tooling, above a certain financial threshhold (ie $500)
- Deere operations are at risk until these key concerns are addressed.

**Goal:**   Design a bailment agreement process which :

**1.)** Clearly outlines how we are going to procedurally insure control of company-owned tooling. (Requirements, Steps, Responsibilities, Data Retention, & Communication)

**2.)** Addresses both Direct & Indirect Material Tooling Assets

**3.)** Supports the monthly reporting of financial assists.

**4.)** Documents our tooling assets

**5.)** Allows Deere to legally recover these assets within pre-defined time periods. (i.e. Bailment requirements)

**6.)** Provides effective managerial controls

**Mission Statement:**   Establish and lead a project team which successfully addresses these concerns

**Major Milestones:**   06 Dec 02 – Discuss assignment and needs (Clyde, Craig, Jerry & I)
13 Jan 03 – Project schedule, metric,  and concept review (Team)
03 Feb 03 – Bailment agreement process in place
03 Mar 03 – Bailment agreements and tooling assets are documented
28 Mar 03 – Resolve outstanding audit issues on JDWW-owned tooling and bailment agreements.
31 Oct 03 – Proc 4 0 re we'd use for recovering our tooling, if needed.

Case 6:12-cv-02050-JSS   Document 84-3   Filed 02/03/14   Page 86 of 190

**APP218**

**Deliverables:**   1.)   ISO Process Flow Chart and Procedure

| **Deliverables (Cont.):** | 2.) | Signed bailment agreements covering company-owned tooling within supplier's facilities. |

**Deliverables (Cont.):**  2.) Signed bailment agreements covering company-owned tooling within supplier's facilities.

3.) Definition of JDWW Bailment requirements

- Financial threshhold for active management & tracking of tooling assets
- Legal requirements
- Time period
- Asset identification

4.) Report which will be used to report financial assists on a monthly basis.

5.) Procedure for recovering Deere tooling at suppliers

**Sponsor:**  Clyde D'Cruz – JDWW Supply Management Mgr

**Team Membership:**  Mike Sellers - Team Leader (Supply Mgmt Process Pro)
Jerry Gehrke or rep.
Pam Nyman - Process
Craig Pashan or rep
PDP representative

**Steering Committee:**  JDWW Supply Management Staff

**Resource People:**  Dave Christy

APP219



Deere & Company World Headquarters
One John Deere Place, Moline, IL 61265 USA
Phone: 309-748-7054 Fax: 309-765-5405
E-mail: KirkKen@JohnDeere.com

**Ken W. Kirk**
Manager, Internal Auditing

**CONFIDENTIAL**

7 December 2004

B. W. Schaffter
Manager, Waterloo Works

### PROCUREMENT AUDIT

We have completed a procurement audit of John Deere Waterloo Works for the period April 2001 through August 2004. The audit included an analysis of the adequacy of the internal controls, an appraisal of compliance with established Corporate operating guidelines, and a review of accounting and other data developed within the procurement function.

Except as noted in the report, it is our opinions that the internal controls governing the procurement function are adequate, corporate operating guidelines are followed and procurement transactions are accurately recorded. A report of our findings and related recommendations is attached, including a unit response for each recommendation.

During the course of our audit, we reviewed the prior audit findings to determine the unit's follow-up actions. As noted in the report, three of the eight comments are a repeat finding from the prior audit.

The key audit recommendations pertain to Systems Access, Bailment Agreements, and Manual Checks. Unauthorized transactions may occur when screen maintenance responsibilities are not properly segregated. In addition, risk of loss of Company assets increases when records and controls related to assets held by outside suppliers are not adequate. Finally, financial loss may occur when there is not adequate segregation of duties related to cash disbursements.

As noted in the report, John Deere Waterloo Works is developing action plans to address these concerns. Follow-up on the status of the recommendations will be requested in November 2005.

K. W. Kirk
Manager, Internal Auditing

C. D. Jensen
Supervisor, Internal Auditing

c   J. C. D'Cruz
D. C. Dolan
J. M. Field

S. K. Kruse
H. J. Markley
G. L. Medd

J. P. Olson
A. A. Zakaria
Deloitte & Touche LLP

John Deere Waterloo Works

Procurement Audit

7 December 2004

Deere & Company

Internal Auditing

Audit Team:   S. L. Groene
              B. D. Jacob
              C. D. Jensen
              K. J. Schmit
              J. L. Watson

Case 6:12-cv-02050-JSS   Document 84-31   Filed 02/03/14   Page 89 of 190

**APP221**

John Deere Waterloo Works

Procurement Audit Report

Table of Contents

Based on our evaluation, the following audit points are listed in priority sequence by relative risk.

Systems Access * .................................................................................................2

Bailment Agreements & Tooling Lists * ................................................................3

Manual Checks.....................................................................................................4

Price Comparison Report * ...................................................................................5

Supplier Master File.............................................................................................6

Corrective Action Plans .......................................................................................7

Open Purchase Orders.........................................................................................8

Small Diverse Suppliers.......................................................................................9

*Designates Repeat Status

**Systems Access \***

Inappropriate transactions may occur when systems access is not reviewed and restricted.

Sound internal controls require systems access be periodically reviewed and properly restricted.

A review of systems access revealed:
- One repeat issue from the 2001 audit:
  - Critical combinations in the Common Purchasing System (CPS) are not reviewed on an annual basis. Reviews were completed in July 2002 and again in September 2004, during which time 95 inappropriate critical combinations surfaced.
- Three new issues for the current audit:
  - The procedure for reviewing critical combinations is not documented and does not include a specific review of the quantity received field in CPS. Testing of 43 individuals found 20 with inappropriate ability to maintain the quantity received field.
  - A process does not exist to periodically review user access levels within CPS and the Gentran EDI system for current and former Waterloo Works employees.
  - Management does not evaluate the reviews of critical combinations and user access levels.

Following are recommendations for systems access review at Waterloo Works:
- Amend and document the critical combination review process such that it occurs annually and includes the appropriate scope.
- Develop and document a process to review user access levels within the purchasing and EDI systems for current and former employees of Waterloo Works.
- Establish and document a process whereby management evaluates the review of critical combinations and user access levels.

<u>Unit Response:</u>

*The unit agrees with the findings. Inconsistencies and missed combinations have since been corrected and complete as of November 19th, 2004*

*Beginning 31 January 2005, the CPS Coordinator (David Christy) will establish and document a process for reviewing critical combinations and systems access for purchasing and EDI systems for current and former employees. Quarterly reviews will be established to be narrower and more focused in scope. Complete reviews will take*

*place annually at the end of the second fiscal quarter each year, beginning 30 April 2005.*

*Recognizing that CPS will be replaced by SAP in August 2005, the process for reviewing critical combinations and systems access will be appropriately modified and managed within the new SAP environment by 31 August 2005.*

*The Division Manager, Supply Management will establish and document a process to review the results of the quarterly and annual reviews of critical combinations and systems access.*

*We commit to resolving each issue in this report and will include in our quarterly internal control certification process that we have closed each issue and will sustain our activity to keep them resolved. We will perform a quarterly review and sign-off by the Manager, Supply Management; Division Manager, Supply Management; and the appropriate Supply Management Specialist for each issue in this report.*

*Person Responsible: Daria Jerauld, Division Manager, Supply Management*
*Implementation Date: 30 April 2005*

### Bailment Agreements & Tooling Lists *

Risk of loss of Company assets increases when records and controls related to assets held by outside suppliers are not adequate.

Waterloo Works Supply Management procedures require Supply Management personnel to obtain a bailment agreement from a supplier prior to issuing a purchase order for tools costing $3,000 or more. Procedures also require annual acknowledgement of company owned tooling held by suppliers.

Review of procedures and records for tooling revealed:
- There are a large number of missing documents:
  - Bailment agreements on file: 133 of 234 (57%)
  - Tooling lists on file: 130 of 234 (56%)
- The unit does not document sound business reasons for not obtaining a bailment agreement (legal issues with foreign countries, supplier proprietary concerns).
- Waterloo Works does not have adequate procedures for management review of tooling bailment agreements.

Following are recommendations regarding bailment agreements at Waterloo Works:
- Bailment agreements and tooling verification lists should be obtained from suppliers that physically hold company-owned tooling and document any exceptions.

- Processes and written procedures should be amended to require documentation for exceptions where bailment agreements cannot be obtained (e.g. letter of understanding from supplier). The unit should update the bailment agreement database with detailed explanations for all exceptions.
- Written procedures should be developed and implemented for management review of bailment agreements.

### Unit Response:

*The unit agrees with the findings.*

*The ISO procedure QP 417 will be re-written by the Division Manager, Supply Management (Daria Jerauld) by 31 December 2004 with input from Deere Legal. The unit acknowledges that it is not possible to acquire a bailment agreement in all cases. The process will be amended to require documentation of why a bailment is not obtained in exception cases (e.g. foreign suppliers where bailment legal language is not accepted).*

*A management review of bailment status and tooling lists will take place quarterly beginning with January 2005 quarter-end. The process of conducting this review will be documented.*

*As of this writing, we have 174 bailments in place of 229 required (76%), covering 92% of the value of the assets.*

*Person Responsible: Daria Jerauld, Division Manager, Supply Management*
*Implementation Date: 31 January 2005*

### Manual Checks

Financial loss may occur when there is not adequate segregation of duties related to cash disbursements.

Sound internal controls require adequate separation of job responsibilities.

A review of manual check procedures revealed the following:

- Three employees who have access to the blank check stock also have the ability to sign checks using the signature stamp.
- One of the three employees also has the ability to enter manual check transactions into CAPS.

Waterloo Works should separate job responsibilities to ensure that those with access to the blank check stock do not also have the ability to act as an authorized signer using the signature stamp.

### Unit Response:

*The unit agrees with the findings. The locked box containing the signature sleeves with the Controller's name has been moved to the Waterloo Works General Manager's Administrative Assistant. This person also has the keys to the box and will keep both in a secured place. If the situation arises where the General Accounting Coordinator needs to use the signature sleeve for a manual check, she will roll the signature in the presence of the Administrative Assistant so that the box does not leave her control.*

*Person Responsible: Supervisor, General Accounting (Sherry Sheffler)*
*Implementation Date: 11 November 2004*

## Price Comparison Report *

Cost reduction opportunities may not be realized when common product costs are not compared.

The Enterprise Price Comparison Report is created on a quarterly basis. It lists common parts purchased by multiple units at different prices. A review of this report helps identify potential cost saving opportunities.

A review of the Price Comparison Report procedures revealed:

- The report had not been worked subsequent to August 2003.
- Any formal documentation verifying the report was worked prior to that date could not be provided.

Following are recommendations for utilizing the Price Comparison Report:

- Procedures should be established and documented to ensure the Price Comparison Report is reviewed on an ongoing basis.
- Documentation should be maintained for all potential cost saving opportunities that are investigated.

### Unit Response:

*The unit agrees with the findings.*

*A new process has been established to review the Price Comparison Report quarterly. Potential projects will be loaded into the JDWW Cost Management System (CMS). The analysis will be performed and documented by a Supply Management Specialist in Continuous Improvement (Kimberly Frank) and has already begun as of October 2004.*

*By 31 March 2005, the process will be drafted as an ISO procedure by the Division Manager, Supply Management (Daria Jerauld).*

**APP226**

*Person Responsible: Volker Graeff, Continuous Improvement Leader, Supply Management*
*Implementation Date: 31 March 2005*

### Supplier Master File

Unauthorized additions or changes to the supplier master file (SMF) may occur and assets may be misappropriated when adequate procedures are not in place for maintenance and management review of the SMF.

Proper internal controls require documentation of business processes, internal control procedures, and management's evaluation of internal control. Sound business practices require review of the SMF.

A review of procedures for the SMF revealed:

- SMF maintenance documentation does not cover Corporate approval for issuance of supplier numbers for new suppliers.
- A review of the SMF is being performed, but the process is not documented.
- Management does not have a process for evaluating the SMF review.
- Systems at Waterloo Works do not provide a report listing changes to the SMF.
- The Supplier Address Form and the Request to Disapprove Supplier Form do not require management signatures.

Following are recommendations for the maintenance and review of the SMF at Waterloo Works:

- Documentation should include details regarding corporate approval for issuance of supplier numbers for new suppliers.
- The process for reviewing the SMF should be included in written procedures.
- Management should periodically evaluate the results of the SMF review, and this process should be documented.
- Management should review a report that summarizes changes to the SMF.
- Management approval should be required on changes to the SMF.

### Unit Response:

*The unit agrees with the findings.*

*Written procedures will be amended to include corporate approval for issuance of supplier numbers for new suppliers, as well as the internal process for reviewing the SMF. This will be performed by the CPS Coordinator (David Christy) by 28 February 2005. After SAP cutover, documented procedures related to the review of the SMF will be updated once the new process is identified.*

*Management will review the results of the SMF review quarterly. This process will be documented and performed by the Division Manager, Supply Management (Daria Jerauld) beginning 30 April 2005.*

*A report summarizing changes to the SMF is not available with current systems.   After SAP implementation, the Division Manager, Supply Management (Daria Jerauld) will review changes to the SMF quarterly utilizing standard SAP reports.*

*The Supplier Address Form and the Request to Disapprove Supplier Form will be revised to require management signatures.*

*Additionally, it is noted herein that the overall SMF for the enterprise is maintained at a corporate level and the unit response applies to our use of a subset of that file as well as to our interface with that file (e.g. we ask for new supplier numbers, we ask for an address to be updated, etc.)  The unit agrees to follow up with enterprise personnel to understand what processes they use to maintain the integrity of the overall SMF.*

*Person Responsible: Daria Jerauld, Division Manager, Supply Management*
*Implementation Date: 28 February 2005*

## Corrective Action Plans

Optimal purchasing decisions may not be made when Deere & Company Supply Management guidelines are not followed.

Enterprise Supply Management policy states:

*"A corrective action plan is required from all suppliers who receive a conditional rating in any [Achieving Excellence] category… If a supplier fails to submit the plan by the deadline, the SM Specialist needs to follow-up and confirm a corrective action plan is submitted in a timely manner."*

Interviews with unit personnel revealed that conditional suppliers have not completed corrective action plans during the previous two years. This finding results in 64 suppliers in FY02 and 39 suppliers in FY03 who have not been issued, nor have completed, such forms.

Waterloo Works should establish a process to ensure all conditional suppliers receive and complete corrective action forms.

<u>Unit Response:</u>

*The unit agrees with the findings.*

*Prior processes at Waterloo Works called for corrective action only on quality and delivery issues throughout the fiscal year. Going forward, the standard form will be used to request corrective action for all components of Achieving Excellence at the end of each fiscal year. This process has already begun with mailings to all conditional suppliers sent on 11 November 2004. This will take place annually as part of the Achieving Excellence process and is documented on JDSN under the Achieving Excellence section.*

*Person Responsible: Daria Jerauld, Division Manager, Supply Management*
*Implementation Date: 30 March 2005*

## Open Purchase Orders

Unauthorized deliveries and payments may occur when open purchase orders (POs) are not periodically reviewed and closed.

Proper internal controls require documentation and evaluation of internal control procedures. Sound business practices require the review of open POs.

A review of procedures for open POs revealed:
- Open POs are being reviewed, but the process is not documented.
- Management does not have a process for evaluating the review of open POs.
- Several PO types were excluded from the review.

Following are recommendations for the review of open POs at Waterloo Works:
- The process for reviewing open POs should be included in written procedures.
- Management should periodically evaluate the results of the review, and this process should be documented.
- The review of open POs should include all PO types.

### Unit Response:

*The unit agrees with the findings.*

*Beginning 31 January 2005, the CPS Coordinator (David Christy) will document and perform a review open POs on a quarterly basis. This review will not allow for the exclusion of any types of POs.*

*Beginning 31 January 2005, the Division Manager, Supply Management (Daria Jerauld) will establish and document a process for reviewing the results of the open PO review on a quarterly basis.*

*Person Responsible: Daria Jerauld, Division Manager, Supply Management*
*Implementation Date: 31 January 2005*

**APP229**

## Small Diverse Suppliers

Deere & Company risks losing federal contracts when units do not comply with Enterprise Supply Management's small, diverse supplier requirements.

Deere units are strongly encouraged to contribute to the goals of Corporate Supplier Diversity by actively pursuing the business of small, diverse suppliers and to consider such suppliers during the competitive assessment process. Also, Enterprise Supply Management policy states that every contract, purchase order or sourcing decision awarding a supplier an amount of $100,000 or more must be documented using the 100K form.

Interviews with unit personnel and a review of unit practices revealed:

- Supply Management Specialists are not actively pursing the business of small, diverse suppliers when making sourcing decisions.
- The 100K form is not consistently completed in accordance with the requirements outlined by Deere & Company.

Following are recommendations for Small Diverse Suppliers at Waterloo Works:

- Current procurement practices should be enhanced to include small diverse suppliers in sourcing decisions.
- The unit should team with Supplier Diversity to update Supply Management Specialists on the appropriate use of the required 100K form.

_Unit Response:_

_The unit agrees with the findings._

_The Division Manager, Supply Management (Daria Jerauld) will coordinate with the Strategic Sourcing Purchasing Managers for Core Technology and Process Technology (Dr. Heinrich Steins and John Bloom, respectively) to assure that Strategic Sourcing is making use of the $100K form in the supplier selection process. This will be done by 15 December 2004._

_Additionally, the Division Manager, Supply Management (Daria Jerauld) will work with Supplier Diversity to ensure proper communication and compliance at JDWW by 31 January 2005._

_Person Responsible: Daria Jerauld, Division Manager, Supply Management_
_Implementation Date: 31 January 2005_

1

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF IOWA
EASTERN DIVISION

- - - - - - - - - - - - - - X
MICHAEL JOSEPH SELLERS,          :

    Plaintiff,               :

vs.                              :   Case No. 12-CV-0250-
                          :   JSS
DEERE & COMPANY A/K/A JOHN        :
DEERE COMPANY, AND CLYDE         :   **VIDEOTAPED DEPOSITION**
D'CRUZ, INDIVIDUAL,              :              **OF**
                          :       **KEVIN KEITH**
    Defendants.              :        **VOLUME 1**
- - - - - - - - - - - - X
WANDA JO LENIUS and GARY         :
GENE LENIUS,                     :

    Plaintiffs,              :

vs.                              :   Case No. 12-CV-2063-
                          :   JSS
DEERE & COMPANY a/k/a JOHN        :
DEERE COMPANY, KEVIN             :
KEITH, CLYDE D'CRUZ, BRIAN       :
MATSON, and ROBERT BARNES,       :
individuals,                     :

    Defendants.              :
- - - - - - - - - - - - X
DELYORCE RAYE REBOUCHE,          :

    Plaintiff,               :

vs.                              :   Case No. 12-CV-2064-
                          :   JSS
DEERE & COMPANY a/k/a JOHN        :
DEERE COMPANY, RODGER            :
BURRIS, and BRUCE BOARDMAN,      :
INDIVIDUAL,                      :

    Defendants.              :
- - - - - - - - - - - - X

---

2

- - - - - - - - - - - - X
GAYLE LELA FORSTER and           :
GREGORY DAVID FORSTER,           :

    Plaintiffs,              :

vs.                              :   Case No. 12-CV-2072-
                          :   JSS
DEERE & COMPANY a/k/a JOHN        :
DEERE COMPANY, KEVIN KEITH,      :
BRIAN MATSON, BRIAN              :
CARLSON, and CLYDE D'CRUZ,       :

    Defendants.              :
- - - - - - - - - - - - X

**DEPOSITION OF KEVIN KEITH - VOLUME 1,**

taken by the Plaintiffs before Melissa A. Burns,

Certified Shorthand Reporter of the State of Iowa, at

700 Walnut Street, Suite 1600, Des Moines, Iowa,

commencing at 9:05 a.m., Monday, September 30, 2013.

APPEARANCES:

For the Plaintiffs:      GREGORY T. RACETTE, ESQ.
                       AMY B. PELLEGRIN, ESQ.
                       PATRICK T. VINT, ESQ.
                       Hopkins & Huebner, PC
                       2700 Grand Avenue, Suite 111
                       Des Moines, IA 50312

For the Defendants:      FRANK HARTY, ESQ.
                       ANGEL A. WEST, ESQ.
                       Nyemaster Goode, PC
                       700 Walnut Street, Suite 1600
                       Des Moines, IA 50309

Also Present:            MICHAEL SELLERS
                       GARY LENIUS
                       GREGORY FORSTER
                       DAVID W. MEIER

Videographer:            AMY STEIN

---

3

I N D E X

WITNESS:  KEVIN KEITH                                    PAGE

By Mr. Racette.....................................   6

EXHIBITS:                                  FIRST REFERENCED

1 - Job Evaluation Approaches for GJE.............  48

2 - Hay Guide Chart Profile Method of Position
    Evaluation....................................  93

3 - Job Family Modeling Draft Project Plan.....  49

5 - Point Rating Table for GJE.................  77

5A - GJE benchmarks for SMS I, II, and III dated
     9-25-02...................................  83

5B - Deere GJE benchmark job evaluation summaries
     dated 6-24-03.............................  88

5D - Deere WWCA memo re gap in supply management
     employees based on position and knowledge
     dated 7-7-03.............................. 156

5E - Deere supply management benchmark job
     evaluation summaries dated 9-22-03........  91

5F - Deere GJE job function analysis for supply
     management, undated......................  93

6B - John Deere Grades Before and After GJE -
     Wanda Lenius & Gayle Forster.............. 185

16 - Wanda Lenius Timeline..................... 188

18 - Gayle Forster Timeline.................... 206

27 - Transcript of Gayle Forster's meeting with
     Kevin Keith on 4-26-04................... 212

36 - Susan Bowman and Linda Hibben emails
     concerning commodity issue in supply
     management dated 9-7-04.................. 236

---

4

EXHIBITS:                                  FIRST REFERENCED

37 - Wanda Lenius email to Kevin Keith dated
     7-9-07................................... 201

38A - Policy Against Harassment..................  27

38B - Business Conduct Violations and
      Anti-Retaliation Policy..................  37

38E - Document Retention Policy.................  41

43 - Key emails involving Clyde D'Cruz and
     Kevin Keith............................. 120

55 - Brian Matson emails regarding specialist
     in supply management department........... 229

90 - John Deere Global Job Evaluation & Job
     Documentation, Job Analyst Training 2003...  58

**5**

1     P R O C E E D I N G S
2          MS. STEIN:  On the record beginning the
3     videotaped deposition of Kevin Keith requested by the
4     plaintiffs in the matter of Michael Sellers, et al.,
5     plaintiffs versus Deere & Company, et al., Defendants,
6     in the United States District Court, Northern District
7     of Iowa, Eastern Division, case numbers 12-CV-2050,
8     2063, 2064 and 2072.
9          Today's date is September 30, 2013, and the
10    approximate time is 9:05 a.m.  This deposition is
11    being held in the offices of Nyemaster Goode,
12    700 Walnut Street, Suite 1600, Des Moines, Iowa.
13    My name is Amy Stein, videographer, of
14    Fidelity Video Services, Incorporated, Johnston, Iowa.
15          Will counsel please identify themselves for
16    the record.
17          MR. RACETTE:  Yeah.  This is Greg Racette
18    and Amy Pellegrin and Pat Vint for the plaintiffs.
19          MS. WEST:  Angel West and Dave Meier for
20    the defendants.
21          MS. STEIN:  The oath will now be
22    administered by Melissa Burns, Certified Shorthand
23    Reporter, of Susan Frye and Associations, Des Moines,
24    Iowa.
25

**6**

1          KEVIN KEITH,
2     called as a witness by the Plaintiffs, being first
3     duly sworn by the Certified Shorthand Reporter, was
4     examined and testified as follows:
5          EXAMINATION
6     BY MR. RACETTE:
7          Q.   Mr. Keith, my name is Greg Racette as I
8     just introduced myself.  I represent the plaintiffs in
9     this case against John Deere.
10          I'm going to ask you some questions today,
11    and I'm sure counsel has talked to you about how this
12    procedure works.
13          Have you had your deposition taken before
14    today?
15          A.   Yes.
16          Q.   Okay.  On a number of occasions?
17          A.   Yes.
18          Q.   Okay.  So you know how it works.
19          A.   Yes.
20          Q.   All right.  If you mean to say yes or no
21    today, you have to verbalize that, you can't shake
22    your head or something like that.  Okay?
23          A.   Yes.
24          Q.   If you don't understand my question, will
25    you please let me know, because I'm going to assume

**7**

1     that you do.
2          A.   Yes.
3          Q.   In getting ready for your deposition, or
4     since this lawsuit's been filed, have you reviewed and
5     looked at all of your emails with the various parties
6     in this lawsuit?
7          A.   No.
8          Q.   Have you ever been asked to look at or
9     find -- let me rephrase that.  Have you ever asked to
10    look at and find all of your emails concerning the
11    parties in this lawsuit?
12          A.   Yes.
13          Q.   Okay.  When was that?
14          A.   That was back a year ago probably.
15          Q.   All right.  And did you then do that, did
16    you look for all the emails you have with the
17    different parties in this lawsuit?
18          A.   Yes.
19          Q.   Were you, you feel, successful in getting
20    all those emails?
21          A.   Yes.
22          Q.   And have you reviewed those before your
23    deposition today?
24          A.   I've reviewed documents that Angel has
25    provided to me, yeah.

**8**

1          Q.   Are you aware of anytime there being a
2     retention put on all documents concerning the parties
3     involved in this lawsuit at Deere's?
4          A.   Yes.
5          Q.   When was that done?
6          A.   I don't remember exactly.  Some time ago.
7          Q.   If I could relate, was it done, do you
8     recall, after the EEOC complaints were filed, or was
9     it done after this lawsuit was filed, or do you recall
10    that way?
11          A.   It was done during the time frame prior to
12    the lawsuit.
13          Q.   Prior to the lawsuits.
14          A.   As part of the EEO case.
15          Q.   Sometime after the EEOC was filed?
16          A.   Correct.
17          Q.   And can you tell me, did that document
18    retention come out of HR or did somebody else tell you
19    to do that, or were you the one that put a document
20    retention on things?
21          A.   It came out of our corporate law
22    department.
23          Q.   And when you received that, what did you
24    do, if anything, to follow that retention order or to

13

1    A.    Sixty-one.

2    Q.    Where do you live now, your home address?

3    A.    Coralville, Iowa.

4    Q.    And how long have you lived there?

5    A.    Five years.

6    Q.    Do you have a street address there?

7    A.    2848 Pine Circle.

8    Q.    And you aren't planning on moving in the

9    near future or anything like that?

10   A.    No.

11   Q.    Educational background.  Can you tell me

12   what schools you've attended and what degrees that you

13   have attained?

14   A.    I have a bachelor's degree in business

15   administration and sociology from Luther College, and

16   I have an MBA from the University of Iowa.

17   Q.    Can you tell me the year that you graduated

18   from Luther?

19   A.    1974.

20   Q.    '74 for Luther?

21   A.    Uh-huh.

22   Q.    And then what year did you get your MBA

23   from Iowa?

24   A.    2004.

25   Q.    Did you -- so you took the MBA courses kind

14

1    of -- did you take them sporadically, or did you just

2    all of a sudden make a decision later?

3    A.    I did the executive MBA program.

4    Q.    I'm sorry?

5    A.    I did the executive MBA program.

6    Q.    Does Deere offer that or something?

7    A.    Yeah.  It was sponsored through Deere &

8    Company.

9    Q.    Okay.  How many years did it take you to

10   get your MBA?  Do you recall how long it took you to

11   do that?

12   A.    Two.

13   Q.    Two?  Okay.  Any other education beyond

14   that?

15   A.    No.

16   Q.    Employment background.  Can you tell me

17   where you worked before you joined John Deere's or if

18   you joined John Deere's right away?

19   A.    I joined Deere in 1974 after graduating

20   from college.

21   Q.    So that was your first really full-time

22   position --

23   A.    Yes.

24   Q.    -- after college?

15

1    A.    And you stayed with them until you retired?

2    A.    Yes.

3    Q.    When you joined John Deere in '74, can you

4    tell me the position you joined them as?  In what

5    position, I should say?

6    A.    I worked in the industrial engineering

7    department.  I was an engineering analyst.

8    Q.    And just briefly what was that job, or what

9    did you do in that position?

10   A.    I did time study work that supported our

11   incentive system.  And I did -- I was in Waterloo.

12   Q.    And what plant were you -- did you work out

13   of in Waterloo when you first started?

14   A.    Well, at that time it was the Tractor

15   Works, I believe.  I don't really remember.  But I

16   timed in the machining departments downtown, gear and

17   shaft machining departments.

18   Q.    And when you said you were doing time

19   studies for work, was that for laborers, you know,

20   union workers, I'm assuming, on their various jobs

21   that they would have in the plant?

22   A.    Yes.

23   Q.    And the incentive would be -- at that time

24   was it parts or something that they could get done

25   within a certain time frame?

16

1    A.    It was a piece rate system.

2    Q.    And when you entered Deere in '74, was

3    there a grading system as to your job?  Was it graded

4    at a 4 or a 5 or a 6 or a 7 or something of that

5    nature?

6    A.    Yes.

7    Q.    Do you remember what grade you started out

8    at?

9    A.    Yes.

10   Q.    And what grade was that?

11   A.    Grade 4.

12   Q.    And can you tell me then how you

13   progressed, what your different job titles were up

14   until you retired?

15   A.    Yeah.  I worked in industrial engineering

16   for roughly three years and moved to Grade 5 during

17   that time frame.  And then in 1976 I moved into HR and

18   worked in the compensation area.  Again, in Waterloo.

19   And was a Grade 6.  I was moved to Grade 6 when I went

20   into HR.

21         And then I -- when the Waterloo operations

22   expanded in 1979 and a new factory was being built, I

23   went into a job working recruiting and staffing to

24   staff the new factory.  Again, that's a Grade 6.  And

25   I held that position until 1985 --

**APP233**

17

1          During that time frame, I became a
2    supervisor within HR and did some other things
3    relative to wage employment and training and staffing,
4    affirmative action, and ended up being a Grade 7.
5          And then in 1985 I left Waterloo and went
6    to the parts distribution center, again in HR, and
7    went into a Grade 6 job and worked in wage employment,
8    did seniority administration and wage employment at
9    the parts distribution center.
10        Q.   And where was that located, Mr. Keith?
11        A.   In Milan, Illinois.
12        Q.   Milan?  Okay.
13        A.   And after a year I went -- then I was
14   transferred to industrial marketing administration,
15   which is the marketing group for construction
16   equipment.  And I worked in HR there for a couple
17   years.
18        In '89 I went and worked at John Deere
19   Credit, worked in employee development and staffing at
20   John Deere Credit, also in the Quad Cities.
21        And then in '91 I came back to Waterloo
22   with the parts -- or excuse me, Product Engineering
23   Center as the HR manager.
24        Q.   That was in product engineering?
25        A.   Yes.  And then in 19 -- late '94 I left

18

1    that --
2        Q.   '94, I'm sorry?
3        A.   Yeah.
4        Q.   Okay.
5        A.   Left that job and went into -- at that time
6    it was called business reengineering.  We were doing
7    reengineering projects throughout the company.
8        Q.   What type of projects?  I'm sorry?
9        A.   Business reengineering.
10        Q.   Business reengineering?
11        A.   Uh-huh.
12        Q.   Okay.  Thank you.
13        A.   So I was doing process redesign of major
14   business processes.  And I did that for about a year.
15   I did that for about a year.  Then I left there and
16   went to -- I became the HR manager back at the parts
17   distribution center in Milan.  And that would have
18   been 1995.
19        Q.   Have you had any grade changes in all these
20   things?
21        A.   Oh.  I'm sorry.
22        Q.   No, that's fine.  I think the last grade
23   that I was aware of, you went over to parts
24   distribution Grade 6 at Milan.

19

1        Q.   Did you get any -- go ahead and answer.
2        A.   So when I went to John Deere Credit, I
3    became Grade 7.  Or went back to Grade 7.
4        Q.   Okay.
5        A.   When I went to John Deere Credit, I was a
6    Grade 8.
7        Q.   Okay.  Was that between '89 and '91 you
8    went from a 6 to an 8?
9        A.   No, I went back to a 7 when I went to -- or
10   excuse me, when I went to industrial marketing
11   administration.  I might have misspoke.
12        Q.   Okay.
13        A.   I went from parts distribution center to
14   industrial marketing administration.
15        Q.   That's right.  So you went to --
16        A.   Went from 6 to 7.  Back to 7.
17        Q.   Gotcha.
18        A.   When I went to John Deere Credit, I went
19   from 7 to 8.
20        Q.   Gotcha.
21        A.   When I went to Waterloo to PEC went to
22   Grade 9.
23        Q.   That was in '91 to '94?
24        A.   Right.
25        Q.   Okay.

20

1        A.   When I did the business reengineering job,
2    I went to Grade 10.  And then --
3        Q.   I got you in parts distribution center
4    again in Milan in '95.
5        A.   Right.  Also as a Grade 10.
6        Q.   Okay.
7        A.   And then at that -- let's see.  I can't
8    remember what year it was.
9        Q.   That was '95.  You told me you started at
10   parts distribution again in Milan.
11        A.   It's Milan.
12        Q.   Milan.  I'm sorry.
13        A.   Yeah.  In '95.  And I was there until, I
14   think, around '98.  And I left there and went to -- we
15   were starting a contingent staffing new model within
16   HR and there was a project team being put together,
17   and I went and worked in -- really in corporate HR as
18   a project manager for the contingent staffing project.
19        Q.   Was that out of Moline?
20        A.   Yes.
21        Q.   And how long were you involved with that,
22   or how long did you stay there?
23        A.   And then I did some other projects related
24   to -- we implemented a new job posting system.  I led
25   that.  We also implemented a new procurement system.  I

Case 8:12-cv-02050-JSS   Document 84-3   Filed 02/06/14   Page 102 of 190
Susan Frye and Associates, Inc.                    (515) 284-1972                    5 of 99 sheets
APP234

---

**21**

1  did that. Did some things with performance
2  management. Led that. And we had a team of people
3  that I worked with. So it was -- we were kind of a
4  project group for corporate HR.
5          And then -- I can't remember the exact
6  year, it was 2000 or 2001, then I became manager of
7  recruiting and staffing, and that was a Grade 11. So
8  I did kind of a corporate HR staffing function for the
9  U.S.
10         Q.   Did you say for corporate USA? Is that
11  what you said?
12         A.   Yeah, for the company, for the U.S.
13  organization. So it was United States staffing group,
14  that was the scope.
15         Q.   And then you went to a Grade 11 at that
16  point?
17         A.   Yes.
18         Q.   Okay. Was that in, again, Moline, I'm
19  assuming?
20         A.   Yes.
21         Q.   And then how long were you at that
22  approximately?
23         A.   Then in 2003 I went back to Waterloo as the
24  HR manager for the Waterloo operations. And that was
25  in 2003.

**22**

1          Q.   That was manager of HR for Waterloo
2  operations?
3          A.   Right. That was in 2003. And I became a
4  Grade 12 at that point.
5          Q.   Okay.
6          A.   And then in 2009 became the group HR
7  manager for all of our factories --
8          Q.   Can you tell me that one again? I'm sorry.
9          A.   Group HR manager. Group human resources
10  manager. For all of our -- most of -- all of our UAW
11  factories and design centers in Iowa and Quad Cities
12  and Coffeyville, Kansas. And I became a Grade 13 at
13  that point.
14         Q.   And is that how you finished out? In that
15  position?
16         A.   Yes. And then I retired in 2012.
17         Q.   Gotcha. Thank you.
18              Let me go back a second and I just want to
19  ask you, up to -- when you became manager of HR for
20  Waterloo operations, you know, in -- 2003?
21         A.   Correct.
22         Q.   Up until that point, when you got promoted
23  or raised a grade, how did that work? Can you explain
24  that to me, the process when you would get these grade
25  raises or increases? How did that work before 2003?

**23**

1          A.   I'm not sure I understand your question,
2  how did it work.
3          Q.   When you would get a grade raise -- you
4  went through several of them in your career at John
5  Deere's.
6          A.   Uh-huh.
7          Q.   Is that correct?
8          A.   Yes.
9          Q.   What I want to know is how did you get that
10  grade raise when you would get them? Who -- how did
11  the process work? Did your immediate supervisor
12  recommend that you would -- should be raised up a
13  grade or recommend you go to a different position with
14  a different grade? How did it work?
15         A.   Well, it goes back a lot of years. Back in
16  the '70s it was -- my manager told me, "Hey, there's
17  an opportunity in HR, they would like to speak with
18  you about it." So I went and talked with Bill Davis
19  in HR, and he offered me a job and a salary.
20         Q.   Okay.
21         A.   Back in -- in the '70s and '80s, that was
22  kind of the way it went. I mean your manager -- my
23  manager contacted me and said, "Someone would like to
24  talk to you about an opportunity."
25         Q.   And then they would interview you and place

**24**

1  you in that opportunity and tell you what you were
2  going to make?
3          A.   Back then, back before job posting, you
4  know, it was -- when you got into the conversation, it
5  was a little bit of an information sharing discussion,
6  but it was -- the offer was part of that. That's the
7  way it was done back then.
8          Q.   And job postings. When did that start? Do
9  you recall?
10         A.   Well, within the corporation, I don't
11  remember for sure, it was probably around maybe 2000,
12  2001. But I don't remember.
13         Q.   All right. And what changed when -- what
14  changed about getting promoted or getting a different
15  position with a different grade after job postings
16  came into effect or started? If anything.
17         A.   Well, initially when job posting was first
18  implemented, I think the jobs were only posted, I
19  believe, through Grade 8. I don't remember exactly.
20              So my personal situation, because it was in
21  the time frame it was in, the offers that I received
22  were the ones like I had told you.
23         Q.   Okay. It didn't affect you. Job postings.
24         A.   No.
25         Q.   When job postings came in, did it affect

Case 3:12-cv-02730-JSW Document 84-3   Filed 02/03/14   Page 103 of 190
Susan Frye and Associates, Inc.                                    (515) 284-1972                                    6 of 99 sheets
APP235

25

1 Grades 8 and lower somehow as far as promotions and

2 getting upgraded?

3     A.    Yes.

4     Q.    And how did it do that or how did that

5 work?

6     A.    Well, there was a lot -- it was a very good

7 change.  There was a lot more transparency around when

8 there was opportunities.  There was a process in place

9 where people could convey their interest in a specific

10 job.  So it was more of a structured process.

11          Whereas, before it was -- people would be,

12 you know, telling their supervisor or networking with

13 other people when they had interest.

14     Q.    Sure.  So up until 2000 or so, basically if

15 someone was going to get a promotion into either a new

16 position or get a promotion as far as upgrading, it

17 would be pretty much personal between the supervisor

18 and whoever else -- the supervisors, whoever he was

19 talking to, that would decide that and where to place

20 them?

21     A.    It's kind of difficult to describe.  There

22 was -- I mean people talked with their supervisors,

23 conveyed interest, there was a lot of networking.  As

24 there is today.  You know, people talking about

25 people.  But it was not, again, more of a formal

26

1 system.

2     Q.    It was not a formal system?

3     A.    Correct.

4     Q.    Okay.  And then when job postings came for

5 Grades 8 and lower in 2000, or around that time frame,

6 it just made it more transparent but it worked about

7 the same fashion?

8     A.    It was -- you know, in job posting the jobs

9 were posted, and people can see that there's an

10 opening and they can apply.

11     Q.    Made it more competitive.

12     A.    Made it different.

13     Q.    And different how?

14     A.    It provided just more access for people to

15 apply, and it expanded the pool of candidates for

16 supervisors.  They could look at a -- in some cases

17 they could look at a broader set of people.

18     Q.    And even with job posting, it would still

19 be the supervisors that were involved with the person,

20 where the person was coming from, and maybe the

21 supervisor where he was going to, that would be

22 involved in really the process of choosing that

23 individual; is that correct?

24     A.    It's -- yeah, that's true.  It was more

25 than the -- I mean I guess -- the supervisor would be

27

1 set of supervisors would work with HR, there would be

2 a set of -- you know, the pool would be paired down to

3 a short list of people, those people would be

4 interviewed.  That's how it typically would go.

5     Q.    And did that process change at all after

6 GJE came into effect with Deere's?

7     A.    No.  Not -- no.  Not that I recall.

8     Q.    I've got some notebooks here in front of

9 you.  I'm going to switch gears here a moment and have

10 you, if you would -- and I don't know your volumes

11 exactly, but --

12          MR. RACETTE:  I'm trying to get Exhibit 38,

13 Angel.  If you could have him open to that.  It's in

14 our Volume III.  I'm not sure...

15 BY MR. RACETTE:

16     Q.    Do you have that open?

17     A.    Uh-huh.

18     Q.    And there's A, do you see the demarcations

19 there with the folders?

20     A.    Uh-huh.

21     Q.    38A, have you turned to that one?

22     A.    Uh-huh.

23     Q.    You have to say yes or no.

24     A.    Yes.

25     Q.    Thanks.  Do you recognize this particular

28

1 policy, Mr. Keith?

2     A.    Yes.

3     Q.    Can you tell me what it is?

4     A.    It's John Deere's policy against

5 harassment.

6     Q.    I'm interested, and we're dealing here,

7 with a time frame from approximately 2002 through 2005

8 or even '6.  Is this -- was this the policy that was

9 in effect at that time, do you recall?

10     A.    Yes.  I believe so.

11     Q.    Okay.  Was there much change in this policy

12 to your knowledge over the years or did it pretty much

13 stay the same?

14     A.    I don't recall.

15     Q.    Was there someone -- strike that.  Who drew

16 these policies up?  Was it corporate law or was it HR,

17 or who was involved in doing this?

18          MS. WEST:  Objection.  Calls for

19 speculation.

20     A.    Well, this is a -- this is a standard

21 Deere & Company policy.  So it would have been done

22 centrally by our corporate office.  I don't know

23 exactly where it came from, but it was probably

24 drafted and worked on by a combination of different

25 than the -- I mean I guess -- the supervisor would be

37

1     Q.  In your credenza?

2     A.  Correct.

3     Q.  All right. And how long would you normally

4 save those documents? Let's assume that -- well, I

5 shouldn't say that. How long would you save the

6 documents regardless of the outcome, or did the

7 outcome make a difference as to how long you would

8 retain them?

9     A.  I would follow the retention policy that

10 was in place.

11     Q.  And what was the retention policy in regard

12 to that?

13     A.  Specifically I don't recall.

14     Q.  Now, if you turn to Exhibit 38B. Do you

15 have that in front of you? Do you recognize this?

16     A.  Yeah. Vaguely.

17     Q.  Can you tell me what you think it is?

18     A.  It's -- it's part of the compliance --

19 looks like it's part of the compliance process, and

20 it's reporting business conduct violations.

21     Q.  And when this says at the top "Global

22 Policies" -- do you see that off to the left of the

23 heavy black print at the top caption?

24     A.  Yes.

25     Q.  What does that mean?

38

1     A.  It means it's a global worldwide policy.

2     Q.  And does that mean for Deere it would apply

3 to all their shops no matter where they are, what

4 country they're in, what state they're in?

5     A.  I believe so.

6     Q.  And do you see the introduction on page 1

7 of Exhibit 38B, it says "As Sam Allen states in the

8 Code of Business Conduct, 'our long record of success

9 is due in no small part to an unwavering commitment to

10 ethical behavior and doing the right things in the

11 right way. Such a dedication to integrity is critical

12 to sustaining great business performance and achieving

13 our future goals.'"

14     I'm assuming that you agree with that?

15     A.  Yes.

16     Q.  Okay. And do you know, "As Sam Allen

17 states," why he would be quoted here? Do you know why

18 they're using him as the person that states that?

19     A.  He was a high level leader in our company.

20 I assume that's why.

21     Q.  If you turn to page 2 of this Exhibit 38B,

22 it talks about retaliation. Do you see that in the

23 top of that page?

24     A.  You mean this kind of middle paragraph

25 here?

39

1     Q.  Right. Right.

2     A.  Yes.

3     Q.  Okay. And do you see it says "Some

4 examples of prohibited retaliation include:

5 Termination, demotion, suspension, failure to promote,

6 unfavorable performance evaluation, and adversely

7 affecting working conditions."

8     Do you agree all those types of things are

9 forms of retaliation that should not be allowed if

10 they exist?

11     A.  Yes. I think those -- if people are

12 retaliating and taking that kind of action, then that

13 would make my list.

14     Q.  Okay. And then in "Investigations" it

15 talks about "Potential instances of fraud, improper

16 activities, and illegal acts will be investigated by

17 the company."

18     Do you know if that would include any

19 violation of the policy of harassment or retaliation

20 or discrimination at Waterloo?

21     A.  Well, as I read this, the context for this

22 is really to supply management fraud, those kinds of

23 illegal acts. Yeah, it could include, I mean, any

24 illegal acts. Discrimination is illegal so it would

25 make the list.

40

1     Q.  And it says "When an individual reports a

2 potential violation, information will be entered into

3 an Investigation Database as appropriate. The

4 Investigation Team will promptly initiate an

5 investigation of potential violation, as appropriate.

6 All reasonable attempts will be made to complete the

7 investigation promptly."

8     What is the "Investigation Database" that

9 they refer to there?

10     A.  As I recall, the compliance group -- I

11 can't remember the time frame, but they would maintain

12 information about -- when they received a compliance

13 complaint, they would maintain a record of the

14 complaint and the investigation and the closure.

15     Q.  Were my clients' complaints to you about

16 age and gender discrimination, were they put into the

17 investigation database?

18     A.  I don't recall.

19     Q.  Should they have been?

20     A.  I don't recall. My recollection is that

21 the reporting process, the formal process, came into

22 play after, or at a later time, but I don't remember

23 for sure. I don't recall.

24     Q.  If it didn't, should it have been in the

25 investigation database? The complaints?

41

1    A.   Well, based on your question, I would have
2    to say yes.
3         Q.   Okay.  If you turn to --
4         A.   If that was the policy, yeah.
5         Q.   If you turn to Exhibit 38E, this has been
6    presented to us, I believe, as the retention policy
7    concerning records.  Does that look like it to you, or
8    do you recognize this at all?
9         A.   I don't recall seeing this document.  I
10   don't remember -- I don't remember it.
11        Q.   Do you remember -- the reason I'm saying
12   that, Mr. Keith, as you look kind of in the
13   right-hand -- if you look in the left-hand columns,
14   you can see there's, you know, categories like
15   "Accident/Incident Reporting," and then if you look to
16   the right column, it has "Applied Retention" and it
17   gives you a number of years or "Permanent."
18        Do you see that?
19        A.   Uh-huh.  Yes.
20        Q.   Is that -- does this look like some type of
21   summary maybe of what the retention policy was as to
22   each of these categories?
23        A.   Again, I'm not familiar with it.  I'm not
24   sure what -- it looks like maybe a supplement or just
25   an information sheet.

42

1         Q.   What was your understanding of what the
2    retention policy was in regard to investigations you
3    made concerning discrimination or retaliation
4    complaints?
5         MS. WEST:  I'll just object as to the
6    scope.  I don't know what year or years you're
7    focusing on.  I think it's vague.
8    BY MR. RACETTE:
9         Q.   If the year matters, let me know, but I'm
10   talking about here from 2000 to 2006 in particular.
11        A.   I don't recall -- I don't recall what the
12   policy was.  I mean if I -- if I did an investigation,
13   I erred on the side of retaining things.
14        Q.   I'm sorry?
15        A.   I erred on the side of retaining things.
16        Q.   Did you keep them forever pretty much?  Is
17   that what you mean?  Keeping them forever?
18        A.   Again, it depends on your time frame.  But
19   during the time that I was in Waterloo, I would
20   have -- I would have retained things.
21        Q.   How about after my clients filed complaints
22   with the EEOC, what was the document retention policy
23   at that point for any documents related to their
24   complaints?
25

43

1         Q.   Would -- I see, here if you look at page 1
2    of Exhibit 38E, down at the bottom it has "Accident
3    Reports Under Investigation - Closed," "Accident
4    Reports Under Investigation - Open."  They're retained
5    permanently.
6         I don't know if that applies to EEOC
7    complaints.  It looks like it applies to more perhaps
8    accidents that would occur on the factory premises or
9    something maybe involved with manufacturing.
10        Do you know what that applies to?
11        A.   Well, I'm reading it, it refers to OSHA and
12   safety.  So I believe it's around accidents in the
13   factory.  But again, I'm not familiar with the
14   document so I'm not an expert on it.
15        Q.   Okay.  But -- so you're telling me as far
16   as once the EEOC complaints were filed by my clients,
17   you weren't aware of how long documents concerning
18   their complaints should be preserved at that point?
19        A.   I don't remember exactly.
20        Q.   Certainly, I'm assuming, and tell me if I'm
21   wrong, that there was -- that you knew at that point
22   you were going to have to retain documents, any
23   documents related to their complaints; is that
24   correct?
25        A.   Yes.

44

1         Q.   Okay.  And what you're telling me, you
2    can't remember how long the policy was to retain
3    those?
4         A.   Correct.
5         Q.   Okay.  Fair enough.
6         I'm going to talk to you a little bit about
7    GJE for a moment.  Do you know when I use that acronym
8    what I'm talking about?
9         A.   Yes.
10        Q.   Okay.  And what is that?
11        A.   Global Job Evaluation.
12        Q.   Can you tell me what your understanding of
13   GJE was or is now?  When they started to talk about
14   it, what was your understanding of what they were
15   going to attempt to do with bringing in this GJE
16   program?
17        A.   It was a new method for assessing work.
18   Salaried -- primarily salaried work globally.
19        Q.   Yeah, that's what I was going to ask you.
20   Thank you.  And it was for salaried work as opposed to
21   union workers?
22        A.   I would say as opposed to production
23   workers.
24        Q.   Production workers.
25        A.   Uh-huh.

**APP238**

45

1     Q.  Did you have -- from 2000 -- let's take
2  that time frame, from 2000 to 2006, did you have
3  production workers that weren't unionized?
4     A.  Not in Waterloo.
5     Q.  But other plants worldwide?
6     A.  Yes.  Yes.
7     Q.  I understand.  I understand.  Okay.  And
8  what was -- in this time frame I'm talking about --
9  let's take, you know, 2000 to 2006, in that time
10  frame.  What was your role -- and I believe you were
11  manager of HR for Waterloo operations during that time
12  frame?
13     A.  Beginning in August of 2003.
14     Q.  Okay.  Gotcha.  From that time then, let's
15  take that time, August of 2003, up until or through
16  2006.  What was your understanding of your role, or
17  HR's role, in this -- developing and rolling out this
18  GJE process?
19     A.  HR's role was to really help the business,
20  help the managers and the departments, help them
21  follow the process and implement the new system.  So I
22  would say it was to support -- the system was done
23  centrally because it was done globally.  So HR's role
24  was really to support the implementation.
25     Q.  And when you say "HR's role," was that HR

46

1  you're talking about globally or Waterloo or what?
2     A.  Globally.
3     Q.  Globally.  Okay.  Do you know if in
4  developing this GJE process Deere hired any outside
5  people to come in and do it, or was it -- did they
6  rely solely on their own people?
7     A.  I'm aware that the company used some
8  outside resources to do the implementation.
9     Q.  And did -- was there certain people in HR
10  that were designated to do more concerning GJE than
11  others in the HR department?
12     A.  Yes.
13     Q.  Okay.  Were you one of those people that
14  was designated to do more with the GJE than others in
15  HR or not?
16     A.  No.
17     Q.  Do you know -- can you give me the names of
18  some of those people in that time frame from 2003 to
19  2006 from HR that were involved with the GJE process?
20  If you know.
21     A.  Well, again, it was a centrally led
22  process.  So, as I recall -- and again, I don't -- I'm
23  not sure about the years.  John Leinart was involved
24  in it at corporate.  Rick Bray.  Steve Jarnecke.
25  And -- that last name is

47

1     A.  Jarnecke.
2     Q.  Jarnecke?
3     A.  Jarnecke.  J-a-r-n-e-c-k-e.
4     Q.  Thank you.  Anybody else that you recall?
5     A.  No.
6     Q.  Was Leinart, Bray and Jarnecke, were they
7  all in HR, or do you know?
8     A.  They were in corporate HR.
9     Q.  Were they all in Moline?
10     A.  Yes.
11     Q.  When you received information concerning
12  GJE, would it come from one of these three gentlemen
13  normally?
14     A.  Yes.
15     MR. RACETTE:  Let's take a break because I
16  think we're about done.
17     We have segments because of the video.  So
18  we'll take a break every once in a while.  And we'll
19  take a short break and get back.  Okay?
20     THE WITNESS:  Okay.
21     MS. STEIN:  Off the record ending Tape 1 at
22  10:03.
23     (Recess taken.)
24     MS. STEIN:  On the record beginning Tape 2
25  at 10:17 a.m.

48

1  BY MR. RACETTE:
2     Q.  Mr. Keith, I just want to talk to you a
3  little bit about GJE and more or less kind of test
4  your knowledge about it and what you do or don't know
5  about it.  Okay?
6     A.  Uh-huh.  Yes.
7     Q.  I'd ask you, would you turn to Exhibit 1 in
8  the Volume I notebook there in front of you.  And that
9  is entitled "Job Evaluation Approaches."  Are you
10  familiar with that as it relates to GJE?
11     A.  Just this one page?
12     Q.  Yeah.  I'm just asking about that one page.
13     A.  No.
14     Q.  Could you turn to page 2.  That says "Job
15  Classification Questionnaire."  Are you familiar with
16  that as it relates to GJE?  And that consists of a
17  number of pages.  Go ahead.
18     A.  I don't -- I don't recall this.  This is,
19  you know, kind of a job evaluation point rating, but I
20  don't recall it.
21     Q.  Let me ask you, was the human resources
22  department reorganized in any way through GJE?
23     A.  No.
24     Q.  Did GJE apply to the human resources

49

1    A.    Yeah.  I mean there's unit HR people, and
2  then there's corporate people who were working on it
3  so -- I'm sorry.  Could you ask the question again?
4    Q.    Sure.
5          (The requested portion of the record was
6  read.)
7    A.    Do you mean the human resources function?
8  Was HR part of GJE from a function standpoint?  Or was
9  HR involved in implementing GJE?
10   Q.    Let me clarify.
11   A.    Okay.
12   Q.    What I was asking is when GJE was being
13 developed and then implemented, did it apply to the
14 employees within HR?
15   A.    Yes.
16   Q.    Okay.  All right.  If you turn to
17 Exhibit 3, that is -- if you turn it kind of so you
18 can read that, it's kind of sideways.  This is dated
19 January 4, 2002, it has "Hay Group," then John Deere's
20 emblem, and it's called "Job Family Modeling Draft
21 Project."
22          Are you familiar with this -- I think this
23 was a PowerPoint of some sort, just copies of the
24 PowerPoint pages.  Are you familiar with -- feel free
25 to just glance through the pages too.  I don't mean

50

1  to -- you've got to turn it around the other way.
2  Sorry about that.
3    A.    No, I don't remember this.
4    Q.    Okay.  When you say, "No, I don't remember
5  this," I don't know how this was presented at Deere's,
6  but this doesn't ring a bell to you anyway as you page
7  through it?
8    A.    As far as how this was presented at Deere,
9  it does not ring a bell with me.
10   Q.    I'm just going to turn to a couple pages in
11 here.  And it's kind of hard to read.  At the bottom
12 of the page down here, Mr. Keith, at the bottom, I
13 want to turn to page 4.  It's labeled page 4 at the
14 bottom here but it has different page numbers on it.
15 And at the top it says "Keep in Mind."
16          Do you see that?
17   A.    Yes.
18   Q.    Okay.  It says -- the first bullet is what
19 I was looking at.  "Far fewer jobs will be evaluated
20 under this revised project plan than under the
21 original plan."
22          Does that mean anything to you?
23   A.    No.
24   Q.    As you go down to the fifth bullet starting
25 "Job Code Models" -- do you see that one?  The bottom

51

1  page -- "typically begin with entry-level professional
2  jobs and end at the technical level mastery level."
3          Does that mean anything to you?
4    A.    Well, I mean, just on the face of it, it
5  means that it -- you know, job family models would
6  begin with entry-level people and end at technical
7  mastery level, which I'm not really sure I understand
8  what that means.
9    Q.    And that was my problem too.  What does --
10 entry-level professional jobs, what does that indicate
11 or mean to you?
12   A.    Those would be professional jobs that
13 people would begin in a certain -- typically an exempt
14 level job, professional-type work, the entry level.
15   Q.    And again, I'm not trying to be facetious,
16 I don't know what "professional" means in this
17 context.  Would that be anybody who is in management
18 that's graded, or would it be a particular type of
19 management employee?
20   A.    "Professional" would typically mean around
21 a certain function.  So a professional person would be
22 someone that works in engineering, that would be a
23 profession.  Someone that works in accounting or
24 finance, that would be a profession.  Someone that
25 works in supply management, that would be considered a

52

1  professional-type.
2          If you're doing work at an exempt level,
3  that would be considered professional-type work.
4    Q.    When you use the term "exempt level," what
5  does that mean?  Because I haven't heard that before.
6    A.    Based on a -- from a wage and hour
7  standpoint.  Looking at job classifications.  Whether
8  or not jobs were exempt for overtime or not.
9    Q.    Okay.  In other words, it would be a
10 salaried position as opposed to an hourly position?
11   A.    It would be considered a salaried exempt
12 position.
13   Q.    Okay.  And you don't know, and I don't
14 know, what technical mastery level refers to?
15   A.    (Moving head from side to side.)  No.
16   Q.    No?
17   A.    Not in this context.
18   Q.    Okay.  If you go to page 5, the next page
19 of that same exhibit, and the copier kind of made this
20 difficult to read, I was interested in the
21 "Functional-Level Teams."
22          Do you see that title in the middle?
23   A.    Yes.
24   Q.    It says "Functional and Steering Teams" I

Case 1:13-cv-02025-SEB-TAB  Document 84-3  Filed 01/30/14  Page 108 of 190
Susan Frye and Associates, Inc.        (515) 284-1972                    13 of 99 sheets
APP240

---

**53**

1  rectangle there?

2  A.  Yes.

3  Q.  "4 to 6 senior managers function," the

4  first bullet, and then the second bullet, "Guides and

5  reviews job family design efforts."

6  Do you ever recall being involved on a

7  steering team of any sort?

8  A.  No.

9  Q.  Do you remember steering teams of the type

10  and nature they're talking about in this rectangular

11  box, four to six senior managers, being developed at

12  John Deere Waterworks (sic) for GJE?

13  A.  There was -- if I followed your question

14  correctly, there was not a functional team developed

15  at the local level, at the factory level.

16  Q.  And I'm not sure -- let me make sure I'm

17  following your answer.  And what I was trying to

18  discern, whether there were functional teams

19  formulated at John Deere Works among supervisors,

20  let's take in supply management, engine engineering,

21  engineering materials, that were involved in

22  these developing family design models?

23  A.  No.

24  Q.  Who did that?  Do you know?

25  A.  These -- the functional teams were made up

---

**54**

1  of a cross-section of -- if my memory serves me

2  correctly, it was a cross-section of people from

3  different units.  People from corporate HR.  You know,

4  they had some consulting help from the Hay people.

5  But there wasn't anything at a factory level set up

6  that way.

7  Q.  Would -- is my understanding --

8  A.  Or a unit level.

9  Q.  Okay.  And my understanding, again, if

10  you -- I'm going to keep going here on the page,

11  you've got to flip it around here as you go forward,

12  and go to page 7 on the bottom there.  It's entitled

13  "Job Family Defined."  Oops, I think you may have gone

14  one too far.

15  Do you have that in front of you?

16  A.  Yes.  I think.

17  Q.  It says -- the first bullet, "A job family

18  describes a number of roles which are engaged in the

19  same or similar kind of work."  Correct?

20  A.  Yes.

21  Q.  "Job families," second bullet, "may cross

22  functional boundaries."  And then the third bullet,

23  "Factors that differentiate jobs within a family

24  include," and it gives some factors there.

25

---

**55**

1  A.  Yes.

2  Q.  My question is -- John Deere Waterworks

3  (sic), is that a large -- how large is that in

4  comparison to other worldwide plants?  Is that one of

5  the largest?

6  A.  The Waterloo Works?

7  Q.  Yes.

8  A.  Yeah.  It's one of the largest factories.

9  I don't know if it's the largest or not, but it's one

10  of the largest operations of the company.

11  Q.  And in developing job families, as I

12  understand this, they're trying to place different

13  types of workers and what they do into families that

14  consider jobs of similar natures, placing them more or

15  less together; is that right?  That may be a poor

16  question, but did you understand what I was getting

17  at?

18  A.  Not exactly.

19  Q.  All right.  Let me rephrase.  As I

20  understand it in this job family, what they are trying

21  to do is look at the jobs at Deere's, and then try to

22  place similar jobs in a family.

23  A.  At Deere, yes.

24  Q.  What I'm having a problem with, how would

25  corporate do that without having the supervisors

---

**56**

1  directly involved with those jobs supply them with

2  information concerning the jobs?

3  MS. WEST:  Speculation.

4  A.  Well, again, this was done centrally and it

5  was done with a cross-section of people, and they

6  were -- you know, they had representatives on the team

7  that were familiar with work in the factory and -- I

8  don't remember for sure, but I know they were getting

9  input from functional people at the factories.  They

10  didn't do this just in a central group and not talk to

11  the factories.  Or the business units, I should say.

12  BY MR. RACETTE:

13  Q.  Okay.  So that would be -- I think what

14  you're telling me is in order for corporate to create

15  job families under GJE, there would have to be input

16  from the various supervisors concerning whatever jobs

17  they were trying to put into families; correct?

18  A.  Yeah.  I mean -- yes.  It would be done

19  with input from the business units.

20  Q.  If you turn to page 9, keep going -- I

21  think you can turn them now and they'll stay the same

22  side up.

23  "Initial Project Steps."  Do you see that?

24  A.  Yes.

25  Q.  Is that -- are you familiar with those steps?

---

57

1    A.   No.  I -- no, I'm not familiar.  I wasn't
2    involved in these steps.
3         Q.   Go to page 10.  It has "Job Family Modeling
4    Project Steps."  Do you -- were you involved with any
5    of these steps?
6         A.   I'm not sure I'm on the right page.
7         Q.   Oh.  It says at the top "Job Family
8    Modeling Project."
9         A.   Oh, okay.  I think I was on the wrong page
10   before.
11        Q.   Were you?  Okay.
12        A.   So the page you were talking about before
13   was "Initial Project Steps"?
14        Q.   Yes.
15        A.   Yeah, same answer.  I wasn't involved and
16   don't remember.
17        Q.   Okay.  So you've already answered my
18   question about page 10, "Job Family Modeling
19   Projects"?
20        A.   Correct.  Correct.
21        Q.   Then if you turn to page 11 at the bottom
22   there of the next page, "Understanding of Function,"
23   are you aware of how that was done?
24        A.   No, I don't recall.
25        Q.   I'm going to refer you to what's in front

58

1    of you here, this Exhibit 90 that's just got a clamp
2    on it there in front of you.  It hasn't been added to
3    our notebook yet.
4              MR. WEST:  Is this the only copy you
5    brought?
6              MR. RACETTE:  Yeah, I do.  I just put one
7    over here.  Right here.
8    BY MR. WEST:
9         Q.   And you can take the rubber band off that.
10   It would be easier, Mr. Keith, to operate with that
11   off of it.  If you turn to page 1 of that Exhibit 90.
12   Under the tab there, it should be the first page.
13        Do you see the John Deere symbol there?
14        A.   Yes.
15        Q.   And if you go to the next page, page 2, it
16   says "Global Job Evaluation & Job Documentation, Job
17   Analyst Training," April 22 to May 1 of '03.
18        Do you have that in front of you there?
19        A.   Yes.
20        Q.   Do you recognize that as -- this as a
21   document that you may have reviewed at some time?
22   Just from reading this page 2?
23        A.   Yes.  I recognize it as a document that I
24   did not review or was involved in.
25        Q.   Okay.  So let's go to the second -- I'm

59

1    going to have you turn to a page, and I'll tell you
2    what it is in a second.  62.  If you could turn to
3    Exhibit 90, page 62.
4         Take a moment, if you would, just read that
5    to yourself, and let me know when you're done.
6         A.   Okay.
7         Q.   Just briefly -- this has a bunch of terms I
8    just wanted to ask you if you knew.  It says
9    "Supervisors have either completed PAQs" -- that's an
10   acronym, P-A-Q.  Do you know what a PAQ is in regard
11   to GJE?
12        A.   Yes.
13        Q.   What was that?
14        A.   It's a position analysis questionnaire.
15        Q.   And what is that?
16        A.   It's used to assess work.
17        Q.   And can you tell me what your understanding
18   of how those were done in the GJE process, how they
19   were prepared?
20        A.   They were completed by supervisors and --
21        Q.   Go ahead.
22        A.   By people that were close to the work that
23   could make those -- that knew what the work was.
24        Q.   Would that be -- for instance we're talking
25   about supply management here, so that would be the

60

1    immediate supervisors of various areas of supply
2    management would be making up PAQs?
3         A.   PAQs would have been completed in all
4    functions.
5         Q.   Would that include like Brian Matson who
6    we're dealing with in this case in supply management?
7         A.   Again, I don't recall if Brian would have
8    submitted a PAQ or not.
9         Q.   Clyde D'Cruz.  Would he have been
10   committing PAQs, or would he rely on his managers
11   below him, or do you know?
12        A.   I don't know specifically if -- again,
13   specifically if they did.  It would be speculative on
14   my part to say.
15        Q.   And it says the supervisors would have
16   completed these position analysis questionnaires "on
17   behalf of their employees or reviewed, revised and
18   approved what was written."
19        Do you know who would have written them if
20   not the supervisors?
21        A.   It's hard for me -- it's hard for me to
22   remember.  You know, I suppose it's possible that a
23   supervisor could have reviewed a PAQ that some other
24   supervisor would have completed if they were similar

Case 3:13-cv-02065-CRW-SBJ   Document 84-3   Filed 02/03/14   Page 110 of 190
Susan Frye and Associates, Inc.                    (515) 284-1972                    15 of 99 sheets
APP242

61

1    I know some employees provided input to
2 PAQs. I don't think they completed them, you know, a
3 hundred percent, but they provided -- so I suppose
4 it's -- but I don't remember.
5    Q.   Sure. But in any event, either the
6 supervisor was preparing the PAQ or reviewing one that
7 was prepared for the same type of employee; correct?
8    A.   That's how this appears, yeah.
9    Q.   Okay. And it says this would make the PAQs
10 "a valuable source for perspective on the size and
11 complexity of the position being evaluated."
12    Is that correct?
13    A.   I'm sorry. Where does it say that?
14    Q.   Right in the last two sentences after the
15 first --
16    A.   Oh, okay. Yeah. Yeah, that makes -- those
17 are factors that would be part of a PAQ.
18    Q.   And do you know then -- evidently they were
19 used as -- this says for a valuable source to
20 determine the size and complexity of the position
21 being evaluated?
22    A.   Yes.
23    Q.   Then the second bullet, "Answers to the
24 following questions should help Job Analysts."
25    Do you know who job analysts -- what that

62

1 refers to? Who a job analyst would be in this
2 context?
3    A.   Yes.
4    Q.   Who would they be?
5    A.   They would be people at -- in a central
6 role that would be analyzing jobs. That would be
7 taking this information and analyzing it.
8    Q.   At the corporate level?
9    A.   Yeah, at a central level.
10    Q.   Would this be John Leinart, Rick Bray, or
11 Steve Jarnecke?
12    A.   No.
13    MS. WEST: Objection. Speculation.
14 BY MR. RACETTE:
15    Q.   It would be somebody maybe they had
16 designated or something like that?
17    A.   Yeah, there would be a team of people that
18 would be considered job analysts.
19    Q.   And it says "Answers to the following
20 questions...should help validate proposed evaluations
21 or provide them with support for revising
22 evaluations." And then it has these little bubbles.
23    The first one on the right, "Does the
24 supervisor consider the proposed grade assignment
25 reasonable in relation to benchmark jobs?"

63

1    Do you know what that refers to?
2    A.   Well, I'm just interpreting what it says.
3 That they're asking the supervisor to -- you know, for
4 a -- does this seem reasonable relative to -- does the
5 grading seem reasonable or not relative to benchmark
6 jobs.
7    Q.   And that would be, again, the direct
8 supervisor who is involved with that work, seeing it
9 on a daily basis?
10    MS. WEST: Objection. Speculation.
11    A.   It would have been -- it would have been
12 the author of the PAQ, presumably the supervisor.
13 Again, I'm just -- I'm operating off this slide and
14 just kind of interpreting what it's saying.
15 BY MR. RACETTE:
16    Q.   I understand, but that will help.
17    If you turn to page 45 of this Exhibit 90.
18 And it says "Using the Algorithm." Do you have that?
19    A.   Uh-huh.
20    Q.   You have to say yes or no.
21    A.   Yes. Sorry.
22    Q.   No problem. First of all, do you know what
23 the algorithm is in regard to GJE?
24    A.   No.
25    Q.   Were you ever involved in -- strike that.

64

1 Were you ever educated as to GJE, this system of
2 algorithms that they used?
3    A.   No.
4    Q.   If you look at the second bullet on page 45
5 of Exhibit 90, it says "when the algorithm generates
6 an evaluation and a grade - from quality assured PAQ
7 responses - the position likely belongs in that grade
8 and almost certainly belongs in the grade...plus or
9 minus 1."
10    Do you see that?
11    A.   Yes.
12    Q.   You being in HR, would you interpret that
13 that even when the algorithm would disclose what it
14 felt a grade was, there was a plus or minus evaluation
15 one way or the other, one down or one up, that it
16 could be changed?
17    THE WITNESS: I'm sorry. Could you repeat
18 that.
19    (The requested portion of the record was
20 read.)
21    A.   Well, how I would interpret that is that
22 the algorithm would get you into a specific grade or
23 maybe two grades that it would -- there might be a
24 range.

Case 1:12-cv-02650-JBS  Document 84-3  Filed 02/03/14  Page 111 of 190
Susan Frye and Associates, Inc.        (515) 284-1972        16 of 99 sheets
APP243

65

1 Q. And then --
2 A. Or maybe not.
3 Q. Okay. And that's fair. And perhaps
4 then -- or do you know -- let me ask you this way,
5 Mr. Keith: Do you know then who would ultimately
6 decide what the grade would be once the algorithm
7 would place the grade range on the job? Do you know
8 how that worked?
9 A. Well, I'll just answer that generally. The
10 grades were determined in a joint way, there were
11 several people involved in that. So it wasn't one
12 group or one person deciding.
13 Q. Gotcha. And that would include the
14 supervisors as one of those people?
15 A. Yeah, with -- the supervisor would have
16 some input. But again, there were several people
17 involved in it from a functional standpoint. So they
18 all would weigh in on that.
19 Q. Who else besides supervisors would be
20 involved to your knowledge?
21 A. Well, as I said earlier, you've got
22 corporate HR people, you've got Hay specialists,
23 you've got functional representatives from the
24 different factories.
25 Q. Let me go to page 26 of Exhibit 90 and let

66

1 you look at that a second.
2 Do you have that in front of you now?
3 A. Yes.
4 Q. Do you recognize this diagram at all?
5 A. The "Quality Assurance Timeline"?
6 Q. Right.
7 A. No.
8 Q. Okay. I just want to go over it a second
9 here and see if you know. It has "HR," do you see
10 that, on the left-hand bottom before the bar?
11 A. Yes.
12 Q. And then up above it has "Business." Do
13 you see that?
14 A. Yes.
15 Q. And it has a timeline in the middle. Do
16 you see that?
17 A. Yes.
18 Q. And the timeline does not give us a year on
19 here; is that correct?
20 A. Yes. Looks that way.
21 Q. Okay. But whatever year GJE -- do you know
22 what year GJE was being developed? Do you recall?
23 A. Well, it was in the 2003, 2004 time frame.
24 Q. That seems to be --

67

1 Q. That seems to me also to be what the
2 documents are showing in this case. So if we can
3 assume -- just for the moment we'll assume this was in
4 2003 this diagram is referring to; would that be fair?
5 A. That's an assumption.
6 Q. Let's just look at this diagram for a
7 moment. Do you -- can you tell me if you understand
8 what the business -- why it's "Business" on the top
9 and "HR" at the bottom of this diagram? Do you know
10 why it's designated in that fashion or what it means
11 in regard to this?
12 A. Well, again, I've not seen this before so
13 I'm just interpreting, but it would be -- the business
14 would be all the other functional groups, which
15 includes HR, and then HR would be -- you know, the HR
16 role would be to, again, facilitate and support the
17 process.
18 So the business would be functional leaders
19 from all the -- functional people from all the
20 functions.
21 Q. And that would include all the supervisors
22 that are in the plants and that type of thing?
23 A. In a global sense. In a very, very general
24 sense, yeah.
25 Q. And it says "Spreadsheets" --

68

1 A. Excuse me, if I could add.
2 Q. Go ahead. Go ahead.
3 A. This is just a generic -- "Business" is
4 just used as a generic term. You know, really, really
5 general. So HR working with the business. I mean
6 that was basically -- but it wasn't specific to
7 supervisors or managers. It was just to the
8 functions.
9 Q. Yeah, and that's what I was trying to
10 understand just if you -- and I appreciate you haven't
11 seen this before, but it would be your understanding
12 from working there all the years you worked there that
13 when you see a diagram like this and they separate
14 "HR" out from "Business," that "Business" is going to
15 refer to everybody else other than "HR"? Is that
16 how you're interpreting it or not?
17 A. This is more of kind of a role diagram. So
18 business played a role in this, and HR played a role
19 in this. I guess the point I'm trying to make is that
20 HR is part of the business.
21 Q. I understand. But when they're separated
22 out like this, it would mean they're taking HR as a
23 special role in this sequence --
24 A. This is a roles and responsibilities kind

77

1  by -- you know, according to this diagram, if this is
2  in '03, at least by August of '03 all the department
3  heads, whether or not they were on the reviewing
4  committee, would by this time be aware, wouldn't they,
5  of what the job descriptions were, how the jobs were
6  mapped to those descriptions, and if they had any
7  problems with it, they would be able to come forth by
8  August and talk about those problems; correct?  If
9  they had anything to criticize.
10    A.   Yeah, that's -- I would say that's how this
11  timeline is laid out.
12    Q.   Okay.  I'm going to ask you to turn to
13  Exhibit 5 in Volume I there.  Sorry to shift gears on
14  you here.
15        Do you recognize that first page of
16  Exhibit 5?
17    A.   The "Point Rating Table"?
18    Q.   Yeah.  Do you recognize that?
19    A.   Vaguely.
20    Q.   Can you tell me what that is?
21    A.   Well, I'm not sure, but it looks kind of
22  like an old point rating table that -- or I should say
23  an older point rating table that we used -- that was
24  used back in prior years.
25    Q.   What was it used for?  I'm not familiar

78

1  with this at all.
2    A.   To assess jobs.
3    Q.   Can you just briefly tell me how it was
4  used to assess jobs?  I'm assuming -- you're saying
5  the old days.  This would be back before GJE; is that
6  correct?
7    A.   Yeah, this is pre GJE, although I can't --
8  I can't remember exactly, you know, when point rating
9  was used.  But yeah, it would have been pre GJE.
10    Q.   And can you tell me how it was used or what
11  it was used for?
12    A.   It was used to assess work.  To evaluate
13  work and come up with a salary grade.
14    Q.   And who would be using these factors to
15  assess the person's job and grade?
16    A.   You mean what level were they or --
17    Q.   No.  Who would be using this point system
18  to set the grade of a job?  Would it be the supervisor
19  involved with the work, or how did that work, if you
20  know?
21    A.   Well, back then this was done, again,
22  jointly with -- there could be a supervisor involved
23  in this, and probably would be, and someone from HR
24  would be involved in it, and someone at corporate that
25  would review it, so there's different departments

79

1  looked at this output.
2    Q.   And I assume the point rating system would
3  always start, and probably end, with the supervisor
4  involved; correct?  Because he's going to have the
5  most knowledge, I'm assuming, about the job position
6  and what needs to be -- what is involved with that
7  position as far as these factors, as far as
8  prerequisite training, physical skill, knowledge,
9  mental versatility.
10        That's something only the supervisor is
11  going to know, isn't it?  Not you or someone in
12  corporate.
13    A.   Yeah, the supervisor should know and have a
14  good feel for this.  Employees also would maybe -- at
15  times would look at this and have some input into it
16  because they're obviously the incumbent doing the
17  work.
18        And depending on the experience of the
19  person in HR, the HR rep, they may have some
20  experience in this too.  And the supervisor should
21  know.  He or she is closest to the work being
22  performed.
23    Q.   So basically pre GJE the supervisor
24  involved with the work, as well as the employee as you
25  just said, those would be the two main people that

80

1  would be involved in determining the factors and
2  trying then to give you or corporate enough
3  information to help them, the supervisor I'm talking
4  about, make the grade and job wages?
5    A.   When you say me, you mean the HR
6  representative?
7    Q.   HR representative; correct?
8    A.   And again, I'm kind of repeating myself,
9  but it would be done jointly.  The supervisor would
10  have input certainly, the employee may or may not have
11  involvement, and HR would be involved from a unit
12  standpoint.  Before it went to, say, corporate, unit
13  HR would be involved in it to look at it and see if it
14  was reasonable or not.
15    Q.   And I get that.  I'm just trying, if I can,
16  to be a little bit more specific in the roles that
17  were played, and what I'm trying to say -- and maybe
18  I'm wrong, correct me if I'm wrong, the supervisors of
19  the job, along with, as you've said, perhaps the
20  employee, would be the ones that would be giving all
21  the information as to the factors of the job, and then
22  what would HR's role be?  Is that correct what I just
23  said?  Because I'm assuming --
24    A.   That's fair.  That's fair.
25    Q.   And I'm assuming HR, if what I said to you,

Case 3:12-cv-02650-JSC Document 84-3 Filed 02/03/14 Page 113 of 190
Susan Frye and Associates, Inc.                    (515) 284-1972                    20 of 99 sheets
APP245

93

1       If we look at Exhibit 5F, do you recognize
2   this document by any chance?
3       A.   No.
4       Q.   As you look at it, can you tell what it is?
5       A.   Yeah, it looks like just some information
6   about jobs, different job titles.
7       Q.   Do you know if this in any way relates to
8   GJE?
9       A.   No. I don't.
10       Q.   There's a date on the lower left-hand side,
11   August 2008, and I don't know if that's a date that
12   was put on there subsequent to this being drawn up or
13   not.
14       Do you have any idea looking at that date,
15   does that refresh your recollection what this is?
16       A.   No. I don't.
17       Q.   Thank you. I'm going to ask you to go to
18   Exhibit 2. Turn back to Exhibit 2, if you would,
19   please. And if you turn to page 6 of that exhibit.
20       Do you have that in front of you?
21       A.   Yes.
22       Q.   If you go down about three-quarters of the
23   way and it says in black bold type "Installation of
24   the Guide Chart - Profile Method."
25       Do you see that?

94

1       A.   Yes.
2       Q.   Could you read that to yourself, that
3   paragraph, up to "Hay Group," where it says "Hay
4   Group," and let me know when you finish.
5       A.   Okay.
6       Q.   Are you familiar with that -- this "Guide
7   Chart- Profile Method" in regard to the Hay process
8   that Deere was adopting?
9       A.   No.
10       Q.   Do you know if that was done concerning
11   their conversion over to GJE?
12       A.   No, I do not.
13       Q.   If you turn to page 7 of that same exhibit.
14       A.   Okay.
15       Q.   And if you would read on that page
16   paragraph 7. It has some subparts (a) through (e).
17   Would you just take a moment and read that over, and
18   when you've finished, let me know.
19       A.   Okay.
20       Q.   I want to refer you in that paragraph to
21   paragraph (d), "No position in the benchmark sample is
22   finally evaluated until they are all finally
23   evaluated; i.e., any evaluation can be changed as the
24   committee proceeds in its learning and becomes a
25   coherent team."

95

1       Did you have that same understanding in
2   regard to benchmarks under GJE, or do you know?
3       A.   No, I did not. I did not have access to
4   this information or look at it in this way.
5       Q.   Finally, page 26 of that Exhibit 2.
6   There's a paragraph 19, do you see that, with a
7   question? These are kind of more or less help
8   questions they put out in this brochure re the Hay
9   system.
10       And if you read the third paragraph --
11   would you just read under 19 the third paragraph
12   starting "Some issues."
13       Would you read that, and let me know when
14   you're done with that, please.
15       A.   Okay.
16       Q.   The sentence in the third paragraph about
17   five lines down starting with "Also Guide Chart points
18   can be used to indicate whether requirements and
19   contributions of assignments are comparable even
20   though the work is not identical. One way to avoid
21   prohibited discrimination is to have similar pay for
22   work of comparable worth."
23       Was that your understanding what GJE was
24   supposed to do?
25       A.   Philosophically, yeah.

96

1       Q.   And did you yourself do any mapping of jobs
2   to particular descriptions under GJE?
3       A.   No, I didn't specifically map any jobs. I
4   guess I'm not sure if I understand the context of your
5   question. You mean jobs in my department or just jobs
6   in general or --
7       Q.   Either one. Either one. It was a general
8   question saying under GJE did you ever map any jobs to
9   job descriptions, yourself?
10       A.   I don't remember that I did.
11       Q.   Do you know if anybody in your department
12   in HR in Waterloo did?
13       A.   Well, my department, my HR department, was
14   involved in some -- as GJE went forward, you know,
15   people would -- they would work with the departments
16   and they would submit jobs for mapping.
17       I mean the GJE implementation was kind of
18   an event at a point in time, but -- and I was involved
19   in a small number of jobs, again, later on, that were
20   mapped.
21       Q.   Do you know in general within a job family
22   if there was supposed to be grade variances at all?
23       A.   Well, by its very nature a job family would
24   have a grade variance. At Deere.
25       Q.   So if you knew in your position how many

97

1    employees over 40 were downgraded in supply management
2    as a result of the GJE?
3        A.    I don't -- I don't recall off the top of
4    the head.  In fact, no employees were downgraded.
5    Their jobs were reevaluated.
6        Q.    Do you know how many employees over 40 were
7    upgraded in GJE?
8        A.    In what scope?
9        Q.    In supply management.
10       A.    Supply management?  No, I don't recall.
11       Q.    Do you have any idea how many employees
12   under 40 were upgraded in GJE?
13       A.    Again, within supply management?  No, I
14   don't.  I don't recall.
15       Q.    Did you know how the mapping was done under
16   GJE by the different supervisors?
17       A.    I'm not sure I understand your question.
18       Q.    When GJE came out -- remember we went
19   through and discussed how there was job descriptions
20   created, and then there was mapping done to those job
21   descriptions?
22       A.    Yes.
23       Q.    Do you understand that?
24       A.    Yes.
25       Q.    And what I'm asking you is do you know how

98

1    the mapping was done to the job descriptions?  Was
2    each supervisor given the job descriptions, and then
3    he would map the positions underneath him to job
4    descriptions, or do you know exactly how that was
5    done?
6        A.    From a process standpoint, supervisors were
7    involved in describing the detail of the work that
8    people were doing, and later on -- the way the process
9    worked, then later on jobs were mapped after, again,
10   the review that we talked about earlier.
11       Q.    Sure.
12       A.    So supervisors had an input into the --
13   from an information standpoint into the process, which
14   ended up being mapping.
15       Q.    And was the mapping also then done by the
16   supervisors once the job descriptions were created?
17             MS. WEST:  Speculation.
18       A.    I guess I'm not sure what you mean by
19   "supervisor."  If there were -- no one did this in a
20   vacuum or by themselves.  So there were people that
21   were supervisory managerial, again, with HR that would
22   have been involved in that.
23       Q.    Let me make sure I'm clear.  What I'm
24   saying is once the job descriptions were made up under
25   GJE, mapping took place --

99

1        A.    Yes.
2        Q.    And would the job descriptions be provided
3    to the supervisors of the different departments and
4    then they would map those jobs to the descriptions?
5        A.    Yeah.  They provided to the manager of
6    the department, the functional manager, and then the
7    supervisor would be involved in that process as well.
8        Q.    And that would include someone like Clyde
9    D'Cruz?
10       A.    Yes, I believe so.
11       Q.    Bob Barnes.  Do you know if that would be
12   the case with him?
13       A.    I don't -- I don't recall.  I assume Bob,
14   because of his level, would have been involved in GJE,
15   but I don't recall.
16       Q.    Brian Carlson?  Would it include him?
17       A.    Again, I don't -- I don't know specifically
18   what their involvement was.
19       Q.    But it could be any manager of the
20   department as well as any supervisors under him.
21       A.    They could -- possibly they could be
22   involved, yeah.
23       Q.    Okay.  All right.  Other than the
24   complaints by my clients in this matter of age and
25   gender and disability discrimination, I want to ask

100

1    you if you're aware of any other complaints being made
2    against Clyde D'Cruz other than by my clients?
3        A.    No.
4        Q.    None.
5        A.    None.
6        Q.    How about in regard to Daria Jerauld?
7        A.    No -- let me rephrase -- let me go back.
8    There may have been -- as I'm thinking about supply
9    management, there may have been a couple other people
10   that had concerns about their jobs or their
11   circumstances, but it was a small number, small group.
12       Q.    About Clyde D'Cruz?
13       A.    Well, I would say just their circumstance,
14   something maybe about their job or -- you know, it was
15   a general -- again, I'm not sure what you mean by
16   "complaint," but --
17       Q.    And what I mean by "complaint" is a
18   complaint of discrimination, a complaint of unfair
19   treatment, a complaint of harassment, anything of that
20   nature.
21       A.    There was no complaints about harassment,
22   about discrimination.  You know, it was a time when
23   there was a lot going on in Waterloo, there were a lot
24   of projects, and I think people -- there was a small

Case 6:12-cv-02050-JSS   Document 84-3   Filed 02/03/14   Page 115 of 190

APP247

109

1    Q.   Okay.  And if there had been complaints
2  about Clyde D'Cruz of the nature I'm talking about,
3  discrimination, harassment, retaliation, or problems
4  with the way he graded people in their jobs, where
5  would that information -- where would those complaints
6  be retained or kept?
7    A.   Well, they would -- you know, they would be
8  kept -- you know, if they came to my attention, they
9  would be kept in my -- with me.  Or with, you know,
10  whoever the complaints or -- the concerns or
11  complaints came to.
12    Q.   When you say "with me," I'm assuming not in
13  your wallet.  They would be --
14    A.   With the person in HR.  HR representative
15  or HR manager role.
16    Q.   Would you open up a file on that particular
17  person and then keep it in your credenza as you said?
18    A.   Yeah.  If there was a complaint that I was
19  involved in, yes.
20    Q.   Would there be anything logged in somewhere
21  so somebody else would know about the complaint that
22  was reviewing him?  For instance, Mr. Pinkston or
23  Mr. Schaffter?  How did that work?
24    A.   Well, if someone complained to me about a
25  manager or whatever, I would -- you know, over time I

110

1  would -- or at the appropriate time, I would have
2  reviewed it or updated my boss on it.
3    Q.   For instance, by the time he was
4  transferred and downgraded, Gayle Forster had
5  complained about his conduct, Wanda Lenius had
6  complained about his conduct, Mike Sellers had
7  complained about his conduct.  Mike Sellers had filed
8  something with OSHA, a complaint, and also he filed
9  something with you formally.
10          Was that all not considered one bit in
11  regard to his performance, job performance?
12    A.   I think if you look at those complaints and
13  the conclusions that were reached on those complaints
14  and the closure that was reached on those complaints,
15  and if you're looking at someone's performance over a
16  several year period, I mean that's all part of Clyde's
17  time in Waterloo, but you know, it's just -- it's
18  those circumstances in addition to all the other
19  things that he was involved in that would have driven
20  his performance.
21    Q.   And I don't know if you answered my
22  question, but let me just ask you.  So it wasn't
23  unusual at John Deere to have several people complain
24  about a department manager in regard to age
25  discrimination, gender discrimination, misgrading --

111

1  retaliation, that that's not a problem?  Pretty much
2  Deere doesn't consider that as far as job performance
3  of a manager?
4          MS. WEST:  Objection.  Argumentative.
5  Compound.
6    A.   No, Deere would take that very seriously
7  and be concerned about it.  And those complaints and
8  so on were looked at, investigated, and brought to a
9  conclusion at least internally within Waterloo and
10  within the supply management group and with Barry or
11  with Pat.  They were aware of that.
12  BY MR. RACETTE:
13    Q.   Did you ever produce to my clients any type
14  of written investigation findings or conclusions?
15    A.   I don't -- I don't recall if that was
16  produced or not.
17    Q.   Did you ever report to anybody above you,
18  your superiors or any superiors above Mr. D'Cruz, as
19  Mr. Schaffter, what the investigation revealed and
20  what the conclusions were?
21    A.   I would have had -- I would have had
22  conversations with the general manager about the
23  nature of the complaint, what we had done.  You know,
24  was -- you know, was Clyde at fault or not.  You know,
25  what was the -- what was Clyde's behavior and was he

112

1  at fault or not.  Or any supervisor, you know, when
2  there's a complaint like that.
3          And so you have to evaluate -- and it's a
4  judgment call.  What's the nature of the complaint and
5  is there -- you know, is it harassment or not, is it
6  discrimination, or is it more of a disagreement.
7          So, I mean, there's a lot of factors that
8  are considered.
9    Q.   In looking at the policy, which was 38A we
10  looked at this morning, in looking at that under the
11  investigative portion of the policy, it looked like to
12  me that investigation was supposed to be made and
13  conclusions supposed to be found, and then the party
14  involved was supposed to be told what the results
15  were.
16          Is that correct?
17    A.   Uh-huh.
18    Q.   Is it your testimony here today that you
19  ever told Mike Sellers what investigation you made and
20  what your conclusions were?
21    A.   Well, in the case of Mike Sellers, Mike was
22  already off work.  And so I didn't personally speak
23  with Mike, because by the time we had looked into his
24  concerns, he was already off on disability.  So I

Susan Frye and Associates, Inc.          (515) 284-1972          28 of 99 sheets
Case 6:12-cv-02050-JSS  Document 84-3  Filed 02/03/14  Page 116 of 190
APP248

113

1    Wanda --

2    Q.    Mike's still an employee today, isn't he?

3    A.    I'm sorry?

4    Q.    Is Mike still an employee today?

5    A.    Yes.

6    Q.    So why wouldn't you follow the policy and

7    get back to him with your findings and what your

8    conclusion was?

9    A.    Because he wasn't -- he was not an active

10   employee and he was off work on disability, and it was

11   my judgment not to do that.

12   Q.    So if someone --

13   A.    At least I don't recall that I spoke with

14   Mike directly about it.

15   Q.    What was your understanding of why he was

16   off work?

17   A.    He was -- he had a disability.

18   Q.    From what?

19   A.    The nature of the disability I don't really

20   recall.  I believe he was being treated at the Black

21   Hawk-Grundy Mental Health Clinic.

22   Q.    I think the record will show you

23   actually -- Dr. Harding met with you and told you what

24   the problem was with Mr. Sellers, including that he is

25   claiming it was due to work discrimination based on

114

1    his age, he thought, and disability and that he

2    actually had PTSD from that he is claiming, and you

3    never got back to him at any time and told him what

4    your findings were and conclusions were?  I don't

5    understand.

6    MS. WEST:  I'm going to object.  At some

7    point he filed an EEOC claim, and obviously Deere

8    isn't going to be talking to him directly.  If that's

9    what you're asking in that time frame.  If you can

10   narrow it.

11   BY MR. RACETTE:

12   Q.    I'm just asking if there's any point where

13   you got back to him and explained to him what your

14   investigation showed and what your findings were.

15   If you're going to tell me if someone filed

16   a complaint with the EEOC that you wouldn't give them

17   your results and conclusions, let me know that as

18   well.

19   Is that what -- are you claiming that?

20   A.    I don't understand -- I guess I don't

21   understand your question.

22   Q.    Okay.  What I'm asking you is the record

23   will show in this matter that Mike Sellers made

24   specific complaints to you -- in fact, we'll go to

25   that here a little bit.  You've got several meetings

115

1    thorough, as Mike is, and they laid out more or less

2    an entire scenario of Clyde D'Cruz discriminating

3    against people in supply management due to their age

4    and doing it in different fashions, as we've talked

5    about earlier, giving older people heavier work

6    assignments, not letting them leave the area, not

7    advancing them, mapping them to what he thought was

8    inappropriate grades, in quite detail, and I've looked

9    at this and you've got this, and then also the record

10   will show you met with his doctor, Dr. Harding, who

11   was treating him for PTSD as a result of these

12   problems at work.

13   And my question is with all that

14   information, you never got back to him at any time

15   with what your investigation showed and what your

16   conclusions were?  That's my question.

17   A.    No, I never got -- I never got back to Mike

18   with what the results of the investigation were.  And

19   again, he was on disability, and typically with

20   respect to someone who is off on disability, I

21   wouldn't have contacted them.  Had Mike returned to

22   work, I would have spoken with him.

23   Q.    Did you have then investigations and

24   conclusions you didn't tell him about?

25   A.    Yeah, I spoke with people internally about

116

1    his concerns and talked to some of the people in

2    supply management about his concerns.

3    Q.    We'll talk about that in a minute.

4    Did you get back to Gayle Forster and tell

5    her what your investigation showed and what your

6    conclusions were?

7    A.    Yeah, I spoke with Gayle several times

8    about kind of where things stood with supply

9    management.  She had several concerns with Brian

10   Matson, and I met with her frequently and talked about

11   what I had found and what I was working on going

12   forward.

13   Q.    You told her what your investigation had

14   revealed and what your conclusions were.

15   A.    Well, what had concerns about, you know,

16   Brian Matson, and she had met with Brian about her job

17   grade and was concerned about that meeting, she was

18   concerned about her shutdown plans, she was concerned

19   about overtime, she was concerned about supplier

20   visits.

21   Q.    What did she tell you she thought the

22   problem was?

23   A.    Well, she believed that it was because of

24   her age.

25   Q.    What did you do to investigate that?

APP249

129

1 reduced because she would have been -- let's say it's
2 a four-year -- four years was the max that people
3 could take it. So that gets her to 54. Well, she
4 still would have had a pretty significant age
5 reduction.
6          So the context for my comment about her age
7 was, "I don't think this is going to be viable, I
8 don't think she's going to be interested in this,"
9 because it's going to have that significant reduction
10 in it. Again, from a pension standpoint.
11     Q.   In reading this I took it to be you were
12 concerned about her from an age standpoint because she
13 was older and didn't want to put her in that position,
14 but you're --
15     A.   Not at all. Not at all. I mean Deb Mirs
16 was a person -- an HR rep at the time who was -- so to
17 answer your question, not at all.
18     Q.   You say "I talked with Tammy about other
19 candidates including people from C&FD, QCHR, Mindy
20 Moye" -- who was Mindy Moye, M-o-y-e?
21     A.   She was an employee at that time.
22     Q.   And what did you talk to her about?
23     A.   You mean what did I talk to Tammy about?
24     Q.   "I talked with Tammy about other candidates
25 including people" -- is this Mindy Moye one of the

130

1 candidates you talked to Tammy about?
2     A.   Yes.
3     Q.   How old was Mindy Moye?
4     A.   I don't -- I don't recall.
5     Q.   Give me your best shot.
6     A.   I don't know. I really don't. My guess
7 would be maybe 35 or 40, somewhere in that range.
8     Q.   How about Paul Winston? Was he another
9 candidate you were considering?
10     A.   Yeah, it was somebody that we were -- you
11 know, we had like a list of people, it was kind of a
12 brainstorm exercise what -- who can we come up with.
13 So, yeah, Paul was in our group.
14     Q.   Was Mindy Moye at that time in HR?
15     A.   She was in corporate HR.
16     Q.   How about Paul Winston. Was he in HR at
17 that time?
18     A.   Yeah, he was in our -- he was in our
19 communications group at that time.
20     Q.   How long had Mindy Moye been with Deere?
21 Do you know how many years she had been?
22     A.   I don't remember.
23     Q.   How about Paul Winston?
24     A.   He came from Coffeyville. I'm sorry, I
25 don't remember the exact date, but it's --

131

1     Q.   More than a year?
2     A.   Oh, yeah. Yeah. Yeah, it was more than a
3 year.
4     Q.   With John Deere in Waterloo, he had been
5 there more than a year?
6     A.   Yeah. Yeah, I would say definitely more
7 than a year.
8     Q.   How much?
9     A.   I would say definitely more than a year.
10     Q.   Two years?
11     A.   I'm sorry. I don't recall. I know he was
12 at Coffeyville and then came to Waterloo, worked in
13 training, and then he ended up moving over into our
14 communications group.
15          So you add all that up, I'm not sure what
16 the sum total of all that is.
17     Q.   About how old was Paul Winston at that time
18 approximately?
19     A.   Again, I don't -- I don't recall.
20     Q.   Under 40?
21     A.   Probably. Again, it's hard to say. I
22 didn't look at people in terms of their age. So I
23 don't remember. But just remembering back then and --
24 so, yeah, probably.
25     Q.   So you said you could get by "with part of

132

1 Jody." Who was that, Jody who?
2     A.   Jody McKowen.
3     Q.   Was she in HR?
4     A.   Yeah, I believe she was like kind of a
5 project manager for John Deere Power Systems.
6     Q.   How old was she at that time approximately?
7     A.   I don't -- approximately maybe mid
8 thirties.
9     Q.   And how about Amy Wagner. How old was she
10 at that time?
11     A.   Probably thirties probably.
12     Q.   And how long had she been in HR
13 approximately?
14     A.   Well, she had worked in HR in Des Moines
15 before she came to Waterloo.
16     Q.   How long had she been in HR in Waterloo?
17 Approximately.
18     A.   Maybe five -- five to seven years,
19 something like that.
20     Q.   How long had Nancy Kohagen been in HR in
21 Waterloo?
22     A.   In terms of the total amount of time,
23 probably, you know, 20 years. Twenty years or more.
24     Q.   If you go to the next page, page 2 of
25 Exhibit 77, this is another 1-1 opener, but it's a

Case 6:12-cv-02050-JSS   Document 84-3   Filed 02/03/14   Page 11 of 190

**APP250**

133

1 notice of a meeting; is that correct?

2     A.   Uh-huh.

3     Q.   **You have to say yes or no.**

4     A.   Yes.

5     Q.   **Thanks.  And this is two days after this**

6 **meeting in regard to Kohagen.  Is that correct?**

7     A.   Yes.

8     Q.   **And this is going to be a meeting notice**

9 **for 5-7-04 with you and Clyde D'Cruz, and you have an**

10 **optional, Mindy Westendorf.  She was optional to be**

11 **there; is that correct?**

12     A.   Yes.  That's the way it looks, yeah.

13     Q.   **Okay.  And this is you writing this; is**

14 **that correct?**

15     A.   Yes.

16     Q.   **To Clyde D'Cruz?**

17     A.   Uh-huh.

18     Q.   **You have to say yes or no.**

19     A.   Yes.  Sorry.

20     Q.   **And you're stating in this meeting notice**

21 **you wanted to respond to some of his questions before**

22 **the meeting; is that correct?**

23     A.   Yeah.  It would appear that way.

24     Q.   **And you're talking about an individual**

25 **named Mel; is that correct?**

134

1     A.   Yes.

2     Q.   **About potentially hiring him; is that**

3 **correct?**

4     A.   As I recall, I don't remember a lot about

5 this, but Mel was -- I believe he was an employee at

6 the Des Moines Works.

7     Q.   **Do you know his last name by any chance?**

8     A.   No.  I don't recall.

9     Q.   **Did he come to you, or how did he come up**

10 **for this position?**

11     A.   Well, as I recall, and I'm not real -- my

12 memory is not real great on this, but I believe that

13 Mel was -- he was working in Des Moines Works as an

14 employee.

15     His wife, who did not work for Deere, had

16 gotten an opportunity to work with some other employer

17 in the Waterloo/Cedar Falls area.

18     So I don't remember who was asked, if it

19 was me -- it was probably me given this circumstance

20 maybe.  You know, "Hey, his spouse has a job in

21 Waterloo/Cedar Falls.  Is there an opportunity for Mel

22 in the Waterloo operation somewhere with John Deere."

23     Q.   **Do you think he contacted you about it, or**

24 **did you just go to him, because I can't imagine that**

25 **you would know of a job in Cedar Falls and**

135

1 where their husband worked or something.  Maybe you

2 do.  I don't know.

3     A.   I don't remember how we were contacted,

4 but -- and maybe it didn't come in to me, it may have

5 come in to someone else in our group, but a request --

6 it might have even been someone in the community,

7 maybe his wife's employer, that said -- basically it

8 was a request to accommodate her move, which was a

9 non-Deere move, and say, "Do you have -- is there a

10 job -- is there an opportunity maybe for Mel," is how

11 it went.

12     But I don't know who talked to who or where

13 the communication came from.

14     Q.   **And you were going to try to place him in**

15 **SM, supply management?**

16     A.   Not necessarily.  I mean it was an open --

17 it was an open request.  And I don't remember what

18 group he worked in.  He may have been in supply

19 management, he may have been in operations.  I don't

20 recall.

21     Q.   **And the sentence in the fourth paragraph**

22 **down, you -- in the fourth line of that fourth**

23 **paragraph, it starts "And it's not all bad."**

24     **Do you see that?**

25     A.   Say it again.  I'm sorry.

136

1     Q.   **Yeah.  I'm in the fourth paragraph down.**

2 **It starts with "I cannot comment."  Did you see that?**

3     A.   Okay.  I see that now.  Yeah.

4     MR. RACETTE:  Why don't we stop there

5 because I think she's got to change the tape.  And

6 I'll leave it up to you or anybody else.  Do you want

7 to take a break, or do you want to just keep going and

8 let her change the tape?

9     THE WITNESS:  I don't care.  It doesn't

10 matter to me.

11     MR. RACETTE:  I'm ready to go, but if

12 anybody needs a break --

13     THE WITNESS:  We can take a break.

14     MR. RACETTE:  Okay.  Sounds good.

15     MS. STEIN:  Off the record ending Tape 3 at

16 1335.

17     (Recess taken.)

18     MS. STEIN:  On the record beginning Tape 4

19 at 1345.

20 BY MR. RACETTE:

21     Q.   **Mr. Keith, I want to turn back one second**

22 **to the page 1 letter of Exhibit 43.  In this scenario**

23 **here, this is after GJE -- I think GJE came in in May**

24 **of '04; is that correct?**

25     A.   I think in May or June, somewhere in there.

Case 2:12-cv-02050-JES  Document 84-3  Filed 02/03/14  Page 119 of 190

APP251

137

1    Q.    And at this point you're discussing a job
2    for Nancy Kohagen between yourself and Mr. Mulvey?
3    A.    I was discussing filling a job opening that
4    we had at the Engine Works.  It wasn't specifically
5    let's find a job for Nancy Kohagen.  It was let's fill
6    this position that we have at the Engine Works.
7    Q.    And did Nancy Kohagen get that position?
8    A.    No.
9    Q.    Was that -- was the job opening, would that
10   have been a lateral move for her or an upgrade, or do
11   you recall?
12   A.    Well, it kind of depends on the situation.
13   HR reps can be either Grade 6 or Grade 7.  This one
14   probably would have been -- over time probably would
15   have been a Grade 7.
16   Q.    And did she get the position?
17   A.    No.
18   Q.    Do you know who did?
19   A.    I believe Mindy Moye got the job.
20   Q.    And she was under 40 at the time, as you
21   recall?
22   A.    I think she was.  I don't remember.
23   Q.    And did Nancy Kohagen complain to you about
24   not getting that job, or did she even know she was
25   being considered for it, or how's that?

138

1    A.    I don't recall if she complained to me
2    about not getting that job or not.  I had some
3    conversations with Nancy, but I don't -- I don't
4    really remember if it was about that job specifically
5    or what it was.  I just don't recall.
6    Q.    Did Nancy Kohagen complain to you about
7    being discriminated against based on her age?
8    A.    No.
9    Q.    Do you know if she complained to the EEOC
10   about being discriminated against due to her age?
11   A.    Yes.
12   Q.    But she never spoke to you about that?
13   A.    No.  She was -- I mean we had some
14   conversations, she was concerned about, you know -- we
15   were reorganizing HR and where was she going to end
16   up.
17          And I know she felt like, "Hey, I can do
18   this.  I can do this work that's more challenging
19   where you have to multitask and deal with difficult
20   situations," and that was my judgment that she couldn't.
21   And it was my job to make those decisions.  And I know
22   that she wanted to do this type of work, she felt she
23   could do it.
24   Q.    And the only concern in the letter that you
25   specifically state is her age -- is that correct?

139

1    A.    Again, the context was around a special
2    paid leave of absence.  My concern about her age was
3    basically that she was too young for that to be
4    attractive to her.
5    Q.    But do you understand how that could be
6    interpreted to mean you had a concern about her age
7    just in general, just not about SPLOA?
8    A.    Again, I suppose.  I suppose someone could
9    interpret that.  But if you read the entire message,
10   up at the top I'm talking about her skills, I'm
11   talking about whether or not it's a good fit or not,
12   I'm talking about other people that have had the same
13   concerns.
14          So you have to kind of look at the whole --
15   but, yeah, if you isolate on just that comment and the
16   word "age," I suppose someone could pick up on that.
17   Q.    Well, the reason I say that -- and again,
18   this is maybe for English majors, not for you and I,
19   but it doesn't seem like you're saying -- if you were
20   talking about something in regard to SPLOA and her
21   age, I would think you would have said, "I'm concerned
22   about the SPLOA in regard to her age because she's
23   only going to have" -- but it doesn't say that.  It
24   just says age in general, "from an age standpoint."
25   Okay?

140

1          And that's why I was saying my
2    interpretation -- I'm not saying it's correct, but I'm
3    saying it could easily be interpreted that way.
4          Do you agree?
5    A.    Could it be interpreted that way?
6    Q.    Yes.
7    A.    Just in a global sense?  Probably.  Again,
8    I would -- you know, I'm talking about her age right
9    after I talk about SPLOA.  So, again, you have to look
10   at the whole paragraph and the whole message.
11   Q.    And let me --
12   A.    But, yeah, it's that possible someone could
13   look at that --
14   Q.    And you're telling me --
15   A.    -- sideways.
16   Q.    Yep.  And that's okay.  Let me ask you
17   this:  If that was the case, if you set out here you
18   were concerned about her age and considered that as
19   far as moving her into that job, would that be
20   inappropriate?
21   A.    Yes.  Definitely.  And we didn't -- and
22   that was not a factor.
23   Q.    Okay.  Going to page 2 now, this notice of
24   meeting with Clyde D'Cruz.  We were at the fourth
25   line.  Okay?  Are you looking at that?

Case 2:16-cv-00050-JES Document 84-3 Filed 02/10/14 Page 121 of 190

**APP252**

233

1  factor is the complexity of the commodity."
2         So what he's saying there is actually every
3  PDP buyer, including Wanda Lenius and Gayle Forster,
4  80 percent of their duties are the same, and the only
5  difference he can find is complexity of commodity and
6  that a specialist II, as they were graded to, was
7  complex.
8         So is there any question in your mind that
9  Brian Matson was saying my clients should have been
10  the same as every other PDP buyer?  From this memo.
11     A.  I think that's what he's saying as far as
12  the job descriptions in his group and that's the
13  opinion that he's giving here.  Or that's how I would
14  interpret it anyway.
15     Q.  Wouldn't it be a fact, Mr. Keith, that,
16  first of all, your investigation was not done as it
17  should have been done into these allegations of my
18  clients?
19     A.  No.
20     Q.  How can you say that?
21     A.  Because as I talked to your clients --
22     Q.  Did you see this document?
23     MS. WEST:  Let him answer the question.
24     A.  Did I see which document?
25  BY MR. RACETTE:

234

1     Q.  What we just read from Brian Matson.
2     A.  Yeah, but I don't understand the context of
3  this.
4     Q.  Why don't you?  You're the guy that was
5  supposed to investigate this.  Why wouldn't you --
6     A.  I didn't see every document that --
7     Q.  Did you talk to Brian Matson?
8     A.  Yes.
9     Q.  And he didn't tell you that he at one point
10  in January of '04 had said my clients' jobs were
11  handling complex products?
12     A.  No.  No, he did not.
13     Q.  So did he lie to you, or you just didn't
14  ask him?
15     A.  I asked him about the --
16     MS. WEST:  Argumentative.
17     A.  I asked him about the commodities and
18  why -- I asked him, you know, the grading and why it
19  was set up that way.
20  BY MR. RACETTE:
21     Q.  And why didn't you tell my clients then
22  right away when they came to you, why didn't you tell
23  them right off the bat, say, "Well, it's a commodity
24  deal.  You know, there's nothing going to happen."

235

1  didn't you tell them that?
2     A.  Because I wanted to check into it further,
3  and I thought perhaps there were some -- you know,
4  when I talked with Wanda and Gayle, there was a
5  collection of concerns.  Okay?  I interpreted their
6  concerns as meaning they were interested in a
7  different job outside of Clyde's organization.
8         So I was doing both things, I was checking
9  out the job mapping but also looking at other job
10  opportunities for them.  And given their view of the
11  department, again, my interpretation of what they
12  wanted to bring closure to it was a different job
13  outside of Clyde's organization.
14     Q.  And when did you start investigating that a
15  commodity may -- you might be able to pin it on a
16  commodity, the discrepancy?
17     A.  I don't recall exactly.  It would have been
18  early on that I would have asked that.
19     Q.  In April of '04?
20     A.  Probably.  Early on, April or May.
21     Q.  And certainly by August or July you would
22  have known; right?
23     A.  I would have -- I would have been aware of
24  that, yeah.
25     Q.  Let's turn to Exhibit 36.  Okay.  Go to

236

1  page 5 if you would of that exhibit, please.  And do
2  you see on page 5 this is an email from Linda Hibben.
3  She worked for you; correct?
4     A.  Yeah, I'm just not sure I'm on the
5  right page.
6     MS. WEST:  Do you have page numbers on
7  yours?
8  BY MR. RACETTE:
9     Q.  Yeah, I've got 5 on the bottom there.  Have
10  you got any page numbers there?
11     A.  No.
12     Q.  I'm sorry, that's my fault.  Start from the
13  first page and count up to the fifth page and that
14  would be the one.
15         Have you got it now?
16     MS. WEST:  What were you referencing at the
17  top?
18     MR. RACETTE:  It just says -- it's a
19  September 1, 2004, email from Linda Hibben to
20  Richard -- or Cathleen Richards and Susan Bowman and
21  Marsha Parker.
22  BY MR. RACETTE:
23     Q.  Have you read it?
24     A.  Yes.
25     Q.  If you knew -- now, who is Linda Hibben?  Wasn't she working

Case 4:12-cv-00350-JAJ-CFB   Document 84-3   Filed 02/03/14   Page 121 of 190
Susan Frye and Associates, Inc.          (515) 284-1972          59 of 99 sheets
APP253

237

1   for you?

2       A.    Yeah, she worked in our group in HR.

3       Q.    Here's September of '04 she's writing this

4   email to -- who was Katherine Richards -- Cathleen

5   Richards?  Excuse me.

6       A.    I don't recall who she was.

7       Q.    Who was Susan Bowman?

8       A.    Susan worked in HR at another factory as

9   did Marsha Parker.

10      Q.    Do you know which factories at that time?

11      A.    I don't remember for sure.  I think maybe

12  Susan was at Harvester and Marsha was at Ottumwa.

13      Q.    And it says "Subject:  Need more help," and

14  it's got "more" capitalized and "help" with an

15  exclamation point.

16            Was this being done at your direction, this

17  investigation?

18      A.    I don't remember for sure, but that would

19  seem logical.

20      Q.    Why wasn't it done until September of '04

21  if you were aware right off the bat that the commodity

22  was the main reason my clients hadn't been upgraded?

23      A.    Well, my initial conversations with -- in

24  supply management looking into this, I was satisfied

25  with the response, with the reply.

238

1       Q.    What reply?

2       A.    That it was based on the commodities and

3   that it was done appropriately.

4       Q.    You didn't tell my clients that.

5       A.    I don't remember -- I don't remember

6   exactly what I conveyed.

7       Q.    I think Gayle -- you did tell Gayle -- in

8   fairness to you, you did tell Gayle -- there was a

9   conversation, I think, in, I believe, late April about

10  commodities, and she explained to you and wrote you

11  some emails we'll get to probably next time, I won't

12  get to them this time, but she explained to you why

13  that wasn't and shouldn't be the case and you never

14  got back to her again.

15            And then it's not until September of '04

16  you start checking commodities as a possible

17  explanation for their grade?

18      A.    I just wanted to go back and take another

19  look at it, have us take another look at it.  As I

20  recall.  I don't remember exactly, but...

21      Q.    And in this Linda Hibben says "Do you have

22  anyone in PDP side of supply management and what are

23  their commodity responsibilities?  For instance we

24  have someone here who is graded as SM II and their

25  commodities are boxes, 1050 and things, can we

239

1   explain the same information on your supply management

2   employees for this investigation for me."

3             And then if you turn the page to the next

4   page, which is page 6 in this Exhibit 36, there is --

5   if you go down the page and start at the bottom and

6   it's Linda Hibben again September 2, which is a day

7   later, she sounds urgent, "Sorry to keep bugging you

8   about this, but wondered if you had any luck getting

9   some info pulled together for me."

10            And then Marsha Parker on that same day

11  emails her back.  "The person I need to talk to is

12  gone till Friday, but all the people in the PDP supply

13  management area are Grade 7."

14            Do you see that?

15      A.    Are we talking about the email from Marsha

16  Parker on Friday, September 3?

17      Q.    On Thursday, September 2.  The next page

18  after the -- yeah, go one page -- go the other way,

19  other way.  Right there in the middle of the page,

20  second from the bottom.

21      A.    Okay.  I see that.

22      Q.    So how or how could it be that Marsha

23  Parker's PDP people are all Grade 7 under Global Job

24  Evaluations and you have people that are 6s?

25            MS. WEST:  Speculation.

240

1       A.    It's a totally different factory, much

2   smaller, less complex, far fewer people.

3   BY MR. RACETTE:

4       Q.    But this is global.  It's supposed to be --

5   everybody in that job family is supposed to have the

6   same job grade that does similar duties, aren't they?

7       A.    In general, that's true, but again, it

8   depends in certain situations based on other

9   considerations.  So comparing Ottumwa to Waterloo and

10  how they do their product design, it's not an apples

11  to apples comparison.

12      Q.    And then in fairness to you, if you go back

13  to page -- the last page in this Exhibit 36.  Linda

14  Hibben, September 16.  Who is James Olson?

15      A.    He was -- at that time I think -- at that

16  time I think he was maybe director of supply

17  management for John Deere Power Systems, although I'm

18  not a hundred percent sure of that, but I think that's

19  the job he was in.

20      Q.    Would he at that point have been above

21  Clyde D'Cruz?

22      A.    He was in a different division in a

23  different role.  You know, gradewise he might have

24  been at a different grade.  He was in a director so it

25  would be -- it would be comparable.  He was in supply

241

1  management duties for a division, Clyde was doing it
2  for a department.
3      Q.   And she says she checked with him regarding
4  the review of SMS II and III job descriptions and the
5  mapping of Lenius and Forster to the SM II positions.
6  And Jim Olson stated that these positions have been
7  through a fair and extensive review.  He agrees with
8  the conclusion that both positions are correctly
9  mapped to SMS II.  He understands that the original
10 mapping is done to match the work being done to the
11 job description, that neither Wanda or Gayle were in
12 those positions at the time.
13      First of all, do you know what extensive
14 review was made that he's referring to?
15      A.   I don't know exactly what he's referring
16 to.  He may -- I don't know -- I don't know exactly --
17 it's hard to tell from this email.
18      Q.   And I don't understand the next sentence.
19 Maybe you do.  "He understands that the original
20 mapping was done to match the work being done to the
21 job description and that neither Wanda nor Gayle were
22 in those positions at the time."
23      Do you know what he's referring to?
24      A.   No, not exactly.  He's talking about the
25 timing of the mapping.  So I don't know.

242

1      Q.   Would that indicate that they originally
2  mapped to a 7 and then someone made them a 6 or can
3  you tell?
4      A.   I can't tell.
5      Q.   Could that be interpreted in that fashion,
6  or do you know?
7      A.   I'm sorry, could you repeat the question.
8      Q.   Yeah.  I'm wondering is he indicating that
9  their jobs were mapped to a higher grade and then
10 somehow subsequently were mapped differently?  Or can
11 you tell?
12      A.   I can't -- I can't really tell.  I would --
13 he says "he understands the original mapping was done
14 to match the work being done to the job description,"
15 which is true for everyone.  "Neither Wanda nor Gayle
16 were in those positions at the time."
17      So, again, it's unclear to me exactly what
18 he's talking about.  I assume he's talking about the
19 jobs in PDP, but I really don't know.
20      MR. RACETTE:  Let's go off the record, Amy,
21 if we could.
22      MS. STEIN:  Off the record at 1619.
23      (Discussion was held off the record.)
24      (Deposition adjourned at 4:19 p.m.,
25 September 30, 2013.)

243

1           C E R T I F I C A T E
2      I, the undersigned, a Certified Shorthand
3  Reporter of the State of Iowa, do hereby certify that
4  there came before me at the time, date, and place
5  hereinbefore indicated, the witness named on the
6  caption sheet hereof, who was by me duly sworn to
7  testify to the truth of said witness's knowledge, that
8  the witness was thereupon examined under oath, the
9  examination taken down by me in shorthand and later
10 reduced to a transcript through the use of a
11 computer-aided transcript device under my supervision
12 and direction, and that the deposition is a true
13 record of the testimony given and of all objections
14 interposed.
15      I further certify that I am neither
16 attorney or counsel for, nor related to or employed by
17 any of the parties to the action in which this
18 deposition is taken, and further that I am not a
19 relative or employee of any attorney or counsel
20 employed by the parties hereto, or financially
21 interested in the action.
22      Dated at Des Moines, Iowa, this 11th day of
23 October, 2013.

24

         /s/Melissa A. Burns_____
25       CERTIFIED SHORTHAND REPORTER

244

09:47:07

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF IOWA
EASTERN DIVISION

- - - - - - - - - - - - - X
MICHAEL JOSEPH SELLERS,          :

        Plaintiff,               :

vs.                              :   Case No. 12-CV-2050-
                                     JSS
DEERE & COMPANY A/K/A JOHN       :
DEERE COMPANY, AND CLYDE         :   **VIDEOTAPED DEPOSITION**
D'CRUZ, INDIVIDUAL,              :            **OF**
                                          **KEVIN KEITH**
        Defendants.              :        **VOLUME 2**
- - - - - - - - - - - - - X
WANDA JO LENIUS and GARY         :
GENE LENIUS,                     :

        Plaintiffs,              :

vs.                              :   Case No. 12-CV-2063-
                                     JSS
DEERE & COMPANY, KEVIN           :
KEITH, CLYDE D'CRUZ, BRIAN       :
MATSON, and ROBERT BARNES,       :
individuals,                     :

        Defendants.              :
- - - - - - - - - - - - - X
DELYORCE RAYE REBOUCHE,          :

        Plaintiff,               :

vs.                              :   Case No. 12-CV-2064-
                                     JSS
DEERE & COMPANY a/k/a JOHN       :
DEERE COMPANY, RODGER            :
BURRIS, and BRUCE BOARDMAN,      :
INDIVIDUAL,                      :

        Defendants.              :
- - - - - - - - - - - - - X

---

246

I N D E X

WITNESS: KEVIN KEITH                                    PAGE

By Mr. Racette.................................... 248

EXHIBITS:                                       FIRST REFERENCED

5F - Deere GJE job function analysis for supply
     management................................. 289

15 - Mike Sellers Timeline...................... 275

19 - Greg Forster Timeline...................... 390

24 - Emails between Gayle Forster and Kevin
     Keith.......................................... 328

27 - Transcript of Gayle Forster's meeting with
     Kevin Keith on 4-26-04...................... 306

28 - Transcript of Gayle Forster's meeting with
     Kevin Keith on 6-8-04....................... 334

29 - Transcript of Gayle Forster's meeting with
     Kevin Keith on 7-12-04...................... 360

30 - Transcript of Gayle Forster's meeting with
     Kevin Keith on 8-20-04...................... 376

49 - Emails concerning technical specialist
     position created for Greg Forster.......... 395

77 - Memo regarding 4-11-05 meeting between
     Kevin Keith, Mike Sellers, and Dr. Harding.. 293

---

245

- - - - - - - - - - - - - X
GAYLE LELA FORSTER and           :
GREGORY DAVID FORSTER,           :

        Plaintiffs,              :

vs.                              :   Case No. 12-CV-2072-
                                     JSS
DEERE & COMPANY a/k/a JOHN       :
DEERE COMPANY, KEVIN KEITH,      :
BRIAN MATSON, BRIAN              :
CARLSON, and CLYDE D'CRUZ,       :

        Defendants.              :
- - - - - - - - - - - - - X

**VIDEOTAPED DEPOSITION OF KEVIN KEITH - VOLUME 2,**

taken by the Plaintiffs before Melissa A. Burns,

Certified Shorthand Reporter of the State of Iowa, at

625 First Street SE, Suite 400, Cedar Rapids, Iowa,

commencing at 9:50 a.m., Friday, October 25, 2013.

APPEARANCES:

For the Plaintiffs:      GREGORY T. RACETTE, ESQ.
                         Hopkins & Huebner, PC
                         2700 Grand Avenue, Suite 111
                         Des Moines, IA 50312

For the Defendants:      ANGEL A. WEST, ESQ.
                         Nyemaster Goode, PC
                         700 Walnut Street, Suite 1600
                         Des Moines, IA 50309
                         -and-
                         GENEVIEVE REINKOESTER, ESQ.
                         Nyemaster Goode, PC
                         625 First Street
                         Suite 400
                         Cedar Rapids, IA 52401

Also Present:            GARY LENIUS
                         GREGORY FORSTER
                         DAVID W. MEIER

Videographer:            AMY COOPER

---

247

1              P R O C E E D I N G S

2              MS. COOPER: On the record continuing the

3    videotaped deposition of Kevin Keith on Volume 2

4    requested by the plaintiffs in the matter of Michael

5    Sellers, et al., Plaintiffs, versus Deere & Company,

6    et al., Defendants, in the United States District

7    Court, Northern District of Iowa, Eastern Division,

8    Case Nos. 12-CV-2050, 2063, 2064, and 2072.

9              Today's date is October 25, 2013, and the

10   approximate time is 9:50 a.m. This deposition is

11   being held in the offices of Nyemaster Goode, One

12   Great America Plaza, 625 First Street SE, Suite 400,

13   Cedar Rapids, Iowa.

14             My name is Amy Cooper, Certified Legal

15   Videographer, of Fidelity Video Services,

16   Incorporated, Johnston, Iowa.

17             Counsel will please identify themselves for

18   the record.

19             MR. RACETTE: Greg Racette here for the

20   plaintiffs along with Gary Lenius and Greg Forster.

21             MS. WEST: Angel West and Genevieve

22   Reinkoester for the defense along with Dave Meier.

23             MS. COOPER: The oath will now be

24   administered by Melissa Burns, Certified Shorthand

25   Reporter and Notary Public, Des Moines, Des Moines,

272

1    A.    I'm not sure I understand your question --

2    Q.    That's okay. What I'm asking is --

3    A.    -- about the tools.

4    Q.    -- back at that time if you were going to

5    investigate and look at an age discrimination

6    complaint, you could have, number one, looked at all

7    the records concerning what happened in the SM process

8    concerning the grading; is that correct?

9    A.    Are you talking about GJE now as far as the

10    grading?

11    Q.    I'm talking about -- what I'm asking,

12    Mr. Keith, is if someone says, "Hey, I have been

13    discriminated against because of my age and it

14    involves this GJE grading process," you could have

15    looked at that process, could you not? Or you don't

16    think you could have? I don't know.

17    A.    Well, if -- relative to GJE, the context

18    for GJE was it was a global implementation. Every

19    employee in the world, their job was evaluated.

20          Waterloo followed the same process, supply

21    management followed the same process with all the

22    oversight. Functional review committees, corporate

23    experts, people looking in on it.

24          So if you're talking GJE, for someone to

25    take a look at was GJE -- was something sideways as

273

1    far as discrimination, you know, that would have been

2    something that I probably couldn't have done. It

3    would have been something that would have been done on

4    a larger scale.

5    Q.    Let me ask you this: Did you ever do any

6    investigation to see if Clyde D'Cruz or Brian Matson,

7    or both, tried to manipulate the system, the GJE

8    system, the system established at John Deere, to

9    discriminate against somebody based on their age? Did

10    you ever look into that?

11    A.    I had conversations with the concerns

12    about -- that employees brought forward that their job

13    had been evaluated incorrectly. But I viewed it based

14    on the facts of their jobs and their jobs being

15    evaluated incorrectly. And it was based on the work,

16    not on their age.

17    Q.    I'm going to ask her to read that question

18    back to you and see if you can answer that question.

19    Okay? Because that's the question I want answered.

20          (The requested portion of the record was

21    read.)

22    A.    There were -- you know, I had conversations

23    internally with people in HR, again, looking at the

24    process that was followed in supply management in

25    Waterloo and that we followed a consistent, "Formal

274

1    conversations, I was comfortable that the process had

2    been followed.

3    Q.    What did you do to look at the process?

4    A.    I talked with people internally within HR

5    and said -- asked them, you know, are we on track as

6    far as GJE. There was nothing -- and I didn't get any

7    feedback that there had been any concerns or issues.

8    Q.    Did you talk to Mike Sellers?

9    A.    I didn't -- I never had a conversation with

10    Mike Sellers.

11    Q.    Did you talk to Mike Grady?

12    A.    I don't know who Mike Grady is.

13    Q.    Maybe I have the first name wrong. Do you

14    know a Grady that was in SM?

15    A.    No. I don't -- no, I don't recall.

16    Q.    Did you talk to anybody other than Brian

17    Matson and Gayle Forster and Wanda Lenius?

18    A.    About -- I don't understand your question.

19    Q.    About age discrimination against my

20    clients.

21    A.    I talked with Clyde D'Cruz. I talked with

22    my boss. I probably -- I don't recall exactly. I

23    would have talked with people in corporate HR.

24    Q.    What would people in corporate HR know

25    about Clyde D'Cruz and Brian Matson discriminating

275

1    against my clients based on their age and gender in

2    the supply management department at Waterloo?

3    A.    I don't know. I don't know what they would

4    know.

5    Q.    Why did you talk to them?

6    A.    Probably to brief them on -- you know, on

7    the topic.

8    Q.    I want you to turn, if you could, to

9    Exhibit 15, page 23. I think you'll have it right

10    here is 15. Page 23 if you can find it.

11          Did you find page 23? Is that Exhibit 15?

12    Page 23 at the bottom. They're handwritten, the page

13    numbers.

14          MS. WEST: Do you have a page 23?

15          MR. RACETTE: Yeah. You should have.

16          MS. WEST: I do not. I only have a

17    page 22.

18          THE WITNESS: I don't have 23.

19          MR. RACETTE: It should be there. That's

20    our 15. I don't know --

21          We don't have the originals here, do we,

22    Melissa.

23          THE REPORTER: They're in my trunk.

24          MS. WEST: What is it?

Case 6:12-cv-02050-JSS    Document 84-3    Filed 02/03/14    Page 125 of 190
Susan Frye and Associates, Inc.                    (515) 284-1972                    8 of 69 sheets
APP257

280

1 these allegations, what they had observed or what they
2 had seen. And I would have had -- again, I had a file
3 pertaining to Mike Sellers and his discrimination
4 charge -- charges.
5          As I recall, Mike filed a work comp claim
6 also. So I would have had files on that.
7          But there's nothing that, like, triggers
8 what you would call an official investigation. I'm
9 not sure what you mean by that.
10     **Q.  Well, was Mike Sellers an employee at that**
11 **time?**
12     A.  I don't recall.
13     **Q.  He was. And as an employee, he's coming to**
14 **you, and copying off these other individuals, and**
15 **making specific complaints of an ongoing process**
16 **occurring in supply management of age discrimination,**
17 **disability discrimination, hostile and harassing**
18 **environment, and retaliation, what you can tell me**
19 **is you spoke to some people? That's what Deere did in**
20 **regard to those types of allegations? That's what you**
21 **recall?**
22     A.  I would have spoken with people and have
23 listened to, you know, "Is this true or not? Have you
24 observed this? What's" -- you know, "Does this have a
25 basis or not?"

281

1     **Q.  Did you -- did you make any findings, come**
2 **to any conclusions, and respond to his allegations in**
3 **this document -- that are contained in this document?**
4     A.  The conclusion was was that from talking
5 with people internally within supply management,
6 primarily people that reported to Clyde, was that this
7 did not have a basis.
8     **Q.  Can you -- did you respond to Mike and go**
9 **down and tell him why each of these areas he was**
10 **complaining about was invalid? Did you ever do that?**
11     A.  I don't believe I spoke with Mike, because
12 at the time that that was -- the conversations were
13 done, he was off work at that time. On disability.
14     **Q.  You didn't respond to Mike about these**
15 **serious allegations refuting them because he was on**
16 **disability?**
17     A.  Yeah, that's what I -- that's what I
18 recall.
19     **Q.  Any other reason?**
20     A.  I don't recall another reason, no.
21     **Q.  And you don't -- you never made any type of**
22 **effort to write to him or speak to him telling him how**
23 **his allegations were incorrect or they didn't have a**
24 **basis; is that correct?**
25     A.  Yes, I think -- I don't recall speaking

282

1 this is fair considering he was in the middle of
2 litigation. I'm sure that he was told not to speak
3 with Mr. Sellers after he was involved in litigation.
4 So to that extent -- pick a time frame. I mean is it
5 before he filed his lawsuit?
6          MR. RACETTE: I want him to testify, not
7 you. If that was the situation, he can tell me that.
8 If you're going to testify, we'll need to swear you in
9 and have you under oath, because you just advised him
10 that he may have been controlled by someone and that's
11 not what he said. So I don't appreciate that. If you
12 have an objection, fine, object.
13          MS. WEST: I am. It's vague, overbroad,
14 ambiguous as to the time frame and the scope.
15 BY MR. RACETTE:
16     **Q.  You still have to answer the question.**
17 **I'll have her read it back in case you didn't**
18 **remember, Mr. Keith.**
19     A.  Again, I don't recall exactly -- I don't
20 recall the timing. Mike filed an EEO charge, I don't
21 remember what the time of that was. He had a work
22 comp claim filed against us. Again, I don't remember
23 the timing of that.
24          So it could have been that because of those
25 claims that were in play, it wasn't appropriate to

283

1 speak with Mike. I don't remember.
2     **Q.  He says -- all right. Turn to page 24 of**
3 **Exhibit 15 there in front of you. I'm referring to**
4 **the third paragraph down, the last sentence in that**
5 **paragraph.**
6          **"In this exchange, a key comment was made**
7 **towards the end of it. It was something like**
8 **"Yeah... we need to get all of these old farts out of**
9 **here."**
10          **Reading on in the next paragraph, "This**
11 **comment didn't bother me much initially, since I know**
12 **that some people believe stereotypes of older**
13 **employees. I.e., they are outdated, can't handle**
14 **major change, don't work hard.**
15          **"I also knew from my own process change**
16 **experience that it is always tougher to sell new ideas**
17 **to older employees because of their experience, but**
18 **that the implementation or execution activities goes a**
19 **lot, lot easier. So I just figured that Clyde**
20 **D'Cruz," as he was referring, "understood this and was**
21 **just blowing off some frustration.**
22          **"However, as you will see in the balance of**
23 **my comments, this was not just a random comment but**
24 **what appears to be a majority strategy of replacing**
25 **older workers, either through premature retirements,**

292

1    Q.   What would Craig Pashan know about --
2    A.   Paul -- Paul Garcia.
3    Q.   Were they direct reports to Clyde?
4    A.   Yes.
5    Q.   On the same level as Brian Matson?
6    A.   Yes.
7    Q.   Have anything to do with Wanda Lenius or
8    Gayle Forster?
9    A.   Well, they both worked for Brian Matson.
10   So --
11   Q.   Did Mike McGonegle, Craig Pashan, Paul
12   Garcia, have anything to do with Gayle Forster or
13   Wanda Lenius?
14   A.   Not directly, no.
15   Q.   Did they have anything to do with Mike
16   Sellers?
17   A.   Daria worked closely with Mike.
18   Q.   For one year?
19   A.   I don't recall.
20   Q.   Anybody else?  I'm sorry.
21   A.   Again, not that I -- not that I recall.
22   Q.   Can you tell me any documents you found
23   that verified that Clyde D'Cruz wasn't discriminating
24   against people based on age?
25   A.   I'm sorry.  Could you repeat the question?

293

1         MR. RACETTE:  Melissa, read it back.
2         (The requested portion of the record was
3    read.)
4    A.   Documents.  No.  I don't recall finding
5    anything.
6    BY MR. RACETTE:
7    Q.   Can you tell me anything that you found in
8    the GJE process that verified in any way that my
9    clients weren't being discriminated against because of
10   their age?
11   A.   No, I didn't -- I didn't find anything that
12   was -- that gave that basis.
13   Q.   If you turn to Exhibit 77.  Hopefully we
14   have that.
15        MR. RACETTE:  Yeah, I don't know which one
16   of yours it is.
17        Is that mine?  This must be mine.
18        MS. WEST:  Do we need to close these up or
19   get them out of the way?
20        MR. RACETTE:  I'd leave them there for a
21   second.  I might refer back to that one.
22   A.   I'm sorry, what --
23   BY MR. RACETTE:
24   Q.   It was Exhibit 77, Mr. Keith.

294

1    Q.   This is Mike Sellers' notes -- and it could
2    be Dr. Harding's notes, I can't remember at this
3    point, but Dr. Harding is a psychologist at Black
4    Hawk-Grundy Mental Health Center that Mike Sellers was
5    seeing, and he testified, and so did Mike, that he --
6    they met with you on April 5, 2005, at the Black
7    Hawk-Grundy Mental Health Center.
8         Do you recall that?
9    A.   I vaguely recall the meeting, yeah.  I
10   don't remember the date exactly.
11   Q.   And if you turn to page 2, I'm assuming --
12   and I can't recall now, but I'm assuming these are
13   Mike Sellers' complaints that he made to you at that
14   time as well.
15        Do you want to take a moment and just read
16   those over and see if you recall that.
17   A.   I don't -- I don't recall getting these
18   from Mike or from Harding.
19   Q.   Do you remember why you went to
20   Black Hawk-Grundy to meet with Dr. Harding and Mike
21   Sellers back in April of '05?
22   A.   Not exactly.  I don't recall.  I know I --
23   I recall the meeting and I was hoping that it would be
24   helpful, that it would help me understand what was
25   going on.

295

1    Q.   He -- again, in this meeting he said he
2    was all presented to you, and I believe, and I don't
3    know if Angel remembers this from Dr. Harding's
4    testimony, but he said you really didn't say much at
5    that meeting, didn't have any responses to any of
6    these things.
7         Do you recall if you had answers at all to
8    any of these complaints that he was making?
9    A.   I don't -- I don't recall.
10   Q.   Did you take action that he requested you
11   take as a result of that meeting?
12   A.   That who requested?
13   Q.   That Mr. Sellers requested, and Dr. Harding
14   was confirming that he felt he was having problems
15   because of it?
16   A.   I don't recall any action being requested
17   of me as a result of this meeting.
18   Q.   You did nothing, as you recall, as a result
19   of the meeting?
20   A.   I was just answering your question that was
21   I asked to take some action as a result of the
22   meeting.
23   Q.   If you turn to page 3 of this Exhibit 77,
24   paragraph 2 under "Major Concerns," paragraph 2, that
25   it states it's a complete and very thorough

Case 6:12-cv-02050-JSS   Document 84-3   Filed 02/06/14   Page 127 of 190
Susan Frye and Associates, Inc.          (515) 284-1972          13 of 69 sheets
APP259

300

1    Do you remember that?
2    A.   I'm not sure -- you're referring to a
3    document?
4    Q.   Yeah.  Yeah.  I can go back to it, but he
5    said that, in fact, their commodities were complex,
6    and in fact, in looking at one other person, I think
7    it was Beuter, he said he couldn't base it on the
8    complexity of the commodities because that wasn't the
9    appropriate way to do it, because 80 percent of their
10   work of all of the PDP people matched up.  Okay?
11   Do you remember that?
12   A.   I remember looking at the document.
13   Q.   And in fact, as late as September, your
14   lieutenant, or your person working under you -- I
15   think Hibben.  What's her first name?  Linda?
16   A.   Linda.
17   Q.   She was still searching around with the
18   other plants in Iowa, I think Ottumwa, I think
19   Dubuque, I think Des Moines, trying to find out what,
20   in fact, their PDP people were graded at.  If they
21   were specialist II, III, whatever.  And in fact, the
22   one that came back -- as I remember, Marsha somebody
23   from I think it was Ottumwa, I'm not sure, came back
24   and said they were all 7s.
25   So evidently -- and I know then we referred

301

1    to the Olson letter saying it was satisfied, but
2    evidently -- and I also showed you the functions of
3    the jobs, and there's no reference to commodities made
4    in the job functions as far as major.
5    So evidently it appears that is that the
6    only basis that you thought they weren't being
7    discriminated against because of their age is because
8    of a commodity difference between what they were doing
9    and the other PDP people were doing?  Is that your
10   testimony and your understanding of what was going on?
11   A.   Yeah.  I mean my -- my view of it is it had
12   nothing to do with their age and that they were not
13   discriminated against.
14   Q.   And that solely is based on their
15   commodities being less complex?  Is that what you were
16   told?
17   A.   Yes.  If you look at the level cutters that
18   were in place and the commodities that they were
19   responsible for.
20   Q.   If that's not true, do you know of any
21   other reason they would have been not graded other
22   than their age or gender?
23   MS. WEST:  I'll object as vague.
24   A.   It's kind of a hypothetical question.
25   BY MR. RACETTE:

302

1    Q.   That's kind of what this lawsuit is about.
2    Okay?  Is there any reason you can think of other than
3    the commodities that they would have been graded
4    differently than anybody else in PDP?  To your
5    knowledge.
6    A.   Well, they were in a job -- they were in
7    job families.  Supply management specialist is a job
8    family.  So they would be -- depending on where you
9    ended up in that family would be based on your
10   commodities or other kinds of things that would
11   differentiate the work.
12   Q.   How do you explain to me, and how was it
13   explained to you -- explain this to me like I'm
14   a four-year-old, I don't get this, but if it's a
15   global rating and someone in an Ottumwa plant, all
16   their PDP people are at a Grade 7 and it's supposed to
17   be global, how can that be global if we have a
18   difference between the Ottumwa plant and evidently the
19   Waterloo and maybe the Des Moines plant and the
20   Dubuque plant?
21   MS. WEST:  Speculation.  Foundation.
22   BY MR. RACETTE:
23   Q.   Did anybody explain that to you?
24   A.   Well, you'd have to look at each individual
25   factory or engineering group --

303

1    Q.   Why?  It's global.
2    MS. WEST:  Argumentative.
3    A.   It was a global project, but at the end of
4    the day, you have to look at each particular
5    department, business unit, and see how they're
6    organized.
7    BY MR. RACETTE:
8    Q.   But how could -- how could everybody in
9    PDP --
10   A.   It's not a one size fits all.  Because
11   Ottumwa has all their PDP buyers in a certain grade
12   level, that doesn't mean that across the board -- you
13   have to look at it more closely than that and see what
14   their responsibility is.  Because it is a job family,
15   you have to look at what is it that differentiates the
16   jobs within the family.
17   Q.   And I thought global was supposed to do
18   away with that so you wouldn't have that ability as a
19   supervisor to make that choice once it was globally
20   decided that a certain family, PDP and SM specialist,
21   were at a certain level?
22   A.   Well, the level cutters were adapted and
23   used as part of this global project.
24   Q.   Did you compare, by the way -- when you

340

1    Gayle asked about what grade it was, but
2    that really wasn't the context for it. I was trying
3    to find an opportunity in Power Systems.
4        Q.   All right. Let me see if I can understand
5    this.
6        So after GJE comes in, it wasn't a
7    situation where every job in the facility was mapped
8    and had a grade. A supervisor could still take
9    someone in and put them in a job in a grade whatever
10   they wanted.
11       MS. WEST: Objection. Argumentative.
12   BY MR. RACETTE:
13       Q.   Is that correct?
14       MS. WEST: Speculation.
15       A.   No.
16       MS. WEST: Compound.
17   BY MR. RACETTE:
18       Q.   Then why didn't you know the grade at that
19   point of the new job you were going to place her in?
20       MS. WEST: Calls for speculation.
21       A.   The reason I wouldn't know --
22   BY MR. RACETTE:
23       Q.   And you didn't say you didn't know. You
24   said it's up in the air.
25       A.   Yeah. Okay. All right. So it's up in the

341

1    air. The job is -- the job is up in -- the job has
2    not been finalized yet. I was talking about it in the
3    context of the, hey, it's a possible opportunity,
4    but --
5        Q.   How could a job not be finalized,
6    Mr. Keith, after GJE?
7        MS. WEST: Speculation. Argumentative.
8    BY MR. RACETTE:
9        Q.   I mean every job -- it's my understanding,
10   and tell me if I'm wrong, GJE is global, and every job
11   after it came into effect in supply management -- is
12   this in Engine Works or supply management?
13       A.   It was at John Deere Power Systems. I
14   think it was Engine Works or John Deere Power Systems.
15   I'm not sure.
16       Q.   But it was a supply management job. Right?
17       A.   Right.
18       Q.   And every supply management job after GJE
19   was mapped, and either it was a supply management
20   planner or supply management specialist I, II, III,
21   IV, et cetera; correct?
22       MS. WEST: Misstates the record. Assumes
23   facts not in the record. Argumentative.
24       A.   GJE was --
25   BY MR. RACETTE:

342

1        Q.   No. Answer that question. The question
2    is --
3        A.   Yeah, repeat it. I'm sorry.
4        Q.   Was -- to your knowledge after GJE came in,
5    every job was supposed to be mapped and graded to a
6    specific job description; correct?
7        MS. WEST: Argumentative. Speculation.
8        A.   As of 1 May 2004, that's correct. Jobs
9    that were in place at that point in time.
10   BY MR. RACETTE:
11       Q.   All right. And this is after that, and
12   you're telling her, "I'm going to place you in this
13   supply management job in Engine Works," and you say to
14   her, "but the grade's up in the air."
15       How could that be?
16       A.   I didn't know -- I didn't know what the --
17   at that point in time apparently, in the conversation,
18   I didn't know what the grade would be.
19       Q.   Why? How could you not know?
20       A.   Because the work changes all the time.
21   It's a very fluid situation.
22       Q.   So these grades aren't stuck in stone under
23   GJE. If a supervisor wants to change it, he can
24   change it; correct?
25       MS. WEST: Object. Argumentative.

343

1    Compound. Misstates the record.
2    BY MR. RACETTE:
3        Q.   You can change it, can't you?
4        A.   GJE was a methodology that was adopted to
5    evaluate work, but the work itself, and the way people
6    organized the work based on -- from a staffing
7    standpoint, is very fluid.
8        And so -- you know, again, I don't remember
9    the specifics here, but it's not like things were put
10   in place one way in 2004 and then they were locked in
11   forever and ever and no job ever changed or no one
12   ever reorganized or no one changed the work that was
13   being performed.
14       So, again, I don't remember the
15   circumstances here, but -- you know, maybe -- I just
16   don't recall. I wasn't clear on what the grade was.
17       Q.   So would you agree with me that GJE may
18   have placed certain jobs at grades, but supervisors
19   and yourself could change those by tweaking the job or
20   doing something else and putting somebody in a grade
21   that they wanted them to be in; is that correct?
22       MS. WEST: Speculation. Foundation.
23       A.   Well, it's driven by the work, and again,
24   supervisors are working on -- it's kind of supply and
25   demand. If there's a lot of work, they're trying -- they want to meet

APP261

344

1 the demands of the business. And so -- but the demand
2 side, the business side, in a place pretty big and
3 pretty complicated like Waterloo, the work was pretty
4 fluid.
5         So, you know, it was not uncommon I guess
6 what I'm saying is for jobs to change over time and
7 for things to be moved around.
8 BY MR. RACETTE:
9         Q.    So -- and again, what I'm trying to --
10        A.    But it was all driven by the demands of the
11 business and trying to get people in the right spots.
12        Q.    So I just want to make sure that I'm
13 tracking with you. So even after GJE came in, if you,
14 or a supervisor -- let's take if a supervisor wants to
15 grade somebody up, make the job a different grade,
16 they can still do that, there is ways to do that if
17 they so desire; correct?
18        MS. WEST:    Speculation.
19        A.    Again, with any job assessment system like
20 GJE, there has to be a rationale and justification,
21 and it has to be approved by several people. But
22 there has to be a basis for it, a rationale.
23 BY MR. RACETTE:
24        Q.    But what I'm saying is, Mr. Keith, after
25 GJE came in, you said that was a system, but it

345

1 didn't -- the situation was fluid, I think, was your
2 term. And you could --
3        A.    I'm saying the work -- the work -- the work
4 and how people organized the work was -- you know,
5 there was some change to it.
6        Not every job changed, certainly not, but
7 there were -- so -- yeah. So you could take a
8 snapshot one way in 2004, take a snapshot six months
9 later, some of the work or some of the organization
10 would change. And part of that is people movement,
11 some of it's the demand of the business.
12        Q.    I'm just trying to make the point if I can,
13 so even after GJE came in, a supervisor by tweaking
14 the work or doing something could easily have upgraded
15 someone, or downgraded them, if they wanted to; is
16 that correct? Under that system?
17        MS. WEST:    Objection. Foundation.
18 Speculation.
19        A.    I don't -- again, there has to be a
20 rationale for it. It's not necessarily a tweak or
21 that a supervisor could just arbitrarily do that.
22 There has to be a basis for it. And again, several
23 people have to look at it, approve it, et cetera.
24 BY MR. RACETTE:
25        Q.    Well, let you 2050 -- so just. Document 84-3

346

1 Gayle Forster into Engine Works, you're talking about
2 placing her in a supply management job that you don't
3 know what the grade is.
4         So evidently there is a lot of room for the
5 fellows to get together, whether it be you, the
6 supervisor, whoever, if you want someone to be placed
7 in a certain job in a certain grade, that can be done,
8 can it not?
9        MS. WEST:    Argumentative.
10 BY MR. RACETTE:
11        Q.    If, as you said, you rationalize it
12 somehow.
13        MS. WEST:    Compound.
14        A.    In this -- in this particular case, I
15 didn't know exactly what the job was and what the
16 grade was.
17 BY MR. RACETTE:
18        Q.    You knew what it was. You were the one
19 that set it up. In fact, you're talking about the
20 problems they were having from Borg-Warner.
21        A.    No, I didn't know what the grade was.
22        Q.    Yeah, I know that, but you knew what the
23 job was because you said it was supply management
24 specialist. That's what you told her.
25        A.    Yeah, it was a supply management

347

1 specialist. It's a -- it's a -- it's kind of a
2 flagship job family in supply management, and we were
3 having trouble getting turbo chargers from
4 Borg-Warner.
5        Q.    But you didn't you didn't know -- you
6 didn't say to her then, "I don't know if this supply
7 management specialist job is a I, II, III, IV." You
8 said, "It's still up in the air, it hasn't been
9 decided."
10        And we know by this time GJE is totally in
11 effect. We'll have documents -- your counsel has
12 supplied me with many documents showing me that GJE
13 was in effect as early as July, they knew the grades,
14 they knew the jobs. By this time, May 1 of '04, it
15 was all in effect for everybody in John Deere.
16        So my question is isn't it fair that
17 despite this GJE process, if a supervisor wanted to
18 change the grade of someone, they could do it as long
19 as they had a rationale for it and as long as they
20 created a rationale for it. Correct?
21        MS. WEST:    Argumentative. Misstates the
22 record. Compound. Asked and answered.
23        A.    They would need to -- they would need to
24 justify it, you know, based on -- again, based on the
25        Filed 02/03/14 as Page 130 of 190 -- want project was --

404

1  around technical path and how people get on the
2  technical path and all that kind of went back and
3  forth. Again, I don't recall. I don't recall
4  exactly.
5      Q. Do you remember directing Jody McKowen to
6  tell Mr. Forster that he couldn't get a Grade 9
7  position because he wasn't managing any people?
8      A. No, I don't -- I don't -- I don't recall
9  that.
10     Q. Do you know if that would have been true?
11  That you could only -- he could only become a Grade 9
12  level by managing people and not doing it by going
13  down a technical path?
14     A. Again, I don't recall what was in place at
15  the time. Clearly, within the engineering jobs you
16  could get to Grade 8. There were some circumstances
17  if you were highly technical in kind of a scientist
18  role, like very specialized and had a lot expertise,
19  that it was possible to get to Grade 9.
20         But I don't -- I don't recall exactly what
21  was in place at the time. I just -- that's, I mean,
22  conceptually anyway what the technical path would be.
23         MR. RACETTE: Thanks. You've been very
24  patient, Mr. Keith. I appreciate you coming back both
25  days. That's all the questions I have.

405

1         MS. COOPER: Off the record ending the
2  deposition on Volume 2, Tape 5, at 1358.
3         (Deposition concluded at 1:58 p.m.,
4  October 25, 2013.)
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

406

1             C E R T I F I C A T E
2      I, the undersigned, a Certified Shorthand
3  Reporter of the State of Iowa, do hereby certify that
4  there came before me at the time, date, and place
5  hereinbefore indicated, the witness named on the
6  caption sheet hereof, who was by me duly sworn to
7  testify to the truth of said witness's knowledge, that
8  the witness was thereupon examined under oath, the
9  examination taken down by me in shorthand and later
10  reduced to a transcript through the use of a
11  computer-aided transcript device under my supervision
12  and direction, and that the deposition is a true
13  record of the testimony given and of all objections
14  interposed.
15         I further certify that I am neither
16  attorney or counsel for, nor related to or employed by
17  any of the parties to the action in which this
18  deposition is taken, and further that I am not a
19  relative or employee of any attorney or counsel
20  employed by the parties hereto, or financially
21  interested in the action.
22         Dated at Des Moines, Iowa, this 8th day of
23  November, 2013.
24
              /s/Melissa A. Burns
25            CERTIFIED SHORTHAND REPORTER

# POINT RATING TABLE

| TOTAL POINTS | SALARY GRADE |
|:---:|:---:|
| 0-22 | 1 |
| 23-31 | 2 |
| 32-41 | 3 |
| 42-52 | 4 |
| 53-64 | 5 |
| 65-78 | 6 |
| 79-95 | 7 |
| 96-Above | 8 |

# FACTORS

1. Prerequisite Training
2. Physical Skill
3. Knowledge

    a) Knowledge of Organization

    b) Knowledge of Company Policies

4. Mental Versatility
5. Responsibility

    a) Responsibility for Valuables and for Confidential Data

    b) Responsibility for Accuracy

6. Independent Action
7. Supervision Exercised
8. Effort



PLAINTIFF'S
EXHIBIT
tabbies
5

# JOB DESCRIPTION

**JOB TITLE:** Human Resources Coordinator

**DATE:** September 1991

**DEPARTMENT:**

**GRADE:**     Exempt
            4   Nonexempt

**REPORTS TO:**

**OCC. CODE:**

**SUPERVISES:** None, but may provide work direction to clerical employees grades 1 –3.

**JOB FUNCTION:** To coordinate a variety of human resources administrative service functions in the Branch.

**PRIMARY DUTIES:**

1. Provides information to employees, retirees and beneficiaries and initiates inquiries and actions to investigate and resolve employees problems and questions regarding benefit programs.

2. Coordinates automobile fleet functions relative to the purchase and disposal of vehicles; may schedule use and maintenance of Branch pool-autos.

3. Maintains records, compiles reports, coordinates procedures and activities for such programs as performance appraisals, affirmative action, compensation changes, safety programs, employee vacations, and residential real estate transactions.

4. Assembles information form personnel records or other sources for special reports and studies.

5. May interview suppliers and administer routine purchasing functions and service functions.

6. May maintain and update the personnel records system.

**APPROVALS:**

_____      _____

_____      _____

\_\_\_NEW JOB \_\_\_REVISED, REPLACES

_____
(Title)              (Grade)      (Date)



# Authority For Job Classification

| Job Code | Date |
|---|---|
| | October 1996 |

DEERE & COMPANY
WORLDWIDE INDUSTRIAL EQUIPMENT DIVISION
JOHN DEERE INDUSTRIAL EQUIPMENT COMPANY

TITLE: DIRECTOR, MARKETING

| SALARY GRADE | | | New Job | _____ |
|---|---|---|---|---|
| Present | __ | _____ | Change of Duties | _____ |
| Proposed | __ | _____ | Other | _____ X _____ |

This Job Replaces: In part Director Marketing

In Salary Grade: (Sept 1994)

Revised to reflect the reorganization of the Industrial Marketing organization.

Job reviewed and approval of
proposed grading recommended

Approved:

_____Date_____
(Unit or Department Manager)

_____Date_____

_____Date_____
(Director of Manufacturing or Marketing)

_____Date_____

_____Date_____
(Vice President)

_____Date_____

_____Date_____
(Executive Officer)

_____Date_____

_____Date_____
(Compensation Committee)

ja-c:\data\jean\jobs\dirmktg

Case 6:12-cv-02050-JSS   Document 84-3   Filed 02/03/14   Page 134 of 190

**APP266**

 **JOB ANALYSIS**

| | |
|---|---|
| | Date |
| | October 1996 |

DEERE & COMPANY
WORLDWIDE INDUSTRIAL EQUIPMENT DIVISION
JOHN DEERE INDUSTRIAL EQUIPMENT COMPANY

TITLE: DIRECTOR, MARKETING

Responsible For: Planning and directing strategic marketing initiatives for market segment prioritization for the Industrial Equipment Division.

Accountable To: Senior Vice President, Marketing

Supervises Directly:

| TITLE | SALARY GRADE |
|---|---|
| Manager Implementation | |
| Manager Process | |
| Manager Trenching | |
| Manager Material Handling | |
| Manager Rental Segmentation | |
| Manager Value Enhancements | |
| Manager Rental & Equipment Remarketing | |

Approximate number of people supervised directly or indirectly...................................Wage

_____

Non-Exempt

Exempt          _____

_____                                    Total

_____

Duties:

- Directs activities to ensure each market segment understands their customers' business, how they compete, what makes them successful and what their needs are.

- Directs segmentation, fleet size and value enhancement prioritization process to determine best marketing opportunities for the Division.

- Directs value enhancement initiatives such as competitive prices, supplier knowledge, 99% parts stocking, on site repairs, next day repairs, etc.

4

**APP267**

## WORLDWIDE HUMAN RESOURCES
### SENIOR VICE PRESIDENT, WORLDWIDE WIDGETS

| GR | COMPENSATION BENEFITS PLANNING | EMPLOYEE BENEFITS | EMPLOYEE DEVELOPMENT | HUMAN RESOURCES INFORMATION SYS | DIVERSITY | SHARED SERVICES | EXEC COMP AND BENEFITS | GR |
|----|----|----|----|----|----|----|----|----|
| 19 | | | | | | | | 19 |
| 18 | | | | | | | | 18 |
| 17 | | | | | | | | 17 |
| 16 | | | | | | | | 16 |
| 15 | | | | | | | | 15 |
| 14 | | Mgr, Wizard Research | | | | | | 14 |
| 13 | | | | | | Supvisor, Shared Widgets | | 13 |
| 12 | | * | | | | | Boss, Big Widget Perks | 12 |
| 11 | | | | Mgr Widget Resources | | | | 11 |
| 10 | | | Master, MBA | | | Gadget Consultant | | 10 |
| 9 | Mgr, Green Dollars | | | | Culturist | | | 9 |

* Dual Graded

APP268

# Job Description Process



HR Mgrs.

GOPA

HR Div Directors

Job descriptions to be processed

Mgr. Corp. Compensation reviews job descriptions (Receives 10-20 per week)

Corp. Compensation logs approved job descriptions into book by title, grade, location, department & date sent to HRIS

HRIS for occ coding

Corp. Compensation sends job descriptions to appropriate HR Mgrs. and logs date sent

Filing

SG 8 & below filed in books by location

SG 9 & above entered on spreadsheets by location, grade & dept & distributed

Replace old job descriptions with new & file old in obsolete file

SG 9 & above filed in drawer by location

6

APP269

| | |
|---|---|
| **From:** | John Hagnell [jph14@hotmail.com] |
| **S** | Friday, January 25, 2002 12:59 PM |
| **To** | Leinart John H (HR) |
| **Subject:** | Report on Job Documentation and Evaluation Processes |

**Attachments:** Final Report.doc; Exhibit A.doc; Exhibit B.doc; Exhibit C.doc; Exhibit D.doc; Exhibit E.doc; Exhibit F.doc

-----Original Message-----
**From:** John Hagnell **[SMTP:jph14@hotmail.com]**
**Sent:** Friday, January 25, 2002 12:59 PM
**To:** Leinart John H (HR)
**Subject:** Report on Job Documentation and Evaluation Processes

Dear John: I enjoyed our brief conversation yesterday and was surprised to hear that the compensation function now reports to you. Attached as requested is the Final Report on the above-captioned processes, and the related exhibits, you called about. Please give me a call if Deere is in need of a compensation consultant again. I have years of executive compensation experience as well as in "general" compensation matters. Regards,
John Hagnell

            

Final Report.doc   Exhibit A.doc (26   Exhibit B.doc (26   Exhibit C.doc (23   Exhibit D.doc (22   Exhibit E.doc (21   Exhibit F.doc (30
(49 KB)                KB)                   KB)                   KB)                   KB)                   KB)                   KB)

**APP270**

**Deere & Company**

**Report on the Current Status of the**

**Job Documentation and Evaluation Processes**

**September 28, 2000**

Prepared by John Hagnell

The first view of Deere is from 10,000 feet. What one can see is a very strong culture and an incredible identity employees have with the Company. Deere has tradition as its bedrock and, overall, a long and successful history. It is a company which focuses on serving its customers. For Human Resources, the customers are the line and function managers and the employees it supports.

Even in initial conversations one senses that management is trying to identify and adopt best practices, often referring to Jack Welch of General Electric, and citing Caterpillar as a competitor to study and learn from.

Looking at job documentation and evaluation within this rich context, it is surprising that these processes are so far below world class in some respects. At this point two definitions are in order. By job documentation is meant a process which encompasses the gathering of job information and the preparation of job descriptions, including qualifications and tasks. By job evaluation is meant a process which extends from the analysis and evaluation of job worth (e.g., using market pricing) to the determination of salary grades. Although job documentation and evaluation are often viewed as one continuous process, they are really two processes. It is worthwhile to take a close look at them independently.

Job information is collected and jobs are described for a variety of important reasons:

- -- It is essential for the selection of job titles, the development of a job worth hierarchy, and the analysis, evaluation and grading of individual jobs.

- -- It is needed for participation in salary surveys and the interpretation of survey results. Jobs cannot be market priced if they are not described. The use of job titles for this purpose is really not sufficient.

- -- Job documentation is also needed for the effective and efficient operation of the following key processes ( note: in some countries the job documentation referred to here cannot be used to support all of these processes):

    recruiting/staffing

2

job posting

assigning employees to appropriate jobs

Affirmative Action Plan and EEO reporting in the United States

establishing performance standards

employee performance appraisals

performance management

training

career paths/planning

leadership development

succession planning

organization design

workforce planning

integration of mergers and acquisitions

legal defense.

The current process for gathering job information and preparing job descriptions varies along a continuum from division to division, and with country differences. It is a rather rigorous process in some divisions/locations and a less disciplined process in others. For jobs in salary grades 1 through 8, the process usually starts with job classification questionnaires which are used to determine job worth using a point-rating system of evaluation. Job descriptions are used in the analysis and grading of jobs (using market pricing) in higher salary grades.

The first shortfall when it comes to having a world-class job documentation process is the state of automation. At Deere it is very limited and, with the exception of the project now underway to bring up a job posting function

3

# APP274-275

# FILED UNDER SEAL



To:      Shannon Lemke, EEOC

From:      Michael J. Sellers
         Supply Mgmt Process Pro / EDI Coordinator
         John Deere Waterloo Works

Date:      March 29, 2005

Subject:      Formal Complaint & Request for Investigation - Potential EEOC Violations

Summary:      This letter is being written to inform you that I and others in my department
         (Supply Management) and potentially the entire business are "continuing" to be
actively

discriminated against and personally harmed (physically, psychologically and
financially.) because of our age (over 40) and our steadfast commitment to each
other, and our corporate values and policies. Values which have been with us for over
200 hundred years, and which have been very carefully crafted to preserve
our company's culture, our integrity, and our international reputation. The information
which I am about to share with you was not assembled without deep thought and a lot
of personal pain. Pain in recalling the actions I've seen, the personal harm which they
inflicted on people, and in knowing that I have been unsuccessful in facilitating a

to the problem. Each of the issues listed below need your immediate attention! ! !

MY PERCEPTION OF THE BACKGROUND:

(The first phase of a plan to replace older employees / 2001)

In the last 3-5 years, the John Deere Waterloo Works, has hired a number of
Managers from other fortune 500 companies as part of an effort to develop a high
performance work environment and a more profitable business. When this occurred,
a wide variety of viewpoints, ethics, and managerial approaches were injected into our
business. Some were positive and some were not. This letter is being sent to
highlight a few of the practices which I believe are still runnning counter to our
company's values and are continuing to harm our employees. The majority of them
appear to originate from Clyde D'Cruz, (Mgr. of Supply Mgmt.) but in all fairness to Clyde,
they could have been mandated at higher levels of the organization.

In early 2001, Clyde had responsibility for the Supply Management department and
was actively trying to develop strategies which he could use to improve the
department's performance. One of his initial areas of focus was the way we
supported the new product introduction efforts. He was being told that a greater
level of support was needed in order to improve this process. He was also trying
to apply his Caterpillar frame of reference and approach to the environment in front of
him.

At that point, I was a pretty "youthful looking" strategic buyer who appeared to have
some good ideas (Aggressive supplier consolidation, pursuit of 10 day leadtimes
on purchased products, Deere-wide strategies, self-directed commodity teams, etc..)
Because of this, I was pulled aside, along with other buyers and given a mini pep
talk about the change which was ahead of us. In this exchange, a key comment was

PLAINTIFF'S
EXHIBIT
tabbies
15

Case 6:12-cv-02050-JSS    Document 84-3    Filed 02/03/14    Page 143 of 190
APP276



made towards the end of it. It was something like " Yeah,....we need to get all of these old farts out of here."

This comment puzzled me initially, although I know that some people still believe the stereo-types of older employees. (ie They are outdated, can't handle major change, don't work hard, etc..) I also knew from my own process change experience that it is always tougher to "sell" new ideas to older employees because of their experience, but that the implementation or execution activites goes a lot, lot easier. So I just figured that Clyde understood this and was just blowing off some frustration. However, as you will see in the balance of my comments, this was "NOT" just a random comment. It was just an early indicator of age discrimination and of what was to follow.

Over the next 5-6 months, Clyde presented his new concepts and strategies to the department and asked for feedback. As he did, it became very apparent that the department did not support a key component of it – major changes to our commodity team concepts. ( A decision which was reversed 2 years later.) The primary concerns were the "inexperience which the new team leaders", the "changes being proposed in our commodity strategies", "supplier relationships", and the "communication problems" it would cause.

Clyde retaliated by announcing that the older and more experienced commodity team leaders (I was one of these) would be moved into less important tactical positions and would take their work direction from a number of 20 year olds who were moved into these and other key positions. This was accomplished in a major year-end reorganization in concert with an early retirement program, and the introduction of a major new tractor. The message to me and other veterans at this point was "very" clear. Because you can't see the wisdom in my new strategy, your ideas and experience are no longer valued, and I will prove to you that our younger employees can successfully implement them. The net result was Zeus introduction problems, a department in chaos, and about 20% of our department (or about 500-600 man-years of knowledge) electing to retire "prematurely".

( The Second Phase / 2002-2003 )

As problems began to occur, older employees were openly, and unfairly blamed for them. When they complained, Clyde used additional reorganizations to retaliate against them. The difference this time around was that the changes were more openly discriminatory. Some of the practices included:

1.) Moving people out of their jobs and then upgrading it to a higher labor grade for their successors.
2.) Utilizing the performance management process to unfairly lower the ratings of good employees.
3.) Not giving older employees (over 40) credit for their accomplishments
4.) Isolating older employees who highlight problems within the department.
5.) Efforts to discredit employees.
6.) Etc.., not given credit for their accomplishments by giving them positions which would isolate them, make it difficult for them to perform, and which would make it easierThey were also publicly ridiculed, in what looked like an effort to break their spirits and self concepts. In addition, The younger employees, on the other hand, were being rewarded and promoted for implementing the commodity plans and ideas which we left them when we were reorganized.

The younger employees appeared to be rewarded for implementing the commodity plans which we left them (especially cost reductions, and new product features), while the older employees were being blamed, punished, and demeaned because of the growing number of problems which they should have been able to fix. At this point, the writing was on the wall. Employees over 40 knew they were working in a hostile and unfair work environment, so they began to exit the department in large numbers. At this point, management was aware of the issues, and we began to receive presentations from our new Vice-President, Mike Triplett, about the importance of ethical and fair practices, as well as better supplier relationships. (Each of these were noted in the annual employee survey results.)

( The Final Phase – 2003/2005 )

Operational performance was beginning to deteriorate in 2003, as the improvements which were in process at the time of our reorganization were used up. The concerns which the veterans had warned Clyde about were now occurring. (The younger and inexperienced decision makers were making ill-advised decisions, and the managers who were brought in from outside Waterloo were breaking processes faster than we could fix them.) We also saw more experienced (over 40) employees either leaving the department or retiring very abruptly.

It was about this time that I also noticed another policy change. (i.e. Employees were being told they couldn't apply for jobs outside of the department, unless they had been in their current position for 18 months, and had mastered that position.) Ironically, our department practices a policy of annual job changes. By the end of 2004, Clyde was making additional threats and additional health problems were being seen.

While this section was meant to be a very general overview, I would hope that it's already beginning to raise some issues worth checking into. I will now outline my individual experience in this same time period, along with the things I believe to be age discrimination and retaliation.

## My specific case:

## 2002

Nov'01 –   Was "reorganized" from a strategic buyer to a tactical one and relocated to the Donald Street facility.   (Note: Overall performance of the commodity has deteriorated since then.)

Mar'02 –   Clyde moves me back to the Product Engineering Center to be a Supply Management Process Pro and to report directly to him.  On a number of occasions, I was referred to as his "Right Hand" Man in departmental meetings.

May'02 –   Jerry Gehrke, gives me an "inaccurate" mid year assessment, saying that I should have had 50% of my goals accomplished, even though I was moved in Mid-March.(4.5 months).

   –   I challenged the assessment and Clyde agreed to change it.

Oct'02 –   Clyde tried to give me a "Does Not Fully 3 leets" (First step to being labelled a

Poor Performer) and I challenged it, saying that I fully met my goals in the first part of the year and noting that things would have been better in the second half with better support from his side. I said that a number of them involved issues which were I had no control over and that he did not support me on. After a very short period of time, it was very clear to me that Clyde wanted me to fix problems which he had been unable to prior to this time period. (Things like accountability, proactive performance planning and transparency on our current status. He also wanted me to develop a monthly update process which was more polished and professional looking, so he could bring in other managers into it.)

When the managers resisted some of these changes, I asked for support and got very little. (Comment or two to get me info., but no enforcement,) From then on, I received comments like "You need to find a way to get along with everyone in the sandbox". As a result, a number of managers unfairly criticized and demeaned me publicly every time they ran into a problem with their presentations. For example, one manager said that I had completely changed his data, when in fact he sent me the wrong one I Others would poke fun at me by saying things like " Hopefully Mike will figure out how to do this the next time, or he must have screwed something else up, etc.." when "they" were contributing to the problems by giving me their suspect information "minutes" before the meeting.

The net result, was a comment stating that I hadn't worked for him long enough to assess me.

## 2003

Feb/Apr'03 - After completing a class on social styles, I came back and told Clyde why there were conflicts within the department and offered ideas for addressing them. I also gave him my candid assessment of the people within the department, and noted that our planners and tactical buyers were being significantly under-rated in terms of skills. It's "important" to note, that I mentioned that most of our planners were very amiable people, who got along with everyone. Shortly thereafter, their skills and self esteem were being attacked again.

May-Aug'03 - Clyde began to make numerous threats to me. One related the ISO recertification audit (ie Pass or else I) and at one time was reiterated publicly about 6 inches from my nose. Another involved an effort to lay out plans and tools for the new employees which

he had just put into Strategic Buyer positions without any background or training. (i.e. We are being cited in ISO audits for not having our new product people trained, and I want you to make it go away. If you can't, I might have to look for someone else next year, etc..) I was told by other managers at the time, that this was just Clyde's behavior.

Aug'03 - Clyde informed me that he was not happy with my performance, and that he was going to bring in a Master Process Pro to replace me. (Daria Jerauld) Clyde also informed me that I would report directly to her.

When I began to apply for other j$_4^+$s (expecting the same pattern of

APP279

assessments

intimidation, and discrimination to continue.) , Daria approached me and asked me to stay. (i.e. Needed my expertise)

I agreed under one condition: That I not receive a "Does Not Fully Meet". (I otherwise had no choice but to move elsewhere.) Daria's response was very enlightening. "Clyde has agreed to that but you need to know that you are "JUST BARELY" meeting expectations and need to step it up a lot. (ie My instincts were right.)

## 2004

Sep/Oct - I was instructed to go through a 360 review, which is where your direct reports, superiors and peers assess your skills anonymously and then the summarized results are returned to you. In my case, the results were to be used in my competency assessment which is very subjective. (This will become a lot more interesting later when you see the results in January below.)

Nov/Dec- Daria told me that she wanted me to supervise 3 people in 2004, in order to optimize the process improvement activities which we were all working on. I was also asked to develop them. At this point, I brought up that I was having some problems with depression and mentioned that she could give the position to someone else - like Dave Christy. Daria responded with something like: "You've got to be kidding!!, you are the

only one

who can do this - If you need to take some "Sick" days, go ahead and do this when they are needed." She also cautioned me that I should be very careful about this topic, as Clyde would see this as a weakness.

Nov-Dec - I was asked to take on Supplier Collaboration Responsibilities in addition to my other responsibilities (ie Support of a web-based application which we used to share documents and information back and forth with our supply base.) since the previous

person

was being moved into a new position. (Took 2-4 hrs a day)

Dec-Jun - I was asked to cover the major part of Trudy Baird's job while she was on medical leave (ordering hot parts back from our Parts Depots in order to keep our assembly lines running.)

This took about 8 hrs /day

Jan - Was asked to use Mitch Munson (Part-time) to cover a planner position, because Emily Delagardelle was moving to another position.

Jan - Was asked to repesent our department in the Enterprise Community of Practice Meetings. When more support was needed, I was asked to help but develop everything for them.

Jan - I began to mention to Daria that I had an unmanageable workload, but instead of getting some help, I was asked to simplify the job. (Note: By the end of the year,

we had had cut the process time by about 80-90%, but increasing requests ate up
part of these gains.)

Mar   - I highlighted to Daria, that the new "Manifest" Implementation effort (Clearly
        establishes the days and time periods which material will be picked up by Deere.)
        was severely impacting our order stability to our supply base, which in turn,
        was resulting in late deliveries and operational performance problems.

      - I developed a new planning process to address the problems. After 2 months
        of successes in a variety of pilots, I was asked to roll it out to the rest of the
        department. As I did, the factory performance correspondingly improved ! ! !
        (This required another 20 hours / wk for the remainder of the year to support it)

Mar-Apr - Was asked to give work direction to 2 UNI students who had to work on a real
          business problem for 4 weeks as part of their class

Apr/May - Was told that I would be losing my part-time person and that his contract would
          not be renewed in August.

Jul-Oct - "Resumed" responsibility of Trudy Baird's position, as she went back on
          medical leave.

Aug    - Submitted a formal requisition / justification for acquiring 2 part-time students for
         2005, to address our workload

       - Supported the pilot and development of an Enterprise-wide Capability Planning
         Tool for Suppliers.

       - Clyde alerted Daria and I to a new process which we were "supposed to be
         addressing" about 10 days prior to our audit ($100K form for SDS compliance)

Oct    - Our department started running into audit problems, and I was getting blamed for it.

Nov 19 - Was given my Fiscal 2004 Performance Review
         (Was told that I was being rated "Does not fully meet" and was also told that
         the audit was a big miss and that Clyde said there was an understanding that
         it was "MY" responsibility)

       - WHAT ???? (It not only wasn't in my goals or responsibilities, with the exception
         of the bailment agreements, but was very specifically assigned to Daria.) .

       - Other "SHOCKING" revelations included:

            1.) I didn't do a good job of supervising, when our team did admirably in the face
                of world-wide shortages, and a multitude of things we were asked to support
                "above and beyond" what we started the year with.

            2.) That I could not take any credit for the factory performance, even though the
                improvement graph matched the improvement graph on my side ! ! (Probably
                because other people were taking credit for it !)

3.) Was told that I would get no credit for fixing and supporting the Factory-wide Manifest Efforts

4.) Was told that my order stability efforts which were highlighted as the "benchmark" for Deere was just "Meeting" expectations. When asked why, it was because I didn't hit the 75% reduction target, "EVEN THOUGH" I clearly had about 30-40% improvement at mid-year and I told them that we would have to be willing to sacrifice improvements in the second half of the year, if we wanted to support the Manifest Implementation.

5.) Being told that my skills were still subpar, when there is absolutedly no doubt in my mind that noone else in our department could have pulled off what I did in 2004 (And that includes Clyde !) When I asked why, I was told that it was because of the audit.

6.) Was told that I would no longer have Dave Christy and Ofelia Iversen reporting to me.

7.) Was told that I would receive "NO" consideration for all of the activities whcih I took on throughout the year.

(Bottom line message to me: We had a visible audit problem and they needed a scapegoat ! ! ! ) This is just one of many "patterns" which have carried over from the very first reorganization (ie Use problems to blame and destroy the credibility of the older employees.)

Nov 19-22    Was told that I should "NOT" attend the final audit review meeting, per Clyde's request (Requested that it be a manager's only meeting at the last second - I wonder why)

Nov 23    - Met with the Deere Doctor to see if he had any ideas which could help my health condition.

= Met with Daria later in the day to inform her that it didn't help me any. She used this moment to tell me that she had only been in this position on one other occasion and she had to fire him.

Dec 5-20    - I Questioned the review again and was told that:

1.) by signing and stepping the review forward I was not necessarily agreeing with it - Only that it was reviewed with you, etc.. &

2.) That we could revisit it if needed after the 360 review came back

- Daria stopped by my desk and asked me "WHAT were you doing in the conference room with Royal Jolley (Just returning from a medical leave himself and in VERY bad shape) I told her that we were asking each other how we were doing and how to make the job arrangements the best for both of us. (ie Whenever one of uswasunder a lot of stress, it was instantly triggering negative ndes to the other - But I didn't even get a chance to say words in parentheses, because she ly shot back with " He has BIG problems, BIG ! ! !) I was stunned by the comment "and" by the suggestion that we should just isolate him, or not help him transition back into the department.

response was "Daria, He's not the only one !". At that point she abruptly said "Fine, don't ~~my advice~~ and stopped away.


- Dec 3 (questioned the review and asked to be moved to a tactical buyer position)
- I told Daria that we were breaking processes faster than I could
  fix them with a "part-time" effort
- Dec6 - first formal review of parm changes at Darias office
- Dec 8th (Had to see a therapist due to trauma)
- Dec 10th was told to stay out of conf rooms and was given new goals, some with due dates within 1-2 weeks
- when I noted that it would hurt my productivity due to my medical issues, she said she still wanted me at my desk.
(I suspect that this was because they had someone either watching me)
- Dec 13th Was told that I would be given an additional job (EDI)
- clarified other issues (Camelot, etc.)
-was also told that it was because Clyde didn't think I had enough to do.
- Dec 15 conf call concerning all of the EDI problems at Seeding Div. (Clyde was present)
- Was clearly confused about my respat this point, so I loaded in what I thought I had resp for. Was then
  chastised for this, when this is part of the perf mgmt process to insure that there is a meeting of the minds
- Daria contacts Mike Robinson on my first goal
  d me to revise perf mgmt and forward it to her immediately


2005

Jan 18th – I learned that I was given the wrong survey in my 360 review (Got the managerial version, instead of the supervisory one. I learned 4 things from it:

   1.) That my overall assessment (3.8) was very close to the industry norm for
       Managers (4.0) and that included a very "LARGE" bias from Daria Jerauld.

   2.) That my direct reports and peers had evaluated me at or above most
       of my own evaluations.

   3.) That there was also a significant difference in my subjective assessments
       within my performance management assessments and this one. &

   4.) That I started receiving "Very" contradictory comments as to what this meant.
       For example, Clyde and Daria told me not to worry about it – it just meant that I had
       direct reports, etc.. However my coach told me something else. Then in an attempt
       to get clarification from our Corporate Training Department, I got a "Lot" of additional
       comments which were also contradictory to other sources I checked.
       I just don't know why.

Jan 25–30 I began to highlight that my workload was unmanageable.
Jan 30? Shortly after this, I learned that I was no long g "supervising" anyone, even

Case 6:12-cv-02050-JSS Document 84-3 Filed 02/03/14 Page 150 of 190

APP283

...ugh it was still in my performance review. When I checked with my co-workers (team, etc..) Dave Christy said something like: "Oh yeah, I just talked to Daria about that and I am supervising him now." Then I went to Leita Thoms who works on the ASN portion of the EDI activities. She told me that she thought I was her new supervisor. Lastly, I talked to Josh Bresson, who was also unsure what was happening. Bottom Line: I wasn't the only one which was surprised by the changes, although I am now being told that I was already told this months ago. So why was "supervising" still part of my performance management responsibilities ?

- Feb 14th (to clarify responsibilities and discuss my workload)
- Key points to the meeting:

1.) That I input the wrong information, but nobody wanted to discuss the "changes" which were made after I went to see the Deere Doctor.

2.) Clyde mentioned that he saw ambiguity in the original stretch goals and responsibilities.

3,) Clyde mentioned that he wants to make sure there are fair practices in place and that he's never been chastised for that. (Hard to believe)

3.) Daria "emphatically" stated that to address my workload concerns everyone had agreed that "No New Suppliers would put on EDI this year. (and then asked me to add 3-4 just days later.)

4.) Daria told me that I had "Lied" to the auditors and tried to get me to admit it. (NOT TRUE ! !)

5.) Clyde started by saying that no threats were intended in the meeting and then ended up by telling me that while my performance review may have "rocked my world" that even harsher punishments were suggested and reminded me that I already had one negative review. (towards Poor Performer status) He also told me that the audit has now impacted my credibility with the staff managers, and bragged that he has already been given at least 3 chances at Deere (Seemingly to suggest that he was untouchable)

6.) Was told that I was very smart and good at what I do (although my performance review didn't reflect it.)

7.) Was told that I was just being held to a higher standard, when I asked why there was so much bias in my 360 review. assessments.

8.) Was told that in good conscience, they can't have someone with a "Does not meet" performance review supervising others. Is this a new departmental policy ?

9.) If you don't want to be here, we will help you find another job, but we can't guarantee you the same labor grade.

10.) Was told very specifically from both of them that they were not Interested in any rebuttals about the work load.

11.) Claimed that they did not tell "anyone" anything negative about me.

12.) Clyde said that he talked to other managers, saw common threads, and that he's tired of the threats. (Wasn't sure if he was referring to my health issues or my comments that I did not want to stay in an area which gives me a "Does not Meets" assessment. (Isn't this kind of common sense??? – why stay where you are obviously not wanted.) Unfortunately, he sees one of them as a threat.

13.) Was told that I completed 65 job responsibilities and good kind of ...

Case 1:20-cv-01059-JES-JEH # 1-3 Page 151 of 190

APP284

Jell together – They are not meant to be evaluated separately.

## Summary:

In summary, there is absolutely "No" doubt in my mind that I am being
actively discriminated against – due to age, and due to my disability. I also believe
that I have been retaliated against a number of times, which is why it's
important to keep this information confidential. Do "NOT" take this complaint
lightly. This is an issue which has gotten so far out of hand, that it's now a health
issue, and I believe there are many others in the exact same condition. As a Process Pro
and "past" supervisor, I have a responsibility to Deere and to my co-workers
to raise these issues and hopefully bring these practices to an end.

I apologize for the delay in getting this information to you, but my post traumatic
Stress has made it "EXTREMELY" difficult to complete (It's taken over 4-5 weeks)
and painful to relive.

If I can be of help, I will try my best to assist where I can. I can be contacted
at 319-415-6736 or my home phone at 319-232-5961.

Michael J Sellers

PS  Why I believe I am being attacked at this point.

- believe that younger employees are being moved too quickly into critical decision making positions
  without sufficient experience, a "very good" understanding of how the businsess works and the key
job
  considerations and ramifications (Retaliation, because I am a threat)
- was trying to give good guidance to others involved with a similar complaint. (retaliation)
- visited the doctor and mentioned the possibility of a medical leave – Then received an additional
job (retaliation)
- Age discrimination (over 40 and no longer one of the chosen few)
- I challenge the borderline practices within the department fom a fairness standpoint and
  highlight issues whcih need to be fixed.

## PERFORMANCE :

I still believe I was unfairly treated (harassed, work restrictions) and evaluated, because of two main factors:

1.) I was an older employee &

2.) I openly and verbally stood up for people who were being unfairly assessed and labeled.

## WHY DO I BELIEVE THIS ? :

1.) Because my first experience with Clyde involved a discussion with 2 other hydraulic buyers about how the group should be organized and one of Clyde's side comments was something like : "Hey, we need to get all of the old farts out of here".   At that time, he obviously had no idea how old I was.

2.) Because I repeatedly saw the same systemic pattern being used to get older employees to either retire early, or leave the department or company.

- Initially it was intimidation.   He'd suggest to people that they might get downgraded by telling them the department was getting reorganized, there were going to be less positions in some job categories, and he's try his best to find a home for everyone if they weren't able to find a different job themselves.

- Then it was the reassignments to less prestigious positions with less control over their own destiny and performance. (ie team member, not the team leader)

- Then they would be contantly yelled at, receive demeaning comments and "blamed" for problems which would occur.
(Many because they simply couldn't make bad ideas from the
younger employees work.)   Clyde would very "publicly" (in
front of entire department) chastise older employees, summarily
dismiss any explanations, and normally end with something like
"your job is to fix those problems and if you or others can't do it

APP286

I'll have to find                                someone who can !"

- Negative performance evaluations would quickly follow.

This was done for a number of reasons:
a.) To justify the promotions, pay raises, and positive position changes being given to the younger workers.
b.) To prevent older workers from speaking out about the problems Clyde was causing. (ie Shut up or I'll get rid of you)
c.) To prevent them from getting out of the department before younger employees were trained. (ie Due to "new" changes in HR policy, employees were not allowed to apply for positions outside of the department unless they had satisfactory performance in their current jobs.)

d.) To give the older employees an incentive to retire early or leave (ie They could get fired or downgraded if they stayed.)

Then they would be physically relocated to different plant sites and continue to receive numerous reassignments. (Annual changes seemed to be the norm.)

This was done for a number of reasons:
a.) To make it difficult to perform well.    If you are always on a new learning curve, your performance rarely compares well with the prior holder of the job. (ie you seem to have more problems and know less about your assignment than the prior job holder)
b.) To isolate and/or break up older employees who've worked together for a long time. This helped isolate them from others who would normally stand up for them when unfounded accusations were made.

- I started seeing more changes in HR policy, procedures, as well as support to keep employees from getting out of the department.    The two issues which had the greatest impact were                          a.) Telling employees that they had to stay in a job for 18 months                   before they could apply for reassignment / open positions.                      b.) They had to "proficient" in their current

12
Case 6:12-cv-02050-JSS   Document 84-3   Filed 02/03/14   Page 154 of 190
APP287

job.

Both prevented the highly skilled, but older
employees from                leaving, until Clyde had all of their
knowledge/insights                    documented

- older employees were told to document their jobs. (ie What
  do you do, for who, define reports/services you provide to
  each, why it's done, etc..

- older employees were eventually replaced and had to train
  their younger replacements, while usually holding their new
  jobs. (Just one more reason it would be difficult to perform well).

- Clyde and his Managers started using "subjective" assessments
  of older employee's skills as a way to lower the performance
  evaluations. The normally would equate to about 30-35% of your
  overall evaluation.

- Clyde then started using a new process called a "360 review"
  where you get anonymous feedback from those who work
  for you, with you, and those who use your services, reports, etc..

  I believe this was done to address the complaints about the
  subjective assessments of skills and to give the appearance
  of being fair and objective. However,.. there were two problems
  with this:

  a.) He instructed his Managers to be extremely critical in their
  assessments. (ie " If I see high ratings, you had better be able to
  prove that they are walking on water !) Keep in mind, that I was
  told to "facilitate" Clyde's staff meetings and measurements so I
  heard these kinds of comments first hand.

  b.) As "I" found out you might also receive the proper assessment
  for your position and labor grade. (In my case, I was assessed as
  a Manager, versus a more appropriate assessment for a team
  leader or supervisor.

- Workloads increased to a point, where some older employees
  just gave up any thoughts of performing well.    Because of the
  changes, constant shifting of positions, etc.. it was impossible
  to maintain adequate staffing. (ie With people leaving/retiring
  and younger employees needing on-going training and support

with problem areas we were always trying to catch up.)  A
number of older employees had to maintain this
"straddle"                                between old and new jobs for 2-3 month
time periods.  In my                      case, it was well over a year, and I
was given additional                      assignments as well......

In summary,  they were being set up for failure (poor evaluations,
possible downgrades in job responsibilities, less control, less pay,
etc..)                      and the message was that they should leave while they still could.

3.)  Because he strated to do the same things to me, in a very unfair way.

4.)  Because I started to receive retaliation whenever I tried to assist Gayle,
Wanda, or others. (Royal Jolly was a good example - Long story short, I
found him a desk which had an operable computer and phone.    In
return, I                     was quickly told that I shouldn't have done that, he was to remain
at his                        desk with no computer or phone until he got them, and I was not
to talk to                    him. (" He has problems!")

## HOW WERE THEY DISCRIMINATORY /UNFAIR ?:

1.)  Unfair evaluations which obviously generated "disparate impact" versus
my younger employees.    Two quick examples:

-   I was moved to a new position 4 months into the year, and when
I was assessed, they expected me to have 6/12 of my prior goals
completed versus 4/12.

-   In my last review, it was quite obvious that the "Does not meet"
assessment was due to us failing our factory audit (Have audio
tape of such comments.), even though our H.R. procedures
specifically state that such "bias" needs to be prevented, that
heavy or abnormal workloads should be taken into account.
Ironically, one of the people reporting to me at the time had
specific audit "failures" which he was "directly" responsible for
, but he received an "above average" performance review.  The
unique difference?   He was in his twenties.

2.)  Clyde and Daria wouldn't let me claim success for things I clearly
improved.   (I worked daily on a major project to improve our material
planning and factory delivery performance.)   Before I was involved,

these areas deteriorated every month.    After I began working on them,
they improved probably 9 of 10 months.    I guess it must have been a
coincidence.    Funny though, when I asked them if I could "undo" some
of        these changes to see if they were responsible for the
improvements, I              was told to leave them alone.    (Also captured on
audio tape)    We all knew        the truth !

3.)    I received average / below average marks for stellar performance.
(Areas where I had received "raving" reviews during the year.)    In fact,
Clyde sent me one on my auditing efforts. (Still have it)

4.)    They gave me very low "subjective" evaluations on my skills, even though
I was seen as one of the very best in many areas (Planning, Purchasing,
Project Mgmt)    How is this possible with sub-par skills ?    I still have
older evaluations showing higher assessments. In fact, Clyde had me
directly reporting to him for 8 months, kept calling me hi "right-hand"
man        and even gave me higher marks initially. (Probably because he wasn't
aware of my age at that point.)    This issue is critical, because they were
making these skills assessments about 30-35% of your overall
assessment, so it had a "big" impact on your evaluation.

5.)    Used different guidelines to evaluate me versus younger employees
(They had me evaluated by a new internal process called a "360 review"
which involved anonymous feedback from direct reports, superiors and
others directly impacted by your work.)    When this was done, my final
numbers were based a "managerial" position, not a supervisory one.
Given this fact, I scored "extremely" well because it basicly showed that
I already had Manager level skills, especially if Daria's low scores were
taken out of the average.)    But, you know what, my subjective
assessments for 2004/2005 still remained the way they were (LOW !!)

Clyde was so shocked by the numbers he said that "you obviously didn't
get feedback from my managers !" to which I replied "Yes, I did."

One key comment came from the brand new Manager which Clyde just
brought into the department and it was something along the lines of
" he chose to resist the obvious biases Clyde's Managers had towards
me"

6.)    Deere Policy / Procedures weren't followed.    Excessive workloads aren't
discriminatory by themselves.    However, when I had 2-3 jobs all year

and the younger employees had 1 (at the same labor grade !) it becomes discriminatory when there is "disparate impact". And that it quite easy to see, when you consider the workloads, the fact that even Deere's HR Policy says it "should" be taken into account when looking at my performance, and the fact Daria was quite clear in stating my assessment was "biased" because of the audit results, let alone the workload.

7.) When it came to my "subjective" skills assessment, they refused to give me any specifics on what the "targeted performance" looked like.

8.) In my last year, I headed up a very successful team, yet I was the only member of the team to get a "DOES NOT FULLY MEET" expectations evaluation.

9.) Disparate impact ! If you look at an organizational chart before Clyde and one when we went on disability, you'll notice one thing pretty quickly. (The older employees went from the top to the bottom, which means they were given less important jobs, less chance at promotions, less decision-making capability, etc.. and many of them were directly reporting to the younger employees who lacked the necessary skills.

I believe Clyde saw this as a smart move, since it moved older employees closer to the door (may be able to eliminate your job next) could still keep the highly skilled ones in the department until the younger ones were fully trained, and provided a logical way to blame problems on the older employees. (ie Their job was to fix the problems, and they obviously aren't doing it !)

Note: Somehow it doesn't make sense for a youthful team leader to get good reviews, when the team members are getting bad ones. Aren't they all working towards the same goals???

## WHY DID THEY DO THIS TO ME ?

1.) Because I was an older employee

2.) Because I was a highly skilled, detail oriented person who is candid, fair, and unafraid to speak the truth. I also was know for having lots of historical records, which is probably why I didn't all of my files returned to me. (It was obvious that someone went through my records, as my personal belongings were shipped to me.)

APP291

These are traits which could easily expose him for what he is - a
narcisistic person focused on replacing the department with people
which                     were younger and which he could intimidate.   He actually said
something                        like this to me in confidence. (ie "At Caterpiller, I didn't
have these kinds                      of problems, because I replaced them all with
women who I could                          intimidate.")

3.)     Because of the audit results.   He needed to throw someone under the
bus                      to save himself from negative consequences.   The audit
assessment                      came down to "TWO" items.   The auditors noted that
accoring to my                          records we had about 100 bailment agreements
and yet weren't fully                      completed yet, while the prior audit said
everything was done and they                          only had about 20-25 agreements
covering our tooling.   Bottom line to                      them - were we mislead in
the prior audit ! !   Hence the reason Daria                      stated (on tape) that I "lied"
to the auditors and then later used the word                      "mislead" them.
The 2nd issue was one concerning Small Disadvantaged                      Supplier
information. In a nutshell, one guideline which is involved with                      getting
Government contracts is to show that we are proactively
considering small, disadvantaged (minority, female owned, etc..)
suppliers before we source parts with people.   In this case, the entire
company had not implemented this process and were scrambling to
cover their backsides before the audit.   When one of my direct reports
told me that a corporate person was suggesting that we assemble the
information on the business which was awarded   in prior time periods and
then "Backdate" the records.   My response was that there was no way in
hell that I was doing that. (ie The back-dating of documents)

Note:   I still have emails between Deere units stating that they didn't
have anything in use and wanting to know what they could all do?

I believe Clyde came to the conclusion that it was "IMPERATIVE" to
"DISCREDIT" me before I might show up in any discussions as an
expert / whistleblower. (EEOC, audit, discrimination, problems in the
department, etc..)   I obviously still want my opportunity to set the
record straight.   (Hence the reason "I" believe they "settled" my
Worker's Comp. suit.)

I will be faxing some quick hand notes on the pattern of discrimination I saw, and a list of some key signs of discrimination. If the latter makes sense, I think we can piece the respective numbers together. (Example: If you prove there is a hostile environment, I would think it would be easier to convince people that harassment of older employees was wide-spread.)

Lastly, I will fax a list of things which I currently think are the most important in proving my case. See what you think. If you agree, I think I can send them fairly quickly.

I literally have over 20 binders worth of emails, etc.. so I'm trying to focus us on the vital few, since my PTSD has obviously limited my ability to put it all together. This information if the one real weapon we have if you actually want to win a court suit. (ie I will have a pretty good chance of proving statements false, while giving the actual date, times and text of what really happened.)

## Key signs of Discrimination / Hostile Work Environment

1.  Organizational charts which are completely inverted from more experienced/older employees in the key decision making jobs at the top to one where they have all been moved to the bottom

2.  Disparate impact in pay increases

3.  Disparate impact in performance evaluations
    The more senior the employees the more skills they have attained over time, so when you start seeing large numbers of them performing lower that kids right out of college, it's not a good thing.

4.  High Turnover rates. In my case, I'll venture a guess that over 50% of a 100+ employee department turned over in a 3 year period. This was the greatest exodus I've witnessed since the early 1980s

when we cut our entire organization by 50-70% when the Ag Industry tanked with the Russian grain embargo. (ie farmers couldn't sell all of their produce, so everything just grinded to a complete stop.)

5. The overall number of complaints surge. This is the reason I suggested that you acquire our annual John Deere Employee Surveys. They will tell you a lot. So much in fact, I heard rumors that they might be stopped for awhile. Imagine that.

6. A surge in health problems. My department had a very noticeable level of significant problems (heart problems, PTSD, anxiety disorders, and depression.) I think we had 4-5 heart issues in a 3 year time period. The MOST INSIDIOUS part of it, was that the on-site/Deere doctor was told that he could no longer place people on leaves of absence if he thought it was required for health reasons. I mean, who would think that a company would stoop this low ?

## Keys to my Case ?

1. Past evaluations / history versus those under seen in Clyde's time in the department.

- Differences in Subjective assessments of skills

- My successes right before this happened. (I had just finished up a successful project team effort, completed my Masters in Technology and wrapped up a lengthy AG Division Re-engineering project which our CEO claimed was the" largest" one in our company's history. (Waterloo had 3 team members - 1 to represent Marketing & our Dealerships, 1 to represent our Systems area, and me to

represent Supply Management and all of our Production Planning/Scheduling areas.)

Does this sound like I was a poor performer? I was chosen for a reason - I was the best at what I did in Waterloo and one of the most knowledgeable people in my professional field. (4 professional certifications, Taught classes for local professional society, etc..)

I then requested a move into Supply Management/Purchasing because I thought it was the most critical to the overall success of the Processes we just developed for the business. I year after arriving, I received a promotion. A year or two later Clyde was appointed our new Manager.

2. The 360 Review Assessment and supporting emails
- To show Daria's bias

- To highlight the new Manager's comment about the current bias toward me at Clyde's staff level.

- To show that I recieved the wrong assessment, and that this sure seemed to be intentional. (No changes were made, it wasn't redone with the right assessment, noone wanted to talk about it, and the fact the corporate training group lied to me about it. How do I know? I did some research, found the group who sold this process to us and I called them to clarify things. I even got to talk with Deere's sales rep. who stated that she was not aware of any problems similar to mine. (Got the wrong assessment)

- Clyde and Daria then lied to me on tape concerning the process which was used. I mean, really.. I knew that both of them had already been through the process at least once, so they knew better.

3. The Organizational charts showing the realignment of older employees from the top to the bottom.

4. Emails showing the HR Policy changes which prove their "active" support for what was going on.

5. Emails and forms highlighting excessive workloads, Deere's policy stating this should be taken into account during assessments, my email concerning my reasonable accomodation request, and those needed to show the unfair aspects of my performance reviews.

6. The audit information showing:
   The differences from the prior audit
   - What I accomplished, which was "significant" (I was on a team to develop a Ag Division/5-10 plant wide process for doing these things in the future.
   - The back dating issue
   - The real results versus the picture painted by Clyde

7. The details of my project improvement efforts which greatly improved our factory's delivery performance, timely availability of materials, lower costs, etc..
   - This will prove the positive impact of my efforts

8. The transcribed notes of my audio tape and the tape recording itself

9. The performance reviews of Dave Christy (A younger employee who reported to me, had direct responsibility for some of the audit failures, yet received a good review - Clyde actively supported it) And believe me, "Nothing" was done in this department without Clyde's approval.  He had to agree to each review before his Manager's could talk to us. (First hand knowledge again from being on his staff.)

10 Examples of harassment.(Some abusive language, some public

insults and belittling, pounding on the table, slamming doors, and even one occasion where he got within a foot of my face and was yelling so loud that I was getting spit on.    Yes, there was a witness or two for all of this.

PLAINTIFF'S
EXHIBIT
382

 **JOHN DEERE**

# POLICY AGAINST HARASSMENT

The Company is committed to maintaining a business environment that is free from all types of unlawful discrimination. In keeping with this commitment, harassment of any employee, group of employees, or any person performing services for the Company by anyone -- including any supervisor, manager, coworker, vendor, customer, or visitor of the Company -- is strictly prohibited.

## DESCRIPTION OF HARASSMENT

Harassment consists of unwelcome conduct, whether verbal, physical, or visual, that is based upon a person's or group of individuals' protected status under the law, including:

- sex
- race
- color
- religion
- national origin
- age
- physical or mental disability
- sexual orientation
- other protected status or activity

The Company will not tolerate harassing conduct that affects tangible job benefits, that interferes unreasonably with an individual's work performance, or that creates an intimidating, hostile, or offensive working environment. Examples of harassment that violate this policy include:

- jokes or ridicule about another person's or group's protected status,
- treating someone or a group of individuals differently because of their protected status, and
- kidding, teasing, or practical jokes directed at a person or group of individuals based on their protected status.

## SEXUAL HARASSMENT

Sexual harassment is misconduct based on sex, whether directed towards a person of the same or opposite sex. Unwelcome sexual advances, requests for sexual favors, and other physical, verbal, or visual conduct based on sex constitute sexual harassment when:

- submission to the conduct is an explicit or implicit term or condition of employment,
- submission to or rejection of the conduct is used as the basis for an employment decision, or
- the conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment.

Examples of sexual harassment include:

- explicit sexual propositions, sexual innuendo, or suggestive comments,
- sexually oriented kidding, teasing, gestures, or practical jokes,
- sexually suggestive or offensive printed or visual material such as posters, tee shirts, cartoons, flyers, magazines, e-mail, Internet sites , and
- physical contact such as pinching, stroking, or intentionally brushing against another person's body.

## WHERE TO GO FOR HELP

If an employee believes that he or she has experienced or witnessed harassment, and feels comfortable doing so, the employee should inform the offender that the offender is engaging in harassing conduct, that it is offensive, and that it should be stopped. If the harassing conduct continues, or if the employee is not comfortable telling the offender to stop, the employee should notify his or her supervisor, or, if this is not appropriate under the circumstances, his or her supervisor's supervisor or a representative of the Human Resources Department.



# JOHN DEERE

## HARASSMENT POLICY

### RETALIATION

The Company forbids retaliation against anyone for making or filing a complaint under this policy or for participating in an investigation or proceeding regarding such complaint. Examples of forbidden retaliation include:

- discharge
- demotion
- discipline
- unfavorable changes in work assignment, workload, or other terms and conditions of employment,
- talking negatively about such person to others,
- sabotaging, damaging, or interfering with such person's work,
- ostracizing or excluding such person or subjecting him or her to hostile treatment,
- holding the person to different standards of performance or accountability, and
- other inappropriate conduct or treatment that is hostile or affects the person's workplace, working environment, equipment, tools, or personal belongings.

Retaliation in violation of this policy is treated as seriously as harassment and may result in discipline up to and including discharge, even for a first offense. If an employee believes that he or she has been retaliated against for engaging in protected activity, the employee should notify his or her supervisor, or, if this is not appropriate under the circumstances, his or her supervisor's supervisor or a representative of Human Resources.

### INVESTIGATION PROCEDURES

The Company's method of investigation will be tailored to the circumstances surrounding the alleged offense. Generally, upon receiving notice of an alleged violation of this Policy, management will investigate the allegations and complete its investigation in a timely fashion, based on the facts and circumstances that are uncovered. Once the investigation is complete, the individual who made the complaint will be informed of the outcome of the investigation. To the extent reasonably necessary, and taking into account the nature and seriousness of the complaint and the need for privacy in relation to the circumstances, management will treat the complaint, the identity of complainants and witnesses, and the terms of resolution of any complaint in a confidential manner as deemed appropriate. If an investigation confirms that a violation of the policy has occurred, and depending on the facts and circumstances of the particular situation, disciplinary action up to and including discharge from employment may be taken, even for a first offense.

### RESPONSIBILITIES UNDER THE POLICY

 All employees of the Company are responsible for creating a working environment that is free from unlawful harassment of any kind. Supervisors and managers have additional responsibilities under this policy. If a supervisor or manager is told about or observes conduct which he or she believes violates this policy, the supervisor or manager should contact a representative of Human Resources to obtain assistance in ensuring that the conduct is appropriately addressed.

Employees are expected and encouraged to use the above procedure to report and resolve their complaints of harassment or retaliation. Additional legal recourse is available through various local, state and/or federal enforcement agencies.

All employees are expected to fully support and comply with this policy. Working together, we can maintain a positive and productive business environment that supports individual dignity and is free from harassment or other forms of unlawful discrimination.



**APP300-302**

**FILED UNDER SEAL**

## Lenius Wanda J

| | |
|---|---|
| **Subject:** | HR Support for Engine Works |
| **Location:** | I'll Call You |
| **Start:** | Wed 5/5/2004 1:00 PM |
| **End:** | Wed 5/5/2004 1:45 PM |
| **Recurrence:** | (none) |
| **Meeting Status:** | Meeting organizer |
| **Required Attendees:** | Keith Kevin S; Freis Steven E |

Steve,

I got your message about your talk with Mulvey. I'm not surprised, he is convinced about our people and the organization make-up. I talked with Tammy today and she has great reservations about Nancy Kohagen being able to work directly with managers, work on performance problems, hold her ground, etc. I cannot strongly argue that Nancy could be effective, and we're already going in with a negative perception as it is. So I'll talk with Ken Huhn about the possibility of her going into an assignment here in Wage Employment, and we'll continue looking within JDPS for an operations or supply management role, and I'll speak with Craig about maybe enhancing a package for her, perhaps a SPLOA. I am concerned about her from an age standpoint. I talked with Tammy about other candidates including people from C&FD, QCHR, Mindy Moye, people from Staffing, and Paul Winston from our shop. I'll call Craig about the C&FD people.

I believe we can get there with part of Jody, a full-time rep, and using Amy Wagner at PEC to help support Engine Engineering. This would give JDPS 30% of my time, 100% of Tammy, 50% of Jody, 100% of the Rep's time, and 30-40% of Amy, getting them to the level they desire. As a frame of reference, HRO's original proposal for all of JDPS was .5 division manager and 1 rep, which I think is too short, but it gives you the overall direction of HR, which is based on ratios and the benefits new processes, the National Shared Serivce, and HR Shop/RecruitSoft.

I'll call you tomorrow at 1:00. Kevin



PLAINTIFF'S EXHIBIT 43

## Lenius Wanda J

| | |
|---|---|
| **Subject:** | Selection Process |
| **Location:** | Your Office |
| **Start:** | Fri 5/7/2004 1:00 PM |
| **End:** | Fri 5/7/2004 1:30 PM |
| **Recurrence:** | (none) |
| **Meeting Status:** | Meeting organizer |
| **Required Attendees:** | Keith Kevin S; D'Cruz J Clyde |
| **Optional Attendees:** | Westendorf Mindy M |

Clyde,

You show as busy but this is my only open window tomorrow, between 1 and 3. Let me know if something else works for you, like 2 or 3.

To respond to some of your questions beforehand:

Mel graduated from the University of Illinois with a degree in Agricultural Engineering in 1973.

I cannot comment on his potential or versatility to do additional types of tasks. I know he has worked in design and quality; and his engineering background should give him some agility in benefiting your group in different areas. He has been in his current grade for awhile, which is not uncommon and doesn't mean he cannot perform at a pretty high level. And it's not all bad to have an experienced person like him as part of your core group. He can provide stability and experience to some of your numerous younger people.

Mel is 53 and has 77 retirement points. With our pension plan designed with the age-reduction factor, I would expect that Mel is planning to work at least another 6-7 years. Mel's wife has accepted a job as a school principal in Waterloo, hence their interest in moving here. With his wife accepting a new job, I would not expect Mel to be viewing this as a retirement destination, at least not in the short term.

As for paying the relocation expense, again I would offer that he's probably not planning to retire soon. And I would caution you in using a broad brush in painting people like him as being not worth investing in or that they carry 'baggage.' If Mel did not have energy and something left in his tank, why would he be requesting a move like this? Your view also creates risk for the company from an age discrimination standpoint which I know you do not want. I can talk with you more on that.

As for the quick action by our group, I haven't spoken with Mindy or Jen in depth so I do not know the circumstances. We can discuss this further tomorrow.

I too, apologize for the email. Hopefully we can get together tomorrow afternoon.

Kevin





**CONFIDENTIAL**

JD-000801



PENGAD 800-631-6989
EXHIBIT
90



## JOHN DEERE

# GLOBAL JOB EVALUATION
# & JOB DOCUMENTATION

## Job Analyst Training
*22 April – 01 May 2003*

**CONFIDENTIAL**

JD-000802

**APP306**

# Agenda – Week 1

- Overview of Non-benchmark Phase (March – September 2003)
- Enterprise Job Evaluation Process (Ongoing)
    - Process
    - Role of the Functional Review Committees
    - Job Evaluation Center
    - Your Role
- Additional Processes
    - Approval
    - Dispute Resolution
    - Special Compensation
- Quality Assurance Timeline
- Differences Between Ongoing and Non-benchmark Processes



3

CONFIDENTIAL      JD-000803

**APP307**

# Agenda – Week 1

- Hay Methodology Training
- Writing Job Descriptions
- Evaluating Non-benchmark PAQs
- Detailed Review of the Non-benchmark Process and the Tools
- PAQ Tool Support Plan & Monitoring the PAQ Mailbox
- Exercises



CONFIDENTIAL

JD-000804

# Agenda – Week 2

- Function reviews by Job Analyst



**CONFIDENTIAL**      **JD-000805**



## JOHN DEERE

# Overview of
# March – September 2003



**CONFIDENTIAL**                    JD-000806

# *Non-benchmark Job Analyst Teams*

- Joachim Scherer (with Bob Bousselot) – Supply Management, Logistics
- Rodolfo Castillo and Mike Doeden – Manufacturing Engineering, Operations
- Gerardo Arrambide and Lisa Harmon – Accounting/Finance
- Debbie Frese and MaryLinda Coward – IT, Health/Safety/Environment
- Bob Bousselot and Steve Waage – Product Engineering, Quality Engineering
- Terri Roman, Becky Etnier and Jeff Bell (part-time) – Marketing/Sales, Product Support, Customer Service
- Val Mead and Julie Borseth – Credit, Administrative/Clerical, Communications, Public Affairs, Legal, Security
- Melissa Temple and Cathy Leppo – Health Care, HR, Nursery/Irrigation



7

**CONFIDENTIAL**

JOHN DEERE

JD-000807

# Overview of Remaining Months





**CONFIDENTIAL**

JD-000808



# JOHN DEERE

# *Enterprise Job Evaluation Process (Ongoing)*



**CONFIDENTIAL**
JD-000809

# PROPOSED JOB EVALUATION PROCESS

## NEW POSITION

○ [Outputs]



### Initial Steps

**Step 1**

**Drivers for New Work:**
Technology
Organizational changes
Customer Requirements
Acquisitions
New Types of Business

Throughout the process map EC refers to the Enterprise Evaluation Center and HR Data Management Center, JA refers to Job Analysts, and PAQ refers to the Position Analysis Questionnaire.

**Step 2**

Mgrs. will work with HR contact to start the process

**Step 3**

HR Contact assigns region code, unit code (where work is) and functional area; establishes the PAQ routing and releases to the Manager. A unique number is automatically assigned by the online tool at this time.

System Tracking Information Item

**Step 4**

Mgr. accesses PAQ via online tool.

Manager completes Part I of the PAQ or assigns to employee for completion.

The online tool will check for completeness of the PAQ

**Step 5**

PAQ reviewed and approved by Mgrs. Manager before PAQ is passed to RC.

**Step 6**

PAQ passed to RC

Tracking System PAQ submission to RC

Note: JS (Orig.) will be checked primarily by EC

New Online JSs will be review by EC

**Step 7**

RC runs PAQ through online tool/algorithm

Tracking System PAQ review by RC

**Step 8**

JA will work with Mgr/HR contact to resolve problem(s) and fix on-line PAQ

Once problems resolved the JA will re-submit to the on-line screening tool.

Compare Hay Points to other jobs in function.

Look at reporting relationships in org.

Compare Hay points to other jobs in unit.

Compare the narrative of the PAQ against the factors.

Look at jobs below and above proposed job.

Finalize job eval. (Internal value)

**Step 9**

Final Hay Points

10

JOHN DEERE

CONFIDENTIAL

JD-000810

# REGIONAL JOB EVALUATION CENTER ACTIVITIES



CONFIDENTIAL

JD-000811

**APP315**

# REGIONAL JOB EVALUATION CENTER ACTIVITIES



○ Regional Center Activities

○ Outputs

RC searches for job in SAP
- Jobs
- Tasks
- Qualifications

Job Not Found in SAP

Grade Assigned

RC determines exemption status & Local/National. Depending on country, add'l info may be required to determine exemption. RC requests Mgr to complete the appropriate exemption form and return to RC

Ask Mgr to complete Part II of PAQ

Tracking System - date completed by Mgr

Mgr completes Part II

Mgr's Mgr approves Part II and returns to RC

Tracking System - date approved by Mgr's Mgr

RC determines tasks from PAQ and search task catalog for needed tasks. Record task #'s for all tasks found

RC determines qualification from PAQ. Search Qual. catalog for needed qualifications and appropriate proficiency scale. Record Qual. #'s for all qualifications found & scale level found. RC makes recommendations to EC as to the appropriate scale level to use

RC determines and records appropriate competencies

RC forwards spreadsheet to EC with major purpose, recorded tasks & qualifications and unabbreviated tasks and qualifications not found, and exemption status

Tracking System - Date forwarded to EC recorded

Refer to EC Activities

12

JOHN DEERE

CONFIDENTIAL                    JD-000812

APP316

# ENTERPRISE JOB EVALUATION AND HR DATA MANAGEMENT CENTER ACTIVITIES

⊛ Regional Center Activities    ◯ Outputs    ⊛ Enterprise Center Activities



CONFIDENTIAL

JD-000813

APP317

## Additional Scenarios and Processes

 To backfill an existing position with no change in work, the unit may "recycle" the position ID and backfill the position without RC or EC involvement. If there are changes in the position (content, title, qualifications, etc.) a new PAQ is required.

 To create a new position within a job that already exists at a unit, the unit may request a new position ID attached to the existing job.

 If a promotion is requested within a job family where the jobs already exist at the unit (e.g. Accountant I to Accountant II or Engineer I to Engineer II), a PAQ is not required. The unit should continue using their current justification process, or if one does not exist should develop one that meets the unit's needs.

 Interim jobs will be available for use in limited circumstances, such as when an employee must be hired quickly.
1. Unit submits request for position ID to RC
2. OM Analyst assigns position ID and assigns position to ungraded interim job.
3. RC follows up with unit HR to have a PAQ completed, following Process for New Work.
4. Interim jobs should be resolved within 60 days
5. Job will be backdated in SAP to show date the incumbent actually entered the job (interim status will be deleted).

 Employees assigned to working teams (full-time status) or placed on a temporary special assignment should keep their current relationship to a job, if appropriate. For a team assignment, the Project Manager or Team Leader will complete a form that identifies the team, summarizes the purpose of the team, and identifies each "fully dedicated" team member and their role on the team. For a temporary special assignment, the Manager will complete a form that identifies the incumbent and the nature of the special assignment. The completed form will be submitted to the EC and a note will be entered in SAP for each identified incumbent, stating the beginning and ending date of the team/special assignment.

14

 JOHN DEERE

**CONFIDENTIAL** JD-000814

## Additional Scenarios and Processes



RC will work with the Integration Department to determine the best approach for gathering job content data within a prescribed timeframe for the acquisition. Consideration should be given to the acquired company's size, culture, location, etc. May want to use a "mini version" of our current implementation process:
- Identify existing jobs within Deere that match acquisition jobs
- Map employees to benchmarks
- Complete PAQ's for unique jobs
- Use "interim" jobs if necessary to bridge the gap



The EC and RC will coordinate regular review sessions with the Functional Review Committees and HR Process Owners to validate tasks, qualifications (with proficiency scale) and competencies (with target levels) associated with existing jobs.





15

**CONFIDENTIAL**

JD-000815

# *Role of the Functional Review Committees*

- Assist in establishing targeted competencies

- Where necessary, provide insights to jobs

- Provide feedback on quality assurance

- Review job hierarchy within function

CONFIDENTIAL

16

JOHN DEERE

JD-000816

# *Job Evaluation Centers*

- Enterprise Center with regional responsibilities



**CONFIDENTIAL**

JD-000817

**APP321**



# **JOHN DEERE**

# *Additional Processes*

- *Approval*
- *Grade Resolution*
- *Special Compensation*

18

**CONFIDENTIAL**                              **JD-000818**

## PROPOSED JOB EVALUATION PROCESS



**Approval Process**

| | Approval Levels: |
|---|---|
| Grades 1–10 | Unit or Department Head & Enterprise HR Mgr |
| Grades 11–15 | Senior Position reporting to Sr. Officer & Enterprise HR Directors |
| Grades 16+ | Senior Officer & VP HR |

JA sends Job Description and Job Description Approval form to Appropriate Line/Function Rep and HR rep

All Approve → Special Comp needed? — No → End of Process

Special Comp needed? — Yes → Special Comp Process

Someone Disapproves → Back to JA for more Analysis → Back To ECA Process

No consensus → In Depth Resolution Process

19

JOHN DEERE

CONFIDENTIAL

JD-000819

## PROPOSED JOB EVALUATION PROCESS

**Grade Resolution Process**



| | Dispute Resolution Levels: | |
|---|---|---|
| | **LEVEL 1** | **LEVEL 2** |
| Grades 1–10 | Enterprise HR Director | VP HR |
| Grades 11–15 | VP HR | Sr. VP HR |
| Grades 16+ | Senior VP HR | Executive Committee |

Line/Functional Rep & HR Rep cannot agree on Description and/or Grade

**Level 1**

Job Description Approval form completed with rationale for appeal & supporting documentation → Level 1 decision → Agree with Appeal → Back To EO Process

Level 1 decision → Deny Appeal → Approval Form Returned with Reason for denial → Resolution Accepted? → Yes → Dispute Resolved Possible Special Comp needed

Resolution Accepted? → No

**Level 2**

Job Description Approval form completed with rationale for appeal & supporting documentation → Level 2 decision → Agree with Appeal → Back To EO Process

Level 2 decision → Deny Appeal → Dispute Resolved Possible Special Comp needed

20



JOHN DEERE

**CONFIDENTIAL**

JD-000820

# PROPOSED JOB EVALUATION PROCESS

## Special Compensation Process



**Approval Levels:**

| | |
|---|---|
| Grades 1–10 | Unit or Department Head & Enterprise HR Mgr |
| Grades 11–15 | Senior Position reporting to Sr. Officer, VP HR & Enterprise HR Directors |
| Grades 16+ | Senior Officer & VP HR |

JOHN DEERE

CONFIDENTIAL

JD-000821