UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF IOWA
EASTERN DIVISION

| | |
|---|---|
| MICHAEL JOSEPH SELLERS,<br><br>      Plaintiff,<br><br>v.<br><br>DEERE & COMPANY a/k/a JOHN DEERE COMPANY, CLYDE D'CRUZ, individual,<br><br>      Defendants. | No. 12-cv-02050-JSS<br><br><br>**BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** |

**Table of Contents**

Introduction ............................................................................................................................1

Factual Background ...............................................................................................................2

    A.    Sellers's employment with Deere. ...........................................................2

    B.    With consultation from Hay Group, Deere implemented a company-wide job grade evaluation. .......................................................................2

    C.    Sellers's job grade, pay, and benefits did not change following GJE. ....................4

    D.    Sellers takes medical leave—and never returns to work. ........................................4

    E.    While on medical leave, Sellers lodges an internal complaint. ..............................4

    F.    While on medical leave, Sellers files an EEOC charge against Deere. ..................4

    G.    Sellers has been receiving disability benefits from Deere and SSDI from the Social Security Administration based on his claimed total disability. ..............................................................................................................5

Argument ...............................................................................................................................5

I.    Sellers's disparate treatment age discrimination claims fail as a matter of law because Sellers did not experience a materially adverse employment action under circumstances giving rise to an inference of age discrimination. .......................................................................5

i

A.    Sellers cannot establish a prima facie case to support his disparate-treatment age-discrimination claims because none of the complained-of conduct constitutes an adverse employment action under the anti-discrimination statutes at issue..............................................................7

    1.    The dynamic nature of Sellers's job as a Process Pro was not an adverse employment action....................................................8

    2.    Because Sellers was not demoted, he cannot establish that he experienced an adverse employment action. .............................10

    3.    D'Cruz and Jerauld's decision to hold Sellers responsible for the audit failure was not an adverse employment action. .........11

    4.    An isolated "does not meet expectations" performance evaluation is not an adverse employment action, particularly since Sellers did not experience a demotion, job transfer, or reduction in pay.........................................................................13

    5.    The GJE mapping of Sellers's position to Grade 7 was not an adverse employment action......................................................14

    6.    D'Cruz's alleged conduct did not constitute an adverse employment action...........................................................................16

    7.    Sellers's allegation that he was denied job opportunities is not an adverse employment action..............................................16

B.    Sellers cannot show the complained-of conduct gives rise to an inference of age discrimination.............................................................17

    1.    The rigorous multi-review GJE framework does not give rise to an inference of age discrimination........................................18

    2.    D'Cruz's remarks and conduct unrelated to the decisional process at issue are not evidence of discrimination. ...................18

C.    Sellers cannot prevail on his disparate-treatment age-discrimination claims because he cannot show that any alleged adverse employment action was a pretext for age discrimination. .........................................19

    1.    Sellers's own opinion regarding his job performance fails to show pretext for age discrimination..........................................20

    2.    GJE was not a pretext for age discrimination. ...........................21

Case 6:12-cv-02050-JSS   Document 84-9   Filed 02/03/14   Page 2 of 74

3.  Sellers's criticism of D'Cruz's management style does not show that Deere's reasons for the complained-of conduct were false or motivated by Sellers's age....................22

4.  Other statements made that had no relationship to Sellers, his work, or any employment decision at issue in this case are not evidence of pretext.....................................23

II.  Sellers's disability-discrimination claim under the ADA fails as a matter of law because Sellers did not experience a materially adverse employment action under circumstances giving rise to an inference of disability discrimination....................................25

A.  Sellers cannot establish a prima facie case to support his disparate-treatment disability-discrimination claim. .........................................25

1.  While Sellers was actively working, Sellers was not "disabled" under the ADA and ICRA. ..............................26

2.  As already discussed, Sellers did not experience an adverse employment action.............................................28

B.  Sellers cannot show that the complained-of conduct gives rise to an inference of disability discrimination, and he cannot show that any alleged adverse employment action was a pretext for disability discrimination. .........................................................28

C.  Sellers was not denied a reasonable accommodation under the ADA..................29

D.  Sellers cannot reconcile his inconsistent assertions that he was disabled for purposes of SSDI benefits and that he could perform the essential functions of his position with or without reasonable accommodation. .................................................31

III.  Sellers's retaliation claims fail because he experienced no adverse action, cannot show a causal connection between any protected activity and any alleged adverse action, and has no evidence of pretext..................................................32

A.  Before March 31, 2005, Sellers did not engage in protected activity. ..................32

B.  For the reasons discussed, Sellers's prima facie retaliation claim fails because none of the alleged adverse actions caused a material change in his employment.........................................35

1.  The dynamic nature of Sellers's job was not an adverse action....................................................36

2.  Alleged defamatory comments made by Jerauld after Sellers's last day of work was not an adverse action. ...............37

3.        Inaction by human resources was not an adverse action. ..........................37

4.        Sellers's speculative allegation regarding home computer surveillance is unsupported by any facts and in any event is not an adverse action.................................................................38

5.        A meeting with Kevin Keith and Dr. Harding is not an adverse action..............................................................38

C.      Sellers cannot satisfy the causation element of his retaliation claim....................38

D.      Sellers's suspicions and conjecture of a retaliatory motive are insufficient to show pretext...................................................................39

IV.     Because civil rights laws do not protect against the complained-of conduct here, Sellers cannot generate a material fact dispute regarding his harassment claims. ....................................41

A.      Because the complained-of conduct does not constitute harassment, Sellers's hostile-work-environment claims fail. ......................................42

B.      The complained-of conduct did not alter the terms or conditions of Sellers's employment. ..............................................................46

V.     Sellers's wage-discrimination claim under Iowa Code § 216.6A fails because he did not earn any "wages" during the time period in question. ...................................................46

VI.    Sellers may not pursue claims that he failed to administratively exhaust. .......................47

VII.   Because Sellers failed to exhaust his administrative remedies against individual defendant Clyde D'Cruz, Sellers is barred from pursuing statutory discrimination and retaliation claims against D'Cruz. ...........................................................................49

VIII.  Sellers's discrimination and retaliation claims are barred by the doctrine of laches. ........50

A.      Sellers's unreasonable and inexcusable delay in filing this lawsuit supports dismissal under the laches doctrine. .......................................52

B.      Sellers's seven-year delay in filing this lawsuit has prejudiced Deere's and D'Cruz's ability to defend themselves in this case because key memories have faded. .......................................56

IX.    Sellers's slander and defamation claim is barred by the statute of limitations and fails on the merits..................................................................................58

A.      Sellers's defamation claim accrued in 2007 and is untimely. ...............................58

B.      Seller's defamation claim fails on the merits because all alleged statements are either hearsay, were protected opinion, were privileged, or were not published to a third person. .............................60

iv

1.     Sellers's claim regarding the alleged statement by Jerauld in her home is based solely on inadmissible hearsay. ...................................61

2.     The statements regarding Sellers's work performance are protected opinion. ......................................................................61

3.     To the extent that Sellers's claim is based on supervisors making statements about Sellers's job performance, the statements are protected by qualified privilege. .......................................62

4.     In any event, Sellers cannot generate material facts to show publication. .............................................................................64

X.     Sellers's settlement of a workers' compensation claim based upon the same facts and alleged injuries bars his claims in this case. .................................................64

XI.     Even if Sellers can establish a claim for age or disability discrimination or retaliation, his wage damages are limited by the amounts Deere has already paid him in long-term disability benefits. .................................................................................................67

Conclusion .................................................................................................68

## Introduction

Statutory anti-discrimination laws are designed to remedy materially adverse employment actions that are motivated by age, disability, and other protected characteristics. Their purpose is not to address the conduct that Michael Sellers complains about in this case: a philosophical difference in opinion over the value of certain jobs within Deere's organization; disagreement with management style; petty slights and hurt feelings; and a general unhappiness with Deere's employment environment. Absent a materially adverse employment action, Sellers's discrimination and retaliation claims fail. His discrimination and retaliation claims also fail because Sellers cannot generate an issue of material fact that shows Deere's business reasons for the complained-of conduct is a pretext for discrimination or retaliation. The doctrine of laches, which is founded in principles of equity and fairness, prohibits a plaintiff from indefinitely delaying the commencement of a legal action. That doctrine squarely applies in this case—Sellers waited seven years to file his claims with the Court. His statutory discrimination and retaliation claims may be dismissed for this reason.

Sellers also failed to administratively exhaust any claims against individual defendant Clyde D'Cruz, which alone warrants D'Cruz's dismissal from this case.

The other claims fail as a matter of law. Sellers's wage claim under Iowa Code section 216.6A is predicated upon the payment of wages that occurred prior to the enactment of that statute. His defamation claim is also untimely—the complained-of conduct occurred outside the statutory limitations period, and is based on statements that are either hearsay, were privileged, or were not published to a third person.

In short, Sellers cannot generate a disputed issue of material fact on any of his claims. Summary judgment is appropriate.

**Factual Background**

A.      **Sellers's employment with Deere.**

Sellers began working at Deere in 1979. App. 68-69; Second Amended Comp. ¶ 10 (Docket No. 45). On April 1, 2002, Sellers became a Grade 7 Process Pro in Deere's Supply Management Department. App. 68. In March 2005, when Sellers went off work on medical leave, Sellers was a Grade 7 Process Pro. *Id.*

In 2002, Sellers began reporting to Clyde D'Cruz, who took charge of Supply Management after Deere recruited him from a competitor manufacturer. App. 68, 7, 8-9, 11. In August 2003, Daria Jerauld became Manager of Supply Management Business Processes. App. 49. In that position, Jerauld reported directly to D'Cruz; Sellers reported to Jerauld. App. 13, 18, 49.

B.      **With consultation from Hay Group, Deere implemented a company-wide job grade evaluation.**

In or around 2002, Deere began a process to evaluate the job Grades of each position in its organization through the Global Jobs Evaluation process ("GJE"). App. 563. GJE is a systematic process for creating a hierarchy of jobs based on their content and value to Deere. App. 575. It is a formal job evaluation system that produces consistent results. App. 562. Deere used GJE to assess the work level of salaried employees at Deere on a global level. App. 238, 244. One of Deere's objectives for implementing GJE was to achieve an improved consistency in job grading and outcomes. App. 582. Deere hired the Hay Group, an independent global management consulting firm, to provide consulting services for the implementation of GJE at Deere. App. 574, 239. The Hay method of job evaluation is the most widely used proprietary job evaluation methodology in the world. It is used by an estimated 8,000 organizations, including

2

half the Fortune 50 organizations, in over 30 countries. App. 577. GJE was designed with multiple levels of review to ensure consistency in job grading and outcomes. App. 582, 239.

Functional review committees examined the accuracy and consistency of all evaluations of jobs within a "function"—or area of work such as Supply Management. App. 585, 566. Functional review committees consisted of Deere employees with knowledge of the function under consideration, human resources representatives, and Hay consultants. App. 241, 244. Functional review committees developed job families—groups of jobs having the same nature of work but requiring different levels of skill, effort, and responsibility. App. 585. Each position at Deere fit into a job family. App. 241. A job family began with entry-level professional jobs and ended at the technical level mastery level. App. 240. By the very nature of job families, jobs within job families had grade variances. App. 246.

Functional review committees also developed "level cutters," which were concise descriptions of the characteristics—major purpose and major duties—of the levels in a job family. App. 585. Functional review committees approved a preliminary benchmark jobs list. App. 566. The functional review committee provided feedback on the preliminary benchmark jobs list. App. 566-67. The benchmark jobs list evolved over time to a final validated benchmark jobs list. App. 567-68.

Positions were mapped to a job grade with guidance from Hay. App. 586. Functional review committees contributed to and reviewed the mapping to ensure consistency. App. 586. Cross-functional review committees also examined mappings to ensure cross-functional consistency. App. 586. All evaluations of benchmarked positions were reviewed by the following groups to ensure consistency: (1) the GJE project team; (2) the functional review

3

committees; (3) cross-functional review committees; (4) a "blue-ribbon" cross-functional review committee of company executives; and (5) Deere's Senior Vice Presidents. App. 587.

### C. Sellers's job grade, pay, and benefits did not change following GJE.

Sellers's pre-GJE position, Process Pro, mapped to Grade 7. App. 644-649, 650-658. Both before and after GJE, Sellers remained at Grade 7. App. 68. Sellers's pay, salary, and job duties did not change following GJE. App. 19, 68, 534-535.

### D. Sellers takes medical leave—and never returns to work.

On March 1, 2005, Sellers took medical leave from work. App. 599, 496. At that time, Sellers continued to be a Grade 7 Process Pro. App. 68, 249.

### E. While on medical leave, Sellers lodges an internal complaint.

On March 31, 2005, Sellers emailed a written complaint to five Deere managers. Jerauld and D'Cruz were not recipients of that email. App. 777-793. At that time, Sellers had been on medical leave since March 1, 2005.

### F. While on medical leave, Sellers files an EEOC charge against Deere.

Sellers filed an EEOC claim on April 26, 2005—nearly two months after he stopped working. Second Amended Complaint ¶ 7 (Docket No. 45); App. 599, 496. In that charge, Sellers complained that he had been:

> Bombarded with more work and job responsibilities, received a negative performance review, was blamed and rated lower on [his] review because of the audit results which [he] had little responsibility for, was no longer allowed to use the conference room and was not given credit for projects [he] had successfully developed and implemented.

App. 541-542. Sellers also complained that his workload was unmanageable; he continued to have supervisory duties; he was accused of lying to the auditors; and he was held responsible for the audit. App. 541-542.

4

G.     **Sellers has been receiving disability benefits from Deere and SSDI from the Social Security Administration based on his claimed total disability.**

After taking medical leave on March 1, 2005, Sellers never returned to work. Sellers considers himself totally disabled and unable to return to his Process Pro job. Since April 1, 2006, Deere has paid him long-term disability benefits. App. 599, 496, 600, 513, 633-634. Sellers also applied for, and received, SSDI from the Social Security Administration, based on his representations to the federal government that he is totally disabled and unable to perform substantial gainful activity. App. 611, 613-626.

## Argument

I.     **Sellers's disparate treatment age discrimination claims fail as a matter of law because Sellers did not experience a materially adverse employment action under circumstances giving rise to an inference of age discrimination.**

Sellers pleaded disparate-treatment age discrimination under the ADEA (Count III) and section 216.6 of the ICRA (Count IV). Because Sellers relies on nearly identical allegations for each of these claims, Defendants analyze these claims together.[1]

Absent evidence of direct discrimination—and Sellers must concede he lacks direct evidence—Sellers's age-discrimination claims are evaluated under the *McDonnell-Douglas*[2] framework. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993); *Holmes v. Trinity Health*, 729 F.3d 817, 821-22 (8th Cir. 2013); *Smidt v. Porter*, 695 N.W.2d 9, 14 (Iowa 2005); *Hulme v. Barrett*, 449 N.W.2d 629, 632 (Iowa 1989). At the first step of the analysis, the plaintiff has the burden to establish a prima facie case of age discrimination. *Ridout v. JBS USA, LLC*, 716 F.3d 1079, 1083 (8th Cir. 2013) (describing burden-shifting framework for ADEA and

---

[1] Contrary to Sellers's assertion that a portion of his lawsuit is brought pursuant to Title VII, he has not pleaded any claim under Title VII. Second Amended Complaint (Docket No. 45). The only mention of Title VII is in the "introduction" and "parties" portion of his Second Amended Complaint. Second Amended Comp. ¶¶ 1, 4 (Docket No. 45).

[2] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03 (1973).

ICRA claims). If a plaintiff meets his prima facie case, it "creates a presumption that the employer unlawfully discriminated against the plaintiff and shifts the burden to the employer to articulate a legitimate nondiscriminatory reason for its actions." *Id.* (citing *Davis v. Jefferson Hosp. Ass'n*, 685 F.3d 675, 681 (8th Cir. 2012)). If the employer meets its burden, "the presumption of discrimination dissolves and the burden returns to the plaintiff to demonstrate that the proffered reason is a mere pretext" for discrimination. *Id.*

On the issue of causation, the analysis diverges. Under the ADEA, Sellers must satisfy a high standard: he must establish that age was the but-for cause of the employer's adverse employment action. *See Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177-78 (2009). Under the ICRA, Sellers must show that age "'played a part' in the adverse employment action, and that the factor 'need not have been the only reason' for the employer's action." *Newberry v. Burlington Basket Co.*, 622 F.3d 979, 982 (8th Cir. 2010) (citing *DeBoom v. Raining Rose, Inc.*, 772 N.W.2d 1, 13 (Iowa 2009)).

To establish a prima facie case of age discrimination under both the ADEA and the ICRA, Sellers must show that he: (1) is a member of a protected class; (2) was meeting his employer's legitimate job expectations; (3) suffered an adverse employment action; and (4) was treated differently than similarly situated employees who were not members of his protected class. *See Jackman v. Fifth Judicial Dist. Dep't of Corr. Servs.*, 728 F.3d 800, 804 (8th Cir. 2013); *Holmes*, 729 F.3d at 822-23; *DeBoom*, 772 N.W.2d at 6.

Sellers cannot satisfy two elements of his prima facie case—that he suffered an adverse action or that the complained-of conduct occurred under circumstances giving rise to an inference of age discrimination. Sellers's age discrimination claims also fail because he cannot

prove that Deere's legitimate non-discriminatory reasons for the complained-of conduct are a pretext for age discrimination.

> **A.** **Sellers cannot establish a prima facie case to support his disparate-treatment age-discrimination claims because none of the complained-of conduct constitutes an adverse employment action under the anti-discrimination statutes at issue.**

Sellers identifies multiple allegedly adverse actions in his disparate treatment age discrimination claims: (1) the dynamic nature of his Process Pro job, his fluid work assignments, and his heavy workload; (2) an alleged "demotion"; (3) D'Cruz and Jerauld's decision to hold him responsible for a procurement audit failure; (4) a "does not meet expectations" performance evaluation in 2004; (5) the GJE mapping of his position to Grade 7; (6) conduct by his supervisor, Clyde D'Cruz, toward him; and (7) denied job opportunities. App. 603-604.

"Proof of an adverse employment action requires a 'tangible change in duties or working conditions that constitute a material disadvantage.'" *Phillips v. Collings*, 256 F.3d 843, 848 (8th Cir. 2001) (citation omitted). "[A]n adverse employment action is exhibited by a material employment disadvantage, such as a change in salary, benefits, or responsibilities." *LaCroix v. Sears, Roebuck, & Co.,* 240 F.3d 688, 691 (8th Cir. 2001). "[N]ot everything that makes an employee unhappy is an actionable adverse action." *Montandon v. Farmland Indus., Inc.*, 116 F.3d 355, 359 (8th Cir. 1997). None of the complained-of conduct that Sellers identifies is an adverse action.

In short, Sellers was not demoted, terminated, reassigned, or suspended. He did not lose any compensation or privileges. He elected to cease actively working for Deere by taking medical leave and later applied for long term disability benefits and SSDI. As a result, Sellers cannot establish a prima facie case of age discrimination.

7

1. **The dynamic nature of Sellers's job as a Process Pro was not an adverse employment action.**

Sellers maintains that Deere devised a "scheme" to set him up for failure by giving him new assignments and changing job expectations. App. 603. He inconsistently contends both that he was given too much work and that his work responsibilities were removed. *Id*. Either way, one fact is not in dispute: Sellers held the Grade 7 Process Pro position from April 1, 2002 until he stopped working on March 1, 2005, when he decided to take a medical leave of absence. App. 68, 599, 496.

On April 1, 2002, Sellers accepted a position as Process Pro. App. 68, 13. Before the change, D'Cruz and Sellers discussed the Process Pro position. App. 20. D'Cruz authorized that lateral move for Sellers because "Mike had a lot of good ideas," and it was an opportunity for Sellers to develop leadership skills. App. 18, 20. In April 2002, D'Cruz confirmed the job expectations with Sellers in writing. App. 36-39. When Sellers accepted the opportunity, he experienced no change in pay, benefits, hours, or grade; he continued to hold a Grade 7 position. App. 19, 68.

The Process Pro position was dynamic and the projects assigned could change from week to week. App. 503, 22-23, 53. Sellers was responsible for troubleshooting problems that would come up on short notice. App. 517. D'Cruz considered Sellers—in the Process Pro role—Supply Management's "Man Friday." App. 19.

In December 2002, Sellers described in detail the many responsibilities he believed he had through the Process Pro position. App. 765-766. On a daily basis, he performed multiple tasks—facilitating meetings, holding people accountable, helping teams work through Six Sigma processes, performing statistical analysis, and documenting processes. App. 53. By Sellers's own account, his primary responsibilities included process management; supporting development of

8

annual goals, plans, and metrics; facilitating departmental planning and update meetings; serving as project leader for quality or process improvement; and facilitating development of Supply Management employees and talent. App. 765-766. As to process management, Sellers described his responsibilities to include "[d]evelop[ing] new processes which are needed (bailment) and improv[ing] existing ones" and "[f]acilitat[ing] correction action on ISO audit issues." App. 766.

Around 2003, D'Cruz asked Sellers to create a document describing the Process Pro position. App. 527. Sellers even participated in the process of completing a PAQ for GJE as it related to his Process Pro position in April 2003. App. 650-658. Once again, Sellers identified no less than eight general job duties, such as "process development" and "process management," that reflected the fluid nature of Process Pro work. App. 527, 548-549, 650-658.

Sellers's current complaint about new projects and changing work assignments is nothing more than a complaint about the nature of the Process Pro job itself—a position that he willingly accepted in 2002. Performing responsibilities within the scope of one's job duties is not an adverse employment action. *See Brown v. Truman Med. Ctr.*, 09-0592-CV-W-HFS, 2010 WL 5173178, at *2 (W.D. Mo. Dec. 14, 2010) ("The job duties plaintiff complains of performing are admittedly within the scope of his work responsibilities, and although his female colleagues may not perform these functions as frequently as he, this does not reach the level of an adverse employment action."). Sellers admits that his responsibilities changed from week to week, and as a Process Pro, he was responsible—on short notice—for troubleshooting and projects. App. 503, 517. In retrospect, he may not have adapted well to the work, but it was the job that he had—and Sellers offers no evidence to show that the work associated with the Process Pro position was in some way motivated by age-based animus.

Sellers alleges he was "unjustifiably stripped of supervisory responsibilities." App. 534, 604. As a Process Pro, Sellers was not a supervisor. App. 18, 34, 51, 650-658, 548-549. He did not have authority to take any tangible employment action against a co-worker, such as hiring, firing, promoting, reassignment, or changing benefits. App. 51. As Sellers's own work product reflects, as a Process Pro, Sellers did lead teams. App. 548-549 (facilitated development of Supply Management employees); ("coach/mentor people within the department."). And Jerauld did assign Sellers some discrete tasks to provide Sellers with leadership development opportunities. App. 51, 500.

Sellers admits that he could not keep up with his workload. He told the EEOC that in January 2005, he "informed Daria that [his] workload had become unmanageable." App. 542. Assuming for summary judgment purposes that Sellers was not keeping up, it was not an adverse employment action for his supervisor to adjust his work assignments in a manner that would allow him adequate time and opportunity to focus on performing his job successfully. This type of minor change in working conditions is not an adverse employment action when there is no reduction in pay or benefits. *Spears v. Missouri Dep't of Corr. & Human Resources*, 210 F.3d 850, 853 (8th Cir. 2000). Even if Sellers could establish that he had supervisory duties that were later removed, that change would not constitute adverse employment action because there was no change to his salary, benefits, or any other material aspect of his employment. *Id.* at 854.

2.     **Because Sellers was not demoted, he cannot establish that he experienced an adverse employment action.**

Sellers alleges he was demoted. The only basis for this belief on his part is that he "saw it . . . on a performance management document in 2005." App. 534. A 2003 performance evaluation apparently had an inaccurate reference to Sellers as a Supply Management Specialist. App. 755. That reference did not change the fact that in 2003, Deere classified Sellers as a

Process Pro. App. 68. And whatever Sellers believes he may have seen in 2005, Deere's records reflect that he continued to hold the Process Pro position until March 2005, when he took medical leave and stopped working. App. 18, 51, 68, 249. Even Sellers considered himself a Process Pro in 2005, as reflected in emails that he sent in January and March 2005. App. 767-768. Because Sellers was not demoted, he cannot establish an adverse action.

3.    **D'Cruz and Jerauld's decision to hold Sellers responsible for the audit failure was not an adverse employment action.**

Sellers also believes that he was subject to an adverse action when D'Cruz and Jerauld held him responsible for a failed bailment and tooling agreement audit in 2004. App. 603-604. Sellers contends that they wrongly held him responsible instead of blaming others. *Id*. It is difficult to reconcile Sellers's current allegation that he was wrongly blamed for the audit failure, when Sellers himself commented on his 2004 performance evaluation in regards to bailment and tooling agreement compliance, that he "did not complete goal and failed to pass our recent procurement audit." App. 753.

Without question, tooling and bailment agreement compliance was Sellers's responsibility. In August 2002, D'Cruz assigned Sellers responsibility to ensure that tooling and bailment agreement compliance was met.[3] App. 40-42, 25, 550-556. At that time, D'Cruz explained to Sellers—in writing—his expectation: "I want a clean audit next time around." App. 552-554.

Later that same year, D'Cruz informed Supply Management personnel that he had selected Sellers to handle the significant responsibility for tooling and bailment agreement compliance. In that announcement, D'Cruz explained:

---

[3] Compliance is important because when a supplier must purchase an expensive tool to make a part, Deere is typically responsible for procuring the tool; that is, Deere is responsible for paying the supplier to have the tool made. Deere held title to the tool it paid for and which the supplier used. App. 484. This is a tooling bailment agreement App. 485.

> Mike Sellers will be the champion to make sure we are complying with the corporate audit recommendations. A true testament to whether Supply Management is doing the basics will be the next audit which I hope will show we got our act together.

App. 551. D'Cruz also indicated that Supply Management would be responsible for the procurement audit so that they would not have to wait for the next audit to "nab [them] for not doing the fundamentals." App. 551.

At one time, even Sellers considered the bailment compliance responsibilities a "must" for his job as Process Pro. App. 548-549. In 2003, Sellers outlined in his own performance management evaluation that a primary responsibility was to "Design a bailment agreement process by 31 Oct. 03." App. 756. At mid-year in 2003, Sellers reported he was "on schedule" and indicated to D'Cruz that "95% of bailment agreements are in place and we are working on the balance." App. 756. He also reported "Bailment Process Improvements – On Target." App. 758.

In 2004, one of Sellers's primary job responsibilities was to "maintain bailments as current." App. 753. In March 2004, D'Cruz asked Jerauld to make sure things were "under control on all of the items for Waterloo with physical verification or audit." App. 555. In response, Jerauld sent Sellers an email requesting that Sellers follow up and report back by month-end. App. 555. Sellers periodically reported that he was making progress and that John Deere was 90 percent compliant. App. 61, 753.

On September 7, 2004, the procurement audit revealed that bailing agreements were at 57 percent—as opposed to the 90 percent that Sellers had been representing. App. 60, 224. The audit findings did not line up with what Sellers had been reporting to Jerauld prior to the audit. App. 64. In Jerauld's view, Sellers misrepresented to the audit staff that the bailing and tooling

information collected was current when in all reality it had not been updated in months. App. 61-62.

In an effort to allow Sellers to recover from the situation that he created with the audit, Jerauld allowed Sellers to continue his work, while behind the scenes other individuals were double-checking his work. App. 62-63. And as discussed, Sellers kept his Process Pro position following the 2004 audit. He was not demoted. His grade remained the same – Grade 7. His pay was not reduced. Jerauld and D'Cruz's assessment that Sellers was responsible for the failed audit was not a materially adverse employment action. *See Jackman*, 728 F.3d at 804 (citing *Wilkie v. Dep't of Health & Human Servs.*, 638 F.3d 944, 955 (8th Cir. 2011)).

### 4. An isolated "does not meet expectations" performance evaluation is not an adverse employment action, particularly since Sellers did not experience a demotion, job transfer, or reduction in pay.

Sellers contends that the "does not meet expectations" performance evaluation rating that Jerauld gave him in late 2004 was an adverse employment action. App. 603-604. The mere fact that Sellers received "does not meet expectations" on his 2004 review—without any indication that Sellers suffered a material disadvantage as a result of the action—does not constitute adverse employment action. *See Montgomery v. John Deere & Co.*, 169 F.3d 556, 559-60 (8th Cir. 1999) (insufficient to support a finding of age discrimination where an employee had never received an unsatisfactory review previously and was referred to as an "old fart"); *Spears,* 210 F.3d at 854 (holding poor performance rating does not in itself constitute an adverse employment action when it has no tangible effect upon the recipient's employment).

While Sellers characterized the unsatisfactory review as career ending, his supervisor did not share that view. Jerauld stated in the performance review that she "value[d] [him] as a member of the team" and was "look[ing] forward to a better 2005," App. 179, suggesting Sellers's continued employment in that role.

13

And while Sellers contends that he did not receive credit for his good performance in 2004, his supervisor acknowledged some success. Jerauld explained that "while your year-end rating does not fully meet, that is not a totally negative rating." App. 179. Jerauld noted that Sellers "did get credit for the solid work you did in parameter management, manifest and order stability. Plus you did very well in ad hoc requests that came up throughout the year." App. 179. Jerauld also explained that in 2005 she planned to work with him more closely to "help you meet (or even do better!) your job responsibilities, stretch goals and competencies." App. 179.

At Deere, a poor performance review is not indicative of future adverse employment action. App. 179, 29. "An unfavorable evaluation is actionable only where the employer subsequently uses the evaluation as a basis to detrimentally alter the terms or conditions of the recipient's employment." *Spears*, 210 F.3d at 854 (citation omitted). Even performance ratings that have a negative impact on promotion potential do not alone constitute an adverse employment action. *See Turner v. Gonzales*, 421 F.3d 688, 696 (8th Cir. 2005). Given that Sellers's 2004 performance evaluation did not result in a detrimental alteration to the terms of his employment, with no demotion or cut in pay, he is unable to establish an adverse employment action.

5. **The GJE mapping of Sellers's position to Grade 7 was not an adverse employment action.**

Sellers belatedly claims he was subject to an adverse action through the GJE process which mapped his position to Grade 7. Prior to filing this lawsuit, Sellers never complained about his GJE mapping and he never included his GJE mapping in the administrative charge that he filed with EEOC. App. 541-542. Because Sellers did not exhaust this discrete employment action in his administrative charge, he may not seek relief for that alleged action in this case. *See*

*Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 109 (2002); *Richter v. Advance Auto Parts, Inc.*, 686 F.3d 847, 850-51 (8th Cir. 2012).

Even if the Court considers this claim, to prevail, Sellers must prove that he was subject to an adverse action due to GJE. He cannot meet his burden based on this element. An adverse employment action is "a material employment disadvantage, such as a change in salary, benefits, or responsibilities." *Sallis v. Univ. of Minn.*, 408 F.3d 470, 476 (8th Cir. 2005). Pursuant to the GJE, Sellers's job was mapped to a Process Pro at Grade 7—the same position and grade that Sellers held before the GJE. App. 68, 644-658. Sellers admits he was at Grade 7 prior to the GJE. Second Amended Complaint ¶ 14 (Docket No. 45). After GJE, Sellers continued to be Grade 7. App. 68. Sellers did not experience any change in pay, benefits, or working conditions following the GJE implementation. App. 534-535.

Absent a reduction in pay, job grade, or benefits following GJE, Sellers cannot prove his prima facie case. An employee's unchanged pay grade or job role cannot give rise to an adverse employment action. *Clegg v. Ark. Dep't of Corr.*, 496 F.3d 922, 927-28 (8th Cir. 2007); *see also Delgado-O'Neil v. City of Minneapolis*, 745 F. Supp. 2d 894, 902 (D. Minn. 2010) (no adverse action when the complained-of conduct resulted in no change in job grade); *Lisdahl v. Mayo Found. for Med. Educ. & Research*, 698 F. Supp. 2d 1081, 1106 (D. Minn. 2010) (an employee who had "the same seniority, and the same pay" before and after the complained-of conduct could not prove an adverse employment action); *cf. Singletary v. Mo. Dep't of Corr.*, 423 F.3d 886, 891 (8th Cir. 2005) (being placed on administrative leave not adverse action where plaintiff "maintained his pay, grade, and benefits"). Because Sellers cannot show the GJE mapping was an adverse employment action, his disparate treatment claim fails.

6. **D'Cruz's alleged conduct did not constitute an adverse employment action.**

Sellers contends that he suffered an adverse employment action based on D'Cruz's alleged conduct. He claims that D'Cruz constantly "harassed, belittled, intimidated, and demeaned" him. App. 603. Case law reflects that, even if the alleged facts are true, this is not an adverse employment action. *See Scusa v. Nestle U.S.A. Co., Inc.*, 181 F.3d 958, 969 (8th Cir. 1999) (teasing, yelling, fist shaking, banging a fist on a table, rude comments, hateful looks, dirty jokes, shunning, and car vandalism, among other actions, did not constitute adverse employment action because there was no diminution in pay or benefits). Absent any discrete employment action, Sellers's allegations regarding D'Cruz's purported conduct fail to establish the requisite adverse action for his prima facie case.

7. **Sellers's allegation that he was denied job opportunities is not an adverse employment action.**

Without specificity, Sellers alleges he was denied job opportunities. Like Sellers's GJE mapping claim, Sellers asserts he was denied job opportunities for the first time in the course of this lawsuit. Before filing suit, Sellers never complained about the job opportunities that he was allegedly denied, and he never included this allegation in the administrative charge that he filed with the EEOC. App. 541-542. The Court should not consider these allegations because Sellers did not administratively exhaust them. *See Morgan*, 536 U.S. at 109; *Richter*, 686 F.3d at 850-51.

Even if the Court considers this allegation, Sellers failed to establish an adverse action. Sellers alleges that he was supposed to be promoted to Grade 8. App. 533. Sellers's allegation is based on nothing more than a hunch. Sellers admits that he was never told he would receive a grade change. App. 533. Instead, he believes D'Cruz "suggested" he would get a grade increase. App. 533. A mere suggestion does not amount to a guarantee.

16

In addition, Sellers believes that he should have been given Jerauld's job in August 2003. App. 538. To the extent Sellers belatedly seeks to assert a failure-to-promote claim based on not getting Jerauld's position (a claim that he neither administratively exhausted nor pleaded) he must show that he applied for a position for "which the employer was seeking applicants." *Chambers v. Wynne Sch. Dist.*, 909 F.2d 1214, 1216 (8th Cir. 1990). Sellers has presented no evidence that he applied for that position. A general expression of interest in a position "without submitting an application is not enough to establish a prima facie . . . case" of discrimination. *Smith v. J. Smith Lanier & Co.*, 352 F.3d 1342, 1345 (11th Cir. 2003) (citations omitted). There can be no discrimination if Sellers did not even discuss Jerauld's position with D'Cruz. As such, any claim based on a failure-to-promote theory fails, not only because Sellers failed to exhaust or plead it, but also because Sellers cannot present a scintilla of evidence to support it.

B.     **Sellers cannot show the complained-of conduct gives rise to an inference of age discrimination.**

Even if Sellers could point to a materially adverse employment action to support his disparate-treatment age-discrimination claims, which he cannot, his prima facie case fails because he cannot prove that he suffered adverse action under circumstances giving rise to an inference of discrimination. *See Fitzgerald v. Action, Inc.*, 521 F.3d 867, 876-77 (8th Cir. 2008) (holding absence of evidence of an inference of discrimination warranted summary judgment on age-discrimination claim). An inference of discrimination "arises when it is more likely than not that the employer's actions were based on unlawful discrimination." *Wierman v. Casey's Gen. Stores*, 638 F.3d 984, 993 (8th Cir. 2011). "One way a plaintiff can establish an inference of discrimination is to prove that [he] was treated less favorably than similarly-situated employees who were not in [his] protected class." *Id.* at 993-94 (citing *Johnson v. Legal Servs. of Ark., Inc.*, 813 F.2d 893, 896 (8th Cir. 1987)). "[C]omments [that] do not suggest discriminatory animus

without resorting to speculation" are insufficient to create an inference of discrimination. *Takele v. Mayo Clinic*, 576 F.3d 834, 839 (8th Cir. 2009).

1. **The rigorous multi-review GJE framework does not give rise to an inference of age discrimination.**

There is no dispute that Sellers was a Grade 7 both before and after GJE. Yet Sellers speculates that age discrimination occurred in the GJE because he was mapped to Grade 7. App. 604. Sellers's rank speculation that his age influenced the GJE outcome for his position is insufficient to support an inference of age discrimination. *See Elam v. Regions Fin. Corp.*, 601 F.3d 873, 880 (8th Cir. 2010).

Further, the multi-review framework of the GJE defeats an inference of discrimination. The PAQ analysis of Sellers's position, as well as the mapping of his position to the Process Pro job—the same job that Sellers held before GJE—was subject to myriad levels of examination, including management, human resources, job analysts, the GJE project team, functional review committees, cross functional review committees, a blue ribbon cross-functional review committee, and Deere's Senior Vice Presidents. App. 587. Additionally, Sellers's job was analyzed with specificity by GJE analysts and committees. App. 644-649. Even Sellers provided input. App. 650. Sellers's speculative theory is insufficient to dispute these facts and create an issue for trial. "Evidence, not contentions, avoids summary judgment." *Haas v. Kelly Servs., Inc.*, 409 F.3d 1030, 1036 (8th Cir. 2005) (abrogated on other grounds by *Torgerson v. City of Rochester*, 443 F.3d 1031 (8th Cir. 2011).

2. **D'Cruz's remarks and conduct unrelated to the decisional process at issue are not evidence of discrimination.**

Sellers points to D'Cruz's alleged remarks. Sellers alleges that in 2001, D'Cruz said "We need to get all these old farts out of here." App. 497. Sellers claims D'Cruz made this type of comment between five to ten times with a variety of terminology such as "they've got way too

18

much baggage" or "they're no good to us." App. 497. Sellers did not think that these alleged comments related to any adverse impact on Sellers himself. App. 499.

Sellers also points to Kevin Keith's notes in a meeting notice involving himself and D'Cruz that related to an older employee considering a transfer to Waterloo Works. App. 604, 304, 250-251. Keith wrote the potential transferee's experience could "provide stability and experience to some of your numerous younger people." App. 304. The meeting notes did not relate to Sellers's Process Pro job, GJE, or his division within Supply Management. It is not clear how Keith's coaching to D'Cruz on managing a potential transferring employee has anything to do with an age discrimination claim.

Sellers has not introduced any evidence that shows that these alleged remarks were tied to any of the complained-of conduct at issue. They therefore cannot establish an inference of discrimination. Statements that have no connection to the decisional process at issue in a discrimination claim are characterized as "stray remarks." *Elnashar v. Speedway SuperAmerica, LLC*, 484 F.3d 1046, 1055 (8th Cir. 2007). "'Stray remarks' standing alone do not give rise to an inference of discrimination." *Fitzgerald v. Action, Inc.*, 521 F.3d 867, 876-77 (8th Cir. 2008) (citing *Fisher v. Pharmacia & Upjohn*, 225 F.3d 915, 922 (8th Cir. 2000)).

Sellers cannot generate material evidence that gives rise to a reasonable inference of discrimination. These claims fail as a matter of law.

   C.   **Sellers cannot prevail on his disparate-treatment age-discrimination claims because he cannot show that any alleged adverse employment action was a pretext for age discrimination.**

Even if Sellers establishes a prima facie age-discrimination claim, his claims fail because he cannot prove that Deere's legitimate business reason for taking the action in question was a pretext for age discrimination. For his ADEA claim, Sellers must generate a material fact issue that (1) Deere's legitimate nondiscriminatory reason was false; and (2) his age was a

determinative, or "but-for," factor in the adverse action. *See Bone v. G4S Youth Servs., LLC*, 686 F.3d 948, 954-55 (8th Cir. 2012); *see also Gross,* 557 U.S. at 177. "Thus, proof that the explanation is false is necessary, but not sufficient, to show a pretext for discrimination under the ADEA. In other words, the plaintiff must show that the employer's stated reason was false and that age discrimination was the real reason." *Tusing v. Des Moines Indep. Cmty. Sch. Dist.*, 639 F.3d 507, 516 (8th Cir. 2011). To show pretext for his ICRA claim, Sellers must show that (1) Deere's reasons for the alleged adverse action were false and (2) age was a "motivating factor" in the alleged adverse action. *See Newberry,* 622 F.3d at 982. To rebut Deere's evidence, Sellers "must point to enough admissible evidence to raise genuine doubt as to the legitimacy of the defendant's motive, even if that evidence does not directly contradict or disprove the defendant's articulated reasons for its actions." *Wierman*, 638 F.3d at 995 (citations and internal quotation marks omitted).

1. **Sellers's own opinion regarding his job performance fails to show pretext for age discrimination.**

Sellers predicates many of his theories on his disagreement with assessments made by his supervisors and company. Sellers disagrees with his "does not meet" performance review in 2004; his supervisors' decisions to hold him responsible for the 2004 failed bailment and tooling agreement audit; and his supervisors' decisions regarding work assignments. Sellers cannot establish pretext based on his own opinion about his qualifications and performance. *See Bullington v. United Air Lines, Inc.*, 186 F.3d 1301, 1318 (10th Cir. 1999), overruled on other grounds by *Morgan*, 536 U.S. at 116-19; *Torlowei v. Target*, 401 F.3d 933, 935 (8th Cir. 2005).

Moreover, as previously discussed, at the time, Sellers agreed that bailment and tooling agreement compliance was his responsibility, and he agreed that he failed. It was Sellers who added a November 30, 2004 comment to his performance evaluation noting that he did not

complete his goal to maintain bailments as current and "failed to pass our recent procurement audit." App. 753. Sellers also acknowledged in his year-end comments that:

> The major 'MISS' this year is in the area of Tooling bailments and passing our procurement audit. Prior audits have focused on improvement trends so I did not expect such a strict assessment of our status. Going forward, I need to do a better job of updating Supply Management managers on my progress, decision points, and performance slippages.

App. 754. Sellers's own acknowledgment that his performance in 2004 included a "major MISS" wholly contradicts his current allegation that he performed well in 2004 and was not responsible for the failed audit.

Additionally, Sellers cannot show that D'Cruz and Jerauld did not honestly believe that he was the person responsible for the failure. The 2004 audit was a "rather traumatic event" in Supply Management. App. 55. The "honest belief" rule applies in this circumstance to defeat Sellers's claim that by holding him responsible, D'Cruz and Jerauld discriminated against him. *Pye v. Nu Aire, Inc.*, 641 F.3d 1011, 1022 (8th Cir. 2011). Even if Sellers correctly asserts that someone else was at fault for the audit failure, that is not enough to prove discrimination. *See id.* Sellers must show that Deere acted with an intent to discriminate, not merely that the reason stated by Deere is incorrect. *Pulczinski v. Trinity Structural Towers, Inc.*, 691 F.3d 996, 1002 (8th Cir. 2012). Here, Deere had an honest belief that Sellers was responsible for the audit failure.

### 2. GJE was not a pretext for age discrimination.

Sellers's criticism of the effect of GJE fails to show that Deere's proffered reason for GJE implementation was pretextual or based on an age-based motive. As stated previously, GJE was implemented with multiple levels of review and cross-review to eliminate unfairness in the job grading process. App. 582, 239. The Process Pro position that Sellers held was subject to documented GJE review. App. 644-649; *see also* App. 650-658. Sellers even provided input.

21

App. 650. All evaluations of benchmarked and non-benchmarked positions were reviewed by numerous groups to ensure consistency. App. 587.

Sellers's own evaluation of what grade he should or should not have been is irrelevant. *See Messner v. Lockheed Martin Energy Sys.*, 126 F. Supp. 2d 502, 520 (E.D. Tenn. 2000). While the ground for Sellers's objection to his GJE grading is not entirely clear, he cannot show that Deere's decision to map his position at a Grade 7 is false, motivated, or determined by age. And Sellers cannot generate a genuine issue of material fact for trial by challenging the wisdom or correctness of Deere's assessment. Courts do not "sit as super-personnel departments reviewing the wisdom or fairness of the business judgments made by employers, except to the extent that those judgments involve intentional discrimination." *Rodgers v. U.S. Bank, N.A.*, 417 F.3d 845, 854 (8th Cir. 2005), abrogated on other grounds by *Torgerson*, 643 F.3d 1031 (citation omitted). "Only disputes over facts that might affect the outcome of the suit . . . will properly preclude the entry of summary judgment." *Elam*, 601 F.3d at 877 (citation omitted).

3. **Sellers's criticism of D'Cruz's management style does not show that Deere's reasons for the complained-of conduct were false or motivated by Sellers's age.**

Sellers's subjective criticism of the management style and personality of D'Cruz fails to show Deere's proffered reason is pretextual or based on an age-based motive. A supervisor and employee who "do not get along" is not pretext. *Barber v. C1 Truck Driving Training, LLC*, 656 F.3d 782, 798 (8th Cir. 2011). "Personality conflicts at work that generate antipathy are not actionable." *Id.* (citation and internal quotation marks omitted).

Furthermore, Sellers concedes that in 2002—when Sellers was over age 40—D'Cruz provided Sellers with a developmental opportunity in the Process Pro job. App. 20. Around that same time, in Sellers's view, D'Cruz expressed age-based animus against other employees; then, two years later, D'Cruz held Sellers responsible for the failed Supply Management audit. The

fact that D'Cruz offered Sellers the Process Pro opportunity and referred to Sellers as his "right hand man"—during the same time frame that D'Cruz allegedly discriminated against Sellers—weighs heavily against a finding of pretext. App. 531, 19. *See Calvin v. Yellow Freight Sys., Inc.*, 218 F.3d 904, 906-07 (8th Cir. 2000) ("The courts have held that it is unlikely that a person would hire [a person in a protected class] and then [ . . .] decide to fire that same person based on [] the [protected] status.").

4. **Other statements made that had no relationship to Sellers, his work, or any employment decision at issue in this case are not evidence of pretext.**

The remaining evidence Sellers points to for pretext is insufficient. Sellers points to the results of the WWCA internal audit, which Sellers believes showed "severe disparities in the age of the employees within" D'Cruz's department. App. 604. This speculative allegation is unsupported by the record.

On May 6, 2002, D'Cruz received an email or notification from WWCA ("World-Wide Corrective Action") concerning the results of an internal audit. App. 15. The WWCA notification generally informed D'Cruz that there was a "gap in knowledge" of supply management employees based on position moves. *Id*. App. 274-275.

WWCA was an internal application with a database used to track the resolution of problems in manufacturing and in the field. App. 661. Anyone who had been authorized to access WWCA could use it to check on problems, or if authorized, add or edit problems. App. 661. When identifying a problem or area of concern, individuals entering the data into WWCA were instructed to use their "best guess" to describe the problem category. App. 669. The WWCA system required that a problem be assigned to a unit to investigate and resolve the identified problem. App. 670. A supervisor or unit leader was entered into the WWCA system as well as the identity of the person ultimately assigned to the matter for resolution. App. 670.

While a May 2002 internal audit revealed knowledge gaps in Supply Management, the knowledge gap coincided with personnel changes that resulted from a voluntary early retirement incentive program, a departmental reorganization, and the introduction of a new divisional level in Supply Management. App. 16. Consequently, another round of training for employees was required. App. 727-728. D'Cruz took action in response to the audit. App. 17. This included making personnel moves to cover the knowledge gap. App. 17. And with respect to the WWCA notification dated May 6, 2002, Problem Number 6156, that responsibility—training Supply Management employee to eradicate the "gap in knowledge"— was assigned to Sellers. App. 717-719, 729-733. As reflected in Sellers' own 2002 performance management documents, Sellers was supposed to "Establish a Supply Management Education & Training process which defines the skills which are needed, assessed our current status and facilitates 2003 development goals and personal training plans." App. 760.

Sellers fails to establish how a knowledge gap that is attributed to personnel changes in a department is evidence of age-based animus. It does not make discrimination more likely to have occurred. The internal audit that identified alleged knowledge gaps in Supply Management fails to show that any justification Deere has presented for the complained-of conduct was false. It also fails to show that the conduct was motivated by age discrimination. *See Tusing*, 639 F.3d at 515-16; *Newberry*, 622 F.3d at 982. Moreover, Keith's meeting notes about the potential transfer of an older employee and the alleged comments by D'Cruz, which had nothing to do with the employment decisions Sellers challenges, are "stray remarks" that are insufficient to show pretext. *See Elnashar*, 484 F.3d at 1056.

II.     **Sellers's disability-discrimination claim under the ADA fails as a matter of law because Sellers did not experience a materially adverse employment action under circumstances giving rise to an inference of disability discrimination.**

Sellers has only pleaded a disability discrimination claim under the ADA (Count II); he has not pleaded an equivalent state law claim. Even if Sellers pleaded a disability discrimination claim under the ICRA, his claim fails for the same reasons as those under the ADA, given that the ICRA mirrors federal law. *See Mercer v. City of Cedar Rapids*, 308 F.3d 840, 845 n.2 (8th Cir. 2002). While Congress enacted amendments to the ADA in 2008 (ADAAA), such amendments are not applicable to this case because the events at issue occurred before 2009 when the ADAAA became effective. *See* 42 U.S.C. § 12112(a); *Magnussen v. Casey's Marketing Co.*, 787 F. Supp. 2d 929, 941 (N.D. Iowa 2011).

A.     **Sellers cannot establish a prima facie case to support his disparate-treatment disability-discrimination claim.**

Sellers must first establish a prima facie case of disability discrimination. *See Olsen v. Capital Region Med. Ctr.*, 713 F.3d 1149, 1153 (8th Cir. 2013); *Thomas v. State of Iowa Child Support Collections*, No. 08-0722, 2008 WL 5484349, at *3 (Iowa Ct. App. 2008). For both ADA and ICRA claims, Sellers must prove he: (1) "had a disability under the ADA"; (2) "was qualified to perform the essential functions of his job with or without reasonable accommodation;" and (3) "suffered an adverse employment action because of his disability." *Hansen v. Seabee Corp.*, 688 N.W.2d 234, 238 (Iowa 2004) (analyzing ADA claim and citing *Kincaid v. City of Omaha*, 378 F.3d 799, 804 (8th Cir. 2004)); *see also Casey's Gen. Stores, Inc. v. Blackford*, 661 N.W.2d 515, 519-20 (Iowa 2003).

In this case, Sellers's disability-discrimination claim fails at the outset because Sellers admits that he does not know whether disability played a role in any adverse employment action. App. 538. That admission aside, his claim fails for compelling reasons. First, he did not have a

disability. Second, as discussed previously, there is no evidence that Sellers experienced an adverse employment action. Third, there is no evidence that Deere knew of an alleged disability or considered any physical or mental impairment in making any employment decisions.

     1.    **While Sellers was actively working, Sellers was not "disabled" under the ADA and ICRA.**

Sellers cannot establish the first element of his prima facie case because he cannot show he was disabled. A person qualifies as disabled if he (1) has an impairment, either physical or mental, that substantially limits one or more major life activities; (2) has a record of such impairment; or (3) is regarded as having such impairment. *See Toyota Motor Mfg., Kentucky, Inc. v. Williams*, 534 U.S. 184, 193 (2002);[4] *Vincent v. Four M Paper Corp.*, 589 N.W.2d 55, 60 (Iowa 1999) (citing Iowa Admin. Code § 161-8.26(1)-(3)). A person is considered disabled if he has an impairment that substantially limits at least one major life activity. *Toyota Motor Mfg.*, 534 U.S. at 193; *Vincent*, 589 N.W.2d at 60-61.

"Substantially limits" means the inability "to perform a major life activity that the average person in the general population can perform, or significantly restricted as to the condition, manner, or duration under which an individual can perform a particular major life activity as compared to an average person in the general population." *Helfter v. United Parcel Serv., Inc.*, 115 F.3d 613, 616 (8th Cir. 1997); *Vincent*, 589 N.W.2d at 61.

A major life activity is one that is "of central importance to daily life." *Toyota Motor Mfg.*, 534 U.S. at 197. Regulations interpreting the ADA delineate a non-exhaustive list of "major life activities," which include "caring for oneself, performing manual tasks, walking, seeing, hearing, breathing, learning," "working," "[s]itting, standing, lifting, and reaching." *See*

---

[4] Superseded on other grounds by statute, ADA Amendments Act of 2008, Pub. L. 110–325, 122 Stat. 353 (2008).

*Weber v. Strippit Inc.*¸ 186 F.3d 907, 912-13 (8th Cir. 1999) (citing 29 C.F.R § 1630.2(i));

*Bearshield v. John Morrell & Co.*, 570 N.W.2d 915, 919 (Iowa 1997).

In determining whether a major life activity is substantially limited, courts look to the nature and severity of the impairment as well as the anticipated duration and potential permanent or long-term impact. *Toyota Mfg. Co.*, 534 U.S. at 196; *Vincent*, 589 N.W.2d at 61. In short, the impairment must affect the major life activity "considerably" or "to a large degree" to fall within the parameters of these provisions. *Simonson v. Trinity Regional Health Sys.*, 221 F. Supp. 2d 982, 990 (N.D. Iowa 2002).

Sellers pleaded that he "has a mental impairment." Second Amended Complaint ¶ 28 (Docket No. 45). Sellers testified to having: PTSD, obsessive/compulsive disorder, depression, and anxiety issues. App. 495. Sellers alleges he became disabled on March 1 or March 2, 2005. App. 514.

Sellers must show that these impairments substantially limited a major life activity at the time of the allegedly adverse actions. *See Browning v. Liberty Mut. Ins. Co.*, 178 F.3d 1043, 1047 (8th Cir. 1999). Sellers offers no evidence that before he was off work on medical leave, his mental condition substantially limited a major life activity. Here, there is no evidence that Sellers could not care for himself, perform manual tasks, walk, see, hear, speak, breathe, learn, or work. Sellers's alleged impairment apparently coincided with the date he went on medical leave and stopped working. App. 514. Because Sellers's impairments did not substantially limit a major life activity while Sellers was actively working for Deere, Sellers was not disabled under the ADA. His disability-discrimination claim must be dismissed.

2. **As already discussed, Sellers did not experience an adverse employment action.**

For those same reasons that Sellers cannot articulate an actionable adverse employment action regarding his age-discrimination claims, he also cannot establish an adverse employment action for his disability-discrimination claim. To the extent that Defendants have already discussed Sellers's alleged adverse employment actions in this brief, that discussion will not be repeated here.

An additional issue relating to timing merits discussion regarding the disability-discrimination claim. All of the alleged disability-based adverse employment actions occurred before March 1, 2005—the date Sellers alleges he became disabled. App. 514. For example, Sellers alleges that he was denied job opportunities in August 2003 because of his disability. App. 605. Sellers believes he should have been given Jerauld's job—a job that she began performing in August 2003. App. 538, 49. That was long before Sellers alleges he was disabled. Consequently, it cannot serve as an adverse employment action relevant to Sellers's disability claim. The remaining alleged adverse employment actions relate to accommodations and are addressed later in this brief.

B. **Sellers cannot show that the complained-of conduct gives rise to an inference of disability discrimination, and he cannot show that any alleged adverse employment action was a pretext for disability discrimination.**

Sellers concedes he does not know whether his disability was related to any adverse employment action that was taken against him. App. 538. D'Cruz and Jerauld, the two individuals Sellers alleges discriminated against him because of his disability, had no knowledge that Sellers claimed to have a "disability" until after he took medical leave in 2005. Furthermore, there is no evidence that "disability" was a factor in any employment decision regarding Sellers. Because Sellers cannot generate material evidence that gives rise to a reasonable inference of

28

disability discrimination, his claim fails as a matter of law. For the reasons discussed, Sellers also cannot show that Deere's legitimate business reasons for taking an action regarding Sellers was a pretext for disability discrimination.

        C.     **Sellers was not denied a reasonable accommodation under the ADA.**

"An employer's failure to make a reasonable accommodation is a separate form of prohibited discrimination under . . . the ADA . . . ." *Buboltz v. Residential Advantages, Inc.*, 523 F.3d 864, 870 (8th Cir. 2008). Sellers alleges that Deere did not participate in the accommodation process required under the ADA. He bases his claim on allegations that he was not allowed to use a conference room and that Jerauld and D'Cruz should have provided information about project assignments in writing. App. 605, 516. Sellers alleges these adjustments should have been made to reduce job-related stress.

A failure-to-accommodate claim is analyzed under a modified burden-shifting analysis. The plaintiff must first make a facial showing that he had an ADA-covered disability, and that he was a qualified individual able to perform the essential functions of his job, with or without reasonable accommodation. *See Magnussen,* 787 F. Supp. 2d at 954. As already discussed, the undisputed material facts show that Sellers was not disabled under the ADA or the ICRA. Even if Sellers makes that showing, he cannot establish the remaining essential elements of his claim.

To prove that an employer failed to participate in an interactive process regarding a reasonable accommodation, an employee must show: (1) that the employer knew he was disabled; (2) that he requested accommodations; (3) that the employer did not make a good faith effort to assist him in making accommodations; and (4) that the employer could have reasonably accommodated, but for its lack of good faith. *Magnussen,* 787 F. Supp. 2d at 956. Here, Sellers cannot show the essential elements for a failure to accommodate claim. That is because Sellers did not notify Deere that when he asked to use a conference room, or asked for work assignments

in writing, he was requesting reasonable accommodations for a disability. Sellers simply made those requests without explanation. "In general, it is the responsibility of the individual with the disability to inform the employer that an accommodation is needed." *Mole v. Buckhorn Rubber Prods., Inc.*, 165 F.3d 1212, 1217 (8th Cir. 1999) (quotation omitted).

Even if Sellers using conference rooms and providing work assignments in writing was a reasonable accommodation, Sellers did not request use of the conference rooms or his goals in writing as part of an accommodation for a disability. App. 65-66. Sellers sent an email to Jerauld on February 14, 2005, stating that he was going to see a physician to find out if special health considerations were warranted, but he never ultimately submitted documentation. App. 746, 65. Sellers never requested either of these options as an accommodation for disability; Sellers states his disability began March 1, 2005 or March 2, 2005. App. 599, 496, 514.

Finally, Sellers's "requests" amount to nothing more than requests to reduce the stress at his job. Reducing job stress is not a reasonable accommodation. *See Cannice v. Norwest Bank Iowa N.A.,* 189 F.3d 723 (8th Cir. 1999). In *Cannice,* the plaintiff suffered from depression. *Id.* The plaintiff argued that any type of job-related aggravation constituted a failure to accommodate his disability. *Id.* at 728. The Eighth Circuit disagreed. "We do not believe, however, that the obligation to make reasonable accommodation extends to providing an aggravation-free environment." *Id.* "The fact [ ] . . . that he was more closely monitored than his colleagues, [does] not, as a matter of law, amount to a failure by Norwest to accommodate his disability . . . ." *Id.* Because Deere did not know Sellers was alleging a disability or requesting an accommodation, Sellers's accommodation claim fails as a matter of law.

D. **Sellers cannot reconcile his inconsistent assertions that he was disabled for purposes of SSDI benefits and that he could perform the essential functions of his position with or without reasonable accommodation.**

Based on Sellers's representations to the Social Security Administration, since his alleged disability onset date—March 1, 2005—Sellers has not been qualified for his position at Deere, either with or without reasonable accommodation. In his SSDI application, Sellers states that since March 1, 2005, he experienced disabling illnesses, injuries, or conditions that limit his ability to work including but not limited to: difficulty in understanding new or unfamiliar topics; significant reduction of mental functioning; difficulty in working towards deadlines; PTSD; and difficulty multitasking. App. 611-626. Sellers represented to the Social Security Administration that he was not able to work. App. 611-626. When asked whether he believed that he was able to work, Sellers checked the box:

⊠ No, I don't believe that I am able to work at this time.

App. 622.

In *Cleveland v. Policy Management Systems Corporation*, 526 U.S. 795 (1999), the United States Supreme Court recognized that "an ADA plaintiff cannot simply ignore [his] SSDI contention that [he] was too disabled to work." *Id*. at 797-98. Here, Sellers cannot reconcile his SSDI contention with his ADA claim that he could perform the essential functions of his position with reasonable accommodation.

While "disability" is defined differently under the ADA and the Social Security Act,[5] it is Sellers's burden to show that he was capable of performing his job with reasonable

---

[5] The Social Security Act defines disability as "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months" or certain circumstances of blindness. 42 U.S.C. § 423(d). The ADA defines a "qualified individual [with a disability]" as "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8).

31

accommodation. *Cleveland*, 526 U.S. at 806. Under no reasonable interpretation of Sellers's representations to the Social Security Administration, can it be said that he is able to perform the Process Pro position. *See Opsteen v. Keller Structures, Inc.*, 408 F.3d 390, 392 (7th Cir. 2005).

Based on Sellers's representations to Social Security Administration, he cannot show that since March 1, 2005, he has been able to perform the essential functions of his position with or without reasonable accommodation.

III. **Sellers's retaliation claims fail because he experienced no adverse action, cannot show a causal connection between any protected activity and any alleged adverse action, and has no evidence of pretext.**

Sellers's retaliation claims under the ADA (Count II), ADEA (Count I), and the ICRA (Count V) fail as a matter of law. To defeat summary judgment on his retaliation claims, Sellers must first establish a prima facie case of retaliation. *See Brannum v. Mo. Dep't of Corrections*, 518 F.3d 542, 547 (8th Cir. 2008); *Stewart v. Indep. Sch. Dist. No. 196*, 481 F.3d 1034, 1042-43 (8th Cir. 2007). To do so, Sellers must show that (1) he engaged in statutorily protected activity, (2) he experienced a materially adverse employment action, and (3) there is a causal connection between his involvement in the protected activity and the adverse employment action. *See Brannum*, 518 F.3d at 547; *Stewart*, 481 F.3d at 1043; *Estate of Harris v. Papa John's Pizza*, 679 N.W.2d 673, 678 (Iowa 2004). If Sellers establishes a prima facie case of retaliation, the burden shifts to Defendants to establish a legitimate, non-retaliatory reason for the alleged adverse employment action. *See Brannum*, 518 F.3d at 548. Once Deere does so, the burden shifts back to Sellers to prove that the proffered reason is merely a pretext for retaliation and, ultimately, that Deere was actually motivated by retaliatory animus. *Id.*; *Stewart*, 481 F.3d at 1042-43.

A. **Before March 31, 2005, Sellers did not engage in protected activity.**

Deere will acknowledge that Sellers engaged in two instances of protected conduct after he took medical leave and stopped actively working at Deere. First, on March 31, 2005, Sellers

emailed a written complaint to five Deere managers—Jerauld and D'Cruz were not recipients. App. 777-793. At that time, Sellers had already been off on medical leave for a month. App. 599. Second, on April 26, 2005, Sellers filed an EEOC charge. App. 541-542. As discussed later, both of these instances of protected conduct occurred after Sellers stopped working. Sellers has not identified any materially adverse employment action that occurred after he made these two complaints.

Aside from these complaints that Sellers lodged after he stopped working, Sellers has not identified qualifying protected conduct under the ADA, ADEA, or ICRA. Sellers characterizes to following as protected activity: (1) he warned D'Cruz about making comments regarding other workers; (2) he "outwardly supported" Wanda Lenius and Gayle Forster; and (3) he emailed Kevin Keith on November 11, 2004 about issues within Supply Management. App. 605.1-605.3. Deere disputes that any of these actions constitute protected conduct.

To prove "opposition" sufficient to support a finding of protected activity for a retaliation claim, a "plaintiff must prove some affirmative complaint or report about the conduct in question that attributed the impropriety of the conduct to "harassment, discrimination or other conduct." *Coe v. N. Pipe Prods., Inc.*, 589 F. Supp. 2d 1055, 1104 (N.D. Iowa 2008); *see also Van Orden v. Wells Fargo Home Mortgage, Inc.*, 443 F. Supp. 2d 1051, 1063-64 (S.D. Iowa 2006) (supervisor did not engage in protected opposition to discrimination by refusing to incorporate negative suggestions into an evaluation of an employee and by relaying a subordinate's discrimination complaint to her boss). The conduct Sellers identifies fails to satisfy this standard.

In 2001, Sellers allegedly "gently raised" an issue with D'Cruz. App. 497, 499. Sellers states that he told D'Cruz to "temper some of those comments" and that there were "too many younger employees" in the department. App. 605.1-605.2, 499. Even if taken as true, such

conduct does not amount to engaging in protected activity. *See Schoonover v. Schneider Nat'l Carriers, Inc.*, 492 F. Supp. 2d 1103, 1153 (S.D. Iowa 2007) (female truck driver's inquiries regarding whether her equipment and work assignments were based on her gender did not constitute opposition to an unlawful employment activity).

Sellers also alleges that around January 2005, he "supported" Gayle Forster and Wanda Lenius by writing a two-page summary that he believes was submitted to the EEOC. App. 535. Sellers never submitted the document to Deere; he has no knowledge that Deere actually received the document. App. 536. It is also not apparent that any such document exists. Sellers cannot generate any evidence that either Deere or D'Cruz was aware that Sellers submitted that two-page summary to the EEOC. Because there is no evidence that the employer was aware of Sellers's alleged protected activity, Sellers cannot rely on this to establish a prima facie case. *See Culton v. Mo. Dep't of Corr.*, 515 F.3d 828, 831 (8th Cir. 2008).

Sellers's November 11, 2004 email to Keith was not protected conduct. In that email, Sellers addresses fairness, developmental opportunities outside of the department, and transparency—but there is no mention of discrimination, harassment, or retaliation. App. 747. Complaining about problems within the department, but failing to attribute the problems to age or disability discrimination, is fatal to Sellers's retaliation claim in this respect. *See Hunt v. Neb. Pub. Power Dist.*, 282 F.3d 1021, 1028-29 (8th Cir. 2002) (plaintiff complained she was entitled to pay increase and change in job title, but did not attribute employer's failure to give raise or promotion to sex discrimination, and therefore did not engage in protected activity); *Lockridge v. HBE Corp.*, 543 F. Supp. 2d 1048, 1060 (E.D. Mo. 2008) ("[N]ot every complaint about conditions in the workplace, legitimate or otherwise, constitutes a protected activity; retaliation

in response to an activity that is not protected does not support a retaliation claim." (citation omitted)).

B. **For the reasons discussed, Sellers's prima facie retaliation claim fails because none of the alleged adverse actions caused a material change in his employment.**

As with his age and disability discrimination claims, Sellers cannot establish that he was subject to adverse employment action, let alone a materially adverse employment action. Thus, he cannot establish a prima facie case of retaliation. *Rester v. Stephens Media, LLC*, No. 12-3934, 2014 WL 103968, at *3 (8th Cir. Jan. 13, 2014).

Sellers alleges the following adverse actions: (1) he received additional job duties; (2) he was subject to "defamatory" remarks by Jerauld;[6] (3) he did not receive assistance or intervention from Human Resources; (4) he was subject to home and computer surveillance; and (5) he met with Kevin Keith and his counselor where health information was discussed. App. 605.1-.3.

None of this conduct constitutes actionable "adverse action." The anti-retaliation provisions of the ADA, the ADEA, and ICRA apply the same "adverse action" standard as the discrimination provision discussed above. That is, in a retaliation claim, an "adverse employment action is defined as a tangible change in working conditions that produces a material employment disadvantage, including but not limited to, termination, cuts in pay or benefits, and changes that affect an employee's future career prospects, as well as circumstances amounting to a constructive discharge." *Jackman*, 728 F.3d at 804 (citing *Wilkie,* 638 F.3d at 955). Anti-retaliation laws do not regulate "trivial harms" in the workplace. *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006); *Welsh v. Derwinski*, 14 F.3d 85, 86-87 (1st Cir. 1994).

---

[6] While Sellers contends that "Jerry Ihm witnessed these comments," Ihm denied ever witnessing such comments. Consequently, this allegation by Sellers is unsupported by material evidence. App. 605.1-.2, 44-45.

Case 6:12-cv-02050-JSS   Document 84-9   Filed 02/03/14   Page 40 of 74

Rather, they prohibit only "materially adverse" actions that would dissuade a reasonable worker from engaging in protected conduct. *Burlington N.*, 548 U.S. at 67-68. The Eighth Circuit has consistently held that to be materially adverse, "retaliation cannot be trivial; it must produce some injury or harm." *Littleton v. Pilot Travel Ctrs., LLC*, 568 F.3d 641, 644 (8th Cir. 2009).

 "[P]etty slights" or "minor annoyances" that often take place at work are not adverse actions. *Burlington N.*, 548 U.S. at 68. The Eighth Circuit has repeatedly made clear that garden-variety complaints about minor workplace slights and disagreements with supervisors are insufficient to support a retaliation claim. It is not enough, for example, that an employee is given the "silent treatment" or excluded from a faculty photo. *See Recio v. Creighton Univ.*, 521 F.3d 934, 940-41 (8th Cir. 2008) (deeming such complaints "nonactionable petty slights"). And it is not sufficient that a plaintiff is excluded from "after work social activities" and feels "ostracized" by a supervisor. *See Weger v. City of Ladue*, 500 F.3d 710, 727-28 (8th Cir. 2007) (deeming complaints "the sort of trivial harms that do not rise to the level of retaliation"). Nor is it enough that a supervisor "belittled" the plaintiff's work, took away his company cell phone, or sent "threatening" emails." *Lisdahl v. Mayo Found.*, 633 F.3d 712, 721-22 (8th Cir. 2011).

1.     **The dynamic nature of Sellers's job was not an adverse action.**

In 2005, new suppliers were added to Electronic Data Interchange ("EDI") within Sellers's role due to a major delay in SAP systems implementation. App. 526. Sellers states it "seemed strange" that he received EDI coordinator responsibilities after submitting the document, but he does not know whether submitting the document to the EEOC on behalf of Gayle Forster and Wanda Lenius was related to the project assignment. App. 535-36. As previously addressed, Sellers's job as Process Pro was a dynamic position where job responsibilities changed from week to week. App. 503, 22-23. The nature of his position and changes in work assignments or workload does not give rise to a materially adverse employment

action. *See Rice v. Snow,* No. 04-0279, 2006 WL 931922, at *20 (W.D. Mo. April 11, 2006) (holding that "increased workload" was not actionable where it "did not result in termination or reduction in pay or benefits").

> 2. **Alleged defamatory comments made by Jerauld after Sellers's last day of work was not an adverse action.**

Sellers cites an alleged defamatory statement by Jerauld at Jerauld's home that Sellers was "out of his mind, f'ing crazy, and lazy". App. 605.1-.2. This statement was made outside Sellers's presence. App. 605.1-.2. The alleged statement did not result in any tangible change in Sellers's employment—Sellers was off work on medical leave and receiving disability benefits at the time the alleged statements were made. Therefore, this alleged comment was not an adverse action. *Jackman*, 728 F.3d at 804; *see also Hanes v. Mobile Infirmary Med. Ctr.*, No. 04-365-BH-C, 2005 WL 1840236, at *15 (S.D. Ala. Aug. 2, 2005) (citation omitted) ("Demeaning comments" cause no materially significant disadvantage to an employee and were not an adverse employment action).

Additionally, this statement constitutes inadmissible hearsay and may not be relied upon to defeat summary judgment. *Scorpiniti*, 918 F. Supp. 2d at 886. And Jerry Ihm, who was present at Jerauld's home when the alleged statement was made, recalled that there was no discussion of Sellers. App. 44-45, 605.1-.2. Furthermore, Sellers did not identify any reduction in pay, denial of promotion, or adverse transfer that resulted from this alleged comment. It is not an adverse action. *Jackman*, 728 F.3d at 804.

> 3. **Inaction by human resources was not an adverse action.**

Sellers alleges that he did not receive assistance from human resources. Under any definition, this "inaction" that Sellers describes is not a materially adverse employment action

because it did not produce a "material employment disadvantage" to Sellers. *Jackman*, 728 F.3d at 804.

      4.      **Sellers's speculative allegation regarding home computer surveillance is unsupported by any facts and in any event is not an adverse action.**

Sellers's allegation that he was subject to home and computer surveillance must be dismissed because he does not offer any facts indicating that Deere actually took such actions. *See Haas*, 409 F.3d at 1036. Moreover, as with Sellers's other allegations, the alleged surveillance did not produce a material employment disadvantage to Sellers because it did not result in a cut in pay or benefits or a change in his future career prospects and purportedly occurred after Sellers took medical leave. App. 521-22. Consequently, it cannot form the basis of a retaliation claim. *Jackman*, 728 F.3d at 804.

      5.      **A meeting with Kevin Keith and Dr. Harding is not an adverse action.**

Sellers does not indicate how a meeting involving Keith and Dr. Harding could constitute a materially adverse action. Sellers invited Keith to attend the meeting with his counselor. App. 523. Again, this meeting did not produce a "material employment disadvantage" to Sellers. Since Sellers did not suffer a cut in pay or benefits or change in his future career prospects as a result of this meeting, it cannot form the basis of a retaliation claim. *Jackman*, 728 F.3d at 804.

      C.      **Sellers cannot satisfy the causation element of his retaliation claim.**

To establish causation under the ADA and the ADEA, Sellers must prove that the desire to retaliate was the "but for" cause of the alleged adverse action. *See Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2533 (2013); *Wright v. St. Vincent Health Sys.*, 730 F.3d 732, 737 (8th Cir. 2013). In other words, he must show that the unlawful retaliation would not have occurred absent the alleged wrongful action of the employer. *Id.* Similarly, under the ICRA, the causation standard for retaliation claims is a "high one," and Sellers must show that the alleged

retaliatory animus was a "significant factor" motivating the alleged adverse action. *See Hulme*, 480 N.W.2d at 42; *see also City of Hampton v. Iowa Civil Rights Comm'n*, 554 N.W.2d 532, 535-36 (Iowa 1996).

Under the ADA, ADEA, and the ICRA, retaliation is an adverse employment action taken in response *to* an employee's protected conduct. *Hulme*, 480 N.W.2d at 42-43. The relevant date here is March 31, 2005, when Sellers submitted by email a written complaint to five members of Deere's management team. App. 777-793. Every adverse employment action that Sellers alleges was retaliatory occurred before that date. Consequently, Defendants' alleged conduct cannot be causally related to Sellers's protected conduct, because when each of those alleged adverse actions occurred, Sellers had not yet engaged in any protected activity. *See Recio v. Creighton Univ.*, 521 F.3d 934, 941 (8th Cir. 2008).

In light of the undisputed facts, Sellers cannot adduce sufficient evidence to establish that retaliation was the "but for" or "significant factor" in motivating the alleged adverse actions. *See Nassar*, 133 S.Ct. at 2533; *Hulme*, 480 N.W.2d at 42; *Stewart*, 481 F.3d at 1042-43.

D.   **Sellers's suspicions and conjecture of a retaliatory motive are insufficient to show pretext.**

For the reasons discussed, Sellers cannot generate material evidence to show that Deere's legitimate, non-retaliatory reason for any alleged action (a) is not the true reason; and (b) is motivated by retaliatory intent. *See Burkhart v. Am. Railcar Indus. Inc.*, 603 F.3d 472, 477 (8th Cir. 2010). Quite simply, Sellers cannot adduce admissible evidence that shows the alleged adverse actions were motivated by retaliatory intent. Sellers's hearsay statements and his speculation are simply not enough to defeat summary judgment. *See Glaze v. Byrd*, 721 F.3d 528, 532-33 (8th Cir. 2013) (hearsay is inadmissible to defeat summary judgment); *Girten v.*

*McRentals, Inc.*, 337 F.3d 979, 982 (8th Cir. 2003) (a theory "supported more by contentions and speculation than evidence [ . . . ] is insufficient to withstand summary judgment").

Sellers's speculative belief that his "support" for Gayle Forster and Wanda Lenius, based on a two-page document that he believes was submitted to EEOC, also fails because Sellers cannot establish causation, given that Sellers cannot produce any evidence showing Deere had knowledge that Sellers prepared or submitted the document to EEOC. Moreover, Sellers admits that he neither submitted the document to Deere and has no knowledge to show that Deere actually received the document. App. 536. It is axiomatic that no causal connection exists where the decision maker had no knowledge of an employee's protected activity. *See, e.g., Talley v. United States Postal Service*, 720 F.2d 505, 508 (8th Cir. 1983); *White v. Arkansas Dep't of Health & Human Srvcs.*, No. 5:04cv318, 2006 WL 229896, at *9 (E.D. Ark. Jan. 30, 2006); *Amin v. Flagstone Hospitality Management, LLC*, No. 03-1181, 2005 WL 3054599, at *8 (D. Minn. Nov. 14, 2005).

Sellers's criticism of Keith's investigation is insufficient to show that Keith's stated purpose in investigating is untrue or motivated by retaliation. Sellers was not told the outcome of the Human Resources investigation because he had been off work on medical leave since March 1, 2005. App. 599, 496, 248-49, 258. Sellers's criticism of Keith's approach is simply insufficient to show this is untrue and motivated by retaliation. Deere "'can certainly choose how to run its business, including not to follow its own personnel policies regarding termination of an employee or handling claims of discrimination, as long as it does not unlawfully discriminate in doing so.'" *Guimaraes v. SuperValu, Inc.*, 674 F.3d 962, 979 (8th Cir. 2012) (quoting *Haas*, 409 F.3d at 1036). "'The appropriate scope of investigation is a business judgment, and shortcomings in an investigation do not by themselves support an inference of discrimination.'" *Guimaraes*,

674 F.3d at 979 (quoting *McCullough v. Univ. of Ark. for Med. Scis.*, 559 F.3d 855, 863 (8th Cir. 2009)). Sellers presents no evidence that Keith "'purposely ignored relevant information or otherwise truncated the inquiry' in order to retaliate" against him. *Guimaraes*, 674 F.3d at 979 (quoting *McCullough*, 559 F.3d at 863).

Deere's legitimate and non-retaliatory business reason for attending the meeting with Sellers and his counselor is that Sellers asked Keith to attend. App. 523. Keith's conduct in attending a meeting in response to Sellers's request cannot show pretext.

In summary, there is no evidence to support a retaliatory inference, much less a retaliation claim, other than speculation. In a retaliation case, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Guimaraes*, 674 F.3d at 980. For this reason, Sellers's retaliation claims fail.

## IV. Because civil rights laws do not protect against the complained-of conduct here, Sellers cannot generate a material fact dispute regarding his harassment claims.

To survive summary judgment on his hostile-work-environment claims for age and disability discrimination under the ADEA (Count I), the ADA (Count II), and ICRA (Count IV), Sellers must "present evidence from which a reasonable jury could conclude that the harassment was sufficiently 'severe or pervasive' to affect a term, condition, or privilege of the plaintiff's employment." *See Powell v. Yellow Book USA, Inc.*, 445 F.3d 1074, 1077 (8th Cir. 2006) (citation omitted); *Peterson v. Scott Cnty.*, 406 F.3d 515, 523-24 (8th Cir. 2005), abrogated on other grounds by *Torgerson*, 643 F.3d 1031; *Farmland Foods, Inc. v. Dubuque Human Rights Comm'n*, 672 N.W.2d 733, 744 (Iowa 2003). The standard for demonstrating an actionable hostile-work-environment claim is demanding, because anti-discrimination laws do not impose a "general civility code" in the workplace. *Barber*, 656 F.3d at 798; *Alagna v. Smithville R-II Sch.*

41

*Dist.*, 324 F.3d 975, 980 (8th Cir. 2003). Hostile work environments, whether created by a coworker or a supervisor, "have the following elements in common: (1) the plaintiff belongs to a protected class; (2) the plaintiff was subject to unwelcome harassment; (3) a causal nexus exists between the harassment and the plaintiff's protected group status; and (4) the harassment affected a term, condition, or privilege of employment." *Gordon v. Shafer Contracting Co., Inc.*, 469 F.3d 1191, 1194-95 (8th Cir. 2006) (citation omitted).

Sellers bases his hostile-work-environment claim on the same conduct he alleges as adverse employment actions for his disparate-treatment age- and disability-discrimination claims. In addition, Sellers describes two situations with D'Cruz. The first incident allegedly occurred in 2002. App. 501. Sellers alleges D'Cruz was talking to him about the status of an audit, and D'Cruz raised his voice and got within six inches of Sellers's face. App. 501. Sellers states that when D'Cruz was done talking, D'Cruz had spit on his face. App. 501. Sellers does not know whether the spitting was intention or unintentional. App. 501. The second incident allegedly occurred at a staff manager meeting in 2002 or 2003. App. 501-502. While Sellers was "trying to hold some of [D'Cruz's] managers accountable for not bringing their information to the meeting," D'Cruz became upset about the metrics and stated, "This is not rocket science. We've got to get this stuff done. We've been at this for 'x' amount of days." App. 501-502. Sellers states D'Cruz then "thrust himself up out of the chair" by "slamming his fist on the table, jumping up fast enough that his chair went back against the wall." App. 502.

A.   **Because the complained-of conduct does not constitute harassment, Sellers's hostile-work-environment claims fail.**

The conduct that Sellers finds objectionable does not meet the legal definition of "harassment." Harassment, the second component of the hostile work environment analysis, occurs when the workplace is permeated with "discriminatory intimidation, ridicule, and insult,

that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive work environment." *Pye,* 641 F.3d at 1018 (citation and internal quotation marks omitted); *see also Farmland Foods, Inc.*, 672 N.W.2d at 744. Harassment must be both subjectively and objectively offensive. *Peterson*, 406 F.3d at 524. The standard is whether a reasonable person would find the environment hostile or abusive. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21-22 (1993). Relevant factors for determining whether conduct rises to the level of abusiveness include: (1) the frequency of the conduct; (2) its severity; (3) whether the conduct is physically threatening or humiliating, or merely an offensive utterance; and (4) whether the conduct unreasonably interferes with an employee's work performance. *Duncan v. Gen. Motors Corp.,* 300 F.3d 928, 934 (8th Cir. 2002). Simple teasing, offhand comments, and sporadic use of abusive language do not amount to discriminatory changes in the terms and conditions of employment. *Faragher v. City of Boca Raton*, 524 U.S. 775, 787-88 (1998). The Eighth Circuit has repeatedly emphasized that anti-discrimination laws do not create a general civility code. *Shaver v. Indep. Stave Co.*, 350 F.3d 716, 721 (8th Cir. 2003).

No reasonable person would find the conduct alleged by Sellers to be hostile or abusive. *See Powell*, 445 F.3d at 1077. Based on Sellers's account, the conduct was infrequent. The sporadic nature of the complained-of conduct defeats Sellers's claims. "[H]ostile-work-environment claims by their nature involve ongoing and repeated conduct, not isolated events." *Farmland Foods*, 672 N.W.2d at 745 (citation omitted); *see also Arraleh v. County of Ramsey*, 461 F.3d 967, 979 (8th Cir. 2006) ("[I]solated incidents (unless extremely serious) will not amount to discriminatory changes in terms and conditions of employment"). The complained-of conduct was also not severe or physically threatening.

Sellers alleges that on one occasion, around 2001, Sellers, Aaron Godfrey, Patricia Reed, and D'Cruz were standing around a desk talking. App. 497. Sellers alleges that during that conversation in 2001, D'Cruz said, "We need to get all these old farts out of here." App. 497. Sellers alleges that managers "openly [made] comments about [him] and just laughing" and "suggesting that [he] needed to get new skills and be better at this the next time, and then laughing and yukking it all up." App. 539.

Even if the Court accepts Sellers's characterization of his communications with D'Cruz, the alleged behavior is not actionable. *See Nitsche v. CEO of Osage Valley Elec. Coop.*, 446 F.3d 841, 846 (8th Cir. 2006) ("To be actionable, the conduct complained of must be extreme in nature and not merely rude or unpleasant"). *See also EEOC v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 315-16 (4th Cir. 2008) ("[R]ude treatment by coworkers" and "callous behavior by one's superiors [ . . . ] are not actionable") (internal quotation marks omitted).

Courts have declined to recognize hostile-work-environment claims based on similar facts. In *Rester v. Stephens Media, LLC*, the Eighth Circuit determined there was no hostile work environment when a supervisor slammed his hands on a desk, began cursing and screaming, and physically restrained the employee from leaving the room until the employee began "wailing and cussing and screaming and hollering." 2014 WL 103968, at *1 (8th Cir. Sept. 24, 2013). The *Rester* facts are more egregious than Sellers's allegations. *See also Breeding v. Arthur J. Gallagher & Co.*, 164 F.3d 1151, 1159 (8th Cir. 1999) (unfair criticism and being yelled at was not harassment), abrogated on other grounds by *Torgerson*, 643 F.3d 1031; *Farmland Foods*, 672 N.W.2d at 746 (a supervisor may "scold and yell at an employee without violating Title VII.") (citations omitted).

44

A hostile work environment based on disability follows the same standards. *See Shaver*, 350 F.3d at 720. As discussed, Sellers is not disabled; therefore, he is not within a protected class for purposes of the hostile-work-environment analysis. Even if the Court determines that he is disabled within the meaning of the ADA, his hostile-work-environment claim based on disability fails for the same reasons that his age claim fails. In *Shaver*, 350 F.3d at 721, the court held there was insufficient evidence for a disability-based hostile work environment where the plaintiff was called a "platehead" and a co-worker said that he "pissed in his pants when the microwave was on." 350 F.3d at 721. Furthermore, in *Ryan v. Capital Contractors, Inc.*, 679 F.3d 772 (8th Cir. 2012), a supervisor called an employee with limited mental functioning a "fucking dummy," "fucking retard," "stupid," "idiot," and "numb nuts," but the court held that such conduct failed to rise to the level of extreme behavior that is required to support a hostile work environment claim in violation of the ADA. *Id*. at 779.

Sellers's assertion that he was subject to a hostile work environment because Deere failed to investigate his complaint is without merit. As already discussed, Sellers lodged no complaint regarding age or disability discrimination before March 31, 2005, while he was off work on medical leave. Since Sellers never complained about age- or disability-based harassment until after he went on leave, he did not engage in any protected conduct that would have triggered an investigation. Here, any failure to investigate would have occurred after Sellers stopped actively working—so Sellers would not have experienced any workplace harassment since he was not coming to work. Failure to investigate, even in conjunction with derogatory terms, has been held to be insufficient for a showing of hostile work environment. *Rollins v. Mo. Dep't of Conservation*, 315 F. Supp. 2d 1011, 1027 (W.D. Mo. 2004).

45

B.	**The complained-of conduct did not alter the terms or conditions of Sellers's employment.**

Sellers's hostile-work-environment claims also fail because the complained-of conduct did not alter the terms and conditions of his employment. *See Palesch v. Mo. Comm'n on Human Rights*, 233 F.3d 560, 567 (8th Cir. 2000). While Sellers may have personally disagreed with D'Cruz's or Jerauld's management style, or found it frustrating to be blamed for mistakes, no reasonable person would find these management decisions to be intimidating, ridiculing, or insulting. *See Tuggle v. Mangan*, 348 F.3d 714, 721 (8th Cir. 2003) ("dissatisfaction with [an employee's] work assignments and training" is not harassment); *Devin v. Schwan's Home Servs., Inc.*, 491 F.3d 778, 788 (8th Cir. 2007) (allegations that amount "to a frustrating work environment" are not actionable), abrogated on other grounds by *Torgerson*, 643 F.3d 1031; *Thomas v. State of Iowa Child Support Collections*, No. 08-0722, 2008 WL 5484349, at *7 (Iowa Ct. App. Dec. 31, 2008) ("[I]t is well-settled that criticism, close supervision of work activities and antipathy between a supervisor and an employee [ . . . ] is insufficient to establish that a reasonable person would find the conduct abusive or hostile").

Hostile work environment claims demand more severe and pervasive circumstances than these. Therefore, Sellers's claims fail as a matter of law.

V.	**Sellers's wage-discrimination claim under Iowa Code § 216.6A fails because he did not earn any "wages" during the time period in question.**

On February 14, 2013, the Court held that Sellers's wage discrimination claims under Iowa Code section 216.6A (Count VI) were barred to the extent he seeks recovery of alleged wage discrimination that precedes the statute's April 28, 2009 effective date. Order (Feb. 14, 2013) (Docket No. 35), at 11-15. Violations of section 216.6A are predicated on the payment of "wages." Iowa Code § 216.6A(2)(a). A wage discrimination claim occurs when a discriminatory pay scheme is adopted, when an employee becomes subject to a discriminatory pay practice, or

46

when an employee receives wages, benefits, or other compensation pursuant to a discriminatory practice. Iowa Code § 216.6A(2)(b).

Sellers has not earned "wages" from Deere since 2005. App. 600. Because all alleged violations of section 216.6A accrued before that statute's effective date, Sellers may not recover under section 216.6A. The Court may dismiss this claim.

VI. **Sellers may not pursue claims that he failed to administratively exhaust.**

Before a plaintiff can bring suit to allege unlawful discrimination or retaliation, the plaintiff must timely file a charge with the EEOC or a state or local agency with authority to seek relief. 42 U.S.C. § 12117(a); 29 U.S.C. § 626(d)(1); Iowa Code § 216.15(13). *See also Morgan*, 536 U.S. at 109.

The exhaustion requirement serves important purposes. Congress established an "elaborate administrative procedure," implemented through the EEOC, to assist in the investigation of claims of discrimination and "to work towards the resolution of these claims through conciliation rather than litigation." *Richter*, 686 F.3d at 850 (quoting *Patterson v. McLean Credit Union*, 491 U.S. 164, 180-81 (1989)). The exhaustion requirement is "central to" these anti-discrimination and anti-retaliation laws' "statutory scheme because it provides the EEOC the first opportunity to investigate discriminatory practices and enables it to perform its roles of obtaining voluntary compliance and promoting conciliatory efforts." *Williams v. Little Rock Mun. Water Works*, 21 F.3d 218, 222 (8th Cir. 1994). Allowing a judicial complaint to encompass allegations beyond those described in the predicate EEOC charge circumscribes the EEOC's investigatory and conciliatory roles just "as surely as would an initial failure to file a timely EEOC charge." *Id.* at 223 (citation and quotation marks omitted).

The Eighth Circuit has observed that the "object of the exhaustion requirement is 'the alleged unlawful employment practice.'" *Richter*, 686 F.3d at 851. The statute's use of the

47

definite article shows that the complainant "must file a charge with respect to *each* alleged

unlawful employment practice." *Id*. (emphasis added). The Supreme Court has noted that

"discrete acts" of alleged discrimination or retaliation are "easy to identify," and "[e]ach incident

of discrimination and *each* retaliatory adverse employment decision constitutes a separate

actionable 'unlawful employment practice.'" *Morgan*, 536 U.S. at 114 (emphasis added). In light

of *Morgan* and the statutory text, "each discrete incident of [discriminatory or retaliatory actions

by an employer] constitutes its own 'unlawful employment practice' for which administrative

remedies must be exhausted." *Richter*, 686 F.3d at 851 (quoting *Martinez v. Potter*, 347 F.3d

1208, 1210 (10th Cir. 2003)).

In this case, Sellers seeks to recover based on various alleged discriminatory or

retaliatory acts that Sellers failed to present to the EEOC in his charge. More specifically:

- the GJE mapping of Sellers's Process Pro position to Grade 7, App. 604;

- denied job opportunities, App. 604;

- demotion, App. 604;

- Sellers did not receive assistance or intervention from human resources after reaching out to Kevin Keith, App. 605.1;

- Jerauld made remarks about him to Jerry Ihm at Jerauld's home, App. 605.1;

- surveillance at his home and on his home computer, App. 605.1; and

- a meeting in 2005 with Kevin Keith and Dr. Harding in which Sellers's medical condition was discussed, App. 605.3.

*Morgan* and *Richter* make clear that these alleged discriminatory and retaliatory actions

are "discrete acts" and constitute separate "unlawful employment practices" for which

administrative exhaustion is an absolute prerequisite to bringing suit. *See Morgan*, 536 U.S. at

114; *Richter*, 686 F.3d at 851. Because Sellers failed to completely exhaust his administrative

remedies with respect to these alleged discriminatory and retaliatory acts, summary judgment is

proper on Sellers's claims under the ADA, the ADEA, and the ICRA to the extent those claims are based upon anything other than the allegations contained in his administrative charge.[7]

**VII.** **Because Sellers failed to exhaust his administrative remedies against individual defendant Clyde D'Cruz, Sellers is barred from pursuing statutory discrimination and retaliation claims against D'Cruz.**

Sellers asserts his claims under the ICRA against individual defendant Clyde D'Cruz.[8] Supervisors may be subject to individual liability under the ICRA. *Vivian v. Madison*, 601 N.W.2d 872, 878 (Iowa 1999). But claims against individuals—like all ICRA claims—must be administratively exhausted. *See* Iowa Code §§ 216.15(13), 216.16(1). Because Sellers failed to exhaust his ICRA claims against D'Cruz, summary judgment is proper on those claims as to D'Cruz.

Under the ICRA, a person claiming to be aggrieved by an unfair or discriminatory practice must initially seek administrative relief by filing a complaint with the Iowa Civil Rights Commission. Iowa Code § 216.16(1). The ICRA provides that a discrimination complaint "shall state the name and address of the person [or] employer [ . . . ] alleged to have committed the discriminatory or unfair practice [and] shall set forth the particulars thereof." Iowa Code § 216.15(1). The complainant must also serve a copy of the discrimination complaint on the person against whom it is filed. Iowa Code § 216.15(3)(a). The failure to exhaust administrative

---

[7] Separate analysis of Sellers's claims under the ICRA is unnecessary. The ICRA, like comparable federal statutes, imposes an administrative exhaustion requirement. Iowa Code §§ 216.15(13), 216.16(1). And the ICRA is modeled after Title VII, so Iowa courts look to federal law for guidance in interpreting the state statute. *McElroy v. State*, 703 N.W.2d 385, 391 (Iowa 2005). This holds true for exhaustion issues, and Sellers's claims under the ICRA are likewise barred to the extent they are based on any alleged discrimination or retaliation outside the scope of his EEOC charge. *See id.* at 391 & n.2 (holding plaintiff failed to exhaust retaliation claims under both Title VII and ICRA and noting that "the same analysis should be applied to [plaintiff's] retaliation claim brought under the ICRA"); *Van DeWalle v. Clarion-Goldfield Cmty. Sch. Dist.*, No. C10-3071-MWB, 2012 WL 1425876, at *7 n.5 (N.D. Iowa Apr. 25, 2012) ("I will utilize federal case law to analyze the timeliness of [plaintiff's] claims under both federal and state law").

[8] Sellers originally asserted his federal ADEA and ADA claims against D'Cruz as well. Individual employees cannot be personally liable under these statutes, and the Court previously dismissed Sellers's federal claims against D'Cruz for that reason. *See* Order (Feb. 14, 2013) at 5 (Docket No. 35).

remedies is significant, as the court "has authority to consider only those [ICRA] claims that first have been presented to the commission." *Lynch v. City of Des Moines*, 454 N.W.2d 826, 831 (Iowa 1990).

Sellers did not name D'Cruz as a respondent in his EEOC administrative charge, or serve him with a copy of Sellers's administrative complaint, as required by the ICRA. *See* Iowa Code § 216.15(1), (3)(a). Sellers's administrative charge listed only John Deere Waterloo Works as the respondent. App. 541. D'Cruz was not served with a copy of Sellers's administrative charge, which was served only on Deere. App. 737-38, 752.

The individually named defendant D'Cruz was wholly omitted from the respondent's list on the charging documents. App. 737-38, 752. "Persons who seek to assert their rights under the ICRA [ . . . ] must follow the statutory processes to obtain relief." *Ackelson v. Manley Toy Direct, LLC*, 832 N.W.2d 678, 680 (Iowa 2013). Because Sellers failed to do so, summary judgment should be granted in favor of individual defendant D'Cruz on the ICRA claims (Count IV). *See Waldermeyer v. ITT Consumer Fin. Corp.*, 782 F. Supp. 86, 88 (E.D. Mo. 1991); *Jones v. Singer Career Sys.*, 584 F. Supp. 1253, 1255-56 (E.D. Ark. 1984); *see also Jackson v. Mills Props.*, No. 4:11CV419SNLJ, 2011 WL 3607920, at *3 (E.D. Mo. Aug. 12, 2011).

**VIII.**   **Sellers's discrimination and retaliation claims are barred by the doctrine of laches.**

Even if the Court concludes that Sellers has generated a disputed issue of material fact on the merits of his statutory discrimination and retaliation claims, summary judgment is nevertheless appropriate because these claims are barred by the doctrine of laches. Laches is an equitable defense an employer may use to "bar[] a plaintiff from maintaining a suit if he unreasonably delays in filing a suit and as a result harms the defendant." *Morgan*, 536 U.S. at 121. "The equitable doctrine of laches is a proper defense to claims of discrimination and retaliatory discharge under Title VII when based upon the plaintiff's post-charge delay in filing

his or her Title VII lawsuit." *Brown-Mitchell v. Kansas City Power & Light Co.*, 267 F.3d 825, 827 (8th Cir. 2001) (citing *Whitfield v. Anheuser-Busch, Inc.*, 820 F.2d 243, 244-45 (8th Cir. 1987)). "'A court may use laches to reach a just result.'" *Id.* (quoting *Whitfield*, 820 F.2d at 244). "Essentially the equitable substitute for a statute of limitations, laches serves to protect defendants from prejudice caused by stale evidence, prolonged uncertainty about legal rights and status, and unlimited exposure to liability damages." *Smith v. Caterpillar, Inc.*, 338 F.3d 730, 733 (7th Cir. 2003) (citing *Cook v. City of Chicago*, 192 F.3d 693, 696 (7th Cir. 1999)).

The laches defense applies to civil rights claims under the ADEA and the ADA. *See EEOC v. Watkins Motor Lines, Inc.*, 463 F.3d 436, 439-40 (6th Cir. 2006) (applying laches analysis to ADA claim); *Rapp v. Lawrence Welk Resort*, 2013 WL 358268, at *7 (S.D. Cal. Jan. 28, 2013) (permitting pleading of laches defense in ADA claim); *O'Donnell v. Vencor, Inc.*, 465 F.3d 1063, 1067 (9th Cir. 2006) (applying laches analysis to ADEA claim). It is also appropriate to apply the laches defense to Sellers's ICRA claims because the ICRA "is patterned after Title VII" and "[i]nterpretations of the federal act are instructive" in the analysis of ICRA claims. *Hy-Vee Food Stores, Inc. v. Iowa Civil Rights Comm'n*, 453 N.W.2d 512, 527 (Iowa 1990); *Annear v. State*, 419 N.W.2d 377, 379 (Iowa 1988).

The defense of laches "requires proof of (1) lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting the defense." *Morgan*, 536 U.S. at 121-22 (citations and internal quotation marks omitted); *see also Brown-Mitchell*, 267 F.3d at 827 ("the defendant must persuade the court that (1) the plaintiff unreasonably and inexcusably delayed filing the lawsuit and (2) prejudice to the defendant resulted from the delay") (citation omitted). Whether to apply the laches doctrine is a matter "within the sound discretion of the district court." *Id.* "[I]n general the decision to apply the doctrine of laches lies on a sliding scale:

the longer the plaintiff delays in filing her claim, the less prejudice the defendant must show in order to defend on laches." *Smith*, 338 F.3d at 734.

As discussed above, in order to commence a statutory discrimination or retaliation claim, a plaintiff must first exhaust his claim by filing an administrative charge with the civil rights agency that has jurisdiction over the claim. 42 U.S.C. § 12117(a); 29 U.S.C. § 626(d)(1); Iowa Code § 216.15(13). A complainant may curtail the EEOC's investigation into an ADA claim by requesting a right to sue letter after 180 days have elapsed since the charge date. 29 C.F.R. § 1601.28(a)(1). Claims filed with the Iowa Civil Rights Commission must be on file for at least sixty days before the ICRC can issue an administrative release upon a complainant's request. Iowa Code § 216.16(2), (3)(a). Right-to-sue letters are not required for ADEA claims. *See* 29 U.S.C. § 626(d); *Julian v. City of Houston*, 314 F.3d 721, 725 n.3 (5th Cir. 2002).

A.    **Sellers's unreasonable and inexcusable delay in filing this lawsuit supports dismissal under the laches doctrine.**

On April 26, 2005, Sellers filed his civil rights charge with the EEOC; that charge was cross-filed with the ICRC. App. 541-42, 752. Sellers did not file his lawsuit based on these charges until July 13, 2012. Docket No. 2. This amounts to a delay of over seven years between the date Sellers originally filed his administrative charge and the date this action began.

Eighth Circuit precedent makes clear that Sellers's seven-year delay in filing this lawsuit is unreasonable. In *EEOC v. Liberty Loan Corporation*, the Eighth Circuit held a delay of four years and four months was unreasonable. 584 F.2d 853, 857 (8th Cir. 1978); *see also Brown-Mitchell*, 267 F.3d at 827 (six-year delay unreasonable). That seven-year delay satisfies the "unreasonable" component of the laches analysis.

And, because Sellers cannot point to any adequate or competent justification for his unreasonable delay in filing the instant lawsuit, the "inexcusable" component of the laches test is satisfied. *Brown-Mitchell*, 267 F.3d at 827. "Whether delay is excusable depends on the facts of each case and is a matter within the district court's sound discretion." *Hukkanen v. Int'l Union of Operating Eng'rs*, 3 F.3d 281, 286 (8th Cir. 1993) (internal citations omitted). A plaintiff has an "obligation to monitor the progress of their charges with the EEOC." *Id.* (citations omitted). In this analysis, a Court considers "the length of the delay and the plaintiff's reasons for the delay." *Whitfield*, 820 F.2d at 245.

Sellers cannot point to ignorance as an excuse for his tardy lawsuit. On May 5, 2005, Sellers was on notice of his right to request a right-to-sue letter. App. 751. When Sellers first filed his civil rights charge with the EEOC and the ICRC in 2005, the EEOC investigator told him he could request a right-to-sue letter, which would allow him to obtain his own representation and pursue his claims in a more expeditious and efficient manner. App. 514. The Iowa Civil Rights Commission provided written notice of the same right. App. 751.

Sellers's conduct reflects that he understood this right. Sellers admits that he was aware he could request a right-to-sue letter from the EEOC or ICRC at anytime. App. 512. Sellers's conduct reflects that he understood his right to pursue litigation. He had several communications with other charging parties, including Rebouche and Gayle Forster, about their claims and retaining attorneys. App. 635-638, 630-632, 511. Additionally, emails to other Deere employees reveal that, during the pendency of the EEOC investigation, Sellers and these employees were actively researching and interviewing lawyers who might be willing to accept them as clients, which would allow them to bypass the EEOC investigation and bring an independent lawsuit. App. 642, 511.

Case 6:12-cv-02050-JSS   Document 84-9   Filed 02/03/14   Page 58 of 74

While Sellers considered this option on many occasions, Sellers decided to continue to delay his lawsuit for over seven years. Despite recognizing that the EEOC was taking an inordinate amount of time to research his claims and becoming dissatisfied with the multi-year investigation, Sellers did nothing to actively pursue bringing a lawsuit within a reasonable period of time. Sellers was aware as early as 2005 that he and other Deere employees may have a hard time remembering information relevant to their claims, and therefore may be unable to provide that information to the EEOC. In a May 13, 2005 email to Shannon Lemke, Sellers stated, "[W]e only get one shot and might not remember everything we should be passing on to you." App. 741. Sellers only exercised his right to obtain a right-to-sue letter after the EEOC concluded its investigation and issued a determination that there was no probable cause to find a violation of law. App. 749-750. This supports a finding of an inexcusable delay. *See Whitfield*, 820 F.2d at 245 (finding a plaintiff's delay in filing a civil rights claim was inexcusable because the plaintiff "has not provided any meaningful explanation for his long silence or denied that he knew he could request the Notice of Right to Sue from the EEOC within 180 days after first filing his charge of discrimination").[9]

Sellers cannot excuse his unreasonable delay by arguing that he wanted to wait for the EEOC to conclude its investigation before turning to the Court for relief. Sellers expressed frustration with the length and ineffectualness of the investigation. App. 511-512. Sellers testified that he was not happy with Shannon Lemke, and he "thought she sold me out." App. 512.

---

[9] *Cf. Holden v. Burlington N., Inc.*, No. 3-81-994, 1984 WL 1045, at *3 (D. Minn. June 15, 1984) (distinguishing case that applied laches defense from case before the court, noting "the crucial distinction between Boone and Karla Keefe is that Boone was on notice that he was entitled to a right to sue letter. In the present case there is no evidence that Ms. Keefe was aware of the fact that she could bypass the EEOC."); *Hukkanen*, 3 F.3d at 286 (holding the plaintiff "did not know she could request a right-to-sue letter, and obtained one soon after she retained her attorney and was informed of this option.").

A plaintiff does not "have an absolute right to wait until the [administrative] proceedings [have] concluded before requesting a right-to-sue letter." *Brown-Mitchell*, 267 F.3d at 827-28; *see also Hukkanen,* 3 F.3d at 286. "Plaintiffs have some obligation to monitor the progress of their charges with the EEOC[.]" *Hukkanen*, 3 F.3d at 286 (citations omitted). Further, the Eighth Circuit has "recognized that 'laches may apply either when the delay in bringing suit was caused by a private plaintiff or when the delay is the fault of an administrative agency.'" *Garrett v. Gen. Motors Corp.*, 844 F.2d 559, 561-62 (8th Cir. 1988) (quoting *Whitfield*, 820 F.2d at 244-45).

The sporadic nature of Sellers's communication with the EEOC also weighs in favor of a finding of inexcusable delay. Sellers let his claims languish with the EEOC with only sporadic email communication seeking status updates on the investigation. App. 741, 608, 610. Sellers testified that he "might have talked to Shannon [Lemke] either by email or by phone maybe three, four times a year. This first year or two. Less after that. Because then it was pretty much just like an annual update." App. 511. This does not satisfy the Eighth Circuit's requirement that Sellers monitor the progress of his charges with the EEOC. In *Brown-Mitchell*, the Eighth Circuit concluded the plaintiff had failed to show her more than six-year delay in filing her lawsuit after her EEOC charge was excusable despite the plaintiff's contention that she had attempted to contact the EEOC five to six times, because the "[p]laintiff's inability to provide or recall details about her five or so contacts with [the human rights agency] over the relevant six-year period belies her allegation that she 'diligently pursued' her claims." 267 F.3d at 828. *See also Whitfield*, 820 F.2d at 245 (finding a plaintiff's failure to make any contact with the EEOC for the ten-year pendency of the claim was inexcusable).

B.    **Sellers's seven-year delay in filing this lawsuit has prejudiced Deere's and D'Cruz's ability to defend themselves in this case because key memories have faded.**

Sellers's delay has interfered with Deere's and D'Cruz's ability to defend themselves in this case because key witnesses in this case testified they were unable to recall key facts.

Even Sellers struggled to recall important details and information about his claims. Sellers could not remember who attended meetings where allegedly discriminatory statements were made by D'Cruz, App. 498-499, 505, 528-529; nor who else might have overheard these comments. App. 523-24. He also could not remember the details surrounding the filing of his EEOC charge, App. 510; or the names of anyone other than Shannon Lemke with whom he worked at the EEOC. App. 511. Most importantly, in his deposition, Sellers could not identify one position or promotion he was ever denied, let alone one denied based on alleged discriminatory intent. App. 538.

Testimony from other several key fact witnesses in this case show that memories have faded. For example, the named defendant in this case also struggled to remember information regarding Sellers's claims. D'Cruz—who was Sellers's manager and who Sellers alleges had a plan to force all people over 40 out of his department—does not recall any specific confrontation with Sellers. App. 32. He also does not remember if he ever required Sellers to complete a 360 review of his position performance or what the results were of this 360 review. App. 29-31. D'Cruz could not recall specifics of audits taking place in his department in 2001 and 2004, and why those audits yielded different results. App. 26-27. Finally, he does not remember any allegations that his department was not trained well, or any steps he may have taken to remedy this lack of training App. 16-17.

Daria Jerauld—who is not a named defendant in this lawsuit, but is a key witness because she was Sellers's direct supervisor during the relevant time period—was also unable to recall many critical facts. In her deposition, Jerauld could not remember specifics about Sellers's job duties, App. 55; the different teams he worked with, App. 50; or whether Sellers took over certain job duties from other employees leaving the department, App. 56. Additionally, she does not remember when she learned about Sellers's health issues, App. 65; specifics about comments made in Sellers's performance evaluations, App. 57-58; whether Sellers was required to complete a 360 review, App. 66; whether Sellers ever came to her in 2004 and asked for help with his job duties, App. 57; why Sellers wanted to work in conference rooms, App. 65; or talking to Sellers about things that would help him perform his job better. App. 65.

Kevin Keith "vaguely" remembers the meeting with Sellers and Dr. Harding at Black Hawk-Grundy Mental Health Center. App. 259. Keith did not remember getting notes from Sellers or Dr. Harding during that meeting. App. 259. Keith does not even remember why exactly he met with Dr. Harding and Sellers in April 2005. App. 259.

The record is replete with instances of lost memories that relate to facts that Sellers believes are important to his case. Many witnesses specifically stated the reason they could no longer remember pertinent facts is because "this was nine years ago." App. 57, 15. Although some witnesses stopped short of attributing their inability to recall to the long delay between the facts and Sellers's case, it is appropriate for the Court to conclude that a delay as long as his—seven years—is to blame for the faded memories. *See Smith*, 338 F.3d at 734-35 (holding that although the employer did not prove the delay itself caused the lost memory, the court was "confident that the passage of eight and one-half years is a contributing factor to their failed memories."). In light of the loss of memory of this critical information, a finding of prejudice to

Deere and D'Cruz is appropriate. *See Barnett v. U.S. Attorney General*, No. 1:11cv203, 2013 WL 1164355, at *4 (N.D. W. Va. Mar. 20, 2013) (concluding prejudice existed and applying laches defense because the defendants submitted affidavits from various witnesses attesting to the fact that the "presumptive witnesses" are no longer employed and other evidence was destroyed). Because the undisputed facts show that Deere and D'Cruz are prejudiced by Sellers's unreasonable delay due to lost memories of key witnesses, it is appropriate to apply the laches defense and dismiss the statutory discrimination and retaliation claims.

## IX. Sellers's slander and defamation claim is barred by the statute of limitations and fails on the merits.

Sellers contends that the following alleged actions constitute the basis for his defamation claim: (1) alleged statements made by Jerauld at Jerauld's home to Jerry Ihm that Sellers was "out of his mind," "f'ing crazy," and "lazy;" (2) statements on his performance reviews from 2000 through 2004 that he "basically . . . [didn't] have skills;" (3) Jerauld's statement to D'Cruz that Sellers misrepresented the bailment agreements; and (4) D'Cruz's statements made in 2001 or 2002 criticizing Sellers's performance in hydraulics. App. 605.1-.2, 531-532. For several reasons, Sellers does not have an actionable slander or defamation claim.

### A. Sellers's defamation claim accrued in 2007 and is untimely.

"Actual application of the appropriate statutory period to a particular case requires the determination of when the claim accrued." *Sandbulte v. Farm Bureau Mut. Ins. Co.*, 343 N.W.2d 457, 462 (Iowa 1984), overruled on other grounds by *Langwith v. Am. Nat'l Gen. Ins. Co.*, 793 N.W.2d 215 (Iowa 2010). "The general rule is that a cause of action accrues when the aggrieved party has a right to institute and maintain a suit." *Sandbulte*, 343 N.W.2d at 462. "Such a right exists when 'events have developed to a point where the injured party is entitled to a legal

remedy.'" *Id.* (quoting *Stoller Fisheries, Inc., v. Am. Title Ins. Co.*, 258 N.W.2d 336, 341 (Iowa 1997)).

A claim typically accrues when the "wrongful act produces injury to the claimant." *Hallett Constr. Co. v. Meister*, 713 N.W.2d 225, 230 (Iowa 2006) (internal citations omitted); *K&W Elec., Inc. v. Iowa*, 712 N.W.2d 107, 116 (Iowa 2006). Under the discovery rule, the statute of limitations is tolled "until the plaintiff has discovered the fact of the injury and its cause or by the exercise of reasonable diligence should have discovered these facts." *Hallett*, 713 N.W.2d at 231 (internal citations omitted). The "concept – 'should have discovered' – is commonly referred to as inquiry notice." *Buechel v. Five Star Quality Care*, 745 N.W.2d 732, 736 (Iowa 2008).

A person is deemed to be on inquiry notice when he or she "gains sufficient knowledge of facts that would put that person on notice of the existence of a problem or potential problem." *Buechel*, 745 N.W.2d at 736. In other words, a plaintiff is deemed to be on inquiry notice when he or she is "aware of facts that would prompt a reasonably prudent person to begin seeking information as to the problem and its cause." *Kestel v. Kurzak*, 803 N.W.2d 870, 875 (Iowa Ct. App. 2011) (quoting *Woodroffe v. Hasenclever*, 540 N.W.2d 45, 48 (Iowa 1995)). For a plaintiff to be deemed on inquiry notice, he or she does not need "exact knowledge of the nature of the problem that caused the injury." *Kestel*, 803 N.W.2d at 875. When someone is on inquiry notice, he or she is deemed to know "all facts that would have been disclosed by a reasonably diligent investigation." *Hallett*, 713 N.W.2d at 231 (internal citations omitted); *K&W Elec.*, 712 N.W.2d at 117; *see also Hook v. Lippolt*, 755 N.W.2d 514, 523 (Iowa 2008) (recognizing "an injured party's duty to undertake a reasonably diligent investigation of the nature and extent of her legal rights to recover for an injury."). Thus, "the question in any given case is not, What did plaintiff

know of the injury done to him? But, what might he have known, by the use of the means of information within his reach, with the vigilance which the law requires of him?" *Woodroffe*, 540 N.W.2d at 49 (citations omitted).

Sellers was aware of his potential defamation claims in or before 2005—he was either present when the statements were made or he was told by others about the statements soon after they were allegedly made. App. 605.1-.2, 531. In other words, Sellers was "aware of facts that would prompt a reasonably prudent person to begin seeking information as to the problem and its cause," thereby placing him on inquiry notice on or before March 2005. *Kestel*, 803 N.W.2d at 875 (citing *Woodroffe*, 540 N.W.2d at 48).

Defamation claims are subject to a two-year statute of limitations as provided in Iowa Code § 614.1(2). The statute of limitations begins to run "on the date of publication." *Davenport v. City of Corning*, 742 N.W.2d 605, 2007 WL 3085797, at *6 (Iowa Ct. App. Oct. 24, 2007) (quoting *Kiner v. Reliance Ins. Co.,* 463 N.W.2d 9, 13 (Iowa 1990)). Because the acts giving rise to Sellers's defamation claim occurred in or before 2005, Sellers needed to file a timely defamation claim in or before 2007. However, he did not file this lawsuit until July 13, 2012. Docket No. 2. This is over five years after the statute of limitations had run on his defamation claim. Because Sellers's defamation claim is time-barred, summary judgment is appropriate on this claim.

B.    **Seller's defamation claim fails on the merits because all alleged statements are either hearsay, were protected opinion, were privileged, or were not published to a third person.**

For the reasons already discussed, the allegedly defamatory statements that Sellers has identified are untimely. Even if the Court considers these claims on the merits, as discussed next, each statement suffers from at least one fatal flaw. Summary judgment on the merits of these

claims is also appropriate, because under Iowa law, the statements that Sellers relies on for his defamation claims are not actionable.

> **1.** **Sellers's claim regarding the alleged statement by Jerauld in her home is based solely on inadmissible hearsay.**

At least one statement that comprises Sellers's defamation claim is inadmissible hearsay. Specifically, Jerauld's alleged statement was made to Jerry Ihm at Jerauld's home where Sellers was not present. App. 605.1-.2. Sellers lacks personal knowledge regarding this alleged defamatory statement and cannot point to any admissible evidence to show this statement was made. And with respect to the alleged defamatory remark, Jerry Ihm testified that he was present at Jerauld's home and Sellers was not discussed. App. 44-45.

Because hearsay constitutes the sole basis of his claim and cannot be relied on to defeat summary judgment, it is appropriate to dismiss Sellers's defamation claim. *See Glaze*, 721 F.3d at 532-33 (plaintiff's proffered inadmissible hearsay was insufficient to defeat summary judgment).

> **2.** **The statements regarding Sellers's work performance are protected opinion.**

Under Iowa law, statements of opinion can be actionable only "if they imply a proveable false fact, or rely upon stated facts that are proveably false." *Yates v. Iowa W. Racing Ass'n*, 721 N.W.2d 762, 771 (Iowa 2006). Jerauld's and D'Cruz's statements made in Sellers's performance reviews, and statements by D'Cruz and Jerauld regarding Sellers's performance on bailment and tooling agreements—after an internal audit—neither imply a proveable false fact nor rely on a stated fact that is proveably false. While Sellers disagrees with D'Cruz and Jerauld, Sellers's work performance is a matter of opinion; there appears to be a difference of opinion between Sellers and his former supervisors.

In *Yates*, the Iowa Supreme Court identified a four-factor test for evaluating whether a statement is protected opinion; (1) the precision and specificity of the disputed statement; (2) the degree to which the alleged defamatory statement is objectively capable of proof or disproof; (3) the literary context in which the disputed statement is made; and (4) the broader social context into which the alleged defamatory statement fits. *Yates*, 721 N.W.2d at 770. Applying that test here further supports that these alleged statements by D'Cruz or Jerauld are protected opinion. First, D'Cruz and Jerauld articulated facts underlying their conclusions that have been proven true. Second, to the extent that statements within Sellers's performance evaluations are not objectively capable of proof or disproof, those statements were D'Cruz's or Jerauld's conclusion based on underlying true facts. Third, in terms of context, Sellers's performance evaluations were provided to him as part of Deere's performance management process to assist employees in improving performance. The evaluations were provided solely to Sellers and were not intended to be made public. Fourth, policy reasons support protecting D'Cruz's and Jerald's alleged statements as opinion. Jerauld and D'Cruz provided Sellers with feedback to improve his job performance moving forward. Punishing Jerauld or D'Cruz for providing employee feedback designed to improve performance would deter employers and managers from communicating negative information to employees. D'Cruz and Jerauld's statements of opinion are based on fully-disclosed, non-defamatory facts. Under the circumstances, a reasonable recipient could find that D'Cruz and Jerauld were giving their personal opinions regarding those facts. *See Yates*, 721 N.W.2d at 773.

3.      **To the extent that Sellers's claim is based on supervisors making statements about Sellers's job performance, the statements are protected by qualified privilege.**

For a separate, but equally compelling reason, alleged statements made about Sellers regarding his involvement with the internal audit in 2004 or statements in his performance

evaluations are protected by qualified privilege. A statement that is otherwise defamatory is not actionable if it is made: "(1) in good faith, (2) concerning a subject matter in which the speaker has an interest, right, duty, or obligation, and (3) to a listener who has a corresponding interest, right, duty, or obligation in the subject matter of the communication." *Taggart v. Drake Univ.*, 549 N.W.2d 796, 803 (Iowa 1996); *see also Theisen v. Covenant Med. Ctr.*, 636 N.W.2d 74, 84 (Iowa 2001). Generally, the applicability of a qualified privilege to a particular statement is a question of law. *Barreca v. Nickolas*, 683 N.W.2d 111, 118 (Iowa 2004). When a statement is subject to a qualified privilege, liability may result if only the plaintiff can establish the privilege was abused. *Id.* Courts have held performance reviews are subject to a qualified privilege. *Roche v. Home Depot USA*, 197 Fed. App. 395, 401 (6th Cir. 2006); *Huckabee v. Time Warner Entertainment Co.,* 19 S.W.3d 413 (Tex. 2000); *Kietschka v. Abbott-Northwestern Hosp., Inc.,* 417 N.W.2d 752, 755 (Minn. Ct. App. 1998); *Kasachkoff v. City of New York,* 107 A.D.2d 130 (N.Y. 1st Dept. 1985).

Defendants can establish all elements of the qualified privilege. The alleged statements were undeniably offered in furtherance of a common interest in Deere's quality work performance and audit practices. *See* Restatement (Second) of Torts § 596 (1977). The statements were made on a proper occasion, in an appropriate manner, and to proper parties.

The 2004 internal audit was conducted by Deere employees. App. 220. When the audit yielded results that substantially differed from the results Sellers previously reported to D'Cruz and Jerauld, an investigation revealed that Sellers was delinquent in his job duties, which resulted in the audit deficiencies. App. 55, 60-61. Any statements about Sellers with regard to his involvement in the audit were made in an attempt to rectify the audit deficiencies and concerned conversations among only those Deere employees who were directly involved with the audit.

App. 760-764. Further, any statements made in Sellers's performance evaluations were made by D'Cruz and Jerauld in an attempt to fairly assess his job performance throughout the year and to help him continue to grow as an employee.

4. **In any event, Sellers cannot generate material facts to show publication.**

Sellers failed to identify any person besides himself that read the content of his performance evaluations. Actionable publication occurs only when a defamatory statement is made in the presence of someone other than the plaintiff. *Huegerich v. IBP, Inc.,* 547 N.W.2d 216, 221 (Iowa 1996) ("A defamatory communication is not published, and is therefore not actionable, unless it is heard and understood by a third person to be defamatory."); *see also Theisen*, 636 N.W.2d at 83 ("A key element of any defamation claim is proof of publication by the defendant to someone other than the subject of the allegedly defamatory statement."). In any event, Sellers has failed to present any evidence that a third person ever read these comments. Because Sellers predicates his claim on statements that D'Cruz and Jerauld made to him about his performance, there is no "publication," and their alleged actions do not support liability.

X. **Sellers's settlement of a workers' compensation claim based upon the same facts and alleged injuries bars his claims in this case.**

Iowa's Workers' Compensation Act is intended to be the exclusive and sole remedy for workers who are injured on the job. Iowa Code § 85.20; *Cincinnati Ins. Co. v. Kirk*, 801 N.W.2d 856, 859 (Iowa Ct. App. 2011). A pure mental injury falls within the statute's definition of "personal injury," and an employee's mental injury is therefore compensable under chapter 85. *Dunlavey v. Economy Fire & Cas. Co.*, 526 N.W.2d 845, 851 (Iowa 1995). In *Dunlavey*, the Iowa Supreme Court recognized that employees may recover under the Workers' Compensation Act "for mental injuries caused by unusual stress in the work environment." *Id.* at 853.

After he quit working at Deere, Sellers commenced a workers' compensation claim based upon alleged post-traumatic stress disorder caused by his experiences while working at Deere. Sellers concedes that the injury at issue in his workers' compensation claim was PTSD and that the alleged injury he seeks to recover for in this case is still PTSD. App. 495. In 2008—approximately four years before he filed this lawsuit—Sellers settled his workers' compensation claim for $150,000 and reached agreement he would receive long-term disability benefits until age 62. App. 543-547.

While workers' compensation statutes do not necessarily preempt state and federal employment discrimination claims, *see Karcher v. Emerson Elec. Co.*, 94 F.3d 502, 509 (8th Cir. 1996), it is axiomatic that "courts can and should preclude double recovery by an individual." *EEOC v. Waffle House, Inc.*, 534 U.S. 279, 297 (2002) (quoting *Gen. Tel. Co. of Nw. v. EEOC*, 446 U.S. 318, 333 (1980)). Likewise, Iowa law has long recognized that "[d]uplicate or overlapping damages are to be avoided." *Revere Transducers, Inc. v. Deere & Co.*, 595 N.W.2d 751, 770 (Iowa 1999) (quoting *Team Cent., Inc. v. Teamco, Inc.*, 271 N.W.2d 914, 925 (Iowa 1978)). A plaintiff is entitled to only one recovery, "no matter how many theories support entitlement." *Id.* Because allowing Sellers to recover on his claims in this case would result in a double recovery based upon the same facts and claimed injuries, his claims should be barred based on his settlement of a workers' compensation claim.

Numerous courts have recognized that a plaintiff's recovery on a workers' compensation claim may operate as a bar to subsequent employment discrimination claims. In *Sabella v. Manor Care, Inc.*, 915 P.2d 901 (N.M. 1996), for example, the court held that a plaintiff pursuing discrimination claims after a workers' compensation settlement "bears the burden of proving that her damages under the [civil rights act] are separate and distinct from those for

which she has already been compensated in her workers' compensation settlement." *Id.* at 906 (noting that "double recovery is prohibited as a matter of law"); *see also Gardinella v. Gen. Elec. Co.*, 833 F. Supp. 617, 619 (W.D. Ky. 1993) (recognizing that "election of remedies may preclude recovery under the Civil Rights Act for an injury previously compensated under the Workers' Compensation Act"); *Marson v. Labor & Indus. Review Comm'n*, 503 N.W.2d 582, 586 (Wis. Ct. App. 1993) (holding that plaintiff's settlement of workers' comp claim "bar[red] a second cause of action on a different theory").[10] To recover on subsequent employment claims, the employee must show that the discrimination claims "give rise to actually independent damages." *Sabella*, 915 P.2d at 906.

Sellers cannot show that his present claims are based on an injury independent of that for which he recovered pursuant to his workers' compensation settlement. The basis of his workers' compensation claim is indistinguishable from his claims in this case—he was allegedly given an excessive workload, subjected to a "hostile work environment" by D'Cruz, Jerauld, and Keith, received a negative performance review, and after he complained he was simply given additional duties. These are the very facts upon which Sellers seeks to recover in this action. Nor is Sellers's alleged injury any different. Sellers himself admits that the injury at issue in his workers' compensation claim was PTSD allegedly caused by his experiences while working at Deere. And he concedes that the injury he seeks compensation for in this case is no different: the "injury is still the PTSD." App. 514-515.

---

[10] After *Marson*, the Wisconsin Supreme Court held that the workers' compensation exclusive remedy provision does not necessarily bar discrimination claims where the facts that are the basis for the discrimination claim might also support a workers' compensation claim. *Byers v. Labor & Indus. Review Comm'n*, 561 N.W.2d 678, 686 (Wis. 1997). However, the court in *Byers* expressly left open the question presented here: whether a plaintiff that has already recovered on a workers' compensation claim is barred from pursuing a discrimination claim against their employer based on the same facts and injury. *Id.* at 685 n.13 (declining to reach "the possibility of double recovery . . . if claims are brought under both statutes").

For these reasons, Sellers cannot show that his present claims are based upon any independent facts or independent injuries from his workers' compensation claim. *Cf. Gardinella*, 833 F. Supp. at 619 (holding plaintiff could pursue employment claims where workers' comp settlement was "only for physical injuries to his right thumb and wrist"); *Lundstedt v. City of Miami*, No. 93-1402-CIV, 1995 WL 852443, at *13 (S.D. Fla. Oct. 11, 1995) (discrimination claim not barred where it "arose some five years later" and was "totally different" than workers' compensation claim). As a result, Sellers's claims should be barred on this basis.

XI.     **Even if Sellers can establish a claim for age or disability discrimination or retaliation, his wage damages are limited by the amounts Deere has already paid him in long-term disability benefits.**

Sellers receives long-term disability payments under Deere's long term disability plan. He has received those payments since April 1, 2006. App. 633-634. The long-term-disability benefits flow directly and exclusively from Deere.

To the extent any portion of Defendants' motion is denied and Sellers submits a claim for past and future wages at trial, Deere is entitled to a verdict-offset based on the long-term-disability benefits that Sellers has been paid. Failure to reduce any verdict for past and future lost wages would result in a windfall to Sellers because Deere would be compensating Sellers twice for the same injury out of which the suit arose. *See Giles v. Gen. Elec. Co.*, 245 F.3d 474, 495 (5th Cir. 2001); *see also Beshears v. Asbill*, 930 F.2d 1348, 1355 n. 11 (8th Cir. 1991). The collateral-source rule, prohibiting an employer from an offset from damages it owes, based on amounts paid by third parties is inapplicable because the "collateral source" in this case is Deere. *See Beshears*, 930 F.2d at 1355 n.11 ("Because we believe that disability benefits qualitatively are different from either social security benefits or unemployment compensation, we doubt whether they should be considered a 'collateral source' in the context of employment

discrimination litigation."); *see also Smith v. Office of Personnel Mgmt.*, 778 F.2d 258, 263 (5th Cir. 1985). Deere is thus entitled to an offset.

## Conclusion

For the reasons set forth in Defendants' Motion, Statement of Undisputed Material Facts, and Brief, Defendants Deere & Company and Clyde D'Cruz request the Court to grant their motion for summary judgment in its entirety, dismiss Plaintiff Michael Sellers's Second Amended Complaint, and grant such other relief as this Court deems just and appropriate under the circumstances.

/s/ Frank Harty AT0003356
/s/ Debra Hulett AT0003665
/s/ Angel A. West AT0008416
/s/ Frances M. Haas AT0009838
/s/ Ryan W. Leemkuil AT0011129
NYEMASTER GOODE, P.C.
700 Walnut, Suite 1600
Des Moines, Iowa 50309-3899
Telephone: 515-283-8100
Facsimile: 515-283-3108
Email: fbh@nyemaster.com
Email: dlhulett@nyemaster.com
Email: aaw@nyemaster.com
Email: fmhaas@nyemaster.com
Email: rwleemkuil@nyemaster.com
ATTORNEYS FOR DEFENDANTS

**Certificate of Service**

I hereby certify that on February 3, 2014, I presented the foregoing document to the Clerk of the Court for filing and uploading into the ECF system, which will send notification to the following ECF system participants:

Gregory T. Racette
HOPKINS & HUEBNER, P.C.
2700 Grand Avenue, Suite 111
Des Moines, Iowa 50312
Telephone: 515-244-0111
Facsimile: 515-697-4299
Email: gracette@hhlawpc.com
ATTORNEYS FOR PLAINTIFF

/s/ Debra Hulett