IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
EASTERN DIVISION

MICHAEL JOSEPH SELLERS,

Plaintiff,

vs.

DEERE & COMPANY a/k/a JOHN
DEERE COMPANY, and CLYDE
D'CRUZ,

Defendants.

No. C12-2050

RULING ON MOTION FOR
SUMMARY JUDGMENT

## TABLE OF CONTENTS

I.   INTRODUCTION .................................................. 2

II.  PROCEDURAL HISTORY ........................................... 2

III. RELEVANT FACTS ............................................... 4
     A.   The Parties ............................................. 4
     B.   Sellers' Work History .................................. 5
     C.   Sellers' Claims ........................................ 7
     D.   D'Cruz's Statements About Older Employees .............. 8
     E.   Global Jobs Evaluation ("GJE") ......................... 9
     F.   WWCA Audit ............................................. 10
     G.   Bailment Audit ......................................... 11
     H.   Sellers' Workload ...................................... 14
     I.   Sellers' Disability .................................... 15

IV.  SUMMARY JUDGMENT STANDARD .................................... 16

V.   DISCUSSION ................................................... 17
     A.   Age Discrimination ..................................... 17
          1.   Applicable Law .................................... 17
          2.   Discussion ........................................ 19
               a.   Direct evidence .............................. 19

|  |  | b. | *Circumstantial evidence* . . . . . . . . . . . . . . . . . . . | 21 |
|  | *B.* | *Disability Discrimination* . . . . . . . . . . . . . . . . . . . . . . . . . . . | 25 |
|  |  | *1.* | *Applicable Law* . . . . . . . . . . . . . . . . . . . . . . . . . . . | 26 |
|  |  | *2.* | *Discussion* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 27 |
|  | *C.* | *Retaliation* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 28 |
|  |  | *1.* | *Applicable Law* . . . . . . . . . . . . . . . . . . . . . . . . . . . | 28 |
|  |  | *2.* | *Discussion* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 29 |
|  | *D.* | *Hostile Work Environment* . . . . . . . . . . . . . . . . . . . . . . . | 31 |
|  |  | *1.* | *Applicable Law* . . . . . . . . . . . . . . . . . . . . . . . . . . . | 32 |
|  |  | *2.* | *Discussion* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 33 |
|  | *E.* | *Iowa Equal Pay Act* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 35 |
|  | *F.* | *Defamation* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 35 |
|  | *G.* | *Additional Defenses* . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 36 |
| *VI.* | *ORDER* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 36 |

## *I. INTRODUCTION*

This matter comes before the Court on the Motion for Summary Judgment (docket number 84) filed by the Defendants on February 3, 2014, the Resistance (docket number 96) filed by the Plaintiff on March 15, and the Reply Brief (docket number 102-2) filed by the Defendants on April 1. Pursuant to Local Rule 7.c, the motion will be decided without oral argument.

## *II. PROCEDURAL HISTORY*

On July 13, 2012, Plaintiff Michael Joseph Sellers filed a seven-count complaint against John Deere Agri Services, Inc., Deere & Company a/k/a John Deere Company, and Clyde D'Cruz. Sellers claimed age discrimination, retaliation, disability discrimination, and wage discrimination. On October 10, 2012, Sellers filed a request for leave to amend his complaint. Two days later, while the request for leave to amend was pending, Sellers voluntarily dismissed John Deere Agri Services, Inc. as a defendant. Sellers' request for leave to amend was subsequently granted, and his amended complaint

was filed on October 29, 2012. The amended complaint, in eight counts, dropped one retaliation count and added claims of defamation and negligence. Each count was directed to both defendants.

On November 12, 2012, Defendants Deere & Company a/k/a John Deere Company ("Deere") and Clyde D'Cruz filed a motion to dismiss, asking the Court to dismiss certain causes of action and certain claims for relief. On February 14, 2013, the Court granted Defendants' motion, dismissing certain claims, finding that certain claims could proceed against Deere only, and limiting the relief which may be pursued in certain claims. Specifically, the Court found that Sellers' claims under the ADA and ADEA would be dismissed against D'Cruz, and would proceed against Deere only. Sellers' claims for emotional distress and punitive damages in the ADEA counts were dismissed, with Sellers' relief on those claims, if any, limited to compensatory damages only. Sellers' defamation claim and negligence claim were dismissed. Regarding Sellers' claim for wage discrimination, the Court concluded that he may only assert a claim for wage discrimination which occurred on or after April 28, 2009. *See* docket number 35.

The Court granted Sellers' subsequent request to amend his complaint to replead a claim for alleged defamation. The Court directed Sellers to file a second amended complaint which was fully compliant with the Court's ruling on Defendants' motion to dismiss. On March 25, 2013, Sellers filed a second amended complaint. *See* docket number 45. Sellers asserts retaliation in violation of the ADEA (Count I), disability discrimination in violation of the ADA (Count II), age discrimination in violation of the ADEA (Count III), age discrimination in violation of the Iowa Civil Rights Act (Count IV), retaliation in violation of the Iowa Civil Rights Act (Count V), violation of the Iowa Equal Pay Act (Count VI), and defamation (Count VII). Defendants filed an answer to the second amended complaint, and affirmative defenses, on April 10, 2013.

3

Meanwhile, on November 26, 2012, the Court adopted a Scheduling Order and Discovery Plan submitted by the parties. Also at that time, the case was referred to me for the conduct of all further proceedings and the entry of judgment, in accordance with 28 U.S.C. § 636(c) and the consent of the parties. After consulting with counsel, this case was scheduled for trial on November 3, 2014.

On February 3, 2014, Defendants timely filed the instant motion for summary judgment.

### III. RELEVANT FACTS

#### A. The Parties

Deere & Company a/k/a John Deere Company is in the business of manufacturing agricultural, forestry, foraging, and construction equipment, with its principal place of business located in Moline, Illinois. In Iowa, Deere has facilities in Des Moines, Ottumwa, Waterloo, Dubuque, and Davenport.

Michael Sellers, who was born in April 1957, holds a bachelor of arts degree in industrial and management engineering from Purdue University and a master of arts in industrial technology from the University of Northern Iowa. Sellers was first hired by Deere on June 1, 1979. Sellers last worked for Deere on March 1, 2005, when he took medical leave.

Clyde D'Cruz was hired by Deere in March 2000 as Division Manager of Purchasing in Waterloo. Nine months later, D'Cruz was promoted to Manager of the Supply Management department.[1] As manager of the department, D'Cruz oversaw approximately 130 employees.

---

[1] Supply Management is responsible for the delivery of products and support systems to Deere. It supports the procurement of materials to Deere's facilities for production of existing and new products. It schedules, purchases, and plans demand for materials for Deere's products.

## B. Sellers' Work History

In June 1979, at age 22, Sellers began working for Deere as an inventory analyst in a "Grade 3" position. In November 1979, Sellers became a senior inventory analyst and his pay grade increased to Grade 4. In November 1980, Sellers changed positions and was increased to Grade 5. In March 1983, his position changed again and his pay grade was decreased to Grade 4. In May 1985, Sellers was laid off and separated from Deere. In December 1988, Sellers exercised his recall rights and returned to work for Deere at a Grade 6. In July 1995, he became a supply management specialist.[2] In June 1997, his pay grade was increased to Grade 7.

In Sellers' performance evaluation dated November 28, 2001 — his last evaluation prior to becoming a "process pro" under D'Cruz's supervision — Sellers' supervisor, Gary Dangelser, suggested Sellers may not be eager to embrace change.

> You have valuable insight into the hydraulic industry and it's product. That's what makes you such a critical player on the hydraulics team. However, when decisions are finally made, you may not agree with all [of] them, but for the good of the team and the organization you must be willing to move on. Mike I would encourage you to use you [sic] experiece [sic] to make a recommendation and then work toward implementation especially on the smaller issues where permission may not be required.

Performance Evaluation dated 11/28/2001 (Plaintiff's App. 148). Dangelser concluded that Sellers "fully meets all expectations."

On April 1, 2002, Sellers became a process pro in the supply management department, reporting directly to Defendant Clyde D'Cruz. The job change was a "lateral move" and did not result in any change in grade, pay, benefits, or hours. On a daily basis, a process pro would facilitate meetings, hold people accountable, help teams work through

---

[2] Sellers has worked as a schedule analyst, interfactory analyst, production control analyst, and production scheduler.

the Six Sigma processes, do statistical analysis, and document processes. The process pro position was "dynamic" — meaning responsibilities could be added — and "fluid" — meaning job assignments and projects could change. The position evolved week-to-week and Sellers was sometimes responsible for addressing problems that would come up on short notice.

When Sellers moved to his process pro position, he was given a desk immediately outside D'Cruz's corner office. D'Cruz had a tendency to emerge from his office and "throw information" at Sellers. Early in his tenure as supply management manager, D'Cruz told others in his department that Sellers was his "right-hand man," and supply management's "Man Friday."

In a 2002 meeting, D'Cruz was critical of Sellers' ability to interact with other managers. D'Cruz told Sellers that he needed to "play nice in the sandbox." In early 2003, Sellers attended a class on "social styles" in an attempt to learn how to better resolve conflicts within supply management and not be as adversarial in interacting with others. After completing the class, Sellers spoke with D'Cruz about "how we were communicating with people in the department." Specifically, Sellers was concerned that purchasing planners — who he described in his deposition as "amiable ones" — were being verbally attacked and chastised. The purchasing planners were, on average, some of the oldest employees in supply management, averaging 47 years old at the time. D'Cruz had previously referred to the purchasing planners as "sheep that can be slaughtered later."

In Sellers' performance evaluation at the end of 2002, D'Cruz expressed "disappoint[ment] with the level of progress" in the development and implementation of a PDP Playbook. D'Cruz expected to "regroup shortly and determine the value and further execution of this project." In his summary, D'Cruz recognized that 2002 was "a year of transition" for Sellers. D'Cruz concluded that "it was difficult to assess your performance as you were developing in a new role." D'Cruz suggested that Sellers

"please focus on building collegial and collaborative relationships with my staff as they will be integral to your success as a process pro in 2003." Regarding an "overall performance rating," D'Cruz checked "not applicable."

On August 1, 2003, Sellers changed departments again and began reporting to Daria Jerauld. (Jerauld reported to D'Cruz.) When Jerauld became Manager of Supply Management Business Processes, Sellers' position did not change, except Jerauld attended staff meetings instead of Sellers. D'Cruz asked Jerauld to help Sellers because he felt that Sellers experienced "analysis paralysis" at times and needed to be a better facilitator to accomplish his goals. In Sellers' 2003 annual performance evaluation, Jerauld gave Sellers a "meets expectations" rating, even though D'Cruz recommended a "does not meet expectations."

When Sellers went off work on medical leave on March 1, 2005, he was a Grade 7 process pro.[3] Sellers has not returned to work since March 1, 2005. Sellers' salary continued for one year, and he then started receiving long-term disability benefits, which are continuing. Sellers also collects social security disability benefits.

## C. Sellers' Claims

On March 31, 2005 — one month after he left work on medical leave — Sellers sent an email to John Deere officials describing perceived problems in the supply management department, and complaining of harassment, discrimination, and retaliation. The 17-page document asserts a pattern of age discrimination by D'Cruz in reorganizing the supply

---

[3] In his response to Defendants' statement of undisputed material facts, Sellers denied he was a Grade 7 process pro, claiming instead that he was "mapped" as a supply management specialist III, Grade 7, under "GJE." In support of his denial, Sellers cites Exhibit 9 (without reference to a page number). Page 1 of Exhibit 9 — identified as Sellers' "personnel record" — states that his position title was process pro, at pay Grade 7, from April 1, 2002 until he was placed on permanent disability on April 1, 2006. *See* Plaintiff's App. 81.

management department. Sellers also claimed he was harassed by co-employees and retaliated against after voicing complaints.

According to Sellers, operational performance in the department began to deteriorate as a result of reorganization implemented by D'Cruz. Sellers asserted that "[t]he younger and inexperienced decision makers were making ill-advised decisions, and the managers who were brought in from outside Waterloo were breaking processes faster than we could fix them." Sellers also claimed that his supervisors — Jerry Gehrke, Clyde D'Cruz, and Daria Jerauld — were "unfair" in assessing his performance. Sellers complained that D'Cruz refused to adopt Sellers' ideas for resolving conflicts within the department. Meanwhile, Sellers was given additional duties and his workload eventually became "unmanageable." Sellers complained he was being left out of meetings, told he could not use the conference rooms, and given conflicting messages regarding his duties. Sellers concluded that his medical disability was caused by his treatment at Deere.

### D. D'Cruz's Statements About Older Employees

Beginning in October 2001, D'Cruz began overseeing a four-year reorganization of supply management. At about that time, Deere offered voluntary early retirement packages to eligible employees. There were many personnel changes in the supply management department which occurred during the four-year reorganization period.

In 2001, D'Cruz and Sellers had an impromptu meeting with Aaron Godfrey and Patricia Reed. According to Sellers, D'Cruz was "trying to paint the picture of where we needed to go in the future." Among other things, D'Cruz said "we need to get all these old farts out of here." At his deposition, Sellers testified that he "initially kind of dismissed it as, you know, kind of off the cuff, probably didn't mean what he said." D'Cruz kept "repeating it over and over again," however, and Sellers tried to "pull him aside" and tell him: "do you realize that that sounds an awful lot like age discrimination and you may want to temper your words a bit."

Sellers personally heard D'Cruz make similar statements five to ten times. D'Cruz said that older employees "have got way too much baggage" and "they're no good for us." D'Cruz also said they needed to work on "getting the old dogs out of here." D'Cruz would make such comments to groups of supply management department employees and, according to Sellers, "would generally look at older employees as he was making them."

### E. Global Jobs Evaluation ("GJE")

In or around 2002, Deere began a process to evaluate the job grades of each position in its world-wide organization through the Global Jobs Evaluation (GJE) process. GJE is a systematic process for creating a hierarchy of jobs based on their content and value to Deere. Deere used GJE to assess the work level of salaried employees, but did not apply GJE to production workers. Deere hired the Hay Group, an independent global management consulting firm, to provide consulting services for the implementation of GJE at Deere. The Hay method of job evaluation is the most widely used proprietary job evaluation methodology in the world. It is used by an estimated 8,000 organizations, including half of the Fortune 50 organizations in over 30 countries.

Prior to GJE, Deere used a point rating table to assess jobs for job grade purposes. The work was done with a supervisor for the position under review, someone from human resources, and a representative from Deere's corporate office. Grading practices varied across Deere, with different processes, tools, and evaluation rationales applied in different business units and geographies. One of Deere's objectives for implementing GJE was to achieve improved consistency in job grading and outcomes.

The GJE process, which is described in detail in Defendants' statement of undisputed material facts, involved extensive analysis and reviews. In his response to the statement of undisputed facts, however, Sellers denies that the evaluations were reviewed at multiple levels to ensure consistency, and claims that his statement of contested facts includes "copious evidence showing that Deere managers D'Cruz and Matson determined

9

which employees would be mapped to which positions months in advance of GJE's announcement, campaigned to move younger and male employees into better positions, intentionally moved older female employees into lower graded jobs, and then announced the results months later."[4] The Court has reviewed Sellers' statement of contested facts, however, and can find no evidence supporting his claim that D'Cruz "campaigned" to move younger and male employees into positions which would score higher on the GJE.

Sellers also asserts that when the GJE was unveiled on May 1, 2004, he "had somehow been mapped by D'Cruz as a supply management specialist, his old position," citing Plaintiff's Appendix 77. That document appears to initially identify Sellers as a process pro at pay Grade 7, and then as a supply management specialist III, at pay Grade 7. Defendants assert that Sellers has "misread and misunderstands" the cited document. Defendants claim that "[t]he reference to 'Supply Management Specialist III' is simply the GJE job name."[5] In any event, it appears undisputed that Sellers remained a process pro until he took medical leave on March 1, 2005. *See* Sellers' Personnel Record (Plaintiff's App. 81) and Sellers' Affidavit (Plaintiff's App. 399).

### F. WWCA Audit

In May 2002, D'Cruz was notified regarding the results of an internal audit conducted by World-Wide Corrective Action ("WWCA"). WWCA was an internal application with a database used by Deere to track the resolution of problems in manufacturing and in the field. When identifying a problem or area of concern, persons were instructed to use their "best guess" to describe the problem category and, if necessary, change the description later after additional analysis was completed. The audit

---

[4] Sellers' Reply to Defendants' Statement of Undisputed Material Facts, ¶ 163 (docket number 96-3 at 9).

[5] Defendants' Responses to Sellers' Statement of Contested Facts, ¶ 120 (docket number 102 at 23).

concluded there was a "gap in knowledge" of supply management employees based on position moves and lack of training. The problem identified in May 2002 was triggered as a result of the voluntary early retirement incentive plan. A problem identified in the WWCA system is assigned to a unit to investigate and resolve the identified problem. D'Cruz assigned the problem to Sellers for investigation and resolution.

Sellers spoke with three of the auditors and then investigated their concerns. Sellers found that "the younger employees were being put into positions which required a great deal of experience and training that they simply didn't have." Sellers concluded that there was nothing he could do to quickly address "this significant deficiency." In an affidavit filed in resistance to the instant motion, Sellers opined that "there was a 'HUGE' intellectual gap and knowledge gap which would take at least, in my opinion, a decade or more to close with the current employees in these positions." According to Sellers, from 2002 until he stopped working in 2005, "the bulk of my assignments were focused on trying to do things in supply management to reduce this gap in skills and knowledge as well as fixing the problems that the inexperience of the young employees was causing to the business." When Sellers requested that "older buyers" be moved back into critical positions, D'Cruz responded "that was not going to happen."

### G. Bailment Audit

When a Deere supplier must purchase an expensive tool to make a part, Deere is typically responsible for paying the supplier to have the tool made. Deere then owns the tool, although it remains in the supplier's possession. This arrangement requires Deere and the supplier to execute a "tooling bailment agreement." The record shows that Deere struggled to obtain full compliance with the bailment requirements. A July 2001 audit found that 94% of Deere Waterloo Works' suppliers did not have a bailment agreement or a physical validation of the tooling.

In 2002, after Sellers' desk had been moved from another site to just outside D'Cruz's office, they were getting ready for an audit of the purchasing department. Sellers testified at his deposition that D'Cruz came out of his office and "wanted to know our status on the audit and what I was doing." According to Sellers, D'Cruz "started getting fairly intense in his comments" and told Sellers that "we've got to pass this audit." Sellers responded that "I'm going to try my best."

According to Sellers, D'Cruz "just exploded and he got probably within six inches of my face." D'Cruz told Sellers that "try is not good enough; you are going to make sure this happens." By the time the conversation was concluded, Sellers "had spit all over my face." D'Cruz then returned to his office and, according to Sellers, "the secretary was laughing herself silly as she was handing a Kleenex box over the wall."

On August 10, 2002, D'Cruz forwarded an email to Sellers which addressed, in part, obtaining compliance regarding tooling bailments. According to the email, a recent audit showed 85.4% compliance by Waterloo suppliers (333 out of 390). Of the remaining 57 suppliers, 20 provided tooling lists, but had not signed the bailment agreement, and 37 suppliers had been contacted, but neither a tooling list nor bailment agreement had been provided. D'Cruz instructed Sellers that he wanted Sellers to "own this and make sure we are complying." D'Cruz advised Sellers that he "want[ed] a clean audit next time around." Sellers was the Team Leader for the group addressing the bailment agreement process.

An email from Jackie Zachmeyer to Jerry Gehrke, dated November 4, 2002, stated that this issue "must be an area we focus on in 2003, as we will continue to get audit comments, both internally & externally, if we have not improved our procedure and received bailment agreements on supplier tooling." On November 22, 2002, D'Cruz sent an email to five persons, with a copy to Sellers, commenting on the procurement audit. D'Cruz expressed an interest in taking steps to "close the gaps" and "not having to wait

for audit to nab us for not doing the fundamentals." According to the email, "Mike Sellers will be the champion to make sure we are complying with the corporate audit recommendations."

At mid-year in 2003, Sellers reported that he was "on schedule" and advised D'Cruz that "95% of bailment agreements are in place and we are working on the balance." In his mid-year summary, Sellers concluded that the bailment process improvements were "on target." In response, D'Cruz expressed disappointment with Sellers' management of the tooling bailment agreements, commented that the reports published by Sellers appeared to be outdated, and observed "a gap appeared between the information you are tracking and presenting." D'Cruz told Sellers that "more diligent and timely follow up is required from you and this must be improved in the second half." D'Cruz also disagreed with Sellers' conclusion that the effort on tooling bailment agreements was "on target."

In November 2003, Sellers reported to Daria Jerauld that "a comprehensive tooling process has been developed and partially implemented." (It should be recalled that on August 1, 2003, Sellers started reporting to Jerauld.) Sellers reported over $44 million of tooling documented, "with 50% of these assets covered by bailment agreements." According to Sellers, this was a "3 fold improvement from the information assembled in the 2 prior years." In her responsive comments, Jerauld acknowledged that Sellers had a "difficult task" in facilitating other staff members to achieve results. Nevertheless, Jerauld concluded that Sellers' "competencies rating" was "below target."

On March 22, 2004, D'Cruz sent an email to Jerauld, reminding her that Sellers had been "tagged" with managing this issue, and asking Jerauld to "verify that things are under control." Jerauld forwarded the email to Sellers and asked that he report back by March 31. In May 2004, Sellers reported that $44 million of tooling had been documented, and "48% (1,486) of the high $ tools are covered by bailment agreements." According to

Sellers' report, 53% of the required bailment agreements were completed. In November 2004, however, Sellers acknowledged that "the major 'MISS' this year is in the area of Tooling Bailments and pssing [*sic*] our procurement audit."

At her deposition, Daria Jerauld testified that because of Sellers' handling of the bailment agreements, "we didn't trust him any longer so we had to have somebody else do the work behind the scenes in addition."

### H. Sellers' Workload

In his unsworn email to management on March 31, 2005, after he left on medical leave, Sellers also complained about his workload. Sellers claims that in late 2004, Jerauld asked him to supervise three people. Sellers told Jerauld that "I was beginning to have some problems with depression and mentioned that she could give the position to someone else." According to Sellers, Jerauld "responded with something like: 'you've got to be kidding!!, you are the only one who has the skills to do this.'" Jerauld also "cautioned" Sellers that he "should be very careful about this topic, as Clyde [D'Cruz] would see this as a weakness." Deere notes that the allegations are contained in an unsworn document, and statements attributed to Jerauld are hearsay.

Sellers asserts that in November 2003, he was asked to handle Supplier Collaboration, a web-based application used to share documents with suppliers, which added two to four hours of work per day to his schedule. Sellers was also required to handle Trudy Baird's position from December 2003 through June 2004, while she was out on sick leave. When Baird's sick leave was extended through October, Sellers stayed in her position. Sellers also claimed that he was spending another 20 hours per week supporting a new planning process that he had developed. Sellers became very frustrated when priorities were continually changing and tasks were thrown at him in the last minute "out of the blue." Sellers believed that his workload had become "unmanageable."

## I. Sellers' Disability

Sellers states that he has post-traumatic stress disorder ("PTSD"), obsessive/compulsive disorder, depression, and anxiety issues. In a November 24, 2004 visit to Dr. Harding at Black Hawk-Grundy Mental Health, Sellers presented with an acute stress reaction to his work environment, stemming from unfairly low performance ratings. By January 26, 2005, Sellers was suffering from acute stress disorder with depression and suicidal ideation.

On February 7, 2005, Sellers met with D'Cruz and Jerauld regarding what Sellers describes as "my deteriorating medical condition." Sellers told D'Cruz and Jerauld that "I was periodically having difficulty comprehending new information under a lot of stress." Sellers asked "if more information could be put into emails so that I could have an easy reference when needed." Sellers made the request because he was having short-term memory lapses due to his depression, anxiety, and post-traumatic stress disorder. D'Cruz responded that he didn't think this would be a "productive use" of his time, and suggested that Sellers visit with the Deere doctor.

Sellers admits he suffered from depression prior to these events, but asserts that "it was made much more significant having gone through 2000 to 2005." Sellers did not see a doctor or counselor prior to 2000, and he did not require medication for depression until the 2004-2005 time period. According to Sellers, his father and son also suffer from depression.

Sellers has not performed work for Deere since March 1, 2005. Sellers was placed on a "salary continuance" for approximately one year. Pursuant to a settlement of his worker's compensation claim, Sellers was paid $150,000 and began receiving long-term disability benefits on April 1, 2006. The agreement with Deere provides Sellers will receive long-term disability benefits until age 62, when he will receive benefits associated with "early retirement." Sellers also receives social security disability benefits. In

applying for benefits, Sellers represented to the Social Security Administration that "I don't believe that I am able to work at this time."

Sellers' post-traumatic stress disorder also led to a bout of problem gambling, "as an escape from the thoughts of what had happened to him at Deere," leading to treatment with a therapist in 2008. Sellers still suffers from symptoms of PTSD. Anything that reminds him of his former work environment, from phone calls to multiple people talking at the same time, can trigger his PTSD. Having multiple people in the room at once eventually puts him in a "brain fog" where he cannot understand what is happening around him. Sellers takes medication for anxiety.

## *IV. SUMMARY JUDGMENT STANDARD*

Summary judgment is appropriate if the moving party shows that "there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(a). A genuine dispute as to a material fact "'exists if a reasonable jury could return a verdict for the party opposing the motion.'" *Anderson v. Durham D & M, L.L.C.*, 606 F.3d 513, 518 (8th Cir. 2010) (quoting *Humphries v. Pulaski County Special School District*, 580 F.3d 688, 692 (8th Cir. 2009)). A fact is a "material fact" when it "might affect the outcome of the suit under the governing law. . . ." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In order to establish the existence of a genuine dispute as to a material fact, the non-moving party "'may not merely point to unsupported self-serving allegations.'" *Anda v. Wickes Furniture Co.*, 517 F.3d 526, 531 (8th Cir. 2008) (quoting *Bass v. SBC Communications, Inc.*, 418 F.3d 870, 872 (8th Cir. 2005)). Instead, the non-moving party "'must substantiate [its] allegations with sufficient probative evidence that would permit a finding in [its] favor.'" *Anda*, 517 F.3d at 531 (quoting *Bass*, 418 F.3d at 873); *see also Anderson*, 477 U.S. at 248 (A nonmoving party must offer proof "such that a reasonable jury could return a verdict for the nonmoving party."). "'Evidence, not contentions,

avoids summary judgment.'" *Reasonover v. St. Louis County, Mo.*, 447 F.3d 569, 578 (8th Cir. 2006) (quoting *Mayer v. Nextel W. Corp.*, 318 F.3d 803, 809 (8th Cir. 2003)). The court must view the record in the light most favorable to the nonmoving party and afford it all reasonable inferences. *Baer Gallery, Inc. v. Citizen's Scholarship Foundation of America, Inc.*, 450 F.3d 816, 820 (8th Cir. 2006) (citing *Drake ex rel. Cotton v. Koss*, 445 F.3d 1038, 1042 (8th Cir. 2006)).

"There is no 'discrimination case exception' to the application of summary judgment, which is a useful pretrial tool to determine whether any case, including one alleging discrimination, merits a trial." *Pye v. Nu Aire, Inc.*, 641 F.3d 1011, 1018 (8th Cir. 2011). "Although employment discrimination cases are 'often fact intensive and dependant on nuance in the workplace, they are not immune from summary judgment." *Id.* "If there is no dispute of material act and reasonable fact finders could not find in favor of the nonmoving party, summary judgment is appropriate." *Id.*

## V. DISCUSSION

In his second amended complaint, Sellers alleges age discrimination in violation of the Age Discrimination in Employment Act ("ADEA") and the Iowa Civil Rights Act ("ICRA") (Counts III and IV), disability discrimination in violation of the Americans with Disabilities Act ("ADA") (Count II), retaliation in violation of the ADEA, ADA, and ICRA (Counts I, II, and V), a violation of the Iowa Equal Pay Act (Count VI), and defamation (Count VII). For a variety of reasons, Defendants ask that all of Sellers' claims be summarily dismissed.

### A. Age Discrimination

#### 1. Applicable Law

The Court will first address Sellers' claim that Defendants discriminated against him based on his age. The ADEA makes it unlawful for an employer to discriminate against an individual because of the individual's age. 29 U.S.C. § 623(a)(1). Similarly, the ICRA

makes it unlawful to discriminate against any employee because of the employee's age. Iowa Code § 216.6(1)(a). The Court generally applies the same analysis to age discrimination claims under the ADEA and the ICRA, with one exception: the standard of proof required. *Tusing v. Des Moines Independent Comm. School Dist.*, 639 F.3d 507, 514 (8th Cir. 2011). In *Gross v. FBL Financial Services, Inc.*, 557 U.S. 167, 180 (2009), the Court held that "a plaintiff bringing a disparate-treatment claim pursuant to the ADEA must prove, by a preponderance of the evidence, that age was the 'but-for' cause of the challenged adverse employment action." In an action brought pursuant to the ICRA, however, the plaintiff need only prove that age was "a motivating factor" in the employer's decision. *Newberry v. Burlington Basket Co.*, 622 F.3d 979, 981-83 (8th Cir. 2010) (citing *DeBoom v. Raining Rose, Inc.*, 772 N.W.2d 1, 11-14 (Iowa 2009)).

A claim of age discrimination may be established either through direct evidence of discrimination or through circumstantial evidence. *Fitzgerald v. Action, Inc.*, 521 F.3d 867, 876 (8th Cir. 2008) (citing *Carraher v. Target Corp.*, 503 F.3d 714, 716 (8th Cir. 2007)); *see also Loeb v. Best Buy Co., Inc.*, 537 F.3d 867, 872 (8th Cir. 2008) ("To establish a claim of intentional age discrimination, a plaintiff may present direct evidence of such discrimination or may prove his claim through circumstantial evidence."). If there is no direct evidence of age discrimination, then the plaintiff's claims are analyzed under the familiar burden-shifting scheme of *McDonnell Douglas*.[6] At the first step of the analysis in applying the *McDonnell Douglas* test, the plaintiff has the burden of establishing a *prima facie* case of age discrimination. *Ridout v. JBS USA, LLC*, 716 F.3d

---

[6] In *Tusing*, the Eighth Circuit Court of Appeals acknowledged that the Supreme Court in *Gross* noted that it had not "definitively decided whether the evidentiary framework of *McDonnell Douglas* is appropriate in the ADEA context." 639 F.3d at 515 n.3. Nonetheless, the Eighth Circuit concluded that the *McDonnell Douglas* analysis is likely still an appropriate way to analyze ADEA "pretext" claims, because *McDonnell Douglas* only shifts the burden of *production* while the Court in *Gross* stated that the plaintiff always retains the burden of *persuasion*. *Id*.

1079, 1083 (8th Cir. 2013). A *prima facie* case creates a presumption that the employer unlawfully discriminated against the plaintiff and shifts the burden to the employer to articulate a legitimate nondiscriminatory reason for its actions. *Id.* If the employer meets this burden, then the presumption of discrimination dissolves and the burden returns to the plaintiff to demonstrate that the proffered reason is a mere pretext for age discrimination. *Id.*

## 2. Discussion

### a. Direct evidence

The parties disagree regarding whether the record establishes direct evidence of age discrimination. Deere argues that "[a]bsent evidence of direct discrimination — and Sellers must concede he lacks direct evidence — Sellers's age-discrimination claims are evaluated under the *McDonnell-Douglas* framework."[7] Sellers makes no such concession. Sellers argues that he has "provided ample direct evidence of discrimination through the evidence of Clyde D'Cruz's discriminatory animus" toward older employees.[8]

"Direct evidence is evidence showing a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable factfinder that an illegitimate criterion actually motivated the adverse employment action." *King v. United States*, 553 F.3d 1156, 1160 (8th Cir. 2009). In *King* — a failure to hire case — members of the selection committee allegedly made prior statements regarding a desire for "educated, young blood," that they had hired (on a prior occasion) a "young, skinny blonde," and that the "has-beens need to listen to the newbies." *Id.* at 1159. At a retirement party shortly after the hiring decision was made, it was said that the director of the section had a "philosophy of hiring younger, educated people." *Id.* The trial court found, and the Eighth Circuit Court of Appeals agreed, that

---

[7] Deere's Brief (docket number 84-9) at 5.

[8] Sellers' Brief (docket number 96-1) at 23.

the first three statements "were not direct evidence because they did not demonstrate a specific link between the alleged discriminatory animus and the committee's decision to select Evans rather than King." *Id.*

> Because these comments did not relate to the committee's selection process, we agree with the district court's finding that they are statements by decisionmakers unrelated to the decisional process itself and do not constitute direct evidence.

*Id.* at 1161. Because the trial court did not specifically address the fourth statement — made after the hiring decision was made — the appellate court was unable to determine if it was direct evidence of age discrimination and remanded "to allow the district court to make the requisite finding in the first instance." *Id.* at 1162.

Similarly, in *Ramlet v. E.F. Johnson Co.*, 507 F.3d 1149 (8th Cir. 2007), the Court was called upon to determine whether statements made by the plaintiff's supervisor were direct evidence of age discrimination. More than a year prior to the plaintiff's termination, the supervisor said that he wanted to hire "a bunch of young, dumb, and full of cum guys." *Id.* at 1152. At least four months prior to the plaintiff's termination, the supervisor said that "he intended to hire 'young studs' to replace the older sales people." *Id.* The plaintiff argued that the supervisor's comments were direct evidence of age discrimination. The Eighth Circuit Court of Appeals disagreed, finding that because the plaintiff had "not demonstrated a specific link between the comments and his termination," the comments were not direct evidence. *Id.* at 1153.

Here, Sellers argues that he has provided "ample direct evidence of discrimination" through D'Cruz's statements establishing "discriminatory animus." D'Cruz told Sellers and others that "we need to get all these old farts out of here," that older employees "have got way too much baggage" and "they're no good for us," and that they needed to work on "getting the old dogs out of here." When referring to purchasing planners, which

averaged 47 years old at the time, D'Cruz said they were "sheep that can be slaughtered later."

While statements made by D'Cruz may be relevant to the issue of whether reasons given by Deere for allegedly adverse employment actions were mere pretext for age discrimination, they do not constitute direct evidence of age discrimination against Sellers. That is, there is no "specific link" between the alleged discriminatory animus exhibited by D'Cruz's statements and any alleged adverse employment actions visited on Sellers. *King*, 553 F.3d at 1160 (requiring a "specific link between the alleged discriminatory animus and the challenged decision"); *Ramlet*, 507 F.3d at 1152-53 (same).

### b. Circumstantial evidence

Because Sellers has not provided any direct evidence of age discrimination against him, the Court analyzes his claim under the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Greene*, 411 U.S. 792 (1973). Sellers has the initial burden of establishing a *prima facie* case of age discrimination. *Ridout*, 716 F.3d at 1083. To establish a *prima facie* case of age discrimination, a plaintiff must show he (1) was at least 40 years old, (2) suffered an adverse employment action, (3) was meeting his employer's legitimate expectations at the time of the adverse employment action, and (4) was replaced by someone substantially younger. *Gibson v. American Greetings Corp.*, 670 F.3d 844, 856 (8th Cir. 2012) (quoting *Morgan v. AG Edwards & Sons, Inc.*, 486 F.3d 1034, 1039 (8th Cir. 2007)).

Deere concedes that Sellers has established the first and third requirements of a *prima facie* case. That is, Sellers was at least 40 years old during the relevant time period (he was 47 years old when he took medical leave on March 1, 2005) and he was meeting Deere's legitimate expectations for his employment. Deere argues, however, that Sellers cannot satisfy the remaining two elements of a *prima facie* case. That is, Deere argues that

Sellers did not suffer "an adverse employment action," nor was he "replaced by someone substantially younger."

It is unclear to the Court what "adverse employment action" Sellers may be asserting in this case.[9] It is undisputed that Sellers became a process pro on April 1, 2002 at pay Grade 7, and remained a process pro until he took medical leave on March 1, 2005. There is no evidence that his wages or benefits were reduced in any way during that time period. Sellers admits that he has been unable to work since taking medical leave on March 1, 2005.

In his age discrimination claim under the ADEA (Count III of the Second Amended Complaint), Sellers claims only that "Defendants failed to compensate Plaintiff at a rate equal to his younger counterparts and commensurate with Plaintiff's Pay Grade." In his ICRA claim (Count IV), Sellers asserts that Defendants "have discriminated against Plaintiff Sellers in the terms and conditions of his employment, have subjected Plaintiff to continual age-based harassment, have committed age discrimination, and have allowed, fostered, and maintained a hostile and offensive work environment."

Defendants devote ten pages of their brief to rebutting a claim of alleged adverse employment action, responding to allegations found in Sellers' response to Interrogatory No. 22.[10] Defendants painstakingly address each of Sellers' complaints, as set forth in his answers to interrogatories, and cite cases in support of their argument that Sellers has not suffered an "adverse employment action" within the meaning of the ADEA. In his brief, Sellers makes no effort to respond to Defendants' argument, nor does he cite any case in

---

[9] It should be noted that even in a "direct evidence" case, the plaintiff must still establish that he has suffered a materially adverse employment action. *Young-Losee v. Graphic Packaging Int'l, Inc.*, 631 F.3d 909, 912 (8th Cir. 2011).

[10] Defendants' App. at 603.

support of his position that he has suffered an adverse employment action. The closest
Sellers comes to addressing the issue is a brief summary of his general complaints:

> [D'Cruz] overloaded Sellers with the work of multiple
> employees and frequently changed both the amount and
> direction of Sellers' work, so that it would become impossible
> for Sellers to keep up. He used GJE to "map" Sellers to a
> dead-end position that Mike had previously held and that did
> not match his job duties in any way, shape, or form,
> effectively preventing him from any further promotion. And
> when Mike delivered the results that he had praised just six
> months earlier, D'Cruz threw him under the bus to cover up
> the fact that he had previously falsified the number of bailment
> agreements Supply Management had procured. In doing so,
> he destroyed Sellers' credibility among management, broke a
> promise made to Sellers in his department, and effectively
> ended Mike's career.

Sellers' Brief (docket number 96-1) at 25.

A recent Eighth Circuit case sets forth the general definition regarding an "adverse
employment action."

> An adverse employment action is defined as a tangible change
> in working conditions that produces a material employment
> disadvantage, including but not limited to, termination, cuts in
> pay or benefits, and changes that affect an employee's future
> career prospects, as well as circumstances amounting to a
> constructive discharge. However, minor changes in duties or
> working conditions, even unpalatable or unwelcome ones,
> which cause no materially significant disadvantage, do not rise
> to the level of an adverse employment action.

*Jackman v. Fifth Judicial Dist. Dept. of Correctional Services*, 728 F.3d 800, 804 (8th
Cir. 2013) (internal citation omitted). *See also Spears v. Missouri Dept. of Corrections
and Human Resources*, 210 F.3d 850, 853 (8th Cir. 2000) ("Termination, reduction in pay
or benefits, and changes in employment that significantly affect an employee's future
career prospects meet this standard, but minor changes in working conditions that merely

inconvenience an employee or alter an employee's work responsibilities do not.") (internal citation omitted).

Sellers complains that he was constantly harassed and belittled by D'Cruz, and that other employees made fun of him. In a Title VII retaliation claim, the United States Supreme Court has said that the law does not set forth "a general civility code for the American workplace." *Burlington Northern & Santa Fe Ry. Co. v. White*, 538 U.S. 53, 68 (2006) (quoting *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 80 (1998)). The Eighth Circuit has observed that "ostracism and disrespect by supervisors" and ostracism by coworkers do not constitute an "adverse employment action." *Scusa v. Nestle USA Co., Inc.*, 181 F.3d 958, 969 (8th Cir. 1999). The Court concludes that Sellers having to endure rude or disrespectful comments by D'Cruz or others does not constitute an adverse employment action within the meaning of the ADEA.

Sellers also claims that he was given new job assignments and duties "in order to set him up to fail at his job." In response to Defendants' statement of undisputed material facts, however, Sellers admits that the position of process pro is fluid, dynamic, and includes multiple responsibilities. The position evolved week-to-week and Sellers was sometimes responsible for addressing problems that would come up on short notice. That was the job Sellers signed up for. He cannot now claim that being assigned varied responsibilities constituted an adverse employment action. *See Wilkie v. Dept. of Health and Human Services*, 638 F.3d 944, 955 (8th Cir. 2011) ("Minor changes in duties or working conditions, even unpalatable or unwelcome ones, which cause no materially significant disadvantage, do not rise to the level of an adverse employment action.") (quoting *Clegg v. Ark. Dep't of Corr.*, 496 F.3d 922, 926 (8th Cir. 2007)); *Sallis v. University of Minn.*, 408 F.3d 470, 476 (8th Cir. 2005) ("Minor changes in working conditions that merely inconvenience an employee or alter an employee's work responsibilities do not [constitute an adverse employment action]").

24

Sellers complains that his poor performance evaluations were unjustified and inaccurate. The case law is clear, however, that a performance evaluation does not constitute an adverse employment action unless it is subsequently relied upon to detrimentally alter the employee's employment.

> A poor performance rating does not in itself constitute an adverse employment action because it has no tangible effect upon the recipient's employment. An unfavorable evaluation is actionable only where the employer subsequently uses the evaluation as a basis to detrimentally alter the terms or conditions of the recipient's employment.

*Turner v. Gonzales*, 421 F.3d 688, 696 (8th Cir. 2005) (quoting *Spears*, 210 F.3d at 854). Here, there is no evidence that Deere used Sellers' evaluations as a basis to alter the terms or conditions of his employment.

After carefully reviewing the voluminous file, the Court concludes that Sellers has not shown that he suffered an adverse employment action within the meaning of the ADEA and the ICRA. Sellers retained the same job title, pay scale, and benefits at all times prior to voluntarily taking medical leave on March 1, 2005. While Sellers may have been required to endure D'Cruz's rude remarks and unfair evaluations, those do not constitute "adverse employment actions." Similarly, changes in Sellers' duties and workload came with the position of process pro and do not rise to the level of adverse employment actions. Because Sellers did not suffer any "adverse employment action," he is not entitled to recover from Defendants on his claim of age discrimination under the ADEA or the ICRA.

### B. Disability Discrimination

Next, the Court addresses Sellers' claim that he was discriminated against in violation of the Americans with Disabilities Act ("ADA") (Count II of the Second Amended Complaint).[11] Sellers asserts in his complaint that he is disabled "in that he has

---

[11] Sellers did not bring a corresponding claim under the ICRA.

a mental impairment that substantially limits one or more major life activities." According to Sellers, Deere failed to provide reasonable accommodations, failed to promote or advance him based on his disability, denied him employment opportunities due to his disability, and subjected him to "continual disability-based harassment." Sellers also asserts that Deere retaliated against him "after asserting his rights under this law."

### *1.    Applicable Law*

The ADA prohibits employers from discriminating against a qualified individual with a disability because of the disability of the individual. 42 U.S.C. § 12112(a). *See also Gretillat v. Care Initiatives*, 481 F.3d 649, 652 (8th Cir. 2007). A disability includes "a physical or mental impairment that substantially limits one or more major life activities." 42 U.S.C. § 12102(1)(A). Major life activities include, but are not limited to, "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(A).

In the absence of direct evidence, the Court analyzes an ADA claim under the burden-shifting framework of *McDonnell Douglas*. *Lors v. Dean*, 595 F.3d 831, 834 (8th Cir. 2010). Under the *McDonnell Douglas* framework, a discrimination plaintiff must first establish a *prima facie* case of discrimination. *Id.* If the employee establishes a *prima facie* case, the burden then shifts to the employer to articulate some legitimate, nondiscriminatory reason for the employer's actions. *Id.* If the employer articulates such a reason, the burden then returns to the employee to show the employer's justification is a pretext. *Id.*

To establish a *prima facie* case of discrimination under the ADA, a plaintiff must show that "(1) he is disabled; (2) he 'is qualified to perform the essential functions of his job, with or without accommodation; and (3) he suffered an adverse employment action under circumstances from which an inference of unlawful discrimination' could be

inferred." *Olsen v. Capital Region Medical Center*, 713 F.3d 1149, 1153-54 (8th Cir. 2013) (quoting *Young v. Warner-Jenkinson Co.*, 152 F.3d 1018, 1021-22 (8th Cir. 1998)).

## 2. Discussion

Deere argues that Sellers cannot establish a *prima facie* case of disability discrimination because he did not have a "disability" until he took voluntary medical leave on March 1, 2005, he did not experience an adverse employment action, and, in any event, "there is no evidence that Deere knew of an alleged disability or considered any physical or mental impairment in making any employment decisions."[12] In his brief, Sellers argues that he suffered an adverse employment action and asserts a "causal connection" between his disability and the action, but he makes no effort to describe the disability or state how it substantially affected one or more major life activities.

The Court assumes that Sellers is arguing his mental health conditions constituted a "disability" within the meaning of the ADA. Sellers suffered from depression, anxiety, and post-traumatic stress disorder. For a mental impairment to constitute a "disability" within the meaning of the ADA, however, it must "substantially limit" one or more "major life activities." 42 U.S.C. § 12102(A). The United States Supreme Court has said that "these terms need to be interpreted strictly to create a demanding standard for qualifying as disabled." *Toyota Motor Mfg. v. Williams*, 534 U.S. 184, 197 (2002). *See also Samuels v. Kansas City Missouri School Dist.*, 437 F.3d 797, 801 (8th Cir. 2006) ("Whether an impairment substantially limits a major life activity is a threshold question.") (quoting *Snow v. Ridgeview Med. Ctr.*, 128 F.3d 1201, 1206 (8th Cir. 1997)).

The existence of a disability must be determined on a case-by-case manner. *Toyota*, 534 U.S. at 198. "An individualized assessment of the effect of an impairment is particularly necessary when the impairment is one whose symptoms vary widely from person to person." *Id.* at 199. That is, not all persons who suffer from depression,

---

[12] Defendants' Brief (docket number 84-9) at 26.

anxiety, or post-traumatic stress disorder are "disabled" within the meaning of the ADA. "It is insufficient for individuals attempting to prove disability status under this test to merely submit evidence of a medical diagnosis of an impairment." *Id.* at 198.

A mental impairment does not constitute a disability unless it "substantially limit[s]" one or more "major life activities." The United States Supreme Court has instructed that "'substantially limits' suggests 'considerable' or 'to a large degree.'" *Id.* at 196. The use of the word "major" in the phrase "major life activities," means that it is "important" and the activities "are of central importance to daily life." *Id.* at 197. Here, the evidence is undisputed that Sellers continued to perform his job until he took voluntary medical leave on March 1, 2005. At his deposition, Sellers agreed that he did not become disabled until that date. In addition, there is no evidence that Sellers' condition substantially limited any major life activities outside of work.

The Court concludes that Sellers is unable to establish a *prima facie* case of disability discrimination, because he was not "disabled" within the meaning of the ADA prior to voluntarily taking medical leave on March 1, 2005. Even *if* Sellers was disabled under the ADA, however, his claim for disability discrimination fails because he did not suffer adverse employment action.

### C. Retaliation

#### 1. Applicable Law

The Court will next address Sellers' claim that Defendants retaliated against him in violation of the ADEA, ADA, and ICRA (Counts I, II, and V of the Second Amended Complaint). The ADEA makes it unlawful for an employer to discriminate against an employee because the employee "opposed" age discrimination or because the employee "made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or litigation under this chapter." 28 U.S.C. § 623(d). Similarly, the ICRA makes it a discriminatory practice for any person to retaliate against another person

28

"because such person has lawfully opposed any practice forbidden under this chapter, obeys the provisions of this chapter, or has filed a complaint, testified, or assisted in any proceeding under this chapter." Iowa Code § 216.11(2).

Without direct evidence of a retaliatory motive, the Court analyzes retaliation claims (whether under Title VII, the ADA, or the ADEA) under the burden-shifting framework of *McDonnell Douglas*. *Stewart v. Independent School Dist. No. 196*, 471 F.3d 1034, 1042-43 (8th Cir. 2007). Using the analytical construct of *McDonnell Douglas*, the initial burden is on the plaintiff to establish a *prima facie* case of retaliation. *Id.* at 1043. The plaintiff in a retaliation action must produce evidence "(1) that he or she engaged in statutorily protected activities; (2) an adverse employment action was taken against him or her; and (3) a causal connection exists between the two events." *Id.* (quoting *Greene v. Franklin Nat'l Bank of Minneapolis*, 459 F.3d 903, 914 (8th Cir. 2006)). *Accord Estate of Harris v. Papa John's Pizza*, 679 N.W.2d 673, 678 (Iowa 2004) (enumerating the elements necessary to establish a *prima facie* case of retaliation under the ICRA).

If the plaintiff establishes a *prima facie* case, then the burden shifts to the defendant to show a "non-retaliatory reason for the adverse employment action." *Stewart*, 481 F.3d at 1043. If the defendant can show a legitimate, non-retaliatory reason for its actions, then the burden returns to the plaintiff to present evidence that "(1) creates a question of fact as to whether defendant's reason was pretextual and (2) creates a reasonable inference that defendant acted in retaliation." *Id.* (quoting *Logan v. Liberty Healthcare Corp.*, 416 F.3d 877, 880 (8th Cir. 2005)).

### 2. Discussion

Here, Defendants argue that Sellers has failed to establish a *prima facie* case of retaliation. Deere argues that Sellers did not engage in any protected activity until *after* he took medical leave on March 1, 2005 and, in any event, he did not suffer any materially adverse employment action. According to Defendants, it necessarily follows that there is

no "causal connection" between an adverse employment action and statutorily protected activity.

In their brief, Defendants identify two instances of protected conduct by Sellers: the email complaint sent by Sellers to Deere executives on March 31, 2005, and the EEOC charge filed by Sellers on April 26, 2005. Both actions occurred *after* Sellers took voluntary medical leave on March 1, 2005. In his resistance, Sellers asserts that he engaged in statutorily protected activity "by defending older employees' usefulness to a manager who wanted to 'slaughter' them like 'sheep' in favor of younger employees."[13] While not addressed by Sellers in his brief, Defendants suggest in their brief that Sellers may be relying on a two-page summary which he allegedly authored in January 2005 in support of Gayle Forster and Wanda Lenius, and a November 11, 2004 email to Kevin Keith.

Even when viewing the evidence in the light most favorable to Sellers, the record falls far short of generating a genuine issue of whether Sellers engaged in statutorily protected activity prior to taking medical leave on March 1, 2005. Referring to older workers, Sellers argues that he "continued to defend them and politely refused to engage in D'Cruz's discriminatory statements and acts."[14] However, "refusing to engage" in D'Cruz's discriminatory statements, or even "pulling him aside" and suggesting that he "temper your words a bit," does not constitute statutorily protected activity. The "two-page summary" has apparently never been produced and Sellers admitted in his deposition that he has no knowledge it was ever submitted to Deere. The Court has also carefully reviewed the November 11, 2004 email to Kevin Keith. While Sellers encourages fairness, developmental opportunities outside of the department, and transparency, he

---

[13] Sellers' Brief (docket number 96-1) at 33.

[14] *Id.*

30

makes no allegations regarding age discrimination or disability discrimination, against himself or others.

Even *if* Sellers engaged in statutorily protected activity prior to taking medical leave, his claim of retaliation fails because he has not produced evidence of an adverse employment action. To establish a *prima facie* case of retaliation, Sellers must produce evidence of an adverse employment action taken against him. "The materially adverse action prong 'is objective, requiring us to consider whether a reasonable employee in the plaintiff's position might have been dissuaded from making a discrimination claim because of the employer's retaliatory actions.'" *Weger v. City of Ladue*, 500 F.3d 710, 726 (8th Cir. 2007) (quoting *Carrington v. City of Des Moines*, 481 F.3d 1046, 1050 (8th Cir. 2007)).

As discussed in more detail above, Sellers retained the same job title, pay scale, and benefits at all times prior to voluntarily taking medical leave on March 1, 2005. Rude remarks, unfair evaluations, and changes in Sellers' duties and workload inherent in the process pro position do not rise to the level of adverse employment actions within the meaning of the ADEA and ICRA.

Because Sellers has not produced evidence of statutorily protected activities prior to taking voluntary medical leave on March 1, 2005, and has failed to produce evidence that he suffered an adverse employment action, it necessarily follows that he cannot show a causal connection between the two events. Accordingly, Sellers has not established a *prima facie* case of retaliation and his claims in Counts I and V of the Second Amended Complaint must fail.

### D. Hostile Work Environment

In his claims of retaliation under the ADEA (Count I), disability discrimination under the ADA (Count II), age discrimination under the ICRA (Count IV), and retaliation under the ICRA (Count V), Sellers also asserts that he was subjected to harassment and

a hostile work environment. Sellers claims that he was verbally and physically assaulted by D'Cruz and argues that it is for the jury to decide whether D'Cruz's behavior was "merely rude or unpleasant."

### 1. Applicable Law

To establish a claim of a hostile work environment, a plaintiff must show: "(1) the plaintiff belongs to a protected group; (2) the plaintiff was subject to unwelcome harassment; (3) a causal nexus exists between the harassment and the plaintiff's protected group status; and (4) the harassment affected a term, condition, or privilege of employment." *Gordon v. Shafer Contracting Co., Inc.*, 469 F.3d 1191, 1194-95 (8th Cir. 2006). *See also Farmland Foods, Inc. v. Dubuque Human Rights Com'n*, 672 N.W.2d 733, 744 (Iowa 2003).

The Eighth Circuit Court of Appeals has described the harassment standards as "demanding." *Arraleh v. County of Ramsey*, 461 F.3d 967, 979 (8th Cir. 2006). "Simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Id.* (quoting *Al-Zubaidy v. TEK Indus., Inc.*, 406 F.3d 1030, 1038 (8th Cir. 2005)).

> A hostile work environment exists when the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the condition of the victim's employment and create an abusive working environment. Relevant factors for determining whether conduct rises to the level of harassment include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interfered with an employee's work performance.

*Pye v. Nu Aire, Inc.*, 641 F.3d 1011, 1018 (8th Cir. 2011) (internal quotations and citations omitted).

"To survive summary judgment, a plaintiff must present evidence from which a reasonable jury could conclude that the harassment was sufficiently 'severe or pervasive' to affect a term, condition, or privilege of the plaintiff's employment." *Powell v. Yellow Book USA, Inc.*, 445 F.3d 1074, 1077 (8th Cir. 2006) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). It is not the purpose of the harassment statutes "to smooth the rough edges of our daily discourse, nor to provide a federal cause of action for every slight." *Id.* The Court has "repeatedly emphasized that anti-discrimination laws do not create a general civility code." *Ryan v. Capital Contractors, Inc.*, 679 F.3d 772, 779 (8th Cir. 2012) (quoting *Shaver v. Indep. Stave Co.*, 350 F.3d 716, 721 (8th Cir. 2003)).

### 2. Discussion

Here, Sellers apparently complains primarily of two incidents. In 2002, D'Cruz approached Sellers regarding an upcoming audit and told him that "we've got to pass this audit." Sellers responded that "I'm going to try my best." According to Sellers, D'Cruz "just exploded and he got probably within six inches of my face." D'Cruz told Sellers that "try is not good enough; you are going to make sure this happens." By the time the conversation was concluded, Sellers "had spit all over my face." Sellers does not contend, however, that D'Cruz intentionally spit on him.

The second incident occurred at a staff manager meeting in 2002 or 2003. In his deposition, Sellers testified that he was trying to explain to D'Cruz "where we stood on the respective metrics and I was trying to hold some of his managers accountable for not bringing their information to the meeting." Sellers then described what happened next:

> In the middle of that explanation, he just blew up again. He started ranting and raving and screaming about the metrics, and his typical comments were things like, you know — using curse words and then following it up with, "this is not rocket science. We've got to get this stuff done. We've been at this for 'X' amount of days" or weeks or months or whatever.

> And with that he just thrust himself up out of the chair at the
> same time — I don't even know how to do it to even mimic it,
> but I mean slamming his fist on the table, jumping up fast
> enough that his chair went back against the wall.
>
> He then pushed himself away from the table — and this was a
> good-sized table, it was probably like four feet by eight feet
> and he pushed it off-center by a foot or so.
>
> And then made a few other choice comments, and by "choice"
> I'm talking about profanity, left the meeting, slammed the door
> on the way out, and he slammed it hard enough — it was kind
> of like this conference room, not as big or as nice, but we had
> a couple windows on the side and he slammed it hard enough
> that the windows were just rattling.  I was convinced they
> were going to shatter but they didn't.

Deposition of Michael Sellers, 58:5-59:4 (Defendant's App. 502).  More generally, Sellers testified that he heard D'Cruz make statements five to ten times regarding "old farts," and "old dogs."  Sellers also claims he was occasionally teased by other employees.

Even viewing the evidence in the light most favorable to Sellers, the Court concludes that the record does not generate a genuine issue of material fact regarding his hostile work environment claim.  There is no evidence that the two incidents described by Sellers — while unpleasant — were causally related to his "protected group status."  That is, while D'Cruz reacted badly to Sellers' comments regarding compliance with an upcoming audit and the adoption of new metrics, there is no evidence that his actions were related to Sellers' age.  (Sellers was approximately 45 years old at the time.)

Furthermore, D'Cruz's comments regarding "old farts" and "old dogs," while potentially evidence of age discrimination, were not so pervasive or unpleasant as to establish a hostile work environment.  *Rester v. Stephens Media, LLC*, 739 F.3d 1127, 1131 (8th Cir. 2014) ("This 'demanding' standard requires 'extreme' conduct 'rather than merely rude or unpleasant' conduct.").  On August 1, 2003, Sellers changed departments

and began reporting to a different supervisor. He continued to work for 17 months before taking medical leave on March 1, 2005. The alleged harassment was not "severe enough to affect the terms, conditions, or privileges of his employment." Accordingly, the Court concludes Defendants are entitled to summary on Sellers' hostile work environment claim.

## E. *Iowa Equal Pay Act*

In Count VI of his Second Amended Complaint, Sellers alleges that Deere failed to compensate him "at a rate equal to his younger counterparts and commensurate with Plaintiff's Pay Grade," in violation of the ICRA. In a pretrial ruling, the Court concluded that Iowa Code § 216.6A could not be applied retrospectively, and Sellers was not entitled to damages for alleged wage discrimination prior to the enactment of the section on April 28, 2009. Deere asks that Sellers' wage-discrimination claim under § 216.6A be dismissed because Sellers has not earned wages from Deere since 2005. Sellers apparently concedes the point. In his brief in resistance, Sellers does not respond in any way to Deere's argument regarding the § 216.6A claim.[15] Because Iowa Code § 216.6A did not become effective until April 28, 2009, the Court concludes that it affords no relief to Sellers under these circumstances.

## F. *Defamation*

In Count VII of his Second Amended Complaint, Sellers claims that Defendants defamed him by falsely accusing him of misrepresenting information and lying to outside auditors. In their instant motion, Defendants assert that the defamation claim is barred by the statute of limitations and also fails on its merits. In his responsive brief, Sellers states that he "does not resist the entry of summary judgment on their [*sic*] claims of defamation,

---

[15] The format and organization of Sellers' brief corresponds with the format and organization adopted by Defendants in their brief. However, Sellers' brief simply skips over that part of Defendants' brief which argues for dismissal of Count VI.

as they have been barred by the applicable statute of limitations." Accordingly, the Court finds that the defamation claim (Count VII) should be dismissed.

### G. Additional Defenses

In their brief, Defendants argue that Sellers' claims should be dismissed for additional reasons, including a failure to exhaust administrative remedies, failing to raise administratively certain claims against D'Cruz individually, the doctrine of laches, the worker's compensation settlement, and the effect Sellers' receipt of long-term disability benefits has on his claim for damages. Because the Court has concluded that Sellers' claims fail on the merits, it is unnecessary to address these additional defenses.

### VI. ORDER

IT IS THEREFORE ORDERED as follows:

1. The Motion for Summary Judgment (docket number 84) filed by the Defendants is **GRANTED**.

2. The Second Amended Complaint filed by Plaintiff is **DISMISSED**.

3. This case is **CLOSED**.

DATED this 19th day of May, 2014.

JON STUART SCOLES
CHIEF MAGISTRATE JUDGE
NORTHERN DISTRICT OF IOWA